ORAL ARGUMENT NOT YET SCHEDULED
No. 22-1031 (and consolidated cases)

# In the United States Court of Appeals for the District of Columbia Circuit

---

STATE OF TEXAS, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ADVANCED ENERGY ECONOMY, ET AL.,
*Intervenors.*

---

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0208)

---

## INITIAL BRIEF FOR PRIVATE PETITIONERS

---

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY[†]
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel & Petrochemical Manufacturers and Energy Marketers of America*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable Fuels Company, LLC*

(Additional counsel listed on the following page)

C. BOYDEN GRAY
JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY & ASSOCIATES,
PLLC
801 17th Street NW, Suite 350
Washington, DC  20006
(317) 513-0622
buschbacher@boydengray
associates.com

*Counsel for Clean Fuels
Development Coalition, ICM, Inc.,
Illinois Corn Growers Association,
Indiana Corn Growers
Association, Kansas Corn Growers
Association, Kentucky Corn
Growers Association, Michigan
Corn Growers Association,
Missouri Corn Growers
Association, and Valero Renewable
Fuels Company, LLC*

DEVIN WATKINS
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street, NW
Washington, DC  20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Competitive Enterprise
Institute, Anthony Kreucher,
Walter M. Kreucher, James Leedy,
Marc Scribner, and Domestic
Energy Producers Alliance*

MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street NW
Washington, DC  20036
matthew.morrison@pillsburylaw.com

*Counsel for Illinois Soybean
Association, Iowa Soybean
Association, Indiana Soybean
Alliance, Inc., Michigan Soybean
Association, Minnesota Soybean
Growers Association, North
Dakota Soybean Growers
Association, Ohio Soybean
Association, South Dakota
Soybean Association, and
Diamond Alternative Energy,
LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC  20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Diamond Alternative
Energy, LLC, and Valero
Renewable Fuels Company, LLC*

† Admitted only in Illinois; pending
approval of application for
admission to the D.C. Bar,
practicing law in the District of
Columbia under the supervision of
principals of the firm who are
members in good standing of the
D.C. Bar.

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, petitioners American Fuel & Petrochemical Manufacturers, Clean Fuels Development Coalition, Competitive Enterprise Institute, Diamond Alternative Energy, LLC, Domestic Energy Producers Alliance, Energy Marketers of America, ICM, Inc., Illinois Corn Growers Association, Illinois Soybean Association, Indiana Corn Growers Association, Indiana Soybean Alliance, Inc., Iowa Soybean Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Anthony Kreucher, Walter M. Kreucher, James Leedy, Michigan Corn Growers Association, Michigan Soybean Association, Minnesota Soybean Growers Association, Missouri Corn Growers Association, North Dakota Soybean Growers Association, Ohio Soybean Association, Marc Scribner, South Dakota Soybean Association, and Valero Renewable Fuels Company, LLC respectfully submit this Certificate as to Parties, Rulings, and Related Cases.

## A.    Parties

Petitioners in Case No. 22-1031 are the State of Texas, State of Alabama, State of Alaska, State of Arkansas, State of Indiana, State of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State

of Nebraska, State of Ohio, State of Oklahoma, State of South Carolina, and State of Utah.

Petitioners in Case No. 22-1032 are the Competitive Enterprise Institute, Anthony Kreucher, Walter M. Kreucher, James Leedy, Marc Scribner, and the Domestic Energy Producers Alliance.

Petitioners in Case No. 22-1033 are the Illinois Soybean Association, Iowa Soybean Association, Indiana Soybean Alliance, Inc., Michigan Soybean Association, Minnesota Soybean Growers Association, North Dakota Soybean Growers Association, Ohio Soybean Association, South Dakota Soybean Association, and Diamond Alternative Energy, LLC.

Petitioner in Case No. 22-1034 is American Fuel & Petrochemical Manufacturers.

Petitioner in Case No. 22-1035 is the State of Arizona.

Petitioners in Case No. 22-1036 are Clean Fuels Development Coalition, ICM, Inc., Illinois Corn Growers Association, Indiana Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, and Valero Renewable Fuels Company, LLC.

Petitioner in Case No. 22-1038 is Energy Marketers of America.

Respondents are the U.S. Environmental Protection Agency and Michael S. Regan in his official capacity as Administrator of the U.S. Environmental Protection Agency.

Intervenors on behalf of respondents are Advanced Energy Economy, Alliance for Automotive Innovation, American Lung Association, Calpine Corporation, City and County of Denver, City and County of San Francisco, City of Los Angeles, City of New York, Clean Air Council, Clean Wisconsin, Commonwealth of Massachusetts, Commonwealth of Pennsylvania, Conservation Law Foundation, District of Columbia, Environmental Defense Fund, Environmental Law and Policy Center, National Coalition for Advanced Transportation, National Grid USA, National Parks Conservation Association, Natural Resources Defense Council, New York Power Authority, Power Companies Climate Coalition, Public Citizen, Sierra Club, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington, State of Wisconsin, and Union of Concerned Scientists.

Amici in this case include the State of West Virginia, Pacific Legal Foundation, the National Federation of Independent Business, the Texas Oil & Gas Association, and the Two Hundred for Housing Equity.

## B.    Rulings Under Review

Under review is the final action of the Administrator of the United States Environmental Protection Agency, entitled *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, published in the Federal Register at 86 Fed. Reg. 74,434 (Dec. 30, 2021).

## C.    Related Cases

Seven consolidated cases in the U.S. Court of Appeals for the District of Columbia Circuit involve challenges to the agency action challenged here: *Texas* v. *EPA*, No. 22-1031; *Competitive Enterprise Institute* v. *EPA*, No. 22-1032; *Illinois Soybean Ass'n.* v. *EPA*, No. 22-1033; *American Fuel & Petrochemical Manufacturers* v. *EPA*, No. 22-1034; *Arizona* v. *EPA*, No. 22-1035; *Clean Fuels Development Coalition* v. *EPA*, No. 22-1036; and *Energy Marketers of America* v. *EPA*, No. 22-1038.

Three related cases challenge a related rule promulgated by the National Highway Traffic Safety Administration: *Natural Resources Defense*

iv

*Council* v. *NHTSA*, No. 22-1080; *Texas* v. *NHTSA*, No. 22-1144; and

*American Fuel & Petrochemical Manufacturers* v. *NHTSA*, No. 22-1145.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, petitioners American Fuel & Petrochemical Manufacturers, Clean Fuels Development Coalition, Competitive Enterprise Institute, Diamond Alternative Energy, LLC, Domestic Energy Producers Alliance, Energy Marketers of America, ICM, Inc., Illinois Corn Growers Association, Illinois Soybean Association, Indiana Corn Growers Association, Indiana Soybean Alliance, Inc., Iowa Soybean Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Anthony Kreucher, Walter M. Kreucher, James Leedy, Michigan Corn Growers Association, Michigan Soybean Association, Minnesota Soybean Growers Association, Missouri Corn Growers Association, North Dakota Soybean Growers Association, Ohio Soybean Association, Marc Scribner, South Dakota Soybean Association, and Valero Renewable Fuels Company, LLC hereby make the following disclosures:

**American Fuel & Petrochemical Manufacturers** is a national trade association that represents American refining and petrochemical companies. The Association has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Clean Fuels Development Coalition** is a business league organization established in a manner consistent with Section 501(c)(6) of the Internal Revenue Code.   Established in 1988, the Coalition works with auto, agriculture, and biofuel interests in support of a broad range of energy and environmental programs.  It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in the Coalition.

**Competitive Enterprise Institute** is a non-profit corporation organized under the laws of the District of Columbia. CEI has no parent corporation, and no publicly held company has a 10% or greater ownership interest in CEI.

**Diamond Alternative Energy, LLC**, a Delaware limited liability company, is a wholly owned direct subsidiary of Valero Energy Corporation, a Delaware corporation whose common stock is publicly traded on the New York Stock Exchange under the ticker symbol VLO.

**Domestic Energy Producers Alliance** is a nonprofit, nonstock corporation organized under the laws of the state of Oklahoma.  The Alliance has no parent corporation, and no publicly held company owns 10% or more of its stock.

**Energy Marketers of America** is a federation of 47 state and regional trade associations representing energy marketers throughout the United

States.  It is incorporated under the laws of the Commonwealth of Virginia, has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**ICM, Inc.** is a Kansas corporation that is a global leader in developing biorefining capabilities, especially for the production of ethanol.  It is a wholly owned subsidiary of ICM Holdings, Inc., and no publicly held company has a 10% or greater ownership interest in ICM Holdings, Inc.

**Illinois Corn Growers Association** is an agricultural organization. It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Illinois Soybean Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b).  Its members are soybean farmers and supporters of the agriculture and soybean industries.  It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members.  The Illinois Soybean Association does not have a parent corporation, it has no privately or publicly held ownership interests, and no publicly held company has an ownership interest in it.

**Indiana Corn Growers Association** is an agricultural organization. It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Indiana Soybean Alliance, Inc.** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers and supporters of the agriculture and soybean industries. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. Indiana Soybean Alliance, Inc. does not have a parent corporation, it has no privately or publicly held ownership interests, and no publicly held company has an ownership interest in it.

**Iowa Soybean Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers and supporters of the agriculture and soybean industries. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Iowa Soybean Association does not have a parent corporation, it has no privately or publicly held ownership interests and no publicly held company has an ownership interest in it.

**Kansas Corn Growers Association** is an agricultural organization. It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**Kentucky Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Anthony Kreucher** is an individual residing in Michigan.

**Walter M. Kreucher** is an individual residing in Michigan.

**James Leedy** is an individual residing in Arizona.

**Michigan Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Michigan Soybean Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers and supporters of the agriculture and soybean industries. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Michigan Soybean Association does not have a parent corporation, it has no privately or publicly held ownership interests, and no publicly held company has an ownership interest in it.

**The Minnesota Soybean Growers Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers, their supporters, and members of soybean industries. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Minnesota Soybean Growers Association is a not-for-profit corporation that is not a subsidiary of any corporation and that does not have any stock which can be owned by a publicly held corporation.

**Missouri Corn Growers Association** is an agricultural organization. It has no parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

**North Dakota Soybean Growers Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers, their supporters, and members of soybean industries. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The North Dakota Soybean Growers Association is a not-for-profit corporation that is not a subsidiary of any corporation and that does not have any stock which can be owned by a publicly held corporation.

**Ohio Soybean Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers, their supporters, and members of soybean industries. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Ohio Soybean Association is a not-for-profit corporation that is not a subsidiary of any corporation and that does not have any stock which can be owned by a publicly held corporation.

**Marc Scribner** is an individual residing in the District of Columbia.

**The South Dakota Soybean Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers, their supporters, and members of soybean industries. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The South Dakota Soybean Association is a not-for-profit corporation, is not a subsidiary of any corporation, and does not have any stock which can be owned by a publicly held corporation.

**Valero Renewable Fuels Company, LLC**, a Texas limited liability company, is a wholly owned direct subsidiary of Valero Energy Corporation,

a Delaware corporation whose common stock is publicly traded on the New

York Stock Exchange under the ticker symbol VLO.

# TABLE OF CONTENTS

Page

GLOSSARY ................................................................................... xxii

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT .................................................. 4

STATEMENT OF THE ISSUES ..................................................... 4

STATUTES AND REGULATIONS ................................................ 5

STATEMENT OF THE CASE ......................................................... 5

I.    Statutory Background .............................................................. 5

    A.    EPA's Standard-Setting Authority ............................... 5

    B.    Compliance, Enforcement, and Remediation ............... 6

II.   Regulatory Background ........................................................... 8

    A.    Greenhouse-Gas Standards ........................................... 8

    B.    The Rule At Issue ........................................................... 9

    C.    Fleetwide Averaging ..................................................... 11

    D.    Mandating Electric Vehicles ...................................... 14

SUMMARY OF ARGUMENT ....................................................... 16

STANDING ....................................................................................... 20

STANDARD OF REVIEW ............................................................. 21

ARGUMENT ..................................................................................... 21

I.    EPA Lacks Statutory Authority To Set Greenhouse-Gas
Emission Standards That Effectively Mandate Electric Vehicles ........ 21

    A.    EPA Must Show Clear Congressional Authorization To
Force Electrification ..................................................... 22

1.   EPA claims a power of vast economic significance.............24

2.   EPA claims a power of vast political significance..............28

3.   EPA claims an unheralded power with staggering implications...................................................................34

B.   EPA Lacks Clear Statutory Authority To Use Fleetwide Averaging To Mandate Electric Vehicles .......................37

1.   EPA may not set fleetwide-average standards...................39

a.   Other provisions in Section 202 demonstrate that emission standards may not be based on averaging ....
.................................................................40

b.   Title II's compliance and enforcement provisions for emission standards confirm that EPA cannot use fleetwide averaging .......................................43

c.   The broader text and history of Title II confirm that the rule exceeds EPA's authority...............................47

d.   EPA's lack of authority for a credit-trading scheme further confirms its lack of authority to set fleetwide averages ........................................................49

2.   At a minimum, EPA may not use fleetwide averaging to require electrification.........................................51

a.   The statutory text demonstrates Congress's focus on technologically achievable emission controls ...........52

b.   The statutory structure confirms Congress's focus on technologically achievable emission controls ............58

c.   Related provisions confirm that Section 202(a) does not authorize averaging of non-emitting electric vehicles........................................................60

II.   EPA's Rule Is Arbitrary And Capricious...................................62

A.   EPA Arbitrarily Calculated The Emissions Of Electric Vehicles................................................................................62

B.   EPA's Cost-Benefit Analysis Is Unsound....................................64

1.   EPA arbitrarily assessed the benefits of the rule .............65

2.   EPA undercounted the costs of the rule ............................68

CONCLUSION..............................................................................................70

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Action on Smoking & Health* v. *Department of Labor*,
  100 F.3d 991 (D.C. Cir. 1996)...................................................21

*Alabama Ass'n of Realtors* v. *HHS*,
  141 S. Ct. 2485 (2021)......................................................22, 23

*American Fuel & Petrochemical Mfrs.* v. *EPA*,
  3 F.4th 373 (D.C. Cir. 2021) .............................................20

*American Pub. Gas Ass'n* v. *DOE*,
  22 F.4th 1018 (D.C. Cir. 2022) ........................................67

*Barnhart* v. *Thomas*,
  540 U.S. 20 (2003)...........................................................55

*Competitive Enter. Inst.* v. *NHTSA*,
  901 F.2d 107 (D.C. Cir. 1990)..........................................20

*Delta Constr. Co.* v. *EPA*,
  783 F.3d 1291 (D.C. Cir. 2015).........................................9

*Epic Sys. Corp.* v. *Lewis*,
  138 S. Ct. 1612 (2018).....................................................48

*FCC* v. *Prometheus Radio Project*,
  141 S. Ct. 1150 (2021).....................................................64

*FDA* v. *Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).....................................................29, 33

*Hunt* v. *Washington State Apple Advert. Comm'n*,
  432 U.S. 333 (1977).........................................................21

*Massachusetts* v. *EPA*,
  549 U.S. 497 (2007)...........................................................8

*National Ass'n of Home Builders* v. *EPA*,
  682 F.3d 1032 (D.C. Cir. 2012).........................................65

*National Shooting Sports Found., Inc.* v. *Jones*,
  716 F.3d 200 (D.C. Cir. 2013)..........................................70

xvii

*NRDC* v. *EPA*,
  655 F.2d 318 (D.C. Cir. 1981)................................................56

*NRDC* v. *EPA*,
  954 F.3d 150 (2d Cir. 2020) ..............................................55

*NRDC* v. *Thomas*,
  805 F.2d 410 (D.C. Cir. 1986)........................................51, 60

*Ohio* v. *EPA*,
  No. 22-1081 (D.C. Cir.)..............................................1, 2, 37

*Robinson* v. *Shell Oil Co.*,
  519 U.S. 337 (1997)........................................................40

*Rotkiske* v. *Klemm*,
  140 S. Ct. 355 (2019)..................................................41, 48

*SAS Inst., Inc.* v. *Iancu*,
  138 S. Ct. 1348 (2018)................................................48, 50

*Truck Trailers Mfrs. Ass'n* v. *EPA*,
  17 F.4th 1198 (D.C. Cir. 2021) ........................................55

*U.S. Telecom Ass'n* v. *FCC*,
  855 F.3d 381 (D.C. Cir. 2017)..........................................28

*United Techs. Corp.* v. *U.S. Dep't of Def.*,
  601 F.3d 557 (D.C. Cir. 2010)..........................................69

*Utility Air Regul. Grp.* v. *EPA*,
  573 U.S. 302 (2014)............................................22, 28, 33, 34, 43

*West Virginia* v. *EPA*,
  142 S. Ct. 2587 (2022).........................3, 4, 16, 17, 22, 23, 24, 25, 28, 29, 30,
  ...........................................31, 32, 33, 34, 36, 37, 38, 39, 52, 57, 58

## Statutes:

5 U.S.C.
  § 706..............................................................21, 62

42 U.S.C.
  § 7411 ...................................................................................58
  § 7521 ..................................2, 4, 5, 6, 18, 39, 40 41, 42, 43, 53, 58, 59
  § 7525 ..................................................................7, 41, 44, 45
  § 7541 ..................................................................6, 7, 8, 46, 47
  § 7545 ..................................................................34, 48, 50
  § 7581 ..................................................................60, 61
  § 7582 ..................................................................60
  § 7586 ..................................................................50, 61
  § 7602 ..................................................................45
  § 7607 ..................................................................4, 21

49 U.S.C.
  § 32902 ...............................................................2, 8, 9, 35, 48, 61

Clean Air Act Amendments of 1970,
  Pub. L. No. 91-601, 84 Stat. 1676 (1970) ..........................49

Clean Air Act Amendments of 1990,
  Pub. L. No. 101-549, 104 Stat. 2399 (1990) ........................60

Energy Policy Act of 1992,
  Pub. L. No. 102-486, 106 Stat. 2776 ...............................61

Infrastructure Investment and Jobs Act of 2021,
  Pub. L. No. 117-58, 135 Stat. 429 .................................29

Inflation Reduction Act of 2022,
  Pub. L. No. 117-169, 136 Stat. 1818 ...............................33

2022 W. Va. Legis. Ch. 235 ............................................29

## Regulations:

40 C.F.R.
  § 86.1818-12 ...........................................................11, 12, 14, 45
  § 86.1865-12 ...........................................................40
  § 86.1866-12 ...........................................................6, 43, 59

48 Fed. Reg. 33,456 (July 21, 1983) ...................................38, 40

54 Fed. Reg. 22,652 (May 25, 1989) ....................................38, 40, 50

55 Fed. Reg. 30,584 (July 26, 1990) ...................................38

58 Fed. Reg. 51,735 (Oct. 4, 1993) ....................................67

74 Fed. Reg. 66,496 (Dec. 15, 2009) ............................................8

75 Fed. Reg. 25,324 (May 7, 2010) ...............................................9

77 Fed. Reg. 62,624 (Oct. 15, 2012) .........................................9, 35

84 Fed. Reg. 51,310 (Sept. 27, 2019) ...........................................9

85 Fed. Reg. 24,174 (Apr. 30, 2020) .........................................9, 15

86 Fed. Reg. 43,583 (Aug. 5, 2021) ..........................................1, 10

86 Fed. Reg. 43,726 (Aug. 10, 2021) ............................................9

86 Fed. Reg. 49,602 (Sept. 3, 2021) ...........................................30

86 Fed. Reg. 74,434 (Dec. 30, 2021) .......................... 4, 10, 12, 14, 15, 20, 24, 26,
............................................................................ 36, 57, 60, 63, 64, 65, 68

87 Fed. Reg. 39,600 (July 1, 2022) ............................................34

Cal. Code Regs. Tit. 13, § 1962.4 .............................................29

**Congressional Materials:**

116 Cong. Rec. 19238-40 (1970) ...............................................32

H.R. Rep. No. 91-1146 (1970) .................................................49

Zero-Emission Vehicles Act of 2019, H.R. 2764, 116th Cong.
(2019) .......................................................................32

Zero-Emission Vehicles Act of 2018, S. 3664, 115th Cong. (2018) ..............32

**Other Authorities:**

Climate 21 Proj., *Transition Memo: Environmental Protection
Agency* (2021) ...............................................................10

Agricultural Retailers Ass'n, *Economic Impacts to U.S.
Biofuels, Agriculture, and the Economy from Subsidized
Electric Vehicle Penetration* (Oct. 2020) ....................................28

Jim Barrett & Josh Bivens, *The Stakes for Workers in How
Policymakers Manage the Coming Shift to All-Electric
Vehicles*, Economic Policy Inst. (Sept. 22, 2021) ............................27

EPA, Regulatory Impact Analysis for the Clean Power Plan
Final Rule ...................................................................36

EPA, *EPA Finalizes Greenhouse Gas Standards for Passenger Vehicles, Paving Way for a Zero-Emissions Future* (Dec. 20, 2021), https://bit.ly/3wJFsTD .................................................................36

International Energy Agency, *The Role of Critical Minerals in Clean Energy Transitions* (Mar. 2022) .......................................................31

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..........................................................41

*Short-Term Energy Outlook* (Sept. 7, 2022), https://www.eia.gov/outlooks/steo..............................................................69

Carlos Waters, *How Electric Vehicle Manufacturing Could Shrink the Midwestern Job Market,* CNBC.com (Sept. 4, 2022), https://www.cnbc.com/2022/09/04/ev-manufacturing-may-shrink-us-midwest-auto-parts-trade.html ........................................27

Watten et al., *Attribute Production and Technical Change: Rethinking the Performance and Fuel Economy Trade-off for Light-Duty Vehicles,* Working Paper (2021).......................................68

# GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| NHTSA | National Highway Traffic Safety Administration |

## INTRODUCTION

The Environmental Protection Agency (EPA) and National Highway Traffic Safety Administration (NHTSA) are on a mission to phase out the internal-combustion engine and electrify the Nation's vehicle fleet. Last year, President Biden announced his administration's "goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles, including battery electric, plug-in hybrid electric, or fuel cell electric vehicles." 86 Fed. Reg. 43,583, 43,583 (Aug. 5, 2021). Achieving that goal would require a massive shift in behavior by manufacturers and consumers. EPA and NHTSA are forcing that shift in three ways, each of which is currently being challenged before this Court.

First, EPA tried to give States a path to force electrification in ways that federal regulators cannot. Under the Clean Air Act, EPA may grant California a preemption waiver for its own emission standards to address its local pollution problems, and other States may then follow California's lead. EPA has now afforded California such a waiver not for local pollutants but for greenhouse gases. *See* Private Pet. Br., *Ohio* v. *EPA*, No. 22-1081 (D.C. Cir. Oct. 24, 2022). California has already declared its plan to use that authority to

ban new gasoline-powered cars and require "100-percent electrification by 2035." *Id.* at 10 (citation omitted).

Second, NHTSA set new average fuel-economy standards for passenger cars and light trucks that are based in significant part on the increasing presence of electric vehicles in automakers' fleets. NHTSA's rule directly contravenes Congress's command that NHTSA "may not consider" the fuel economy of electric vehicles. 49 U.S.C. § 32902(h)(1). Congress has granted NHTSA the authority to set fuel-economy standards at the maximum level feasible for a fleet of traditional internal-combustion vehicles, but Congress has reserved for itself—not the Executive Branch—policy judgments about any potential transition to electric vehicles.

Third, in the rule at issue here, EPA purported to exercise its authority under Section 202 of the Clean Air Act, 42 U.S.C. § 7521, to set greenhouse-gas emission standards for light-duty vehicles. All of EPA's previous greenhouse-gas rules under Section 202 were promulgated jointly with NHTSA because vehicles' carbon-dioxide emissions and fuel economy are two sides of the same coin. For the first time, EPA decoupled its rulemaking from NHTSA's—precisely so EPA could avoid the statutory prohibition on NHTSA's considering electric vehicles. EPA then made the emission

standards so stringent that they amount to a *de facto* electric-vehicle mandate, because automakers can meet them only by decreasing production of conventional vehicles and dedicating an increasing percentage of their fleets to electric vehicles or subsidizing the electric-vehicle production of their competitors.

If that move seems familiar, it is. In *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2613 n.3 (2022), EPA "announc[ed] what the market share of coal, natural gas, wind, and solar must be, and then require[d] plants to reduce operations or subsidize their competitors to get there." Here, EPA has similarly "announc[ed] what the market share of" electric vehicles "must be and then require[d]" automakers to meet that target for their fleets "or subsidize their competitors to get there." *Id.* In both cases, EPA reached its desired result by setting standards beyond what could be achieved with the disfavored power source (there, coal-fired power generation; here, the internal-combustion engine). And in both cases, EPA effectively ordered regulated parties to phase out the disfavored technology.

As in *West Virginia*, Congress has not authorized any of this. The Clean Air Act does not allow EPA to set emission standards for motor vehicles based on fleetwide averaging—let alone to force electrification by "averaging" in a

large number of zeros for all the electric vehicles that EPA wants to see on the market. EPA is once again straining statutory text to force a seismic shift in the Nation's energy policy, only this time for automobiles rather than power plants. The question of whether and how internal-combustion vehicles should be phased out in favor of electric vehicles is hugely consequential: it involves millions of jobs, the restructuring of entire industries, and the Nation's energy independence and relationship with hostile powers. Congress has never delegated those policy judgments to EPA. Here as in *West Virginia*, EPA's rule exceeds its statutory authority and should be set aside.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to review EPA's Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards, 86 Fed. Reg. 74,434 (Dec. 30, 2021), under 42 U.S.C. § 7607(b)(1). The rule is a "standard under section 7521," and petitioners timely sought review on February 28, 2022, "within sixty days from the date notice of such promulgation … appear[ed] in the Federal Register."

## STATEMENT OF THE ISSUES

1.    Whether EPA has authority under Section 202 of the Clean Air Act, 42 U.S.C. § 7521, to phase out conventional vehicles in favor of electric ones by setting fleetwide-average emission standards that cannot be met

solely by conventional vehicles and instead require automakers to dedicate an increasing portion of their fleets to electric vehicles.

2.    Whether the rule is arbitrary and capricious because EPA failed to perform an adequate lifecycle analysis of electric vehicles' greenhouse-gas emissions or an adequate and evenhanded cost-benefit analysis.

## STATUTES AND REGULATIONS

Pertinent statutes are set forth in the Addendum.

## STATEMENT OF THE CASE

### I.    Statutory Background

### A.    EPA's Standard-Setting Authority

Title II of the Clean Air Act sets forth a comprehensive scheme for regulating motor-vehicle emissions.  At the center of the scheme is Section 202, which directs the EPA Administrator to

> by regulation prescribe (and from time to time revise) … standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.

42 U.S.C. § 7521(a)(1).  "Such standards shall be applicable to such vehicles and engines for their useful life," "whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control

such pollution." *Id.* The standards may not take effect until "after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." *Id.* § 7521(a)(2).

Congress specified numerous emission standards applicable to individual vehicles that EPA had to promulgate under Section 202(a) for specific pollutants. *See*, *e.g.*, 42 U.S.C. §§ 7521(a)(3)(B)(ii), 7521(b)(1)(A)-(B). Some of these statutorily specified standards provided for phase-in periods during which the standards applied to an increasing percentage of manufacturers' fleets. *See, e.g.*, *id.* §§ 7521(g), 7521(h), 7521(j), 7541(c)(4)(A), 7541(c)(4)(B)(ii), 7541(c)(5). In addition, to support emission-control technologies like "the catalytic converter and oxygen sensor," Congress obligated EPA to mandate diagnostic systems that could determine if those technologies were deteriorating or malfunctioning in a way that "could cause or result in failure of the vehicles to comply with emission standards" under Section 202(a). *Id.* § 7521(m)(1).

## B.    Compliance, Enforcement, and Remediation

To determine compliance with these standards, EPA "shall test, or require to be tested in such manner as [it] deems appropriate, any new motor

vehicle or new motor vehicle engine submitted by a manufacturer." 42 U.S.C. § 7525(a)(1). "If such vehicle or engine" submitted by the manufacturer complies with the standards, EPA "shall issue a certificate of conformity." *Id.* And each manufacturer must "indicate" that a certificate of conformity covers such vehicle or engine with a "label or tag permanently affixed to such vehicle or engine." *Id.* § 7541(c)(3)(C).

In addition to testing these prototypes, EPA may test or require that the manufacturer test "new motor vehicles" to determine if such vehicles "do in fact conform with the regulations with respect to which the certificate of conformity was issued." 42 U.S.C. § 7525(b)(1). If after testing an individual "new vehicle or engine," EPA determines that "such vehicle or engine" is not in compliance, EPA may "suspend or revoke" a certificate of conformity "insofar as it applies to such vehicle or engine." *Id.* § 7525(b)(2)(A)(ii).

Manufacturers "shall warrant" that "each new motor vehicle and new motor vehicle engine … is (A) designed, built, and equipped so as to conform at the time of sale with applicable regulations under [Section 202]." 42 U.S.C. § 7541(a)(1). Title II gives EPA several remedial options when vehicles fail to conform. One is to seek civil penalties from automakers for each individual vehicle they distribute, sell, or offer in commerce without an effective

7

certificate of conformity.  *Id.* §§ 7522(a)(1), 7524(a)-(b).  In addition, where "a substantial number of any class or category of vehicles or engines" fail to conform, EPA must notify manufacturers, dealers, and purchasers, and "require the manufacturer to submit a plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given." *Id.* § 7541(c)(1)-(2).

## II.    Regulatory Background

### A.    Greenhouse-Gas Standards

EPA did not regulate motor-vehicle greenhouse-gas emissions until 2010.  Following the Supreme Court's decision in *Massachusetts* v. *EPA*, 549 U.S. 497 (2007), EPA first issued an endangerment finding under Section 202(a) for "well-mixed greenhouse gases"—*i.e.*, carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. *See* 74 Fed. Reg. 66,496 (Dec. 15, 2009).

EPA then promulgated its initial greenhouse-gas emission standards in a joint rulemaking with NHTSA, which sets corporate average fuel-economy standards under the Energy Policy and Conservation Act, 49 U.S.C. § 32901 *et seq*.  As the agencies explained, carbon-dioxide emissions—EPA's central focus in the greenhouse-gas rules—are "essentially constant per gallon

combusted of a given type of fuel," so carbon-dioxide emission standards and fuel-economy standards are two sides of the same coin. 75 Fed. Reg. 25,324, 25,327 (May 7, 2010); *see* 84 Fed. Reg. 51,310, 51,315 (Sept. 27, 2019); *Delta Constr. Co.* v. *EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) ("[A]ny rule that limits tailpipe [greenhouse gas] emissions is effectively identical to a rule that limits fuel consumption.") (citation omitted).

Until now, all subsequent EPA rules updating the Title II greenhouse-gas emission standards for cars and light-duty trucks were also jointly promulgated with NHTSA. *See* 85 Fed. Reg. 24,174 (Apr. 30, 2020); 77 Fed. Reg. 62,624 (Oct. 15, 2012). Because Congress prohibited NHTSA from considering the fuel economy of electric vehicles in setting fuel-economy standards, *see* 49 U.S.C. § 32902(h)(1), the agencies' jointly promulgated standards could not be so stringent that they effectively required automakers to include electric vehicles in their fleets.

**B.    The Rule At Issue**

In August 2021, EPA issued a notice of proposed rulemaking for new greenhouse-gas emission standards. EPA proposed to replace the 2020 standards and promulgate "the most stringent vehicle [greenhouse-gas] standard[s] … to date." 86 Fed. Reg. 43,726, 43,746 (Aug. 10, 2021). Notably,

EPA determined—for the first time—to set such standards on its own, without engaging in a joint rulemaking with NHTSA. *Id.* at 43,755. Before joining the administration, the heads of the Council on Environmental Quality and EPA's Office of Air and Radiation (which wrote this rule) advocated this "decoupling" precisely so that EPA could take "a bolder approach on light duty vehicle electrification." Climate 21 Proj., *Transition Memo: Environmental Protection Agency* 11 (2021).

Around the same time, President Biden set "a goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles" and directed EPA to set greenhouse-gas emission standards accordingly. 86 Fed. Reg. at 43,583. Following that directive, EPA ultimately chose standards even more stringent than it had initially proposed. *See* 86 Fed. Reg. at 74,437.

On December 30, 2021, EPA finalized the rule at issue here, setting revised greenhouse-gas standards for light-duty vehicles for model years beginning with 2023. 86 Fed. Reg. at 74,434. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles, due to three interlocking mechanisms of the regulation. *See id.* at 74,438. First, EPA promulgated fleetwide-average standards

instead of vehicle-specific standards.  Second, EPA put a thumb on the scale for electric vehicles by stipulating for purposes of the standards that such vehicles are responsible for no emissions, meaning producers of electric vehicles will appear to have much lower fleetwide-average emissions.  Finally, EPA offered credit-based incentives for electric vehicles.

### C.    Fleetwide Averaging

Instead of issuing greenhouse-gas emission thresholds that any given *vehicle* must meet, EPA has issued its greenhouse-gas standards as a formula setting fleetwide-average emission levels that manufacturers' *fleets* must meet.  Each manufacturer is held to a fleetwide-average standard derived from its annual sales—one standard for its fleet of cars and another standard for its fleet of light trucks (*i.e.*, larger SUVs, minivans, and pickup trucks).  40 C.F.R. § 86.1865-12(i).

Manufacturers' fleets include multiple vehicle models, each of which is given a non-binding carbon-dioxide emission target.  EPA bases these targets on the vehicle's size (or "footprint").  40 C.F.R. § 86.1818-12(c)(2).  A car with the smallest footprint (41 square feet) will have a target of 145.6 grams of carbon dioxide emitted per mile traveled (g/mile) in 2023, which reduces to 114.3 g/mile by 2026, while a car with the largest footprint (56 square feet) will

11

have a target of 199.1 g/mile in 2023 and 160.9 g/mile in 2026. 86 Fed. Reg. at 74,450, 74,522.

Individual vehicles are not directly required to achieve these footprint-based targets. As EPA explained, "[b]ecause compliance is based on the full range of vehicles in a manufacturer's car and truck fleets, with lower-emitting vehicles compensating for higher-emitting vehicles, the emission levels of specific vehicles within the fleet are referred to as targets, rather than standards." *Id.* at 74,439 n.16. The targets are used as inputs to determine a unique fleetwide-average standard for each manufacturer. That fleetwide average is "production-weighted," meaning it accounts for each vehicle's share of the manufacturer's fleet. 40 C.F.R. §§ 86.1818-12(c)(2)(ii), 86.1865-12(i)(1).

Compliance with the fleet average depends on sales for the entire year and thus can be determined only once the year ends. At the end of each year, a manufacturer must compare its actual production-weighted fleetwide-average carbon-dioxide emission level to its production-weighted fleetwide standard. 40 C.F.R. § 86.1865-12(j). If the actual average emission level is higher than the standard, the manufacturer will be assessed a deficit in proportion to the disparity between the performance and the standard. But if the actual average emission level is below the standard, the manufacturer will

be given a proportional number of "credits." *Id.* § 86.1865-12(k)(1), (4). Manufacturers can use credits generated for one fleet to offset a deficit in the other fleet. If there is no such deficit, manufacturers can also "bank" credits to offset deficits accrued in future years. And manufacturers can "trade" credits to competitors in exchange for money. *Id.* § 86.1865-12(k)(7)(i), (9).

EPA has also created other ways to generate credits. The most significant additional credits are offered for the production of "electric vehicles, plug-in hybrid electric vehicles, and fuel cell vehicles," which, for simplicity's sake, we will call "electric vehicles." 40 C.F.R. § 86.1866-12(a); *see id.* § 86.1803-01 (defining terms). EPA regulations stipulate that, for the purposes of calculating fleetwide targets and fleetwide performance, electric vehicles are to be treated as if they emit 0 g/mi of carbon dioxide—even when they pull electricity from a grid that is powered by carbon-emitting sources. *Id.* § 86.1866-12(a). EPA inflates such credits even more by applying a multiplier to the total number of electric vehicles each manufacturer produces in model years 2023 and 2024. *Id.* § 86.1866-12(c). In this rule, EPA selected multipliers of 1.5 and 1.3, meaning that, for example, if a manufacturer produces a million cars in model year 2023, 100,000 of which are electric, EPA will calculate its credits as if the manufacturer produced 150,000 electric

13

vehicles (subject to annual cumulative credit caps). *Id.* § 86.1866-12(b); 86 Fed. Reg. at 74,458-63.

Credits and credit-trading play a pivotal role in EPA's compliance regime. Manufacturers can carry forward a deficit for up to three years before being subject to sanction. But if, after three years, the manufacturer has failed to offset the deficit, EPA will withhold certification from a portion of the manufacturer's vehicles. 40 C.F.R. §§ 86.1818-12(c)(1), 86.1865-12(j), (k)(8); *see id.* § 86.1865-12(k)(8)(ii)-(iii) (formula for determining which vehicles in a noncomplying fleet must have certification withheld). The only way a manufacturer can avoid these sanctions is by purchasing credits. Manufacturers are also subject to financial penalties for selling vehicles not covered by such certificates.

## D.     Mandating Electric Vehicles

In the final rule, EPA opted for the "most stringent standards considered in the proposed rule." 86 Fed. Reg. at 74,435. The rule projects that the average fleetwide targets for cars and light-duty trucks will be 132 g/mi and 187 g/mi, respectively, in 2026. *Id.* at 74,440. Those figures are significantly stricter than the standards from the 2020 joint EPA-NHTSA rule (204 g/mi and 284 g/mi). *See* 86 Fed. Reg. at 43,732; 85 Fed. Reg. at 24,183.

14

The rule's stringent standards are expressly designed to force manufacturers to produce a certain percentage of electric vehicles as a share of the new-vehicle market. When the final rule issued, EPA estimated that electric vehicles made up about 3.6% of the year's vehicle sales. 86 Fed. Reg. at 74,486. EPA projects—and its data confirm—that to meet the new standards, manufacturers must increase the market share for electric vehicles to 7% in model year 2023 and to 17% in model year 2026. *Id.* at 74,485; *see id.* at 74,438 (explaining that the standards are achievable "with a growing percentage of electrified vehicles"). Manufacturers thus must *double* production of electric vehicles within a year, and more than *quadruple* it within a few years.

Natural market forces would not produce that growth rate. EPA acknowledged that the projected 17% market-penetration rate for electric vehicles is "driven" by "the increased stringency of our final standards." 86 Fed. Reg. at 74,484. Compliance with those standards "will necessitate greater implementation and pace of technology penetration," including of electric vehicles. *Id.* at 74,493. Indeed, EPA projected that, if it had maintained the 2020 standards, the electric-vehicle penetration rate in 2026 would be just 7%, less than half the 17% rate under the new standards.

Regulatory Impact Analysis (RIA) 4-27 tbls. 4-27 & 4-28.  EPA's new rule is thus clearly intended to force electrification of the Nation's vehicle fleet.

## SUMMARY OF ARGUMENT

I.    EPA's rule must be set aside because it exceeds the agency's authority under Section 202 of the Clean Air Act.

A.    EPA has claimed a power of incredible consequence:  to phase out combustion-engine vehicles in favor of electric ones.  There can be no denying the "vast economic and political significance" of that authority. *West Virginia*, 142 S. Ct. at 2605.  The costs of EPA's proposed transition make this one of the most expensive agency rules, if not *the* most expensive, in the Nation's history.  By the agency's own estimates, the rule will cost billions of dollars annually and $300 billion in total—far more than what the Supreme Court has found to be economically significant in other major-question cases.  Moreover, EPA's rule would eliminate millions of jobs and force the restructuring of multiple industries.

EPA's rule also goes to the heart of a critically important political question.  As in *West Virginia*, the rule preempts an active debate in Congress and among the States about the future of conventional vehicles.  *See* 142 S. Ct. at 2614.  And it puts EPA in the position of deciding a host of major national

policy questions on which it lacks expertise. Among other policy concerns, electrification will make the automotive industry dependent on supply chains dominated by China and other hostile nations. *See id.* at 2612. Importantly, Congress has previously considered and rejected proposed bills that would force vehicle electrification. Instead, Congress's broader plan for tackling motor-vehicle greenhouse-gas emissions has focused on renewable fuels rather than forced electrification.

B.     Given the vast economic and political significance of EPA's rule, it "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 142 S. Ct. at 2609. Because Congress nowhere provided clear authorization for EPA to effectively mandate electrification of the Nation's vehicles, the rule cannot stand. On the contrary, Congress clearly *precluded* EPA from using Section 202(a) to phase out internal-combustion vehicles. EPA achieves that result only by misconstruing the standard-setting tools at its disposal.

EPA could accomplish its objective of compelling automotive manufacturers to dedicate an increasing percentage of their fleets to electric vehicles only by setting emission standards on a fleetwide-average basis. But the statute's text and structure foreclose EPA from proceeding in this manner.

17

They require that emission standards under Section 202(a) apply to all vehicles *individually*, not manufacturers' fleets on average. EPA must therefore set emission standards that are achievable by individual combustion-engine vehicles on their own.

Even if fleetwide averaging were generally permissible under Section 202(a), the statute forecloses EPA from using fleetwide averaging to mandate electrification. Section 202(a) authorizes EPA to set "standards" for "emission[s]" from "any class or classes of new motor vehicles or new motor vehicle engines, which … cause, or contribute to," potentially harmful air pollution. 42 U.S.C. § 7521(a). In EPA's judgment when setting standards, electric vehicles do not actually "emi[t]" carbon dioxide—the relevant pollutant—or "cause, or contribute to," air pollution. Thus, EPA may set standards for internal-combustion vehicles, but it may not include electric vehicles in the class, let alone make the standard so stringent that only an ever-increasing number of electric vehicles will enable manufacturers to meet the "average" emissions level.

II.    In the alternative, EPA's rule must be set aside because it is arbitrary and capricious. In multiple ways, EPA irrationally put a thumb on the scale in favor of its preferred technology.

18

A.    EPA treated electric vehicles as a pure environmental good that contributes zero emissions.  It did so by focusing myopically on tailpipe emissions and avoiding other lifecycle emissions in its standards.  EPA asserted that ignoring lifecycle emissions "is appropriate" given the agency's "goal of encouraging further transition to electric vehicles."  Response to Comments (RTC) 6-64.  That is the very definition of arbitrary decisionmaking:  the agency ignored emissions that did not support the answer it wanted.

B.    EPA's cost-benefit analysis was also flawed, on both sides of the ledger.  To justify the rule's $300 billion price tag, EPA claimed $320 billion in cost savings to consumers from more fuel-efficient cars.  EPA acknowledged that if electric vehicles really provided those benefits to consumers, one would expect consumers to buy the vehicles without the need for government intervention.  But it asserted without credible evidence that consumer behavior would be driven by irrational economic decision-making.  On the other side of the ledger, EPA unreasonably discounted the rule's costs, assuming energy prices that defy reality.

## STANDING

Petitioners include entities that produce or sell liquid fuels and the raw materials used to produce them, along with associations whose members include such entities. By design, EPA's emission standards reduce the demand for liquid fuels and their raw materials by displacing an increasing number of combustion-engine vehicles with electric vehicles that use little to no liquid fuel. *See* 86 Fed. Reg. at 74,503 ("Through 2050, our rule will reduce gasoline consumption by more than 360,000 million gallons."). As shown in the accompanying declarations, depressing the demand for those fuels injures petitioners and petitioners' members financially. This economic injury constitutes injury-in-fact under Article III that is caused by the challenged regulatory action and redressable by vacatur of the rule. *See, e.g.*, *American Fuel & Petrochemical Mfrs.* v. *EPA*, 3 F.4th 373, 379-380 (D.C. Cir. 2021). Petitioners also include four individuals and a nonprofit whose board members will be harmed in their individual ability to find affordable gasoline-powered vehicles to purchase. *See Competitive Enter. Inst.* v. *NHTSA*, 901 F.2d 107, 111-113 (D.C. Cir. 1990); *Action on Smoking & Health* v. *Department of Labor*, 100 F.3d 991, 992 (D.C. Cir. 1996).

The petitioners that are membership associations also have associational standing to challenge EPA's decision.  *See Hunt* v. *Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342-343 (1977).  Their members have standing to sue in their own right, for the reasons described.  The interests petitioners seek to protect are germane to their organizational purposes, which include safeguarding the viability of their members' businesses.  And neither the claims asserted nor the relief requested requires the participation of individual members.

## STANDARD OF REVIEW

This Court "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

## ARGUMENT

**I.    EPA Lacks Statutory Authority To Set Greenhouse-Gas Emission Standards That Effectively Mandate Electric Vehicles.**

EPA's rule should be set aside because it exceeds the agency's statutory authority.  *See* 5 U.S.C. § 706(2)(C); 42 U.S.C. § 7607(d)(9)(C).  The rule implicates a "major question," which means that EPA must point to clear congressional authorization for the power it asserts.  Yet Congress did not

clearly authorize EPA's approach.  On the contrary, Congress *denied* EPA the power to use fleetwide averages, and at a minimum it did not allow averaging in zeros to represent the electric vehicles EPA would force onto the market.

## A. EPA Must Show Clear Congressional Authorization To Force Electrification.

Under the major-questions doctrine, a court may not construe a statute to "authoriz[e] an agency to exercise powers of 'vast economic and political significance' " unless the statute does so in "clea[r]" terms.  *Alabama Ass'n of Realtors* v. *HHS*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014)).  Thus, an agency seeking to exercise such significant powers must identify "something more than a merely plausible textual basis for the agency action."  *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *Utility Air*, 573 U.S. at 324).  "The agency instead must point to 'clear congressional authorization' for the power it claims."  *Id.*

In assessing the economic and political significance of a rule, the Supreme Court has considered both the rule's direct effects and the implications of the agency's underlying claim of authority.  For example, in *West Virginia*, although EPA's Clean Power Plan only incrementally shifted power generation, EPA had asserted the "highly consequential power" to "announc[e] what the market share of coal, natural gas, wind, and solar must

be, and then requir[e] plants to reduce operations or subsidize their competitors to get there." 142 S. Ct. at 2609 & 2613 n.4; *see Alabama Ass'n of Realtors*, 141 S. Ct. at 2489 (considering the "sheer scope of the [agency's] claimed authority" in addition to the rule's "economic impact"). An agency cannot avoid the need for clear backing from Congress by claiming an awesome power but exercising only a little of it in the first instance.

This case directly parallels *West Virginia* at both a broad and a more specific level. Broadly, just as in *West Virginia*, EPA is claiming the power to effect a wholesale shift in energy policy: moving the Nation's vehicle fleet from vehicles powered by internal-combustion engines that use liquid fuels to vehicles powered by battery-operated electric motors. The only difference is that EPA is waving its wand over motor vehicles instead of power plants. At a more specific level, the Supreme Court in *West Virginia* identified several clues from the statutory and regulatory scheme indicating that EPA needed clear congressional authorization for its Clean Power Plan. Those same clues are present here in spades. The lesson should be unavoidable: EPA needs clear support from Congress to replace the kind of vehicles America drives on its roads.

### 1.    EPA claims a power of vast economic significance.

At the threshold, the rule's economic significance is staggering, in both its direct effects and the implications of the authority EPA claims. Several considerations underscore the rule's enormous economic cost.

***Direct Compliance Costs.*** EPA projects that the rule will cost *$300 billion* by 2050. 86 Fed. Reg. at 74,509. This would be one of the most expensive agency rules, if not *the* most expensive, in the Nation's history. In 2023 alone, it will cost the economy $6 billion, rising to $19 billion by 2030. *Id.* at 74,509 (using 2018 dollars). Even accounting for inflation, that is twice the economic cost of the Clean Power Plan, which the Supreme Court in *West Virginia* found significant enough to trigger the major-questions doctrine. *See West Virginia*, 142 S. Ct. at 2610; EPA, *Regulatory Impact Analysis for the Clean Power Plan Final Rule* 3-22 (projecting up to $3 billion in costs in 2025 and up to $8.4 billion in costs in 2030).

***Transformation of the Vehicle Market.*** The underlying authority EPA claims in the rule is even more economically significant. In substance, EPA has asserted the power to phase out conventional vehicles. The rule effectively mandates that a decreasing percentage of the fleet be gasoline-powered, and an increasing percentage be electric. It does so by setting greenhouse-gas

emission standards so strict that manufacturers cannot meet them with conventional vehicles alone, but must instead increase the share of electric vehicles in their overall production.

In *West Virginia*, the Court explained that EPA had sought to "substantially restructure the American energy market." 142 S. Ct. at 2610. Here, EPA seeks to "substantially restructure" the American vehicle market, and with it, much of the Nation's energy market. As EPA explained, "[c]ompliance with the final standards will *necessitate* … further deployment of [electric-vehicle] technologies." 86 Fed. Reg. at 74,493 (emphasis added); *see id.* at 74,485 ("[T]he final standards can be met with a fleet that achieves a gradually increasing market share of [electric vehicles]."). EPA explained that the final standards "are achievable primarily through the application of advanced gasoline vehicle technologies *but with a growing percentage of electrified vehicles*." *Id.* at 74,438 (emphasis added). And it "project[ed] that during the four-year ramp up of the stringency of the [greenhouse-gas] standards, the standards can be met with gradually increasing sales of plug-in electric vehicles in the U.S. from about 7 percent market share in [model year] 2023 … up to about 17 percent in [model year] 2026." *Id.* at 74,438.

Furthermore, EPA made clear that it set greenhouse-gas standards not merely to require the level of electrification the market would otherwise provide, but to "driv[e]" electric-vehicle production. 86 Fed. Reg. at 74,484. EPA acknowledged that in a "no-action" scenario—*i.e.*, a scenario in which it promulgated no new greenhouse-gas standards and maintained the status quo—the electric-vehicle market-penetration rate in model year 2026 would be just 7%, less than half the 17% penetration rate under the new standards. RIA 4-27 tbls. 4-27 & 4-28. EPA thus claims the power to accelerate the electrification of the fleet (and the corresponding demise of conventional vehicles) by using greenhouse-gas standards to require electric-vehicle penetration rates at whatever level EPA believes feasible—a judgment it claims is entitled to "particularly great deference." 86 Fed. Reg. at 74,452.

***Elimination of American Jobs.*** EPA's electrification goal would overhaul the American automobile industry, which "supports 10 million direct and indirect jobs" and "accounts for more than three percent of GDP." Securing America's Future Energy (SAFE), Comment 5 (Sept. 27, 2021); *see* U.S. Chamber of Commerce, Comment 7 (Sept. 27, 2021). The United States is unlikely to replace those jobs with jobs manufacturing electric vehicles, because battery and battery-cell production is dominated by Asia and, to a

lesser extent, Europe.  *See* Jim Barrett & Josh Bivens, *The Stakes for Workers in How Policymakers Manage the Coming Shift to All-Electric Vehicles*, Economic Policy Inst. 7-8 (Sept. 22, 2021).   Moreover, electric-vehicle production is far more automated, "requir[ing] 30% less manufacturing labor when compared with conventional cars."  Carlos Waters, *How Electric Vehicle Manufacturing Could Shrink the Midwestern Job Market*, CNBC.com (Sept. 4, 2022), https://www.cnbc.com/2022/09/04/ev-manufacturing-may-shrink-us-midwest-auto-parts-trade.html.

The effects of EPA's rule would extend well beyond the automobile industry.  Electrification would overhaul the American oil and natural gas sector, which "supports more than ten million U.S. jobs."  American Petroleum Inst., Comment 1 (Sept. 27, 2021).  With two-thirds of petroleum demand coming from the transportation sector, most of those jobs in drilling, refining, and distribution depend on the conventional-vehicle market.  *See* U.S. Energy Info. Admin., Monthly Energy Rev. 78 (July 2022).  Countless supply chains and end products such as asphalt, chemicals, and lubricants would be affected. Phasing out conventional vehicles would also devastate the biofuels industry. According to one industry group, a ban on conventional vehicles by 2035 would reduce U.S. GDP by $321 billion and cost 255,000 jobs, concentrated in a few

corn-producing states.  Agricultural Retailers Ass'n, *Economic Impacts to U.S. Biofuels, Agriculture, and the Economy from Subsidized Electric Vehicle Penetration* 13, 16 (Oct. 2020).

By any relevant economic measure—"the amount of money involved for regulated and affected parties, the overall impact on the economy, [or] the number of people affected," *U.S. Telecom Ass'n* v. *FCC*, 855 F.3d 381, 422-423 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)—EPA's asserted power to force a transition from gasoline-powered vehicles to electric ones represents "an enormous and transformative expansion in [its own] regulatory authority," affecting "a significant portion of the American economy."  *Utility Air*, 573 U.S. at 324 (citation omitted).

### 2. EPA claims a power of vast political significance.

The rule's political significance is just as vast.  In *West Virginia*, the Court identified several considerations that are equally present here.

***Ongoing Policy Debate.***  The target of EPA's rule—to say nothing of climate change more generally—is "the subject of an earnest and profound debate across the country."  *West Virginia*, 142 S. Ct. at 2614.  While California is moving aggressively to accelerate electrification by regulatory fiat, *see* Cal. Code Regs. Tit. 13, § 1962.4 (Zero-Emission Vehicle Standards

for 2026 and Subsequent Model Year Passenger Cars and Light-Duty Trucks),
other States oppose efforts to shift energy-investment and generation from
petroleum to other sources, *see, e.g.*, Act Relating to Financial Institutions
Engaged in Boycotts of Energy Companies, 2022 W. Va. Legis. Ch. 235.

Congress itself is debating this very issue, which makes EPA's claim to
policymaking authority "all the more suspect." *West Virginia*, 142 S. Ct. at
2614; *see FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155
(2000). Congress has yet to reach an answer and remains in factfinding mode
as it considers the benefits and risks of electrification. Just a month before
EPA promulgated the rule, Congress enacted the Infrastructure Investment
and Jobs Act of 2021, which requires several agencies—notably not EPA—to
prepare three separate reports for Congress on the implications of electrifying
the Nation's vehicle fleet. Pub. L. No. 117-58, §§ 25006, 40435, 40436, 135 Stat.
429, 845-49, 1050 (2021) (requiring reports on "the cradle to grave
environmental impact of electric vehicles" and "the impact of forced labor in
China on the electric vehicle supply chain," among other things).

***Balancing National Policy Considerations.*** In *West Virginia*, the
Court found it significant that EPA's rule would put the agency in the position
of "balancing the many vital considerations of national policy implicated in

deciding how Americans will get their energy." 142 S. Ct. at 2612. The Court was concerned that the agency would decide "how much of a switch from coal to gas" the grid could tolerate, and "how high energy prices [could] go" before becoming "exorbitant." *Id.* at 2612. Here, too, EPA's rule puts it in the position of deciding "how much of a switch" to electrification the nation's power grids can tolerate, and how high vehicle and energy prices can climb without being "exorbitant." *See* Texas Br. 15-22.

As the State petitioners' brief explains more fully, EPA's asserted authority also implicates another key "consideration[] of national policy": national security. *See* Texas Br. at 22-24. NHTSA has acknowledged that the United States "has very little capacity in mining and refining any of the key raw materials" for electric vehicles. 86 Fed. Reg. 49,602, 49,797 (Sept. 3, 2021). And unlike biofuels and petroleum, most of the supply of critical components of batteries and motors for electric vehicles is controlled by hostile or unstable foreign powers, in particular China. Shifting to electric vehicles would thus make the American automotive industry critically dependent on one of the Nation's primary geopolitical rivals.

Specifically, China is by far the largest source of graphite, which is used for lithium-ion batteries, and rare-earth elements like neodymium, which are

used for permanent-magnet motors. By some estimates, a transition to electric vehicles would raise demand for graphite by 2500% and rare-earth elements by 1500%. International Energy Agency, *The Role of Critical Minerals in Clean Energy Transitions* 97 (Mar. 2022) (May 2021 ed. cited in Alliance for Automotive Innovation (AAI), Comment 101-102 (Oct. 26, 2021)). Another key component of lithium batteries, cobalt, is controlled by the Democratic Republic of the Congo, which is implicated in significant human-rights concerns (including child labor), and Chinese state-owned enterprises have a controlling interest in 70% of Congo's cobalt mines. AAI Comment at 108.

**Lack of Agency Expertise.** To force electrification, EPA would need to understand and weigh "many vital considerations of national policy." *West Virginia*, 142 S. Ct. at 2612; *see* pp. 29-31, *supra*. The policy judgments here involve not only potential climate impacts but millions of jobs, the restructuring of entire industries, the Nation's energy independence and relationship with hostile powers, and supply-chain and electric-grid vulnerabilities. EPA does not have any expertise in those matters. It implicitly conceded as much when it declined to consider in the rulemaking the "shifts in employment associated with the transition from gasoline vehicles to

[electric vehicles]" or the "security risks associated with the manufacture and importation of different types of vehicles and vehicle components." RTC 22-11, 19-18.  The judgments here are not ones "Congress presumably would" entrust to an "agency [with] no comparative expertise," but are "ones that Congress would likely have intended for itself." *West Virginia*, 142 S. Ct. at 2612-2613.

 ***Prior Rejections by Congress of Similar Policies.***  As evidence that the judgments here belong to Congress rather than the Executive, both Houses of Congress have previously "considered and rejected" multiple bills with effects similar to EPA's rule. *West Virginia*, 142 S. Ct. at 2614 (quoting *Brown & Williamson*, 529 U.S. at 144).  Congress even rejected one bill that would have mandated a level of electric-vehicle penetration roughly equal to the 50%-by-2030 target EPA embraces in the rule.  *See, e.g.*, Zero-Emission Vehicles Act of 2019, H.R. 2764, 116th Cong. (2019); Zero-Emission Vehicles Act of 2018, S. 3664, 115th Cong. (2018); *see also* 116 Cong. Rec. 19238-40 (1970) (proposed amendment to Title II that would have banned internal-combustion vehicles by 1978).  Congress's "consistent judgment" against the very sorts of mandates imposed by EPA undercuts any claim of congressional

authorization. *Brown & Williamson*, 529 U.S. at 147-148, 160; *accord West Virginia*, 142 S. Ct. at 2614.

**Conflict with Congress's Broader Design.** EPA's rule is also inconsistent with the broader statutory scheme and Congress's plan for tackling climate change. *See Utility Air*, 573 U.S. at 321. When Congress has sought to address greenhouse-gas emissions from the transportation sector, it has done so by promoting corn ethanol and other biofuels, which are used in conventional vehicles and which—unlike electric-vehicle components—are in abundant domestic supply. *See, e.g.*, Inflation Reduction Act of 2022, Pub. L. No. 117-169, §§ 13202, 13404, 22003, 136 Stat. 1818, 1932, 1966-1969, 2020 (2022). Indeed, Congress has consistently legislated against the background expectation that conventional vehicles powered by liquid fuels will remain on the market.

For example, in Title II's Renewable Fuel Program, Congress mandated that "gasoline sold or introduced into commerce in the United States" must contain a year-over-year increasing share of renewable fuels. 42 U.S.C. § 7545(o)(2)(A)(i). Under that standard, gasoline in the U.S. market in 2022 must include tens of billions of gallons of renewable fuel. *Id.* § 7545(o)(2)(B); *see* 87 Fed. Reg. 39,600 (July 1, 2022). EPA is thus working at

cross-purposes with Congress, which has required increases in liquid renewable fuels at the same time that EPA is seeking to eliminate vehicles that use such fuels. The obvious reason for the mismatch is that Congress has not decided to mandate electrification—nor has it placed that power in EPA's hands.

### 3. EPA claims an unheralded power with staggering implications.

In asserting the sweeping power to mandate increasingly high levels of electrification, EPA claims to have "discover[ed] in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Utility Air*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 159). The novelty and broad implications of the agency's approach are powerful clues that Congress never authorized it.

***Novel Assertion of Agency Authority.*** Skepticism is warranted when an agency asserts an "unheralded power representing a transformative expansion in its regulatory authority." *West Virginia*, 142 S. Ct. at 2610 (internal quotation marks omitted). Never before has EPA claimed that Title II of the Clean Air Act authorizes it to use emission standards to mandate electric-vehicle production, let alone to phase out conventional vehicles. Rather, in prior rules setting greenhouse-gas emission standards, EPA has

34

treated electric vehicles as a compliance "option" or "flexibility." *See*, *e.g.*, 77 Fed. Reg. at 62,917 ("[E]lectrification is an option for compliance but is not required under this rule.").

Indeed, forced electrification has never before even been on the table. As discussed above, EPA's previous standards were always jointly promulgated with NHTSA. *See* pp. 9-10, *supra*. Congress prohibited NHTSA from considering the fuel economy of electric vehicles in setting fuel-economy standards, *see* 49 U.S.C. § 32902(h)(1), so the agencies' joint rules could never force electrification. Cooperating and coordinating with NHTSA was no real constraint, however, because EPA has never claimed the authority to mandate electric vehicles. EPA decoupled its rulemaking from NHTSA's only when it purported to discover new authority in old provisions of the Clean Air Act.

***Future Implications of the Agency's Claimed Power.*** EPA has made no secret of the significance of the power it exercised here. In its proposed rule, EPA "expect[ed] that electrification would continue to play a relatively modest role" in compliance. 86 Fed. Reg. at 74,442. But around that time, President Biden set as "a goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles" and directed EPA to set greenhouse-gas emission standards accordingly. *Id.* at 43,583.

35

In response to the President's directive, EPA's final rule was much more aggressive. EPA ratcheted up the final emission standards from its initial proposal, explaining that the more stringent standards "provide a more appropriate transition to new standards for [model year] 2027 and beyond," "[c]onsistent with the direction of Executive Order 14037." 86 Fed. Reg. at 74,437. EPA did not hide its commitment "to encouraging the rapid development and deployment of zero-emission vehicles." *Id.* at 74,494. As in *West Virginia*, there is no reason to believe that EPA will stop here. "[O]n this view of EPA's authority, it could go further, perhaps forcing" car manufacturers to "cease making" internal-combustion vehicles altogether. 142 S. Ct. at 2612.

Indeed, that is exactly where EPA is headed. When EPA promulgated its final rule, the Administrator declared the rule "a giant step forward" in "paving the way toward an all-electric, zero-emissions transportation future." EPA, *EPA Finalizes Greenhouse Gas Standards for Passenger Vehicles, Paving Way for a Zero-Emissions Future* (Dec. 20, 2021), https://bit.ly/3wJFsTD. And in one of the companion cases before this Court, EPA authorized California to adopt its own greenhouse-gas emission standards—an authority California is already citing to ban new combustion-

36

engine vehicles and require "100-percent electrification by 2035." Private Pet. Br. 10, *Ohio* v. *EPA*, No. 22-1081 (D.C. Cir. Oct. 24, 2022) (citation omitted). Both parts of EPA's strategy reveal the agency's goal to convert America to electric vehicles.

## B. EPA Lacks Clear Statutory Authority To Use Fleetwide Averaging To Mandate Electric Vehicles.

Given the vast economic and political significance of EPA's rule, it "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 142 S. Ct. at 2609. There is not one word in the Clean Air Act about a nationwide agency-led transition from conventional internal-combustion vehicles to electric vehicles. To be sure, EPA has the power to set emission standards for air pollutants from motor vehicles, just as EPA had the power in *West Virginia* to set emission standards for air pollutants from power plants. But what EPA claims here for the first time is the authority to set standards in such a way that manufacturers can comply only by abandoning internal-combustion vehicles in favor of electric vehicles. And nothing in the Clean Air Act authorizes *that*.

EPA has effectively conceded as much before. EPA is requiring electrification by setting average emission standards for manufacturers' nationwide fleets and "averaging" in more and more zeros to represent the

37

electric vehicles it wants to see in future years.  Manufacturers that exceed the standards may bank credits and trade them to other manufacturers that fall short.  EPA has previously acknowledged that the Act is silent on those mechanisms:  averaging, banking, and trading.  When EPA first adopted fleetwide averaging, it recognized that "Congress did not specifically contemplate an averaging program when it enacted the Clean Air Act." 48 Fed. Reg. 33,456, 33,458 (July 21, 1983).  And "[j]ust as the statute does not explicitly address EPA's authority to allow averaging, it does not address the Agency's authority to permit banking and trading."  54 Fed. Reg. 22,652, 22,665 (May 25, 1989); *see* 55 Fed. Reg. 30,584, 30,593 (July 26, 1990) (same). By definition, then, the Act does not address—let alone clearly authorize—the use of averaging, banking, and trading to electrify the Nation's vehicle fleet.

That should be the end of the analysis.  Section 202 of the Clean Air Act does not itself "direct [conventional vehicles] to effectively cease to exist." *West Virginia*, 142 S. Ct. at 2612 n.3.  EPA has instead relied on mechanisms that are not themselves spelled out in the statute and that have never before been used to mandate electric vehicles.  Just as in *West Virginia*, EPA has nothing "close to the sort of clear authorization" necessary for such a transformational policy shift.  142 S. Ct. at 2614.

38

But in truth, the problem is far worse for EPA than that.  As explained below, the Act unambiguously *precludes* fleetwide-average emission standards under Section 202(a).  And even if the statute permitted some fleetwide averaging, it does not allow EPA to take the additional step of incorporating non-emitting vehicles into emission averages and thus forcing the market toward electric vehicles.  EPA is not merely stretching vague statutory language.  It is defying clear statutory text.

### 1.    EPA may not set fleetwide-average standards.

The text and structure of Section 202, and of Title II more broadly, unambiguously require that emission standards under Section 202(a) apply to individual vehicles, not manufacturers' fleets on average.  EPA claims to find authority for fleetwide averaging in Section 202(a), which authorizes EPA to issue "standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles … which in [its] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare."  42 U.S.C. § 7521(a).

On its face, that provision authorizes EPA to set standards for *vehicles* that emit harmful air pollutants.  It says nothing about averaging across fleets.  As noted, when EPA first adopted fleetwide averaging, it acknowledged that

"Congress did not specifically contemplate an averaging program when it enacted the Clean Air Act." 48 Fed. Reg. at 33,458. EPA claimed to have the authority because the Act "does not explicitly *preclude* standards" based on averaging. 54 Fed. Reg. at 22,666 (emphasis added). EPA was wrong. "[T]he broader context of the statute as a whole," *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 341 (1997), makes clear that Section 202(a) does not permit fleetwide averaging.

### a. Other provisions in Section 202 demonstrate that emission standards may not be based on averaging.

i. Title II is replete with provisions that necessarily apply to vehicles individually, not to fleets on average. That is evident first in the emission standards prescribed by Section 202 itself. In Section 202(b), the Act sets forth specific light-duty vehicle emission standards that EPA must promulgate in "regulations under" Section 202(a). 42 U.S.C. § 7521(b). For example, for vehicles in model years 1977 to 1979, the standards must provide that "emissions from such vehicles and engines may not exceed 1.5 grams per vehicle mile of hydrocarbons and 15.0 grams per vehicle mile of carbon monoxide." *Id.* § 7521(b)(1)(A).

Those provisions require that the "regulations under [Section 202(a)]" apply to "vehicles and engines," not "vehicles and engines *on an average basis across a fleet*." Construing those provisions to allow averaging would, in effect, add words to the statute that change its meaning. Neither courts nor agencies may "supply words … that have been omitted." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012); *accord Rotkiske* v. *Klemm*, 140 S. Ct. 355, 360-361 (2019). And supplying the extra words "on average" would have a significant substantive effect: "roller coaster riders must be 48 inches tall" means something very different from "roller coaster riders must be 48 inches tall *on average*."

The testing requirements accompanying the Section 202(b) standards confirm that those standards apply to all vehicles. In particular, EPA must "test any emission control system incorporated in a motor vehicle or motor vehicle engine … to determine whether such system enables such vehicle or engine to conform to the standards required to be prescribed under [Section 202(b) of the Act]." 42 U.S.C. § 7525(a)(2). If the system complies, EPA must issue a "verification of compliance with emission standards for such system." *Id.* Those requirements plainly contemplate standards that apply to individual vehicles and their emission-control systems. Not only does the statutory text

41

frame the inquiry as whether an individual "vehicle" or "engine" conforms to the emission standards, but the provision's foundational premise—that an emission-control system can enable a vehicle to meet emission standards— depends on individually applied standards.

ii.    Other parts of Section 202 further demonstrate that emission standards under Section 202(a) cannot rely on averaging.  Section 202(b)(3), for example, authorizes EPA to grant waivers from certain nitrogen-oxide emission standards—which, again, are standards "under" Section 202(a), *see* 42 U.S.C. § 7521(b)(1)(B)—for no "more than 5 percent of [a] manufacturer's production or more than fifty thousand vehicles or engines, whichever is greater."  *Id.* § 7521(b)(3).  This provision would be nonsensical under a fleetwide-averaging regime.  It contemplates a default under which every vehicle meets a standard, then gives manufacturers a waiver from that default for up to 5% of the fleet.  But under fleetwide averaging, no waiver is needed.  Instead, a vast proportion of a manufacturer's fleet—perhaps 50% or more— effectively has a "waiver" so long as a sufficient number of vehicles outperform the standard.    Likewise, Section 202(g), which specifies an increasing "percentage of each manufacturer's sales volume" of each model year's

42

vehicles that must comply with specified emission standards, is fundamentally incompatible with averaging.  *Id.* § 7521(g)(1).

iii.    Similarly, under Section 202(m), EPA must require manufacturers to install on "all" new light-duty vehicles and trucks "diagnostic systems" capable of identifying malfunctions that "could cause or result in failure of the vehicles to comply with emission standards established under this section."  *Id.* § 7521(m)(1).  As this requirement makes clear, individual vehicles must "comply with emissions standards established under [Section 202]."  *Id.*  Otherwise, requiring diagnostic equipment on "all" vehicles makes no sense.   In a fleetwide-averaging regime, this requirement would be pointless, as the deterioration or malfunction of an individual vehicle's emission-related systems would provide virtually no information about whether the fleet as a whole is compliant.

> **b.    Title II's compliance and enforcement provisions for emission standards confirm that EPA cannot use fleetwide averaging.**

Fleetwide averaging also clashes with "the design and structure of [Title II] as a whole."  *Utility Air*, 573 U.S. at 321 (citation omitted).  Title II sets forth a comprehensive, interlocking scheme for enforcing emission standards through testing, certification, warranties, remediation, and penalties.

43

Fleetwide-average standards are incompatible with these provisions, which are "designed to apply to" individual vehicles and "cannot rationally be extended" to fleets. *Id.* at 322.

      i.   ***Testing and Certification.***  Under Title II, EPA must "test, or require to be tested in such manner as [it] deems appropriate, any new motor vehicle or new motor vehicle engine submitted by a manufacturer to determine whether such vehicle or engine conforms with the regulations prescribed under [Section 202]." 42 U.S.C. § 7525(a)(1). If the "vehicle or engine conforms to such regulations," EPA must issue the manufacturer a "certificate of conformity." *Id.* EPA may later test a manufacturer's vehicles and engines, and if "such vehicle or engine does not conform with such regulations and requirements, [EPA] may suspend or revoke such certificate insofar as it applies to such vehicle or engine." *Id.* § 7525(b)(2)(A)(ii). A manufacturer may not sell a vehicle or engine not "covered by a certificate of conformity." *Id.* § 7522(a)(1).

      Fleetwide averaging is incompatible with these requirements in at least two respects. First, by using the singular terms "vehicle" and "engine," along with "any" and "such," the statute contemplates that *individual* vehicles may be tested, determined to "not conform" with the standards, and have their

certificates of conformity suspended or revoked. In a fleetwide-averaging regime, testing an individual vehicle or engine does not enable EPA to determine whether it "conforms with the regulations prescribed under [Section 202]," 42 U.S.C. § 7525(a)(1), because conformity turns not on an individual vehicle's emissions but on the fleet's average performance overall.

Second, fleetwide averaging also makes it impossible to determine compliance with applicable emission standards *before* a vehicle is sold, as required to obtain the certificate of conformity needed for a sale. *See* 42 U.S.C. § 7522(a)(1). Under fleetwide-average standards, a vehicle's "conform[ity] with the regulations prescribed under [Section 202]" cannot be determined until the manufacturer calculates its production-weighted average at "the end of each model year," when the manufacturer knows the quantity and model of "vehicles produced and delivered for sale." 40 C.F.R. §§ 86.1818-12(c)(2)(2), 86.1865-12(i)(1), (j)(3).

For similar reasons, fleetwide averaging is inconsistent with the statutory definition of an "emission standard," which "limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." 42 U.S.C. § 7602(k). It is impossible to know on a "continuous basis" whether a manufacturer's fleet complies with EPA's average standards, because a

manufacturer cannot calculate its production-weighted average until the end of the year.  Simply put, an after-the-fact compliance regime is incompatible with the Act's testing and certification scheme.

ii.  ***Warranties and Remediation.***  Fleetwide-average standards similarly clash with Title II's warranty provisions.  Under Section 207, a manufacturer must "warrant to the ultimate purchaser and each subsequent purchaser" "*at the time of sale*" that each new vehicle complies with applicable regulations under [Section 202].  42 U.S.C. § 7541(a)(1) (emphasis added).  Yet, as with certificates of conformity, manufacturers cannot warrant conformity with fleetwide-average emission standards at the time of sale, because compliance can be determined only at the end of the year.  *See* 40 C.F.R. § 86.1865-12(i)(1) (requiring manufacturers to compute their "production-weighted fleet average" by "using actual production [data]" for the year in question).

Fleetwide-average emission standards are also inconsistent with Title II's remediation and notification provisions.  Those provisions state that if EPA "determines that a substantial number of any class or category of vehicles or engines … do not conform to the regulations prescribed under [Section 202]," the manufacturer must remedy "the nonconformity of any such

46

vehicles or engines." 42 U.S.C. § 7541(c)(1). If "a motor vehicle fails to conform," the manufacturer bears the cost. *Id.* § 7541(h)(1). Further, "dealers, ultimate purchasers, and subsequent purchasers" must be given notice of any nonconformity, *id.* § 7541(c)(2), which requires identification of specific nonconforming vehicles. None of this is possible where the nonconformity is tied to a fleet on average.

      iii. ***Penalties.*** Finally, EPA's fleetwide-averaging regime is inconsistent with the statute's penalty provision. Under Section 205, any violation "shall constitute a separate offense with respect to *each* motor vehicle or motor vehicle engine," with each offense subject to its own civil penalty of up to $25,000. 42 U.S.C. § 7524(a) (emphasis added). Under EPA's approach, however, no individual vehicle or engine violates the applicable standard, only the fleet as a whole. The statute provides no method for calculating penalties when a fleet fails to meet its fleetwide-average standard—because it does not authorize fleetwide-average standards.

      **c.**    **The broader text and history of Title II confirm that the rule exceeds EPA's authority.**

Other indicia of statutory meaning demonstrate that the rule exceeds EPA's statutory authority under Section 202(a). Elsewhere in Title II, Congress showed that it knew how to legislate with respect to "average annual

aggregate emissions." 42 U.S.C. § 7545(k)(1)(B)(v)(II) (directing EPA to take certain actions if "the reduction of the average annual aggregate emissions of toxic air pollutants in a [designated district] fails to meet" certain standards). Thus, "if Congress had wanted to adopt an [averaging] approach" for motor-vehicle standards under Section 202(a), "it knew how to do so." *SAS Inst., Inc.* v. *Iancu*, 138 S. Ct. 1348, 1351 (2018); *see Rotkiske*, 140 S. Ct. at 360-361 ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."). It did not choose that approach in Section 202(a).

The Energy Policy Conservation Act, enacted just two years before the 1977 Clean Air Act amendments, reinforces that conclusion. There, Congress directed the Secretary of Transportation to issue regulations setting "average fuel economy standards for automobiles manufactured by a manufacturer" in a given model year. 49 U.S.C. § 32902(a). That Congress has not used similar language in Section 202(a) of the Clean Air Act is a "telling clue" that the Act does not permit fleetwide averaging. *Epic Sys. Corp.* v. *Lewis*, 138 S. Ct. 1612, 1626 (2018).

The Clean Air Act's history also reflects Congress's understanding that emission standards would apply to all vehicles individually. Congress was so

48

focused on reducing emissions at the level of the individual vehicle that, in the 1970 amendments, Congress permitted EPA to test any individual vehicle as it comes off the assembly line.  *See* Pub. L. No. 91-601, § 8, 84 Stat. 1676, 1694-1696.  Such a vehicle-by-vehicle test was meant to supplement the pre-1970 testing of prototypes.  Congress explained that while testing of prototypes "will continue," "tests should require each prototype rather than the average of prototypes to comply with regulations establishing emission standards." H.R. Rep. No. 91-1146, at 6 (1970).  And if Congress forbade averaging across *prototypes*, it certainly did not permit averaging across entire *fleets*.

### d. EPA's lack of authority for a credit-trading scheme further confirms its lack of authority to set fleetwide averages.

As explained above, *see* pp. 12-14, *supra*, the credit banking and trading program is critical to EPA's electrification mandate.  But the agency also lacks authority under Title II to establish a credit scheme as part of its emission standards under Section 202(a).

As with fleetwide averaging, EPA has previously acknowledged that Title II says nothing about banking and trading credits in connection with motor-vehicle emission standards.  *See* 54 Fed. Reg. at 22,665.  What EPA has ignored, however, is that Title II is *not* silent regarding banking and trading

in other contexts.    Indeed, in multiple other provisions under Title II, Congress expressly authorized the use of bankable and tradable credits.  *See, e.g.*,   42   U.S.C.   §   7545(k)(7)   (reformulated   gasoline   credits); § 7545(*o*)(2)(A)(ii)(II)(cc),   (5)(A)(i)   (renewable   fuel   credits);   *id.* § 7545(*o*)(2)(A)(ii)(II)(cc),   (5)(A)(ii)   (biodiesel   credits);   *id.* § 7545(*o*)(2)(A)(ii)(II)(cc), (5)(A)(iii) (small refineries credits); *id.* § 7586(f) (clean-fuel fleet-operator credits); *id.* § 7589(d) (California pilot test program's clean-fuel vehicle manufacturer credit).

Under EPA's approach, those provisions would all be superfluous, because EPA already had the discretion to adopt a credit-trading regime for any program.  If Congress had wanted to permit credits in connection with emission standards under Section 202(a), it knew how to and would have done so expressly.  *See SAS Inst.*, 138 S. Ct. at 1351.

\*    \*    \*

For all these reasons, this Court has cast substantial doubt on EPA's authority to set fleetwide-average emission standards.  As the Court explained in *NRDC* v. *Thomas*, 805 F.2d 410 (D.C. Cir. 1986), the "engine specific thrust" of Title II's "testing and compliance provisions" is evident both in Congress's choice to "spea[k] of 'any,' 'a,' or 'such' motor vehicle or engine" in the text of

50

the statute and in the "troubling" legislative history recounted above. *Id.* at 425 n.24. The arguments were not dispositive in *Thomas* only because the parties there had failed to present them. *Id.* But the Court nevertheless recognized that the arguments were relevant to "future proceedings," *id.*, like this one.

### 2. At a minimum, EPA may not use fleetwide averaging to require electrification.

Despite the absence of statutory authorization for fleetwide averaging, EPA has long employed that mechanism without significant industry pushback. That is likely because fleetwide averaging has generally been offered as an accommodation to regulated parties, allowing them flexibility that the statute does not in fact permit. In its new rule, however, EPA is not offering an extrastatutory accommodation. It is taking an additional step away from the statutory text by using fleetwide averaging to mandate electrification.

To be clear, in prior rules EPA set an average emission standard and allowed manufacturers to make some vehicles that emitted more and some that emitted less. Here, EPA has set tailpipe greenhouse-gas emission standards at a level so stringent that manufacturers *must* incorporate an increasing percentage of electric vehicles—which EPA treats as zero-emission

vehicles—into their averages in order to comply with the "standards." *See* p. 13, *supra*. Put differently, the agency is setting an emission standard that is artificially low because it incorporates electric vehicles, which EPA treats as emitting zero pollutants for averaging purposes.

Whatever the permissibility of fleetwide averaging, the text and structure of Title II make plain that EPA cannot manipulate averaging as a means to force production of an increasing market share of electric vehicles. Section 202 does not grant EPA the power to make the internal-combustion engine go the way of the horse and carriage. At the very least, Section 202 is hardly clear in granting that awesome power—which is what matters under *West Virginia*. For automobiles as for power plants, EPA has purported to discover in the Clean Air Act the authority to "forc[e]" manufacturers to "cease making" a particular type of energy "altogether." 142 S. Ct. at 2612. We have seen that play recently before, and it should end the same way.

> **a.      The statutory text demonstrates Congress's focus on technologically achievable emission controls.**

i.      Section 202(a)(1) provides that EPA shall prescribe "standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [its] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger

public health or welfare." 42 U.S.C. § 7521(a)(1). The statute, of course, does not expressly specify which vehicles are to be included in any average emission standard—because, as discussed above, it does not contemplate averaging in the first place. But to the extent averaging is permissible, the text makes clear that the vehicles included in such averaging must, in EPA's judgment, *actually emit the relevant pollutant*.

To begin with, the statute focuses on standards for the "*emission*" of an air pollutant, which immediately indicates Congress's focus on vehicles deemed to actually "emi[t]" the relevant pollutant. 42 U.S.C. § 7521(a)(1) (emphasis added). Here, EPA's rule stipulates that electric vehicles are to be treated for averaging purposes as if they emit no carbon dioxide (even when they pull electricity from a grid that is powered by carbon-emitting sources). 40 C.F.R. § 86.1866-12(a). EPA has thus decided that electric vehicles as a class do not "emi[t]" the relevant pollutant. 42 U.S.C. § 7521(a)(1). And given the textual focus on harmful emissions, it would be extremely unusual for EPA to include non-emitting vehicles in the standards that EPA calculates and imposes.

Next, the statute is explicit that the things for which EPA sets standards must "in [EPA's] judgment cause, or contribute to, air pollution which may

53

reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). The key textual question is thus *what* exactly EPA must "judg[e]" to "cause, or contribute to" potentially dangerous air pollution. The grammatical structure of the provision offers only two plausible options. Because the verbs "cause" and "contribute" are in the plural form, their subject must be plural as well. *See* Scalia & Garner, *supra*, at 140 ("Judges rightly presume … that legislators understand subject-verb agreement."). The only plural nouns that could plausibly "cause" or "contribute" to pollution are either the "new motor vehicles or new motor vehicle engines," or the "class or classes" of those vehicles or engines.

Under either reading, *all* of the covered vehicles must emit the relevant pollutant. If it is the "vehicles" or "engines" that EPA must judge to "cause, or contribute to, air pollution," then Section 202(a) authorizes EPA to set standards only for "new motor vehicles or new motor vehicle engines which in [EPA's] judgment cause, or contribute to" potentially dangerous pollution. In other words, EPA may set standards only for motor vehicles that in its judgment actually emit the regulated pollutant—here, combustion-engine vehicles that emit carbon dioxide. The converse is equally true: Section 202(a)

does *not* authorize EPA to set standards for vehicles that it deems *not* to cause or contribute to harmful pollution.

That is the natural reading of the statute under the "grammatical 'rule of the last antecedent,'" which provides that a "limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart* v. *Thomas*, 540 U.S. 20, 26 (2003). Here, the relevant limiting phrase is: "which in [EPA's] judgment cause, or contribute, to air pollution." And the immediately antecedent phrase is "new motor vehicles or new motor vehicle engines." The rule of the last antecedent thus indicates that it is the "*vehicles*" in the class that must "cause, or contribute" to the pollution, and not the "class" as a whole.

This Court and others have adopted that natural reading. This Court has observed that Section 202(a) "requires the EPA to set emissions standards for new motor vehicles and their engines *if they emit harmful air pollutants*." *Truck Trailers Mfrs. Ass'n* v. *EPA*, 17 F.4th 1198, 1201 (D.C. Cir. 2021) (emphasis added); *see NRDC* v. *EPA*, 954 F.3d 150, 152 (2d Cir. 2020) (Section 202(a) "requires EPA to regulate emissions from new motor vehicles if EPA determines that *the vehicles* 'cause, or contribute to,' [potentially dangerous] air pollution") (emphasis added).

Alternatively, if it is the "class or classes" of vehicles or engines that must "cause, or contribute to, air pollution," the result is the same. When we refer to a class of objects that does something, the ordinary and accurate meaning is that *all* the members of the class do that thing. For example, when a doctor warns a patient about a "class of medications that cause drowsiness," the class does not include non-drowsiness-inducing medicines. And that is the best way to read the statute here: a class that causes pollution is most naturally defined to include only those vehicles that cause pollution. EPA has broad leeway to group those pollution-emitting vehicles into classes how it sees fit. *See NRDC* v. *EPA*, 655 F.2d 318, 338 (D.C. Cir. 1981). But the vehicles must actually be pollution-emitting in EPA's judgment.

In short, under either plausible reading of the statute, when EPA sets an emission standard for a pollutant, it must consider only the vehicles that it judges to emit the relevant pollutant. Even if fleetwide averaging were allowed as a general matter, averaging would be permissible only among types of vehicles that "emi[t]" the harmful pollutant and that, "in [EPA's] judgment cause, or contribute" to harmful air pollution. If EPA determines that a particular category of vehicle is not "emi[tting]" the relevant pollutant or "caus[ing], or contribut[ing] to" the resulting pollution, it makes no sense to

include that category in calculating the emission standard.  That is not really "averaging" at all, as it does not help EPA arrive at a technologically feasible threshold for pollutant-emitting vehicles.

ii.     EPA has adopted such a faux "average" here.  The agency set a carbon-dioxide emission target for passenger cars and light trucks that "averages" in a category of vehicles that it deems not to emit carbon dioxide.  EPA treats electric vehicles as "zero-emission vehicles," and assumes they contribute "zero (0) grams/mile" of carbon dioxide.  40 C.F.R. § 86.1866-12; *see* 86 Fed. Reg. at 74,446.  Setting aside the flaws in that assumption, *see* pp. 62-64, *infra*, if EPA chooses to treat electric vehicles as "zero emission," it must abide by the statutory consequences of that decision:  the electric-vehicle category cannot textually or logically be "averaged" into the emission standards under Section 202(a).

This error is not new.  The Supreme Court recently rejected parallel reasoning in *West Virginia*.  There, a similar provision of the Clean Air Act authorized EPA to guide States in "establish[ing] standards of performance for any existing [power plant] for any air pollutant."  42 U.S.C. § 7411(d)(1).  The Court explained that authorization to "establish[] standards of performance for existing source[s]" does not equate to the power "to direct

existing sources to effectively cease to exist." *West Virginia*, 142 S. Ct. at 2612 n.3 (quoting 42 U.S.C. § 7411(d)) (second alteration in original).  The same logic applies to Section 202(a):  in empowering EPA to set emission standards for "vehicles" or "classes" of "vehicles" that "cause, or contribute to, air pollution," Congress did not permit EPA "to direct [conventional vehicles] to effectively cease to exist." *Id.*

> **b.**    **The statutory structure confirms Congress's focus on technologically achievable emission controls.**

Several provisions of Section 202 confirm that Congress focused on technologically feasible standards for vehicles deemed to emit pollutants that actually cause or contribute to pollution.  Section 202(a)(2) requires EPA to provide manufacturers with lead time to comply with the standards, in order "to permit the development and application of the requisite technology." 42 U.S.C. § 7521(a)(2).  Similarly, Section 202(a)(3)(A)(i) provides that EPA's heavy-duty-vehicle standards for certain criteria pollutants should reflect the "greatest degree of emission reduction achievable through the application of technology which the [EPA] determines will be available" during the relevant model year.   *Id.*  § 7521(a)(3)(A)(i).   Those provisions contemplate that technological feasibility will meaningfully constrain the emission standards that EPA sets under Section 202(a).   EPA cannot ignore technological

58

feasibility and simply decide to require production of fewer internal-combustion vehicles.

Other provisions show the type of "technology" that Congress contemplated car manufacturers would develop to meet those standards. Section 202(m) requires EPA to command manufacturers to install on "all" new light-duty vehicles and trucks "diagnostic systems" that identify "emission-related systems deterioration or malfunction … which could … result in failure of the vehicles to comply with emission standards established under this section." 42 U.S.C. § 7521(m)(1). The required diagnostic systems must monitor, "at a minimum, the catalytic converter and oxygen sensor." *Id.* In other words, to ensure compliance with emission standards under Section 202(a), Congress required "emissions-related systems" and accompanying "diagnostic systems" on each vehicle—again underscoring Congress's view that the vehicles subject to an emission standard actually emit the relevant pollutant in EPA's judgment.

As the statutory structure demonstrates, EPA may set standards that are "technology-forcing," because they require manufacturers to adopt nascent technology that may not yet be "adequately demonstrated." *NRDC*, 805 F.2d at 419. EPA's rules thus have promoted the development of

"automotive technologies, such as on-board computers and fuel injection systems" that improve emissions from combustion engines. 86 Fed. Reg. at 74,451. But the statute does not permit what EPA has done here: enacting "average" standards divorced from technologically achievable limits on emitting vehicles, which instead force manufacturers to produce a different type of supposedly non-emitting vehicle altogether.

> **c.  Related provisions confirm that Section 202(a) does not authorize averaging of non-emitting electric vehicles.**

i.  Other provisions of the Clean Air Act drive home the lack of statutory authorization to mandate electrification. In the Clean Air Act Amendments of 1990, Congress spoke directly to the phase-in of electric vehicles on America's roads. Congress instructed EPA to establish standards for "clean-fuel vehicles" operating on "clean alternative fuel," including "electricity." Pub. L. No. 101-549, § 229, 104 Stat. 2399, 2513 (codified at 42 U.S.C. §§ 7581(2), (7), 7582(a)). Congress required that certain areas of the country with the worst pollution would have to "phase-in" a "specified percentage" of "clean-fuel vehicles" using "clean alternative fuels" (defined to include "electricity") in certain fleets. 42 U.S.C. § 7586; *see id.* § 7581(a). The 1990 amendments highlight that Congress knows how to clearly establish

standards that apply to electric vehicles, and to directly require that such vehicles be phased into a particular fleet. But Congress chose to do so only on a targeted, regional basis. The contrast between the 1990 amendments and Section 202(a) highlights the absence of any statutory authority for EPA's rule.

ii.    Other related statutes suggest the same. In the Energy Policy Act of 1992, Congress directed NHTSA to set fuel-economy standards based on averages, but *prohibited* NHTSA from setting fuel-economy standards that average in the fuel economy of electric vehicles. *See* Pub. L. No. 102-486 §§ 302, 403, 106 Stat. 2776, 2870-2871, 2876 (later codified at 49 U.S.C. § 32902(h)). This prohibition bars NHTSA from doing exactly what EPA is doing here: misusing its regulatory authority to force a transition from conventional vehicles to electric vehicles by artificially tightening the "average" standard a fleet must meet. Of course, when Congress finalized the language of Section 202(a)(1) in 1977, it had no need to explicitly block EPA from considering electric vehicles, because it did not contemplate that EPA would set emission standards using averaging in the first place (or that EPA would be setting standards for greenhouse gases). The prohibition on NHTSA nevertheless underscores just how far EPA is reaching here: it is straining

statutory language to seize a power that Congress expressly denied to a sister agency that actually has authority to promulgate fleetwide-average standards.

## II.    EPA's Rule Is Arbitrary And Capricious

Alternatively, EPA's rule must be vacated because it is arbitrary and capricious.  *See* 5 U.S.C. § 706(2).  Two defects in EPA's analysis render the rule unreasonable.  First, EPA irrationally chose to treat electric vehicles as "zero-emission" vehicles, ignoring the upstream emissions that accompany electrification.  Second, EPA's assessments of both the benefits and the costs of the rule were unsupported.  Both defects illustrate the same overarching error:  EPA irrationally treated electric vehicles as an unalloyed good, without grappling with any of the downsides of forced electrification.

### A.    EPA Arbitrarily Calculated The Emissions Of Electric Vehicles.

EPA's rule is arbitrary and capricious because it treats electric vehicles as though they contribute zero emissions in some contexts, while acknowledging their upstream emissions in other contexts.  Even worse, EPA took this arbitrary approach with the deliberate purpose of putting a thumb on the scale in favor of electrification.

In setting its standards, EPA elected to use "tailpipe-only values" to determine vehicles' greenhouse-gas emissions.  *See* 86 Fed. Reg. 74,446.  But

as many commenters pointed out, *all* transportation systems emit greenhouse gases during the course of their lifecycle. *See* RTC 6-52 to 6-64. Electric vehicles generate non-tailpipe emissions in several ways. Significant emissions are associated with the mining, production, and disposal of the batteries that power the vehicle. *See* American Fuel & Petrochemical Manufacturers, Comment 4 (Sept. 27, 2021). The generation of the electricity used to charge and power the vehicle also produces significant emissions. A 2020 study performed by Argonne National Laboratory, for example, found that increased use of electric vehicles in China, the European Union, and the United States would result in 1 billion tons of additional greenhouse-gas emissions through 2050. *Id.*

EPA seemingly does not dispute the upstream emissions caused by electric vehicles. Indeed, the agency actually included some upstream emissions of both greenhouse gases and non-greenhouse gases in its analysis of the rule's impact on total emissions. *See* RTC 6-64; 86 Fed. Reg. at 74,488-74,492. Nor could EPA ignore upstream emissions on the ground that they were too complex. Elsewhere in the rule, EPA was perfectly content to adopt complex calculations even further afield from direct tailpipe emissions. For example, the agency wholeheartedly embraced the "social cost of carbon"

calculus, which covers even highly attenuated economic costs of greenhouse gases. *See* Texas Br. at 24-25. But in setting compliance standards, the agency turned a blind eye to those considerations and examined only tailpipe emissions.

EPA was transparent about its reasoning for arbitrarily excluding upstream emissions from its compliance calculations, while simultaneously acknowledging their existence and calculating them for other purposes. The agency explained that ignoring lifecycle emissions from electric vehicles "is appropriate" given the agency's "goal of encouraging further transition to electric vehicles." RTC 6-64. But the agency's bare preference for one technology cannot satisfy the requirement that it "reasonably consider[] the relevant issues and reasonably explain[] the decision." *FCC* v. *Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

## B.    EPA's Cost-Benefit Analysis Is Unsound.

EPA's rule is arbitrary and capricious for another reason. The agency concluded that its rule will cost $300 billion by 2050—perhaps the costliest rule in history. It nevertheless concluded that the benefits of the rule outweighed that unprecedented cost. When, as here, an agency relies "on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can

64

render the rule unreasonable." *National Ass'n of Home Builders* v. *EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). Here, EPA's cost-benefit analysis suffers from "serious flaw[s]" on both sides of the ledger. EPA improperly put a thumb on the scale in favor of electric vehicles by overstating the benefits of electric vehicles and underestimating the substantial costs of electrification.

### 1.    EPA arbitrarily assessed the benefits of the rule.

EPA tried to wave away the $300 billion price tag for its rule. It stated that the costs of the rule would be offset by $320 billion in cost savings to consumers resulting from more fuel-efficient cars. *See* 86 Fed. Reg. at 74,509-74,510. The agency recognized the tension between its assessment and the realities of consumer behavior: "If the benefits to vehicle buyers outweigh the costs to those buyers of the new technologies," such as electric vehicles, "conventional economic principles suggest that automakers would provide them, and people would buy them," without the need for government intervention. *Id.* at 74,500.

EPA blamed the mismatch between consumer behavior and its estimate of cost savings on consumers' failure to understand their own best interests when it comes to fuel savings—a market failure it called the "energy efficiency gap." In endorsing that supposed market failure, EPA rejected the

alternative explanation that consumers do not currently demand as many electric vehicles for rational economic reasons: "adverse effects on other vehicle attributes" offset any fuel-savings benefits. *Id.* Both EPA's finding of a market failure and its rejection of an obvious alternative explanation were unreasonable.

First, EPA failed to support its conclusion that "there are market failures in the provision of fuel-saving technologies." 86 Fed. Reg. at 74,501. EPA candidly acknowledged that it is "challenging to identify" the correct explanation for the supposed "energy efficiency gap." *Id.* It acknowledged the lack of "consensus" in the scholarly literature about the consumer side of this supposed market failure, and the lack of "research" on the producer side. *Id.* Nevertheless, EPA asserted that it "agreed" with certain commenters that "evidence on technology costs, fuel savings, and the absence of hidden costs suggest that there are market failures in the provision of fuel-saving technologies." *Id.* But an agency cannot simply fail to provide adequate "evidence of some market failure" justifying its action and instead claim to have done "the best it could with the data it had." *American Pub. Gas Ass'n* v. *DOE*, 22 F.4th 1018, 1027-1028 (D.C. Cir. 2022). That is a paradigmatic "failure to 'engage the arguments raised before it' [and] bespeaks a failure to

consider an 'important aspect of the problem.'" *Id.*; *accord* Executive Order 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993). If EPA failed to substantiate a "market failure," it cannot proceed as though there is one.

Second, EPA unreasonably dismissed the alternative explanation that consumers do not purchase as many electric vehicles as EPA thinks they should because fuel savings are offset by "adverse effects" on other aspects of vehicle performance. EPA acknowledged that the National Association of Auto Dealers had explained in comments a documented adverse impact to performance from increased fuel efficiency. National Association of Auto Dealers, Comment 7-8 (Sept. 27, 2021). But EPA disagreed "that vehicle buyers must give up performance to get better fuel economy; it is possible to get more of both," apparently without any "trade off" or additional cost. 86 Fed. Reg. at 74,501.

EPA based that conclusion largely on a single working paper. *Id.* (citing Watten et al., *Attribute Production and Technical Change: Rethinking the Performance and Fuel Economy Trade-off for Light-Duty Vehicles,* Working Paper 34 (2021)). But that paper actually excluded from its empirical analysis "vehicles that are not powered by gasoline." Watten, *supra*, at 25. And it did not say that there are *no* trade-offs, only that we are "*closer* to a world where

it is most profitable to add technologies to meet fuel economy standards than to do so by reducing power." *Id.* at 35 (emphasis added). Moreover, a single, unpublished paper that has not undergone peer or publication review is hardly credible evidence, especially when the paper defends a proposition that consumers and car dealers have roundly rejected.

### 2.    EPA undercounted the costs of the rule.

On the other side of the cost-benefit analysis, EPA's calculation of costs was unreasonable. In particular, it assumed an unjustifiably low price of the electricity needed to power electric vehicles. EPA estimated without explanation that the price of electricity will rise to approximately $0.129 per kWh by 2030. *See* RIA 4-37 fig. 4-4. The California Energy Commission—no critic of electric cars—projects that electricity prices, and thus operating costs, will be nearly *double* EPA's projections by 2030. *See* Transportation Energy Demand Forecast, California Energy Commission at 21 (Dec. 3, 2020). Indeed, EPA's estimates have already proven incorrect. According to the U.S. Energy Information Administration, electricity prices currently average $0.148 kWh—more than EPA's projected worst price over the next 30 years— and are projected to continue rising. *Short-Term Energy Outlook* (Sept. 7, 2022), https://www.eia.gov/outlooks/steo. It is no doubt difficult for an agency

with no expertise in the electricity market to project future costs. But this does not mean EPA may arbitrarily rely on "conclusory or unsupported suppositions." *United Techs. Corp.* v. *U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010). Instead, it only highlights why Congress would not have left this decision to EPA. *See* pp. 31-32, *supra.*

EPA's arbitrary thumb on the scale in favor of electric vehicles also led it to unreasonably ignore an obvious alternative solution that would have helped achieve the agency's goals in a more cost-effective manner: elevating the minimum octane standard. As many commenters noted, higher-octane gasoline could further reduce greenhouse-gas emissions from conventional vehicles. *See* RTC 26-19 to 26-158. EPA has asserted the authority under Section 211(c)(1) of the Clean Air Act to set a minimum octane standard. *See* RTC 26-177. But EPA simply ignored the issue, stating that fuel quality was beyond the rule's scope. RTC 26-158. An agency must consider all important aspects of the regulatory problem, including the availability of "significant and viable and obvious alternatives." *National Shooting Sports Found., Inc.* v. *Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (internal quotation marks omitted). EPA's failure to do so was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should set aside EPA's rule.

NOVEMBER 3, 2022

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY[†]
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel &
Petrochemical Manufacturers and
Energy Marketers of America*

C. BOYDEN GRAY
JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY & ASSOCIATES, PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(317) 513-0622
buschbacher@boydengray
associates.com

*Counsel for Clean Fuels
Development Coalition, ICM, Inc.,
Illinois Corn Growers Association,
Indiana Corn Growers Association,
Kansas Corn Growers Association,
Kentucky Corn Growers Association,
Michigan Corn Growers Association,
Missouri Corn Growers Association,
and Valero Renewable Fuels
Company, LLC*

Respectfully submitted,

s/ Jeffrey B. Wall
JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Washington, DC 20006-5215
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable Fuels
Company, LLC*

MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW PITTMAN
LLP
1200 Seventeenth Street NW
Washington, DC 20036
matthew.morrison@pillsburylaw.com

*Counsel for Iowa Soybean Association,
Minnesota Soybean Growers Association,
South Dakota Soybean Association, and
Diamond Alternative Energy, LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Valero Renewable Fuels
Company, LLC and Diamond Alternativ
Energy, LLC*

70

DEVIN WATKINS
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street, NW
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Competitive Enterprise
Institute, Anthony Kreucher, Walter
M. Kreucher, James Leedy, Marc
Scribner, and Domestic Energy
Producers Alliance*

[†] Admitted only in Illinois; pending approval of application for admission to the D.C. Bar, practicing law in the District of Columbia under the supervision of principals of the firm who are members in good standing of the D.C. Bar.

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(f) and (g), along with the Court's September 22, 2022 Order because it contains 14,000 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5) and (6) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

NOVEMBER 3, 2022

## CERTIFICATE OF SERVICE

I hereby certify that, on this 3rd day of November, 2022, I electronically filed the foregoing Initial Brief for Petitioners with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

s/ Jeffrey B. Wall
JEFFREY B. WALL

NOVEMBER 3, 2022