**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 22-1031 (and consolidated cases)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

STATE OF TEXAS, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
et al.,

*Respondents.*

**PROOF BRIEF OF STATE AND PUBLIC INTEREST**
**RESPONDENT-INTERVENORS**

ROB BONTA
*Attorney General of California*
ROBERT W. BYRNE
EDWARD H. OCHOA
*Senior Assistant Attorneys General*
MYUNG J. PARK
GARY E. TAVETIAN
*Supervising Deputy Attorneys General*

MICAELA M. HARMS
M. ELAINE MECKENSTOCK
THEODORE A.B. MCCOMBS
*Deputy Attorneys General*
600 W. Broadway, Suite 1800
San Diego, CA 92186-5266
Telephone: (619) 738-9003
Theodore.McCombs@doj.ca.gov

*Attorneys for Respondent-Intervenor State of California, by and through its
Governor Gavin Newsom, Attorney General Rob Bonta, and the California
Air Resources Board*

*Additional counsel listed in signature block*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel provides the following information for all consolidated cases.

### A.    Parties and Amici

**1.**  All parties, intervenors, and amici appearing in these consolidated cases are listed in the Proof Brief of State Petitioners (ECF No. 1972073), Initial Brief for Private Petitioners (ECF No. 1972107), and the EPA's Proof Answering Brief (ECF No. 1987499), with the exception of the following:

*Amici for Respondents*:

American Thoracic Society, American Medical Association, American Public Health Association, American College of Occupational and Environmental Medicine, American Academy of Pediatrics, American Association for Respiratory Care, Climate Psychiatry Alliance, American College of Physicians, American College of Chest Physicians, Academic Pediatric Association, and American Academy of Allergy, Asthma and Immunology; Constitutional Accountability Center; the Institute for Policy Integrity at New York University School of Law; Senator Thomas R. Carper and Representative Frank Pallone, Jr.; Margo Oge and John Hannon; the National League of Cities and the U.S. Conference of Mayors; Consumer Reports; and the International Council on Clean Transportation.

**2.** The Respondent-Intervenor Public Interest Organizations joining this brief are American Lung Association, Clean Air Council, Clean Wisconsin, Conservation Law Foundation, Environmental Defense Fund, Environmental Law & Policy Center, National Parks Conservation Association, Natural Resources Defense Council, Public Citizen, Sierra Club, and Union of Concerned Scientists. All are non-profit public interest organizations; none of them has any parent corporation; and no publicly held entity owns 10 percent or more of any of them.

### B.     Rulings Under Review

The agency action under review is entitled, "Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards," 86 Fed. Reg. 74,434 (Dec. 30, 2021).

### C.     Related Cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATUTES AND REGULATIONS ......................................................2

STATEMENT OF THE CASE................................................................2

SUMMARY OF THE ARGUMENT ......................................................2

ARGUMENT ..........................................................................................3

   I.   The Court Should Not Reach Petitioners' Statutory Authority
       Arguments ....................................................................................3

   II.   The Rule Fits Squarely within EPA's Section 202(a) Authority......6

       A. Section 202(a) Authorizes Fleetwide-Average Standards that
          Reflect and Encourage Increased Application of Zero-Emission
          Technologies........................................................................6

       B. Petitioners' Arguments against Fleetwide Averaging Fail on the
          Merits................................................................................11

       C. Petitioners' Arguments against Including Zero-Emission Vehicles
          in the Fleet Average Are Contrary to Section 202(a)'s Text ..............17

   III.   Increasing Application of Zero-Emission Technologies Does Not
        Implicate the Major Questions Doctrine..................................... 19

       A. Section 202(a) Is One of the Most Significant and Frequently
          Exercised Authorizations in the Clean Air Act ........................20

       B. The Rule Is Consistent with Longstanding Regulatory Practice
          and Core Agency Expertise ................................................21

       C. The Rule's Economic Significance Reflects the Significance of
          *Congress's* Choice to Require EPA to Regulate Vehicle
          Pollution............................................................................23

       D. The Rule Does Not Claim for the Agency a Decision of Vast
          Political Significance..........................................................26

       E. Congress Provided Clear Authorization for the Rule..............28

CONCLUSION......................................................................................29

# TABLE OF AUTHORITIES

## CASES

*Ali v. Federal Bureau of Prisons*
  552 U.S. 214 (2008) ............................................................... 19

*Catawba County v. Environmental Protection Agency*
  571 F.3d 20 (D.C. Cir. 2009) ................................................ 12

*City of Columbus v. Ours Garage & Wrecker Service, Inc.*
  536 U.S. 424 (2002) ............................................................... 16

*Coalition for Responsible Regulation, Inc. v. Environmental Protection Agency*
  684 F.3d 102 (D.C. Cir. 2012) ................................... 4, 19, 25

*Cyan, Inc. v. Beaver County Employees Retirement Fund*
  138 S.Ct. 1061 (2018) ........................................................... 18

*Entergy Corp. v. Riverkeeper, Inc.*
  556 U.S. 208 (2009) ............................................................... 16

*Facebook, Inc. v. Duguid*
  141 S.Ct. 1163 (2021) ........................................................... 18

*Federal Energy Regulatory Commission v. Electric Power Supply Ass'n*
  577 U.S. 260 (2016) ............................................................... 25

*International Harvester Co. v. Ruckelshaus*
  478 F.2d 615 (D.C. Cir. 1973) ................................. 7, 8, 9, 23

*Lamie v. United States Trustee*
  540 U.S. 526 (2004) ............................................................... 11

*Massachusetts v. Environmental Protection Agency*
  549 U.S. 497 (2007) ................................................... 9, 16, 21

---

\* Authorities on which State and Public Interest Respondent-Intervenors chiefly rely are marked with asterisks.

iv

*Mossville Environmental Action Now v. Environmental Protection
  Agency*
  370 F.3d 1232 (D.C. Cir. 2004) ........................................................... 5

*Motor & Equipment Manufacturers Ass'n, Inc. v. Environmental
  Protection Agency*
  627 F.2d 1095 (D.C. Cir. 1979) ........................................................ 23

*Motor & Equipment Manufacturers Ass'n v. Nichols*
  142 F.3d 449 (D.C. Cir. 1998) ............................................................ 5

*\*Natural Resources Defense Council v. Environmental Protection
  Agency*
  655 F.2d 318 (D.C. Cir. 1981) ............................................................ 7

*Natural Resources Defense Council v. Environmental Protection
  Agency*
  954 F.3d 150 (2d Cir. 2020) ............................................................. 10

*\*Natural Resources Defense Council v. Thomas*
  805 F.2d 410 (D.C. Cir. 1986) ................................................... 11, 13

*Northeast Maryland Waste Disposal Authority v. Environmental
  Protection Agency*
  358 F.3d 936 (D.C. Cir. 2004) ......................................................... 19

*Truck Trailers Manufacturers Ass'n v. Environmental Protection
  Agency*
  17 F.4th 1198 (D.C. Cir. 2021) ........................................................ 18

*\*West Virginia v. Environmental Protection Agency*
  142 S.Ct. 2587 (2022) ................................................ 1, 5, 19, 20, 21, 23-28

v

**STATUTES**

42 U.S.C.

§ 7404(a)(2) ...................................................................................8, 29
*§ 7521(a)(1) ................................... 3, 6, 7, 8, 9, 12, 17, 18, 19, 29
*§ 7521(a)(2) ................................... 3, 6, 7, 10, 11, 24, 26, 29
§ 7521(a)(6) .............................................................................10, 16
§ 7521(b)(1) ...................................................................................19
§ 7521(g) ................................................................................10, 16
§ 7521(h) ................................................................................10, 16
§ 7521(i) ........................................................................................10
§ 7521(j) ........................................................................................16
§ 7521(m)(1) ...................................................................................14
§ 7524(a) ........................................................................................15
§ 7525(a)(1) .............................................................................13, 15
§ 7541(a)(1) ...................................................................................14
*§ 7550(2) ...............................................................................3, 17, 29
§ 7581(2) ..........................................................................................8
§ 7586 ...................................................................................8, 29
§ 7589 ...................................................................................8, 29
§ 7607 ...................................................................................5, 20

**REGULATIONS**

40 C.F.R.

Part 600 ...........................................................................................13
§ 86.1801-01 *et seq.* ........................................................................13
§ 86.1818-12 .............................................................................13, 14
§ 86.1848-10 .............................................................................13, 15
§ 86.1865-12 ...................................................................................13
§ 600.514-12 ...................................................................................14

**FEDERAL REGISTER**

38 Fed. Reg. 1254 (Jan. 10, 1973) .................................................22

45 Fed. Reg. 14,496 (Mar. 5, 1980)..................................................7

45 Fed. Reg. 79,382 (Nov. 28, 1980)..............................................11

48 Fed. Reg. 33,456 (July 21, 1983)................................................16

54 Fed. Reg. 22,652 (May 25, 1989) ............................................................11, 13

55 Fed. Reg. 30,584 (July 26, 1990) ...................................................................13

59 Fed. Reg. 16,262 (Apr. 6, 1994) .....................................................................16

60 Fed. Reg. 40,474 (Aug. 9, 1995) .....................................................................22

65 Fed. Reg. 6698 (Feb. 10, 2000) .........................................................................4

66 Fed. Reg. 5002 (Jan. 18, 2001) ....................................................................7, 22

74 Fed. Reg. 57,671 (Nov. 9, 2009)......................................................................22

*75 Fed. Reg. 25,324 (May 7, 2010) ............................... 4, 7, 10, 11, 13, 14, 15, 22

77 Fed. Reg. 62,624 (Oct. 15, 2012).................................................................4, 22

79 Fed. Reg. 23,414 (Apr. 28, 2014) .................................................................5, 9

85 Fed. Reg. 24,174 (Apr. 30, 2020) .....................................................................5

85 Fed. Reg. 40,901 (July 8, 2020)................................................................. 24-25

*86 Fed. Reg. 74,434 (Dec. 30, 2021)......................................8, 13, 24, 25, 26, 27

## LEGISLATIVE HISTORY

116 Cong. Rec. 19238 (1970) ..............................................................................27

H.R. 2454, 111th Congress (2009) .......................................................................28

H.R. 2764, 116th Congress (2019) .......................................................................27

S.3664, 115th Congress (2018)............................................................................27

## OTHER AUTHORITIES

J.R. Mondt, *Cleaner Cars: The History & Technology of Emission
    Control Since the 1960s* 214 (2000) ............................................................24

Greg Dotson & Dustin J. Maghamfar, *The Clean Air Act Amendments
    of 2022: Clean Air, Climate Change, & the Inflation Reduction
    Act*, 53 ENV. L. REP. 10017 (2023) ..............................................................28

## GLOSSARY

| | |
|---|---|
| Act | Clean Air Act, 42 U.S.C. § 7401 *et seq.* |
| Auto Br. | Answering Brief for Intervenor Alliance for Automotive Innovation |
| Carper-Pallone Amicus Br. | Brief of Sen. Thomas R. Carper & Rep. Frank Pallone, Jr. as Amici Curiae in support of Respondents |
| CAC Amicus Br. | Brief of Constitutional Accountability Center as Amicus Curiae in support of Respondents |
| Consumer Reports Amicus Br. | Brief of Amicus Curiae Consumer Reports in Support of Respondents |
| Elec. Indus. Br. | Brief for Industry Respondent-Intervenors |
| EPA | U.S. Environmental Protection Agency |
| EPA Br. | EPA's Answering Brief |
| Fuel Br. | Brief for Private Petitioners |
| ICCT Amicus Br. | Brief of Amicus Curiae International Council on Clean Transportation in support of Respondents |
| JA | Joint Appendix |
| NOx | oxides of nitrogen |
| Oge-Hannon Amicus Br. | Brief of Amici Curiae Margo Oge and John Hannon in support of Respondents |
| Rule | U.S. EPA, "Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards," 86 Fed. Reg. 74,434 (Dec. 30, 2021) |
| Texas Br. | Brief for State Petitioners |

**INTRODUCTION**

Since 1965, federal motor vehicle standards under Section 202 of the Clean Air Act have been a cornerstone of Congress's efforts to prevent dangerous air pollution. Section 202 tasks EPA with regulating new motor vehicles—one of the nation's largest sources of air pollution—and has empowered EPA to eliminate billions of tons of smog precursors, soot, and greenhouse gases from the nation's air by encouraging the application of cost-effective emission-control technologies.

The emission standards challenged here continue this work using longstanding, statutorily authorized regulatory approaches. The standards use a fleetwide-average structure that EPA has employed in Section 202 rules for almost forty years. That fleetwide average incorporates zero-emission vehicles, including electric vehicles, as has every set of light-duty vehicle emission standards since 2000. The challenged Rule preserves these structural features, which Petitioners now claim are unauthorized, while tightening the standards' stringency to reflect significant progress in emission-control technologies. Because EPA's Section 202 rules have long employed the very regulatory features Petitioners challenge, those challenges are untimely. They are also not exhausted, because Petitioners did not raise their legal objections to these features even in *this* rulemaking.

Nor is this an "extraordinary case[]" of an agency asserting "unprecedented" and "extravagant" powers that the relevant statutes do not clearly provide. *West*

1

*Virginia v. EPA*, 142 S.Ct. 2587, 2608-09 (2022). To the contrary, here, EPA exercised authority it has always clearly possessed: updating emission standards applicable to specified types of new motor vehicles to reflect the capabilities of relevant emission-control technologies.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations that are not reproduced in the addenda to Petitioners' and Respondents' briefs are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

State and Public Interest Respondent-Intervenors adopt EPA's Statement of the Case.

## SUMMARY OF THE ARGUMENT

The petitions should be dismissed because Petitioners' objections are untimely and were not exhausted during the comment period. The two features of the Rule that Petitioners claim are unauthorized—fleetwide-average standards and the incorporation of electric vehicles within those averages—are unchanged from prior light-duty greenhouse gas standards, and no commenter challenged them with reasonable specificity before the agency.

If not dismissed, the petitions should be denied on their merits. Section 202(a) authorizes EPA to set standards that apply to emissions from groups of vehicles—including vehicles designed as "complete systems" to "prevent" pollution—and, in doing so, to consider anticipated and existing emission-control

2

technologies. 42 U.S.C. § 7521(a)(1)-(2). EPA did exactly that in finalizing fleetwide-average standards that include zero-emission vehicles. Congress did not prescribe a specific structure for Section 202(a) standards. Rather, its directions that EPA apply Section 202(a) authority in diverse ways demonstrate the breadth of regulatory flexibility granted. And, because zero-emission vehicles fit squarely within Congress's definition of "motor vehicle," 42 U.S.C. § 7550(2), they are properly included in the fleetwide-average standards.

Nor does the increased role for zero-emission technologies in controlling pollution implicate the major questions doctrine. EPA has long issued rules under Section 202(a) that reflect and encourage technological progress, and Congress's choice fifty years ago to regulate a significant industry does not indicate any transformation of EPA's authority here. Regardless, Congress provided clear authorization for the Rule.

## ARGUMENT

### I.    THE COURT SHOULD NOT REACH PETITIONERS' STATUTORY AUTHORITY ARGUMENTS

Petitioners press two statutory authority arguments: (1) that EPA may not set fleetwide-average standards, Fuel Br. 39-51; and (2) that EPA may not "require electrification" by including zero-emission vehicles in fleetwide-average standards, *id.* at 51-62. *See also* Texas Br. 14. Neither argument is properly before the Court.

3

1.  Petitioners' arguments are untimely because they challenge aspects of EPA's program that are unchanged from its inaugural greenhouse gas standards adopted in *2010*, and these aspects were not reopened in this rulemaking. EPA Br. 34-39. Many Petitioners here challenged that 2010 rule, but none argued that averaging or including zero-emission vehicles was unauthorized. *See Coal. for Resp. Reg.*, *Inc. v. EPA*, 684 F.3d 102 (D.C. Cir. 2012), *cert. denied*, 571 U.S. 951 (2013). EPA has used fleetwide averaging in emission standards since the 1980s, EPA Br. 13, and has incorporated zero-emission vehicles into emission standards since its "Tier 2" light-duty NOx standards adopted in *2000*. The Tier 2 standards required manufacturers to certify all light-duty vehicles into one of eight emissions profiles, called bins. A sales-weighted average of these bins determined the manufacturer's compliance with a fleet-average NOx standard. 65 Fed. Reg. 6,698, 6,734 (Feb. 10, 2000). Bin "1" represented zero-emission vehicles. *Id.* at 6,746. Including zero-emission vehicles in the average, in EPA's view, "provide[d] a strong incentive" and "a stepping stone to the broader introduction of this technology." *Id.*

Subsequently, zero-emission technologies and fleetwide averaging have appeared together in *all* light-duty standards for greenhouse gases and for other dangerous pollutants, across presidential administrations. 75 Fed. Reg. 25,324, 25,341 (May 7, 2010) (greenhouse gas standards); 77 Fed. Reg. 62,624, 62,849

4

(Oct. 15, 2012) (greenhouse gas standards); 79 Fed. Reg. 23,414, 23,451, 23,453-4 (Apr. 28, 2014) (Tier 3 standards); 85 Fed. Reg. 24,174, 24,314, 24,469-74 (Apr. 30, 2020) (greenhouse gas standards). EPA did not reopen either issue in those rulemakings; nor did it here. Under 42 U.S.C. § 7607(b)(1), Petitioners' arguments are barred.

2.   Separately, Petitioners' arguments may be considered only if they were raised with "reasonable specificity" during the comment period for this Rule. 42 U.S.C. § 7607(d)(7)(B). Petitioners did not do so and identify no commenter who did. EPA Br. 38-39; *see Mossville Env'tl Action Now v. EPA*, 370 F.3d 1232, 1238 (D.C. Cir. 2004) ("Reasonable specificity requires something more than a 'general [challenge] to EPA's approach.'"). The Court applies this exhaustion requirement "strictly" to "ensure that EPA has an opportunity to respond to every challenge to the regulatory regime it administers." *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998). Here, EPA had no reason to *sua sponte* defend regulatory approaches that had appeared in earlier rules, without challenge, for more than a decade. EPA Br. 16.

3.   Petitioners' double default also disposes of their major questions doctrine arguments. That doctrine does not determine the validity of an agency's action, but only the degree of "skepticism" with which a court evaluates the agency's claim to statutory authority. *West Virginia*, 142 S.Ct. at 2607-09, 2614-15. Because

5

Petitioners' objections to EPA's authority are time-barred and were not exhausted, no statutory interpretation question is properly before the Court, and their invocations of the major questions doctrine are unavailing.

## II. THE RULE FITS SQUARELY WITHIN EPA'S SECTION 202(a) AUTHORITY

If the Court reaches the merits of Petitioners' challenges, it should deny them. The Rule, which updates EPA's program for light-duty vehicles' greenhouse gas emissions, is a straightforward exercise of EPA's authority under Section 202(a). EPA Br. 40-43, 62-65.

### A. Section 202(a) Authorizes Fleetwide-Average Standards that Reflect and Encourage Increased Application of Zero-Emission Technologies

Section 202(a) directs EPA to adopt "standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [its] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). In crafting such standards, EPA must assess the state of technology to afford manufacturers lead time to allow "development and application of the requisite technology," with "appropriate consideration" of industry's compliance costs. *Id.* § 7521(a)(2). These provisions authorize the two features of the Rule that Petitioners belatedly target—its encouragement of zero-emission technologies and its use of fleetwide averaging.

1. ***Zero-emission technologies***. Section 202(a) authorizes EPA to set emission standards by reference to both "future advances" and "presently available" technologies that could be applied more broadly. *NRDC v. EPA*, 655 F.2d 318, 328, 330 (D.C. Cir. 1981) (cleaned up); 42 U.S.C. § 7521(a)(2). Thus, in the 1970 amendments, Congress directed EPA to use this Section 202(a) authority to set emission standards at specified levels reflecting then-experimental catalytic converter technology. *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 623-24 (D.C. Cir. 1973). Thereafter, EPA has frequently set standards under Section 202(a) that reflect application of emerging technologies as well as wider use of existing technologies across the relevant vehicle classes. *See, e.g.*, 45 Fed. Reg. 14,496, 14,497-98 (Mar. 5, 1980) (trap-oxidizers); 66 Fed. Reg. 5002, 5049-54 (Jan. 18, 2001) (NOx adsorbers); 75 Fed. Reg. at 25,454-55 (hybrid technologies); Oge-Hannon Amicus Br. 17-32.

Moreover, Congress expressly directed EPA to apply its standards to vehicles that "are designed as complete systems," as well as those that "incorporate" additional "devices," to "prevent or control" pollution. 42 U.S.C. § 7521(a)(1). This language squarely includes zero-emission technologies, such as battery-electric or fuel-cell powertrains, which are "complete systems" that entirely "prevent" tailpipe pollution. As this Court has recognized, "Congress expected the Clean Air Amendments to force the industry to broaden the scope of its research—

7

to study new types of engines and new control systems" beyond the combustion engine. *Int'l Harvester*, 478 F.2d at 634-35.

Thus, in the 1970 amendments, Congress funded research "to develop low emission alternatives to the present internal combustion engine." 42 U.S.C. § 7404(a)(2). And, in the 1990 amendments, Congress required EPA to foster the development of cleaner, alternative-fueled vehicles, including electric vehicles, through a mandate for certain large fleets and a pilot program in California. *Id.* §§ 7581(2), 7586(b), 7589(c). It is implausible to posit, as Petitioners do, that Congress denied EPA the authority to consider technologies whose development and commercialization those programs supported when it regulates vehicle emissions. *See also* EPA Br. 44. And Section 202(a)'s text prohibits such a reading by applying standards to "complete systems" that "prevent" pollution. 42 U.S.C. § 7521(a)(1).

Consistent with this mandate, in this Rule, EPA considered a large menu of available engine, transmission, air-conditioning, and electrification technologies, including battery-electric powertrains. EPA Br. 19-21; 2016 Technical Support Document, EPA-HQ-OAR-2021-0208-0117, pp. 2-12 to 2-13, JA__-__. EPA reasonably predicted manufacturers could apply these technologies at increased rates in the relevant model years and accordingly tightened its greenhouse gas standards by 28% over four years. 86 Fed. Reg. 74,434, 74,441 (Dec. 30, 2021).

8

For comparison, the "Tier 3" light-duty standards for NOx and particulate emissions tightened the fleetwide average for these pollutants by *80%* and *70%*, respectively. 79 Fed. Reg. at 23,417. Notably, auto manufacturers do not challenge EPA's predictive judgments about the technologies they may feasibly apply. *See* Auto Br. 3-4.

2. ***Fleetwide averaging***. Fleetwide averaging effectuates Congress's direction to EPA in Section 202(a) to reduce dangerous pollution from *groups* of vehicles. EPA Br. 63-65. Congress was concerned with the collective emissions of millions of vehicles, *Int'l Harvester*, 478 F.2d at 622, and accordingly tasked EPA with determining whether emissions from any "class or classes" of new vehicles caused or contributed to dangerous pollution. 42 U.S.C. § 7521(a)(1). Congress likewise required standards be "applicable to" the emissions from such "class or classes." *Id.* And, importantly, Congress did not dictate the structure of standards or the composition of classes, providing EPA with flexibility to tailor its approach to the specific problem being addressed.

Congress purposefully used broad language in Section 202(a) to confer "regulatory flexibility" on EPA. *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). That flexibility likewise appears in Congress's directions that EPA adopt Section 202(a) standards with diverse structures in specific circumstances. In multiple provisions, Congress instructed EPA to promulgate regulations *under Section*

9

*202(a)* that required manufacturers to meet a particular standard with a specified "percentage of [their] sales volumes" in a given vehicle class: *e.g.*, 40% of light-duty vehicles in 1994, 80% in 1995, and 100% in 1996. 42 U.S.C. § 7521(g)(2); *see also id.* § 7521(a)(6), (g)(1), (h), (i). By congressional design, these Section 202(a) regulations did not apply a single standard to every vehicle in a given class; rather, they established enforceable requirements at the *fleet* or *class* level. Congress's instructions as to how EPA should apply its Section 202(a) authority in specific contexts demonstrate the range of regulatory structures available to EPA. *See also* EPA Br. 74-75.

Moreover, fleetwide averaging is consistent with Congress's directions that EPA provide manufacturers lead time for the "development and application of the requisite technology" and give "appropriate consideration" to their "cost of compliance." 42 U.S.C. § 7521(a)(2). As EPA has explained, new technologies cannot always "automatically be incorporated fleet-wide." 75 Fed. Reg. at 25,404; *see also NRDC v. EPA*, 954 F.3d 150, 153 (2d Cir. 2020) (describing the "almost infinite number of technology combinations" for controlling vehicle emissions, each with "its own price tag and lead time requirements"). But as the phase-in provisions above illustrate, Congress did not require EPA to delay regulations—and allow otherwise preventable emissions—until every vehicle in a class could employ such technology. Under a fleetwide-average structure, manufacturers can

10

add and upgrade technology to vehicles on their own redesign schedules as they bring their fleets into compliance, with substantial cost savings to industry and consumers. 75 Fed. Reg. at 25,332. Providing for fleetwide averaging (and credit banking and trading) is thus a time-tested, efficient, and environmentally sound means for EPA to reduce emissions while building lead time and "appropriate consideration" for costs into its standards. 42 U.S.C. § 7521(a)(2); 45 Fed. Reg. 79,382-83 (Nov. 28, 1980); 54 Fed. Reg. 22,652, 22,665-67 (May 25, 1989).

### B.    Petitioners' Arguments against Fleetwide Averaging Fail on the Merits

Petitioners contend that the Act "unambiguously *precludes* fleetwide-average emission standards under Section 202(a)." Fuel Br. 39. But this Court long ago rejected that argument. *NRDC v. Thomas*, 805 F.2d 410, 425 (D.C. Cir. 1986). As EPA explains, the Act's text and purposes support EPA's decades-long practice of fleetwide averaging. EPA Br. 62-75.

1.    Petitioners argue Section 202(a) authorizes EPA to set standards for "*vehicles*," and emission standards must therefore "apply to individual vehicles, not manufacturers' fleets on average." Fuel Br. 39. But the statute's command is that standards apply to the emissions that *classes*—i.e., groups—of vehicles emit, not that they specify limits for each *individual* vehicle. *Supra* 9-10; *see Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (courts may not "read an absent word into the statute" in the guise of construing it).

11

2.  Petitioners next point to provisions in Section 202(b) that directed EPA to prescribe standards for specific pollutants in specific model years, using terms that Petitioners interpret as vehicle-specific. Fuel Br. 40-41. Even assuming these provisions are vehicle-specific, *but see* EPA Br. 66-67, congressional directives to use Section 202(a) to set vehicle-specific standards in certain circumstances do not, *sub silentio*, limit EPA's discretion when setting standards outside those circumstances. *See* 42 U.S.C. § 7521(a)(1) (establishing scope of EPA's Section 202(a) authority "[e]xcept as otherwise provided in subsection (b)"). This Court has "consistently recognized" that a "congressional mandate in one section and silence in another often suggests … a decision *not to mandate* any solution in the second context, i.e., to leave the question to agency discretion." *Catawba Cnty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (cleaned up).

To be sure, Section 202(a) *allows* EPA to prescribe standards that each vehicle in a class must meet. But nothing requires that *all* Section 202(a) standards share that characteristic. Rather, Congress directed EPA to adopt Section 202(a) standards with different structures—including the fleet-level phase-in standards directed by Sections 202 (g), (h), and (j)—highlighting the flexibility it gave EPA. *Supra* 9-10.

3.  Petitioners wrongly assert that averaging is "incompatible" with provisions regarding testing and certification, warranties, and penalties. Fuel Br.

43-47. But the regulations that have successfully implemented fleetwide-average standards under these very provisions are largely unchanged since the first greenhouse gas standards in 2010,[1] and no one challenged this framework following the 2010, 2012, 2016, or 2020 standards. Petitioners did not make their certification-and-compliance arguments even in *this* rulemaking. Because no challenge was "raised by any party before the agency" during this rulemaking, it "cannot be dispositive here." *Thomas*, 805 F.2d at 425 n.24.[2] And this regulatory framework's successful, longstanding use contradicts Petitioners' claim that fleetwide averaging makes the Act's compliance provisions unworkable.

Far from rendering provisions "pointless," Fuel Br. 43, EPA's certification and compliance framework effectuates EPA's obligation to develop "appropriate" methods to test and certify regulatory compliance for each vehicle sold. 42 U.S.C. § 7525(a)(1); *Thomas*, 805 F.2d at 425 & n.24. Specifically, EPA requires manufacturers to submit production plans before each model year begins, from

---

[1] 86 Fed. Reg. at 74,456; 75 Fed. Reg. at 25,468-77. The key regulatory provisions that implement the statutory requirements are in 40 C.F.R. §§ 86.1801-01 through 86.1871-12, and in particular §§ 86.1818-12, 86.1848-10 and 86.1865-12, as well as 40 C.F.R. Part 600.

[2] Petitioners observe that in *Thomas*, this Court questioned the compatibility of an earlier fleetwide-average standard with certain legislative history, Fuel Br. 50-51, but ignore EPA's subsequent answers, *see* 54 Fed. Reg. at 22,665-66; 55 Fed. Reg. 30,584, 30,593-94 (July 26, 1990). And the reason *Thomas* did not resolve the point is equally applicable here: it was not raised before EPA. 805 F.2d at 425 n.24.

13

which a fleetwide standard is projected. 75 Fed. Reg. at 25,470-71; *see* EPA Br. 11-12. These plans also explain how manufacturers' fleets will comply with the projected standard, by specifying emission levels for each vehicle model that, averaged together, will yield a compliant fleet. 75 Fed. Reg. at 25,471; 40 C.F.R. § 600.514-12(b)(1); EPA Br. 13, 69. Those manufacturer plans, together with consistent testing data from demonstration vehicles, provide the grounds for EPA to issue certifications prior to sale, conditioned on, *inter alia*, the manufacturer's compliance with the fleetwide-average standard at the end of the model year. 75 Fed. Reg. at 25,473; Auto Br. 15-16. These certified emission levels are, in turn, the basis for warranties that each vehicle is "designed, built, and equipped" to conform with regulations under Section 202—*i.e.*, that it is designed to meet an emission level that maintains fleet compliance—and free from defects that may cause noncompliance. 42 U.S.C. § 7541(a)(1); 75 Fed. Reg. at 25,486-87; EPA Br. 69. EPA determines whether an individual vehicle remains in compliance while "in use," as the statute requires, by testing it against its certified emission level, plus a 10% margin for testing variability.[3] 40 C.F.R. § 86.1818-12(d); 75 Fed. Reg. at 25,474, 25,476.

---

[3] Onboard diagnostic systems may meaningfully measure whether a vehicle's malfunction could result in noncompliance with this in-use standard. *See* 42 U.S.C. § 7521(m)(1); *contra* Fuel Br. 43.

Exercising its express statutory authority to issue certificates of regulatory conformity subject to "such terms" as it "may prescribe," 42 U.S.C. § 7525(a)(1), EPA further conditions each certificate "upon the manufacturer attaining [its] $CO_2$ fleet average standard." 75 Fed. Reg. at 25,482; 40 C.F.R. § 86.1848-10(c)(9)(i). EPA makes that determination after final production figures for a model year are submitted (taking into account available credits and flexibilities). 75 Fed. Reg. at 25,469. In case of noncompliance, EPA determines "which vehicles caused the fleet average standard to be exceeded," by "designat[ing] as nonconforming those vehicles with the highest emission values first, continuing until a number of vehicles equal to the calculated number of non-complying vehicles … is reached." *Id*. at 25,482. EPA then may impose monetary penalties for each noncomplying vehicle. 42 U.S.C. § 7524(a). This longstanding methodology fully conforms with the Act's compliance and enforcement provisions.

4.  Petitioners also assert that certain other statutes and other provisions in the Clean Air Act, which explicitly require averaging or crediting, imply that Section 202(a) must not authorize averaging. Fuel Br. 47-50. But none of those provisions suggests that Congress *prohibited* averaging in Section 202(a). It is "eminently reasonable" to instead interpret Congress's comparative "silence" in Section 202(a) "to convey nothing more than a refusal to tie the agency's hands."

15

*Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222 (2009).[4] And any inference from these other provisions is particularly weak because none resembles Section 202(a). *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435-36 (2002) (presumption that the presence of a phrase in one provision and its absence in another reveals Congress' design "grows weaker with each difference in the formulation of the provisions under inspection").

5.  As EPA observes, Petitioners never argue that fleetwide averaging in itself triggers special judicial skepticism under the major questions doctrine. EPA Br. 62 n.16. At best, Petitioners try to connect fleetwide averaging to their major questions arguments by asserting, without support, and without first presenting the claim to EPA, that EPA can compel greater electric vehicle adoption *only* through averaging. Fuel Br. 17. That assertion is wrong: EPA has repeatedly used Section 202(a) to phase in technology or emission standards using other approaches also permitted by statute, such as fleet-percentage schedules. 42 U.S.C. § 7521(a)(6), (g), (h), (j); 59 Fed. Reg. 16,262, 16,262-63 (Apr. 6, 1994). Even if it were correct,

---

[4] Petitioners cite EPA's earlier assertion that it "appears" Congress did not "specifically contemplate" an averaging program when it enacted Section 202(a)(1). 48 Fed. Reg. 33,456, 33,458 (July 21, 1983). That assertion, if true, is irrelevant. Congress "might not have appreciated" precisely how statutory language would apply in the future but incorporated enough "regulatory flexibility" into Section 202(a) to keep pace with "changing circumstances." *Massachusetts*, 549 U.S. at 532. In 1990, Congress rejected proposals to restrict averaging and has never seriously entertained a similar proposal in the thirty years since. EPA Br. 18.

Petitioners' assertion still would not suggest that fleetwide averaging is itself transformative, novel, consequential, or politically significant, *see infra* Part III.A-D, so it cannot trigger any rule of extraordinary skepticism for this familiar, longstanding regulatory structure. EPA has been using fleetwide averaging in emission standards since the early 1980s, Auto Br. 6-8, and experience has shown this approach generally *moderates* those standards' economic impacts, *id.* at 14. And no one has seriously contested the practice in decades. Petitioners thus fail to identify, under ordinary *or* extraordinary modes of scrutiny, any basis to find the Rule's fleetwide-average framework unauthorized.

### C.    Petitioners' Arguments against Including Zero-Emission Vehicles in the Fleet Average Are Contrary to Section 202(a)'s Text

Petitioners contend that, even if EPA can set fleetwide-average standards, it cannot account for zero-emission vehicles in those standards. Fuel Br. 51-62. The Act's text contradicts Petitioners' premise that zero-emission vehicles fall outside Section 202(a)'s scope. Congress defined "motor vehicles" according to their function—"any self-propelled vehicle designed for transporting persons or property on a street or highway"—not their technology or fuel. 42 U.S.C. § 7550(2); EPA Br. 42.

Petitioners' contrary reading asserts Section 202(a) standards may apply only to vehicles that themselves emit pollutants, and thus "cause, or contribute to" dangerous pollution. Fuel Br. 53-56; *but see* EPA Br. 78 (noting plug-in hybrid and

17

battery-electric vehicles do have associated emissions). But "cause, or contribute" refers to "any class or classes" of vehicles—standards must apply "to the emission of any air pollutant from *any class or classes* of new motor vehicles or new motor vehicle engines, which … *cause, or contribute to*, [dangerous] air pollution," 42 U.S.C. § 7521(a)(1) (italics added)—and it is undisputed that the light-duty vehicle classes emit greenhouse gases. EPA Br. 76. Petitioners' invocation of the "last antecedent" rule, Fuel Br. 55, is mistaken: "vehicles" is not one of several antecedents but part of a prepositional phrase modifying "class or classes," 42 U.S.C. § 7521(a)(1), which "hangs together as a unified whole, referring to a single thing." *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S.Ct. 1061, 1077 (2018); *see also id*. (the Court has "not applied the [last antecedent] rule when the modifier directly follows a concise and 'integrated' clause"). Nor does the last antecedent rule hold where, as here, a comma separates the limiting phrase ("which … cause, or contribute to") and the immediately preceding term ("vehicles or engines"). *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163, 1170 (2021).[5]

Petitioners also contend that the relevant "class" can include only pollution-emitting vehicles. Fuel Br. 56. But, consistent with the Act's functional definition

---

[5] Petitioners imply this Court adopted their reading in *Truck Trailer Manufacturers Ass'n v. EPA*, 17 F.4th 1198, 1201 (D.C. Cir. 2021). Fuel Br. 55. But that case concluded trailers are not "motor vehicles" because they are not "self-propelled," not because they do not emit pollutants. 17 F.4th at 1201.

of "motor vehicle," *supra* 17, EPA reasonably classified light-duty vehicles according to their size and operation, not their emission profile. EPA Br. 77. The term "class" "could hardly be more flexible," *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 947 (D.C. Cir. 2004), and "*any* class or classes" all the more so. *Ali v. BOP*, 552 U.S. 214, 219 (2008) ("'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"). Congress itself grouped light-duty vehicles into one class for certain purposes. 42 U.S.C. § 7521(b)(1)(A)-(B). Petitioners identify no grounds to rewrite EPA's endangerment finding, upheld eleven years ago, to excise zero-emission vehicles from the classes EPA found to contribute to dangerous pollution. *See Coal. for Resp. Reg.*, 684 F.3d at 115.

Nor can the statute be read to exclude from EPA's standards vehicles that eliminate tailpipe pollution. EPA Br. 77-78. Congress expressly ruled out that perverse approach by providing for standards to apply to vehicles designed as "complete systems" that "prevent" (and not just "control") pollution. 42 U.S.C. § 7521(a)(1). Given that instruction, there is nothing unlawful, or even "unusual," Fuel Br. 53, about including zero-emission vehicles in EPA's light-duty standards.

## III.    INCREASING APPLICATION OF ZERO-EMISSION TECHNOLOGIES DOES NOT IMPLICATE THE MAJOR QUESTIONS DOCTRINE

Petitioners' arguments under the major questions doctrine offer no "reason to hesitate," *West Virginia*, 142 S.Ct. at 2609, in crediting EPA's authority to include zero-emission technologies in its standard-setting. EPA Br. 47-62.

19

Certainly, the doctrine does not excuse Petitioners' obligations to exhaust their arguments before the agency, bring timely challenges, and rely on record evidence. 42 U.S.C. § 7607(b)(1), (d)(7)(A)-(B); EPA Br. 34-39. Nor does the doctrine transform factual or policy objections judged under the arbitrary and capricious standard into statutory defects. *See* 42 U.S.C. § 7607(d)(9)(A); EPA Br. 49, 51.

The major questions doctrine's clear-authorization requirement is triggered only in "extraordinary" cases where the "history and the breadth of the authority that the agency has asserted," coupled with "the economic and political significance of that assertion," prompt enhanced skepticism. *West Virginia*, 142 S.Ct. at 2608 (cleaned up). Here, Petitioners argue that "forcing" adoption of electric vehicles—*i.e.*, issuing standards that effectively require manufacturers to increase application of zero-emission technologies—is a major question. Fuel Br. 16-18; Texas Br. 14-15. However, neither zero-emission technologies nor their purported impacts raise major questions.

### A. Section 202(a) Is One of the Most Significant and Frequently Exercised Authorizations in the Clean Air Act

In *West Virginia*, the Supreme Court concluded that EPA had asserted "extravagant" authority to shift electricity generation from regulated, existing fossil-fueled plants to new wind and solar plants, based on "the vague language of an ancillary provision … that was designed to function as a gap filler and had rarely been used in the preceding decades." 142 S.Ct. at 2609-10. By contrast, EPA

20

has used Section 202(a) for half a century to do precisely what it did here: regulate emissions of classes of new motor vehicles based on evolving technology. EPA Br. 48; Oge-Hannon Amicus Br. 16-32. And far from "vague language" or "subtle devices," *West Virginia*, 142 S.Ct. at 2609 (cleaned up), Section 202(a) uses "broad language" that "reflects an intentional effort to confer … flexibility," *Massachusetts*, 549 U.S. at 532. EPA's authority to set technology-forcing standards thus derives from exactly the sort of statute one would expect.

### B. The Rule Is Consistent with Longstanding Regulatory Practice and Core Agency Expertise

Past regulatory practice and agency expertise inform whether a regulation represents an "unheralded" expansion of agency authority. *West Virginia*, 142 S.Ct. at 2610-12; *see* CAC Amicus Br. 15-16, 18-19. EPA has over fifty years' experience in analyzing vehicular emission control and translating technological progress into increasingly stringent standards. Previous Section 202(a) rules routinely encouraged adoption of innovative technologies, including electrification technologies. *Supra* 7; EPA Br. 16; Oge-Hannon Amicus Br. 18-22, 24-30. And EPA regularly evaluates how vehicle standards impact the auto industry and

interact with adjacent markets, such as fuels,[6] components,[7] and service/repair industries.[8] In particular, the technology menus that EPA uses to simulate manufacturers' compliance with alternative stringency levels, *see* EPA Br. 20, reflect EPA's extensive expertise on vehicle emission-control technologies. *See, e.g.*, 75 Fed. Reg. at 25,449-51. In every round of light-duty greenhouse gas standards, EPA has consistently included zero-emission technologies on these menus, alongside engine, aerodynamics, air-conditioning, and other technologies. EPA Br. 16. Petitioners offer no reason to isolate EPA's consideration of battery-electric technologies—which Congress anticipated even before the 1970 amendments, EPA Br. 9—as triggering special judicial skepticism. EPA Br. 49-51.

---

[6] *See, e.g.*, 38 Fed. Reg. 1254 (Jan. 10, 1973) (basing unleaded gasoline requirement in part on lead's impairment of catalytic converters required to meet 1975-76 emission standards); 66 Fed. Reg. at 5002 (requiring low-sulfur fuel to support NOx standards based on advanced control devices susceptible to sulfur damage).

[7] *See, e.g.*, 74 Fed. Reg. 57,671, 57,673 (Nov. 9, 2009) (evaluating supply infrastructure for chemical component of heavy-duty truck NOx control technology); 77 Fed. Reg. at 62,809-10 (analyzing supply chain for alternative refrigerant supporting air-conditioning greenhouse gas control technology).

[8] *See, e.g.*, 60 Fed. Reg. 40,474, 40,475-6 (Aug. 9, 1995) (requiring auto manufacturers to distribute information on onboard diagnostic computers to service and repair industry).

### C.   The Rule's Economic Significance Reflects the Significance of *Congress's* Choice to Require EPA to Regulate Vehicle Pollution

Section 202 effectuates Congress's choice of how to reconcile two "central observations": "The automobile is an essential pillar of the American economy," and "[t]he automobile has had a devastating impact on the American environment." *Int'l Harvester*, 478 F.2d at 622. Many of Petitioners' arguments about economic significance owe to that consequential choice *by Congress*: the auto industry's compliance costs appear large because the auto industry is large. Moreover, Petitioners' assertion that the Rule carries predictable *impacts* on adjacent sectors does not amount to a credible argument that EPA is *regulating* those sectors.

### 1.   The Rule's Projected Costs to the Auto Industry Do Not Indicate a Major Question

"Every effort at pollution control exacts social costs. Congress, not the Administrator, made the decision to accept those costs." *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1118 (D.C. Cir. 1979). The Rule's costs—and its even greater benefits—thus reflect the significance of a choice Congress *already made*.

The major questions doctrine focuses on "separation of powers principles and a practical understanding of legislative intent," not regulatory costs, and the economic impacts of a rule alone do not trigger enhanced scrutiny. *West Virginia*,

23

142 S.Ct. at 2609; EPA Br. 56-57 (citing cases); CAC Amicus Br. 4, 9-12. Instead, economic significance informs the doctrine only insofar as it indicates Congress meant to "make [the] major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 142 S.Ct. at 2609 (cleaned up). But here, Congress directed EPA to regulate the economically significant auto industry and expressly called on EPA's expert judgment to consider and balance the costs of doing so. 42 U.S.C. § 7521(a)(2).

Those total costs reflect the size of the industry Congress tasked EPA with regulating; on a *per-vehicle* basis, this Rule's costs are lower than in past EPA vehicle rules. EPA Br. 60. Annual U.S. sales of new light-duty vehicles range from 15-17 million vehicles, so the $300 billion cost figure Petitioners cite, Fuel Br. 16, covers 400 million vehicles over nearly three decades of production.[9] Regulating an industry of such scale, as Congress directed, inevitably involves considerable costs and benefits.[10] For example, EPA's 2020 rule weakening light-duty standards was projected to produce $631 billion in *lost* benefits—$56 billion more than

---

[9] Regulatory Impact Analysis, p. 8-10, JA__; 86 Fed. Reg. at 74,509 ($300 billion represents present value of cumulative costs through 2050).

[10] Vehicle pollution control historically has entailed substantial aggregate industry costs: "when three-way catalytic converters were implemented in 1980-83, the additional cost increment [per vehicle, in 1996 dollars] amounted to approximately $1200." J.R. Mondt, *Cleaner Cars: The History & Technology of Emission Control Since the 1960s* 214 (2000).

avoided costs. 85 Fed. Reg. 40,901, 40,904 (July 8, 2020). In contrast, the public

benefits of the current Rule far exceed its costs, by $120-190 billion. 86 Fed. Reg.

at 74,443. The auto industry that will bear these costs in the first instance is

*defending* the Rule. Auto Br. 1. And to the extent manufacturers pass costs on to

purchasers, those purchasers will more than recoup them through reduced fuel

expenditures. 86 Fed. Reg. at 74,511-12.

### 2.  State Petitioners' Arguments about Grid Effects and Supply Chains Fail Doctrinally and on the Record

The major questions doctrine's central concern is preventing agencies from

regulating outside their delegated authority. *West Virginia*, 142 S.Ct. at 2609. The

Rule's potential to impact other sectors like electricity and mining, which State

Petitioners emphasize, does not amount to EPA *regulating* outside its delegated

authority over the auto industry. EPA Br. 55, 57; Elec. Indus. Br. 5; *see also FERC

v. Elec. Power Supply Ass'n*, 577 U.S. 260, 281-82 (2016) (market effects on retail

electricity from FERC setting wholesale rates did not amount to *regulation* of retail

electricity). Petitioners are wrong to equate a rule that may increase electricity

demand (and by only 0.1 to 0.6 percent in the regulated years[11]) with EPA deciding

"the Nation's energy independence and relationship with hostile powers," Fuel Br.

31; *see also* Texas Br. 21-22.

---

[11] Regulatory Impact Analysis, p. 5-16, JA__.

Here, to ensure reasoned consideration of its actions, EPA examined certain effects of its Rule on electricity demand. EPA Br. 58; Elec. Indus. Br. 10-17. Petitioners do not challenge EPA's conclusions as arbitrary or capricious. If, as Petitioners speculate, EPA's future rules go significantly further, *see* Fuel Br. 35-36, that would have to happen on a record showing industry can comply at reasonable cost within the allotted lead time. 42 U.S.C. § 7521(a)(2).

Greater application of zero-emission technologies might well be possible in future rules, given market trends in the auto and electricity sectors, along with Congress's investments in electric vehicle infrastructure, *infra* 28. 86 Fed. Reg. at 74,486 (manufacturer commitments to achieve 50%-100% zero-emission vehicle sales by 2030 or 2035); Consumer Reports Amicus Br. 7-15. Should evidence be presented in those rulemakings that grids might not reliably sustain associated demand, EPA would have to answer any objections and provide evidence to support that rule. The same goes for Petitioners' objections around battery supply chains. *See* Elec. Indus. Br. 19-21. Petitioners fail to show that EPA overstepped in *this* Rule, however.

### D.    The Rule Does Not Claim for the Agency a Decision of Vast Political Significance

The specific standard-setting decision EPA made here is not of the momentous kind that courts presume "Congress intends to make … itself." *West Virginia*, 142 S.Ct. at 2609. Petitioners mischaracterize the Rule as EPA deciding

26

by how much and how quickly the nation should transition from gas- and diesel-fueled vehicles to electric vehicles. *See, e.g.*, Fuel Br. 3, 26, 30; Texas Br. 18. But, as EPA explains, the Rule is not a mandate that 17% of new vehicles be electric or plug-in hybrids. Br. 54-55; 86 Fed. Reg. at 74,484; ICCT Amicus Br. 15-19 (noting viable compliance pathways without *any* increased production of zero-emission vehicles). Instead, the record shows that *industry* is increasing its zero-emission vehicle production, and that consumer preferences have a strong role in accelerating this shift. 86 Fed. Reg. at 74,485-87. Petitioners offer no grounds to isolate EPA's exercise of authority as exceptionally politically significant within this transition.

Nor does the Rule attempt to enact any policy "conspicuously and repeatedly" rejected by Congress. *West Virginia*, 142 S.Ct. at 2610; *contra* Fuel Br. 32. Petitioners point to a few unenacted bills resembling hundreds of others that are introduced on the floor and referred to committee, only to go nowhere, *id.* (citing H.R. 2764, 116th Cong. (2019) and S.3664, 115th Cong. (2018)),[12] and one legislator's failed amendment offered in a floor debate over fifty years ago, *id.* (citing 116 Cong. Rec. 19238-40 (1970)). None of those bills resembles the policy

---

[12] *See* https://www.congress.gov/bill/116th-congress/house-bill/2764/all-actions (H.R. 2764 referred to committee and never voted on); https://www.congress.gov/bill/115th-congress/senate-bill/3664/all-actions (S.3664 introduced and never voted on).

27

EPA adopted here, CAC Amicus Br. 20-21, and none evinces an "earnest and profound debate around the country," *West Virginia*, 142 S.Ct. at 2614.[13] If anything, Congress has "repeatedly and conspicuously" *encouraged* greater zero-emission vehicle adoption. EPA Br. 8-10; Carper-Pallone Amicus Br. 28-35. By expanding vehicle-charging infrastructure and reducing the cost of zero-emission technologies for manufacturers and consumers, Congress has set the table for EPA to tighten its standards at reasonable costs, "supplement[ing], rather than supplant[ing], EPA's regulatory authorities." Greg Dotson & Dustin J. Maghamfar, *The Clean Air Act Amendments of 2022: Clean Air, Climate Change, & the Inflation Reduction Act*, 53 ENV. L. REP. 10017, 10034 (2023); *see also id.* at 10018, 10028-29.

### E.     Congress Provided Clear Authorization for the Rule

Even if *West Virginia*'s enhanced scrutiny applied here, Congress has clearly authorized EPA to base the stringency of its standards on the capabilities of relevant control technologies, including battery-electric and plug-in hybrid technologies. As discussed in Part II, Congress expressly authorized EPA to require manufacturers to apply technologies *more* than they have to date, as long as

---

[13] In *West Virginia*, by contrast, the Supreme Court cited one of the most high-profile, closely fought legislative battles in recent history; the 2009-2010 Waxman-Markey cap-and-trade bill, H.R. 2454 (111th Cong.), was the subject of massive, protracted legislative debate. *See West Virginia*, 142 S.Ct. at 2614.

EPA provides adequate lead time. 42 U.S.C. § 7521(a)(2). Congress expressly included "vehicles … designed as complete systems" to "prevent … pollution" among such technologies. *Id.* § 7521(a)(1). Congress expressly fostered zero-emission technologies and other combustion-engine alternatives through research, a production- and sales-mandate pilot program, and purchase requirements for large fleets. *Id.* §§ 7404(a)(2), 7586, 7589. And the Act's definition of "motor vehicle" does not distinguish between zero-emission vehicles and combustion-engine vehicles, any more than it distinguishes between gas- and diesel-fueled vehicles. *Id.* § 7550(2).

## CONCLUSION

This Court should deny the petitions, if it does not dismiss them.

Dated:      March 21, 2023                Respectfully submitted,

                                          FOR THE STATE OF CALIFORNIA

                                          ROB BONTA
                                          Attorney General of California
*/s/ Sean H. Donahue*                     ROBERT W. BYRNE
SEAN H. DONAHUE                           EDWARD H. OCHOA
Donahue & Goldberg, LLP                   Senior Assistant Attorneys General
1008 Pennsylvania Avenue, SE              MYUNG J. PARK
Washington, DC 20003                      GARY E. TAVETIAN
(202) 277-7085                            Supervising Deputy Attorneys General
sean@donahuegoldberg.com

VICKIE L. PATTON                          */s/ Theodore A.B. McCombs*
PETER ZALZAL                              THEODORE A.B. MCCOMBS
ANDREW P. SU                              MICAELA M. HARMS
ERIC M. WRISTON                           M. ELAINE MECKENSTOCK
GABRIELLE STEPHENS                        Deputy Attorneys General
Environmental Defense Fund                600 W. Broadway, 18th Floor
2060 Broadway, Ste. 300                   San Diego, CA 92101
Boulder, CO 80302                         (619) 738-9003
(303) 447-7214                            theodore.mccombs@doj.ca.gov
vpatton@edf.org
pzalzal@edf.org
asu@edf.org                               *Attorneys for State of California by and*
ewriston@edf.org                          *through its Governor Gavin Newsom,*
estephens@edf.org                         *Attorney General Rob Bonta, and the*
                                          *California Air Resources Board*

*Counsel for Environmental Defense Fund*

30

FOR THE STATE OF COLORADO

PHILIP J. WEISER
Attorney General

*/s/ Scott Steinbrecher*
SCOTT STEINBRECHER
Assistant Deputy Attorney General
DAVID A. BECKSTROM
Assistant Attorney General
Natural Resources and Environment
Section
Ralph C. Carr Colorado Judicial Center
1300 Broadway, Seventh Floor
Denver, Colorado 80203
(720) 508-6287
scott.steinbrecher@coag.gov

*Attorneys for the State of Colorado*

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General

MATTHEW I. LEVINE
Deputy Associate Attorney General

*/s/ Scott N. Koschwitz*
SCOTT N. KOSCHWITZ
Assistant Attorney General
Connecticut Office of the Attorney
General
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5250
scott.koschwitz@ct.gov

*Attorneys for the State of Connecticut*

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General

*/s/ Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
RALPH K. DURSTEIN III
JAMESON A.L. TWEEDIE
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8400
Christian.Wright@delaware.gov
Ralph.Durstein@delaware.gov
Jameson.Tweedie@delaware.gov

*Attorneys for the State of Delaware*

FOR THE STATE OF HAWAII

ANNE E. LOPEZ
Attorney General

*/s/ Lyle T. Leonard*
LYLE T. LEONARD
Deputy Attorney General
465 S. King Street, #200
Honolulu, Hawaii 96813
(808) 587-3050
lyle.t.leonard@hawaii.gov

*Attorneys for the State of Hawaii*

31

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General

MATTHEW DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division

*/s/ Jason E. James*
JASON E. JAMES
Assistant Attorney General
Office of the Attorney General
201 West Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

*Attorneys for the State of Illinois*

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General

*/s/ Emma Akrawi*
EMMA AKRAWI
Assistant Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
Emma.Akrawi@maine.gov

*Attorneys for the State of Maine*

32

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General

*/s/ Cynthia M. Weisz*
CYNTHIA M. WEISZ
Assistant Attorney General
Office of the Attorney General
Maryland Dept. of the Environment
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3014
Cynthia.weisz2@maryland.gov

JOSHUA M. SEGAL
Special Assistant Attorney General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202
(410) 576-6446
JSegal@oag.state.md.us

*Attorneys for the State of Maryland*

FOR THE COMMONWEALTH OF
MASSACHUSETTS

ANDREA JOY CAMPBELL
Attorney General

SETH SCHOFIELD
Senior Appellate Counsel

*/s/ Matthew Ireland*
MATTHEW IRELAND
Assistant Attorney General
Office of the Attorney General
Energy and Environment Bureau
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200
matthew.ireland@mass.gov

*Attorneys for the Commonwealth of
Massachusetts*

FOR THE STATE OF MICHIGAN

DANA NESSEL
Attorney General

*/s/ Gillian E. Wener*
NEIL D. GORDON
GILLIAN E. WENER
Assistant Attorneys General
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
wenerg@michigan.gov

*Attorneys for the State of Michigan*

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General

*/s/ Peter Surdo*
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2127
(651) 757-1061
peter.surdo@ag.state.mn.us

*Attorneys for the State of Minnesota*

FOR THE STATE OF NEVADA

AARON D. FORD
Attorney General

*/s/ Heidi P. Stern*
HEIDI PARRY STERN
Solicitor General
DANIEL P. NUBEL
Senior Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson Street
Carson City, Nevada 89701
(775) 684-1225
HStern@ag.nv.gov

*Attorneys for the State of Nevada*

FOR THE STATE OF NEW JERSEY

MATTHEW J. PLATKIN
Attorney General

*/s/ Lisa J. Morelli*
LISA J. MORELLI
RACHEL MANNING
NELL NRYSHKO
Deputy Attorneys General
New Jersey Division of Law
25 Market St.
Trenton, New Jersey 08625
(609) 376-2745
Lisa.Morelli@law.njoag.gov

*Attorneys for the State of New Jersey*

34

FOR THE STATE OF NEW MEXICO

RAÚL TORREZ
Attorney General

*/s/ William Grantham*
WILLIAM GRANTHAM
Assistant Attorney General
408 Galisteo Street
Santa Fe, NM 87501
(505) 717-3520
wgrantham@nmag.gov

*Attorneys for the State of New Mexico*

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General

JUDITH N. VALE
Deputy Solicitor General
ELIZABETH A. BRODY
Assistant Solicitor General
YUEH-RU CHU
Chief, Affirmative Litigation Section
Environmental Protection Bureau

*/s/ Gavin G. McCabe*
GAVIN G. McCABE
ASHLEY M. GREGOR
Assistant Attorneys General
28 Liberty Street, 19th Floor
New York, NY 10005
(212) 416-8469
gavin.mccabe@ag.ny.gov

*Attorneys for the State of New York*

35

FOR THE STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General

DANIEL S. HIRSCHMAN
Senior Deputy Attorney General
FRANCISCO BENZONI
Special Deputy Attorney General

*/s/ Asher P. Spiller*
ASHER P. SPILLER
Special Deputy Attorney General
ASHTON ROBERTS
Assistant Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400
Aspiller@ncdoj.gov

*Attorneys for the State of North Carolina*

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

*/s/ Paul Garrahan*
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

*Attorneys for the State of Oregon*

36

FOR THE COMMONWEALTH OF
PENNSYLVANIA

MICHELLE HENRY
Attorney General

JILL GRAZIANO
Chief Deputy Attorney General

*/s/ Ann R. Johnston*
ANN R. JOHNSTON
Senior Deputy Attorney General
Office of Attorney General
14th Floor
Strawberry Square
Harrisburg, PA 17120
(717) 497-3678
ajohnston@attorneygeneral.gov

*Attorneys for the Commonwealth of
Pennsylvania*

FOR THE STATE OF RHODE
ISLAND

PETER F. NERONHA
Attorney General

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ
Special Assistant Attorney General
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2297
nvaz@riag.ri.gov

*Attorneys for the State of Rhode Island*

FOR THE STATE OF VERMONT

CHARITY R. CLARK
Attorney General

*/s/ Nicholas F. Persampieri*
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
nick.persampieri@vermont.gov

*Attorneys for the State of Vermont*

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General

*/s/ Christopher H. Reitz*
CHRISTOPHER H. REITZ
ALEXANDRIA DOOLITTLE
Assistant Attorneys General
Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504
(360) 586-4614
Chris.Reitz@atg.wa.gov
Alex.Doolittle@atg.wa.gov

*Attorneys for the State of Washington*

FOR THE STATE OF WISCONSIN

JOSH KAUL
Attorney General

*/s/ Gabe Johnson-Karp*
GABE JOHNSON-KARP
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904
johnsonkarpg@doj.state.wi.us

*Attorneys for the State of Wisconsin*


FOR THE CITY AND COUNTY OF
DENVER

KERRY TIPPER
City Attorney

*/s/ Edward J. Gorman*
EDWARD J. GORMAN
Assistant City Attorney
Denver City Attorney's Office
201 W. Colfax Avenue, Dept. 1207
Denver, Colorado 80202
(720) 913-3275
Edward.Gorman@denvergov.org

*Attorneys for the City and County of
Denver*


FOR THE DISTRICT OF COLUMBIA

BRIAN L. SCHWALB
Attorney General

*/s/ Caroline S. Van Zile*
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for the
District of Columbia
400 6th Street N.W., Suite 8100
Washington, D.C. 20001
(202) 724-6609
Caroline.VanZile@dc.gov

*Attorneys for the District of Columbia*


FOR THE CITY OF LOS ANGELES

HYDEE FELDSTEIN SOTO
City Attorney

*/s/ Michael J. Bostrom*
MICHAEL J. BOSTROM
Senior Assistant City Attorney
200 N. Main Street, 6th Floor
Los Angeles, CA 90012
(213) 978-1867
Michael.Bostrom@lacity.org

*Attorneys for the City of Los Angeles*

FOR THE CITY OF NEW YORK

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel
ALICE R. BAKER
Senior Counsel

*/s/ Christopher G. King*
CHRISTOPHER G. KING
Senior Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 356-2074
cking@law.nyc.gov

*Attorneys for the City of New York*

FOR THE CITY AND COUNTY OF
SAN FRANCISCO

DAVID CHIU
City Attorney

*/s/ Robb Kapla*
ROBB KAPLA
Deputy City Attorney
Office of the City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102
(415) 554-4647
robb.kapla@sfcityatty.org

*Attorneys for the City and County of San
Francisco*

*/s/ James P. Duffy*
JAMES P. DUFFY
ANN BREWSTER WEEKS
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(802) 233-7967
jduffy@catf.us
aweeks@catf.us

*Counsel for American Lung Association,
Clean Air Council, Clean Wisconsin, and
National Parks Conservation Association*

*/s/ Emily K. Green*
EMILY K. GREEN
Conservation Law Foundation
53 Exchange Street, Suite 200
Portland, ME 04101
(207) 210-6439
egreen@clf.org

*Counsel for Conservation Law
Foundation*

*/s/ Robert Michaels*
ROBERT MICHAELS
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 795-3713
rmichaels@elpc.org

*Counsel for Environmental Law & Policy Center*

*/s/ Ian Fein*
IAN FEIN
Natural Resources Defense Council
111 Sutter Street, 21st Floor
San Francisco, CA 94104
(415) 875-6100
ifein@nrdc.org

DAVID D. DONIGER
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, DC 20005
(202) 289-6868
ddoniger@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Scott L. Nelson*
SCOTT L. NELSON
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
snelson@citizen.org

*Counsel for Public Citizen, Inc.*

*/s/ Vera Pardee*
JOANNE SPALDING
ANDREA ISSOD
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5725
joanne.spalding@sierraclub.org
andrea.issod@sierraclub.org

JOSH BERMAN
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
(202) 650-6062
josh.berman@sierraclub.org

VERA PARDEE
726 Euclid Avenue
Berkeley, CA 94708
(858) 717-1448
pardeelaw@gmail.com

*/s/ Jessica Anne Morton*
JESSICA ANNE MORTON
SARAH GOETZ
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org
sgoetz@democracyforward.org

*Counsel for Union of Concerned Scientists*

*Counsel for Sierra Club*

40

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations of the applicable rules and this Court's briefing format order dated September 22, 2022 (ECF No. 1965622). According to Microsoft Word, the portions of this document not excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1) contain 6,369 words. Combined with the word count of the other Respondent-Intervenors briefs, this does not exceed the 14,700 words the Court allocated to all Respondent-Intervenors.

I further certify that this brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using a proportionally spaced typeface (Times New Roman) in 14-point font.

Dated: March 21, 2023

*/s/ Theodore McCombs*
THEODORE MCCOMBS
*Attorney for Respondent-Intervenor State of California, by and through its Governor Gavin Newsom, Attorney General Rob Bonta, and the California Air Resources Board*

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2023, I electronically filed the foregoing

**PROOF BRIEF OF STATE AND PUBLIC INTEREST RESPONDENT-**

**INTERVENORS** with the Clerk of the Court for the United States Court of

Appeals for the District of Columbia Circuit using the Court's CM/ECF system.

I further certify that all parties are participating in the Court's CM/ECF

system and will be served electronically by that system.


Dated:     March 21, 2022

*/s/ Theodore McCombs*
THEODORE MCCOMBS