# In the United States Court of Appeals
# for the District of Columbia Circuit

### STATE OF TEXAS, ET AL.,
*Petitioners*

*v.*

### ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY,
*Respondents*

### ADVANCED ENERGY ECONOMY, ET AL.,
*Intervenors*

On Petitions for Review of a Final Action
of the United States Environmental Protection Agency

## PROOF REPLY BRIEF FOR STATE PETITIONERS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

RYAN S. BAASCH
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov

WESLEY S. WILLIAMS
Assistant Attorney General

Counsel for the State of Texas

# TABLE OF CONTENTS

Page

Table of Authorities ..................................................................... ii

Introduction ................................................................................. 1

Argument ....................................................................................... 2

    I.   State Petitioners' Arguments are Properly Before the Court. ...................... 2

    II.  EPA Lacks Authority to Promulgate the Standards. ................... 5

      A.   The Standards present a major question. ................................. 5

      B.   EPA has no congressional authorization. ............................... 6

    III.  The Standards Are Arbitrary and Capricious. ........................... 8

Conclusion .................................................................................. 12

Certificate of Compliance ......................................................... 17

Certificate of Service ................................................................. 18

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Air All. Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018) ............................................................ 3

*Am. Pub. Gas Ass'n v. DOE*,
22 F.4th 1018 (D.C. Cir. 2022) ............................................................ 10

*Ams. for Clean Energy v. EPA*,
864 F.3d 691 (D.C. Cir. 2017) ............................................................ 8

*ARCO Alaska v. FERC*,
89 F.3d 878 (D.C. Cir. 1996) ............................................................ 2

*Bank of Am. Corp. v. City of Miami*,
581 U.S. 189 (2017) ............................................................ 3

*Competitive Enter. Inst. v. FCC*,
970 F.3d 372 (D.C. Cir. 2020) ............................................................ 2

*CSL Plasma Ins. v. CBP*,
33 F.4th 584 (D.C. Cir. 2022) ............................................................ 3

*Energy Future Coal. v. EPA*,
793 F.3d 141 (D.C. Cir. 2015) ............................................................ 4

*FDA v. Brown & Williamson*,
529 U.S. 120 (2000) ............................................................ 7

*Indus. Union Dep't v. Am. Petroleum Inst.*,
448 U.S. 607 (1980) ............................................................ 8-9

*King v. Burwell*,
576 U.S. 473 (2015) ............................................................ 6

*Lexmark Int'l v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ............................................................ 3

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ............................................................ 3

*Music Choice v. Copyright Royalty Bd.*,
970 F.3d 418 (D.C. Cir. 2020). ............................................................ 12

*Myersville Citizens v. FERC*,
783 F.3d 1301 (D.C. Cir. 2015) ............................................................ 4

*NARUC v. FERC*,
   964 F.3d 1177 (D.C. Cir. 2020) ............................................................ 3

*Nat'l Petrochemical & Refiners Ass'n v. EPA*,
   287 F.3d 1130 (D.C. Cir. 2002) ............................................................ 4

*NFIB v. OSHA*,
   142 S. Ct. 661 (2022) .................................................................... 5, 6

*NRDC v. EPA*,
   824 F.2d 1146 (D.C. Cir. 1987) ............................................................ 5

*NRDC v. Thomas*,
   805 F.2d 410 (D.C. Cir. 1986) ............................................................. 7

*Rodriguez v. United States*,
   480 U.S. 522 (1987) ......................................................................... 4

*Se. Fed. Power Customers, Inc. v. Green*,
   514 F.3d 1316 (D.C. Cir. 2008) ........................................................... 3

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ............................................................. 1, 5, 6, 8

**Statutes and Regulations:**

42 U.S.C.:
   § 7415 ........................................................................................11
   § 7415(c) ....................................................................................11
   § 17352(a)(3) ...............................................................................11

47 U.S.C.:
   § 7543 ......................................................................................... 4
   § 7544 ......................................................................................... 4

49 U.S.C § 32902 ............................................................................ 7-8

86 Fed. Reg. 74,434 (Dec. 20, 2021) ................................................ 2, 9, 10

**INTRODUCTION**

EPA indisputably lacks authority to "substantially restructure the American energy market." *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022). EPA contends here, though, that it has authority to take the comparably consequential action of substantially restructuring the American automobile market. But the Clean Air Act gave EPA no authority to do the former, and "Congress certainly has not conferred a like authority upon EPA anywhere else in the" Act. *Id.* at 2613. That describes—and settles—this entire case.

The major questions doctrine confirms EPA's lack of authority. State Petitioners have presented two reasons why the Standards implicate that doctrine: The Standards will undermine both electric grid reliability and national security. EPA does not dispute that a rule implicating those issues raises a major question. EPA instead contends that it reasonably addressed the question by concluding that the Standards will not have meaningful consequences. But the point is that EPA should not be making decisions about electric grid reliability and national security *in the first place*—it is beside the point whether facts on the ground show that EPA exercised this far-reaching authority *reasonably*.

EPA's monetization of greenhouse gas emission reductions also renders the Standards arbitrary and capricious. EPA's *ipse dixit* that this monetization was immaterial does not square with repeated representations that the agency made during rulemaking. The record reflects that the monetization of emission reductions was a significant justification for the Standards, including particularly their stringency. And EPA fails to rehabilitate the monetization on the merits.

1

# ARGUMENT

## I.   State Petitioners' Arguments are Properly Before the Court.

### A.   State Petitioners have standing.

The States will suffer pocketbook injury because the Standards will reduce oil extraction, and States depend on oil extraction taxes for revenue. States' Br.13; *ARCO Alaska v. FERC*, 89 F.3d 878, 882 (D.C. Cir. 1996). EPA all but admitted this reduction would occur because it expects that by 2050 the Standards will have "reduce[d] U.S. gasoline consumption" by "15 percent." 86 Fed. Reg. at 74,498. Gasoline consumption, of course, is a primary driver for oil extraction. EPA responds (at 30) that this reduction in domestic gasoline consumption "does not necessarily translate into less oil extraction in any particular state" because "worldwide demand" might make up for the lack of domestic demand. But reduced demand from one major purchaser group will logically reduce demand on the whole. *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 382 (D.C. Cir. 2020) ("CEI") (finding standing based on "basic laws of economics"). EPA's implied counterfactual—that the global economy might *fully* offset all reductions in U.S. gasoline consumption—is not credible because it undermines EPA's *own* position that the Standards help address the "global problem" of "climate change." EPA Br.88. There is also no redressability problem given that it is "reasonably predictable" that electrification will slow if the Standards are vacated. *CEI*, 970 F.3d at 384. Although automakers may "continue to produce more electric vehicles [than now] even without the" Standards, EPA Br.30, the Standards "necessitate greater" electrification than would occur naturally, 86 Fed. Reg. 74,434, 74,493 (Dec. 20, 2021). Vacatur

necessarily would fix State revenue losses at least "to some extent." *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007).

Second, State Petitioners have a quasi-sovereign interest in managing their electric grids and preventing the harm the Standards will inflict on the grids. States' Br.13-14; *NARUC v. FERC*, 964 F.3d 1177, 1184-85 (D.C. Cir. 2020) ("state utility commissions" have standing to challenge federal orders impairing "sovereign[]" electric grid control). EPA's only response (at 31) is that the States have not alleged they "own" electric grids. But that conflates one basis for state standing— "proprietary interests" (*i.e.*, ownership)—with analytically distinct "sovereign interests." *Air All. Houston v. EPA*, 906 F.3d 1049, 1059 (D.C. Cir. 2018); *see also, e.g.*, *Se. Fed. Power Customers, Inc. v. Green*, 514 F.3d 1316, 1322 (D.C. Cir. 2008) (standing for States to defend "quasi-sovereign interests" in water flow).

**B.** State Petitioners' suit is also within the Clean Air Act's zone of interests.

The zone-of-interests test asks whether a "particular class" of persons can sue under a specific "substantive statute." *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). The "salient consideration" is whether the "challenger's interests . . . can be expected to police the interests that the statute protects." *CSL Plasma Ins. v. CBP*, 33 F.4th 584, 589 (D.C. Cir. 2022). The test is "lenient," and "the benefit of any doubt goes to the plaintiff." *Id.*

State Petitioners' interest in preventing reduced economic activity and consequential "lost tax revenue" easily satisfies this test. *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197 (2017). That is so even though the Clean Air Act is

"designed" to "lower emissions." *Contra* EPA Br.26. The Act does not pursue this goal "at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) ("no legislation" does this). Instead, the Act also seeks to preserve "economic activity" even if that activity "may result in some emissions of pollutants." *Energy Future Coal. v. EPA*, 793 F.3d 141, 145 (D.C. Cir. 2015) (Kavanaugh, J.).

State Petitioners' quasi-sovereign interest in protecting their electric grids suffices too. The zone-of-interests test looks at the statute as a whole to determine if the plaintiff is in the class Congress sought to grant a cause of action. *See Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147 (D.C. Cir. 2002). And multiple Clean Air Act provisions both recognize the relevance of State authority generally, *see* 47 U.S.C. § 7543 (applicability of State standards); *id.* § 7544 (grants to States to implement standards), as well as the electric grid specifically, *see* States' Br.21. That is enough. *See, e.g.*, *Myersville Citizens v. FERC*, 783 F.3d 1301, 1316 (D.C. Cir. 2015) (test satisfied based on "provisions focused primarily on the preservation of state and local authority").

C. State Petitioners join the Private Petitioners' arguments (reply at 7-10) explaining why EPA's other threshold arguments (at 34-39) fail. In addition, there is no dispute the States submitted multiple comments presenting arbitrary and capricious arguments. States' Br.23. EPA also recognized below that those comments addressed "national security" implications. RTC 1-32, JA___ (Ohio); *see also* RTC 6-63, JA___ (Valero). And others commenters discussed impacts on the electric grid. *See* States' Br.19; Industry Br.8-9 (conceding this). The fact that not all

of these comments were *the States*' is irrelevant. *NRDC v. EPA*, 824 F.2d 1146, 1150-51 (D.C. Cir. 1987).

## II.   EPA Lacks Authority to Promulgate the Standards.

### A.   The Standards present a major question.

State Petitioners explained (Opening Br.14-24) that the Standards present a major question because they will profoundly impact the electric grid—interfering with a core State prerogative—and because they jeopardize national security. EPA's defenses fail.

1.   Starting with grid reliability, EPA does not dispute that this issue has monumental national importance. And EPA does not dispute that the Standards will affect the grid at least to some degree. *See* States' Br.18-19 (showing EPA admitted certain effects below). EPA argues instead (at 57-58) that there is "no evidence" that the Standards will meaningfully undermine grid reliability, because in EPA's view technological advances and investments will keep pace with the demands the Standards impose. *See also* Industry Br.12 ("power companies and utilities have already been making [grid] investments").

EPA's fact-bound response fails because agencies cannot avoid the major questions doctrine by claiming that they correctly answered the major question. The doctrine governs whether agencies have authority to "assert[] highly consequential power" to begin with, *West Virginia*, 142 S. Ct. at 2609, not whether they have asserted the power reasonably. Precedent proves that. OSHA's COVID-19 vaccination mandate implicated the doctrine because it covered "84 million Americans." *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022). That was "no 'everyday

exercise of federal power,'" *id.*, and the number of affected persons was a significant reason why, *accord King v. Burwell*, 576 U.S. 473, 485 (2015). It was doubtless true that most of those 84 million would vaccinate voluntarily—but that was not relevant to OSHA's authority. The same applies here. It is no "everyday exercise of federal power," *OSHA*, 142 S. Ct. at 665, for EPA to take action that dramatically impacts the electric grid. And it is no answer to say that utilities and other stakeholders can handle it. EPA has no authority to make "[t]he basic and consequential tradeoffs involved in such a choice." *West Virginia*, 142 S. Ct. at 2613.

　　2.　　EPA's national security argument is similar, albeit more egregious. EPA does not dispute that a rule with national security implications presents a major question. Instead, EPA claims (at 58) the Standards actually "project to improve" national security by reducing reliance on foreign oil. But again, the whole point of the major questions doctrine is to limit an agency's authority to weigh in on such a monumental issue to begin with. EPA should not be the entity balancing the national security risks of relying on Middle East actors for oil versus relying on China and its proxies for electric vehicle inputs. States' Br.22-24. EPA "has no comparative expertise" in national security, and so it is implausible Congress would give it this task. *West Virginia*, 142 S. Ct. at 2612-13.

## B.　EPA has no congressional authorization.

EPA lacks the requisite clear congressional authorization to interfere with grid reliability or national security. States' Br.20-22, 24. Section 202 is silent on these topics, and "[i]t is highly unlikely that Congress would require the EPA to transverse

such an obstacle course without even mentioning it." *NRDC v. Thomas*, 805 F.2d 410, 421 n.18 (D.C. Cir. 1986).

State Petitioners join Private Petitioners' textual arguments. EPA's brief, however, reveals a more sweeping problem with its claimed authority. EPA claims (at 41) it can "set standards as long as they are technologically feasible—even if meeting them could require developing new technologies" such as entirely new propulsion systems. That is functionally an authority to *ban* the internal combustion engine. Indeed, if the "new technologies" resulted in lower tailpipe emissions (as electric vehicles do), then there is a strong argument, under EPA's own logic, that EPA's failure to eventually ban internal combustion engines would be arbitrary and capricious.

Congress did not grant EPA that authority. That is obvious because the "collective premise of [many] statutes" enacted after section 202 is that internal combustion engines "will continue to be sold in the United States." *FDA v. Brown & Williamson*, 529 U.S. 120, 139 (2000). That makes this case much like *Brown & Williamson*. FDA's statutory interpretation there "logically impl[ied]" that the agency had power to "remove [tobacco products] from the market." *Id.* at 135. That "plainly contradict[ed] congressional policy" because multiple other statutes showed that Congress expected tobacco product sales to continue. *Id.* at 139. And it was no answer that FDA's rules there would merely "reduce tobacco consumption among children." *Id.* at 125. The *implications* of its claimed authority were fatal.

EPA suffers from the same problem here as FDA in *Brown & Williamson*. For example, Congress's directive for NHTSA to set "**fuel** economy standards," 49

U.S.C § 32902 (emphasis added) (at issue in a companion case to this one), plainly contemplates manufacturers will continue producing engines using fuel. The Clean Air Act itself also includes the Renewable Fuel Standard program, which "requires that increasing volumes of renewable fuel be introduced into the Nation's supply of transportation fuel each year." *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 697 (D.C. Cir. 2017). That likewise shows that Congress expects engines to continue using fuel. EPA logically must not have authority to ban those very engines. This is fatal for EPA, because without an authority to ban, there is no apparent statutory interpretation that gives the agency authority to take the lesser-included action it took here. *See West Virginia*, 142 S. Ct. at 2612 (EPA's lack of authority to force "coal plants" to "cease making power altogether" informed Court's view that EPA could not take lesser-included action at issue).

## III.   The Standards Are Arbitrary and Capricious.

**A.**   State Petitioners have explained how EPA's cost-benefit consideration of monetized climate benefits is flawed in multiple ways. States' Br.24-26. EPA first says (at 85) this consideration was "not required" by section 202. But even if that is true, EPA's use of the analysis meant that it had to be used reasonably. States' Br.27. Moreover, if EPA's other statutory arguments prevail, then consideration of costs likely *was* required. A power to set any "standards as long as they are technologically feasible," EPA Br.41, regardless of whether costs exceed benefits, is unconstitutionally standardless. Indeed, in *Industrial Union Department v. American Petroleum Institute*, the Supreme Court rejected a materially similar statutory construction in order to avoid the non-delegation problems "this kind of open ended

grant" of authority would produce. 448 U.S. 607, 645-46 (1980) (agency contended its action was "limited only by the constraint of feasibility," and not costs).

EPA also says (at 87) the cost-benefit analysis was not "material" because the agency would "still adopt the standards" even if it had never considered monetized climate benefits. EPA bears a heavy burden to establish immateriality. States' Br.27. And its own representations in the rule preamble doom that effort. EPA admitted the cost benefit analysis was "[a]n essential factor." 86 Fed. Reg. at 74,498. EPA justified its decision to tighten the prior standards by "plac[ing] greater weight on the importance of reducing GHG emissions" than the agency did previously. *Id.* at 74,499. And EPA's examination of its "authority" to issue the Standards expressly incorporated the analysis. *Id.* at 74,492; *see id.* at 75,500. The Standards are plainly tethered to the monetization of emission reductions.

**B.**     EPA suggests (at 87 n.27) that the point is moot because "even if there were no monetized climate benefits, fuel savings alone ($320 billion) would exceed the standards' total costs ($300 billion)." But that does not save EPA because there is evidently a linkage between the results of the cost benefit calculation and the Standards' *stringency*. EPA's proposed rule contained less stringent standards but then, after the agency concluded that the "[n]et benefits of [its] final rule are higher than those estimated in the proposed rule," 86 Fed. Reg. 74,500 n.186, EPA adopted "more stringent" standards, *id.* at 74,435.

And the "fuel savings" benefit is also arbitrary and capricious. EPA recognized that "conventional economic principles suggest that" if fuel savings truly "outweigh[ed] costs" of purchasing and owning electric vehicles, then consumers

would *already* be buying them. *Id*. at 74,500. The fact that consumers are not suggests the "fuel savings" benefit is illusory, because it is canceled out by other vehicle costs. EPA tried to get around this problem by concluding that consumers suffer "myopia" with purchasing behavior reflecting a "market failure." *Id*. at 74,501. But EPA needed real "evidence" to corroborate that "market failure." *Am. Pub. Gas Ass'n v. DOE*, 22 F.4th 1018, 1027 (D.C. Cir. 2022). Instead of offering any, EPA candidly admitted it "cannot demonstrate at this time which specific failures operate in this market." 86 Fed. Reg. at 74,501.

The evidence actually shows EPA ignored rational consumer behavior. Electric vehicles are very expensive. *Id*. at 74,519. Consumers living paycheck-to-paycheck cannot afford them. Housing Equity Br.12-13. Many consumers such as renters have no obvious means of charging them. 86 Fed. Reg. at 74,519. And consumers reasonably fear that the lack of highway charging stations would impair their ability to take road trips. Buckeye Inst. Br.17-19. EPA even recognized that the first purchaser of an electric vehicle may *never* enjoy enough fuel savings to offset the other costs because the consumer might sell the vehicle before reaching that tipping point. 86 Fed. Reg. at 74,498 (EPA recognizing that in this instance the benefits would be "realized" only "by subsequent owners").

The shortcomings with EPA's "fuel savings" benefit underscore the materiality of EPA's monetization of emission reductions. The massive benefits EPA attributed to reducing greenhouse gas emissions, States' Br.10-11, provide a significant buffer between the Standards' alleged benefits and their indisputable

costs. That made it critical that EPA get the greenhouse gas monetization analysis right.

      **C.**      EPA did not get it right. State Petitioners identified that in the limited instances where Congress authorized EPA to consider global impacts, it *clearly* said so, like in 42 U.S.C § 7415. States' Br.25. Indeed, section 7415 shows that Congress does not authorize consideration of foreign impacts without imposing practical limits on that consideration. That section allows EPA to consider pollution impacts in a "foreign country" only if that country "has given the United States essentially the same rights with respect to the prevention or control of air pollution occurring in *that* country." 42 U.S.C. § 7415(c) (emphasis added). Here, by contrast, EPA apparently takes the view that it has plenary power to consider global impacts, both as to countries that share our pollution values and those that do not. Section 7415 shows that Congress would not authorize something like that, much less silently — as EPA is forced to argue here. *See also* 42 U.S.C. § 17352(a)(3) (additional example where Congress gave agency limited authority to consider "global greenhouse gas emissions"). EPA has no response other than to straw-man the alleged "best [statutory] evidence" State Petitioners presented. EPA Br.88 (ignoring section 7415).

      EPA also changed positions from its 2020 rulemaking without displaying awareness or offering a reasoned explanation. States' Br.25-26. Specifically, EPA's 2020 rulemaking adhered to Circular A-4's default cost-benefit framework, whereas the Standards are based on a different analytical framework (considering global costs, and different discount rates). EPA responds (at 88-89) that Circular A-4 allowed the

agency to adopt this different approach, and that the agency "independently conclud[ed]" that this allowance makes sense. But that is a *non-sequitir*; EPA was obligated to reasonably explain *why* it changed course, not simply why it was *allowed*. *See, e.g.*, *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429-30 (D.C. Cir. 2020).

## Conclusion

State Petitioners' petition for review should be granted and the Standards should be vacated.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General
*Counsel of Record*

/s/ Ryan S. Baasch
RYAN S. BAASCH
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov

WESLEY S. WILLIAMS
Assistant Attorney General

*Counsel for Petitioner the State of Texas*

STEVE MARSHALL
Attorney General of Alabama

/s/ Edmund G. Lacour, Jr.
EDMUND G. LACOUR JR.
Solicitor General
Office of the Alabama Attorney
General
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
Tel: (334) 242-7300
Edmund.lacour@AlabamaAG.gov

*Counsel for Petitioner the State of
Alabama*

TREG TAYLOR
Attorney General of Alaska

/s/ Garrison Todd
GARRISON TODD
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Tel.: (901) 269-5100
Garrison.Todd@alaska.gov

*Counsel for Petitioner the State of Alaska*

TIM GRIFFIN
Attorney General of Arkansas

/s/ Nicholas J. Bronni
NICHOLAS J. BRONNI
Solicitor General
DYLAN L. JACOBS
Deputy Solicitor General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Tel.: (501) 682-2007
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Petitioner the State of Arkansas*


DANIEL CAMERON
Attorney General of Kentucky

/s/ Matthew F. Kuhn
MATTHEW F. KUHN
Office of the Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
Tel.: (502) 696-5300
Matt.Kuhn@ky.gov

*Counsel for Petitioner the State of Kentucky*


THEODORE E. ROKITA
Indiana Attorney General

/s/ Thomas M. Fisher
THOMAS M. FISHER
Solicitor General
Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Tel.: (317) 232-6255
Tom.Fisher@atg.in.gov

*Counsel for Petitioner the State of Indiana*


JEFF LANDRY
Attorney General of Louisiana

/s/ Elizabeth B. Murrill
ELIZABETH B. MURRILL
Solicitor General
SCOTT ST. JOHN
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel.: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Petitioner the State of Louisiana*

LYNN FITCH
Attorney General of Mississippi

/s/ Justin L. Matheny
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel.: (601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for Petitioner the State of Mississippi*

ANDREW BAILEY
Attorney General

/s/ Joshua Divine
JOSHUA DIVINE
Solicitor General
Office of the Missouri Attorney General
Supreme Court Building
P.O. Box 899
Jefferson City, Missouri 65102
Tel.: 573-751-8870
Fax: 573-751-0774
Josh.Divine@ago.mo.gov

*Counsel for Petitioner the State of Missouri*

AUSTIN KNUDSEN
Montana Attorney General

/s/ Christian Corrigan
CHRISTIAN B. CORRIGAN
Solicitor General
215 North Sanders Street
Helena, MT 59601
Tel.: (406) 444-2026
Christian.Corrigan@mt.gov

*Counsel for Petitioner the State of Montana*

MIKE T. HILGERS
Attorney General of Nebraska

/s/ Eric Hamilton
ERIC J. HAMILTON
Solicitor General of Nebraska
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Tel.: (402) 471-2682
Eric.Hamilton@nebraska.gov

*Counsel for Petitioner the State of Nebraska*

DAVE YOST
Ohio Attorney General

/s/ Benjamin M. Flowers
BENJAMIN M. FLOWERS
Ohio Solicitor General
30 E. Broad St., Fl. 17
Columbus, OH 4315
Tel.: (614) 466-8980
bflowers@OhioAGO.gov

*Counsel for Petitioner the State of Ohio*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Bryan Cleveland
BRYAN CLEVELAND
Deputy Solicitor General
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel.: (405) 521-3921
Bryan.Cleveland@oag.ok.gov

*Counsel for Petitioner the State of Oklahoma*

ALAN WILSON
Attorney General of South Carolina

/s/ James Emory Smith, Jr.
JAMES EMORY SMITH, JR.
Deputy Solicitor General
P.O. Box 11549
Columbia, S.C. 29211
Tel.: (803) 734-3642
esmith@scag.gov

*Counsel for Petitioner the State of South Carolina*

SEAN D. REYES
Utah Attorney General

/s/ Melissa A. Holyoak
MELISSA A. HOLYOAK
Solicitor General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
melissaholyoak@agutah.gov

*Counsel for Petitioner the State of Utah*

## Certificate of Compliance

I hereby certify that the State Petitioners' Reply Brief, dated April 18, 2023, complies with the type-volume limitations of Rule 32 of the Federal Rules of Appellate Procedure and this Court's Circuit Rules. I certify that this brief contains 2,996 words, as counted by the Microsoft Word software to produce this brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

/s/ Ryan S. Baasch
Ryan S. Baasch

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing State Petitioners'
Reply Brief to be filed on April 18, 2023 using the Court's CM/ECF system, and
that, therefore, service was accomplished upon counsel of record by the Court's
system.

/s/ Ryan S. Baasch
Ryan S. Baasch