# In the United States Court of Appeals for the District of Columbia Circuit

---

STATE OF TEXAS, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN
HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ADVANCED ENERGY UNITED, ET AL.,
*Intervenors.*

---

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0208)

---

## INITIAL REPLY BRIEF FOR PRIVATE PETITIONERS

---

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel &
Petrochemical
Manufacturers and Energy
Marketers of America*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable
Fuels Company, LLC*

(Additional counsel listed on
the following page)

C. Boyden Gray
Jonathan Berry
Michael B. Buschbacher
Boyden Gray & Associates,
PLLC
801 17th Street NW, Suite 350
Washington, DC  20006
(317) 513-0622
buschbacher@boydengray
associates.com

*Counsel for Clean Fuels
Development Coalition, ICM, Inc.,
Illinois Corn Growers Association,
Indiana Corn Growers
Association, Kansas Corn Growers
Association, Kentucky Corn
Growers Association, Michigan
Corn Growers Association,
Missouri Corn Growers
Association, and Valero Renewable
Fuels Company, LLC*

Devin Watkins
Competitive Enterprise
Institute
1310 L Street, NW
Washington, DC  20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Competitive Enterprise
Institute, Anthony Kreucher,
Walter M. Kreucher, James Leedy,
Marc Scribner, and Domestic
Energy Producers Alliance*

Matthew W. Morrison
Pillsbury Winthrop Shaw
Pittman LLP
1200 17th Street NW
Washington, DC  20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

*Counsel for Illinois Soybean
Association, Iowa Soybean
Association, Indiana Soybean
Alliance, Inc., Michigan Soybean
Association, Minnesota Soybean
Growers Association, North
Dakota Soybean Growers
Association, Ohio Soybean
Association, South Dakota
Soybean Association, and
Diamond Alternative Energy, LLC*

Brittany M. Pemberton
Bracewell LLP
2001 M Street NW, Suite 900
Washington, DC  20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Diamond Alternative
Energy, LLC, and Valero
Renewable Fuels Company, LLC*

**TABLE OF CONTENTS**

Page

Glossary.................................................................................................vi

Introduction and Summary of Argument ............................................1

Argument ..............................................................................................4

I.    Petitioners' Arguments Are Properly Before The Court.........................4

    A.    Petitioners Are Within The Zone Of Interests.................................4

    B.    Petitioners' Arguments Are Timely..................................................7

    C.    Petitioners' Arguments Are Preserved ...........................................9

II.    EPA Lacks Authority To Set Greenhouse-Gas Emission Standards That Effectively Mandate Electrification..............................11

    A.    This Case Presents A Major Question Requiring Clear Congressional Authorization ............................................................11

        1.    EPA claims a power of vast economic significance.............11

        2.    EPA claims a power of vast political significance ...............12

        3.    EPA claims a newfound power to shift America's energy policy ........................................................................13

    B.    EPA Lacks Clear Statutory Authority To Mandate Electric Vehicles ............................................................................17

        1.    The Clean Air Act does not authorize EPA to set emission standards using fleetwide averaging....................17

        2.    At a minimum, EPA may not mandate electrification .......24

            a.    The text focuses on vehicles that emit the relevant pollutants ................................................................24

            b.    The statutory structure and history are consistent with the plain text........................................................30

c.    Related provisions confirm the lack of statutory authorization ...................................................31

III.   EPA's Rule Is Arbitrary And Capricious.................................................32

    A.    EPA Arbitrarily Calculated The Emissions Of Electric Vehicles.............................................................................32

    B.    EPA's Cost-Benefit Analysis Is Unsound.....................................34

    C.    EPA's Refusal To Consider The Efficiency Benefits Of Higher-Octane Liquid Fuels Was Unreasonable..........................36

Conclusion.........................................................................................37

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*American Fuel & Petrochemical Mfrs.* v. *EPA*,
937 F.3d 559 (D.C. Cir. 2019)....................................................10

*American Pub. Gas Ass'n* v. *Department of Energy*,
22 F.4th 1018 (D.C. Cir. 2022) ...................................................34

*Amgen, Inc.* v. *Smith*,
357 F.3d 103 (D.C. Cir. 2004)....................................................5, 6

*Appalachian Power Co.* v. *EPA*,
135 F.3d 791 (D.C. Cir. 1998).....................................................10

*Barnhart* v. *Thomas*,
540 U.S. 20 (2003)........................................................................26

*Delaware Dep't of Nat. Res. & Env't Control* v. *EPA*,
785 F.3d 1 (D.C. Cir. 2015).........................................................36

*Delta Construction Co.* v. *EPA*,
783 F.3d 1291 (D.C. Cir. 2015)..................................................6, 8

*DHS* v. *Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020).................................................................36

*Energy Future Coal.* v. *EPA*,
793 F.3d 141 (D.C. Cir. 2015).......................................................5

*Ethyl Corp.* v. *EPA*,
306 F.3d 1144 (D.C. Cir. 2002).....................................................5

*Grocery Mfrs. Ass'n* v. *EPA*,
693 F.3d 169 (D.C. Cir. 2012).......................................................6

*International Harvester Co.* v. *Ruckelshaus*,
478 F.2d 615 (D.C. Cir. 1973)......................................................31

*Kennecott Utah Copper Corp.* v. *Department of Interior*,
88 F.3d 1191 (D.C. Cir. 1996).......................................................9

*Koons Buick Pontiac GMC, Inc.* v. *Nigh*,
543 U.S. 50 (2004)........................................................................18

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
  572 U.S. 118 (2014)..................................................................4

*Massachusetts* v. *EPA*,
  549 U.S. 497 (2007)................................................................32

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*,
  567 U.S. 209 (2012)..................................................................4

*Medical Waste Inst.* v. *EPA*,
  645 F.3d 420 (D.C. Cir. 2011)...............................................7

*National Ass'n of Mfrs.* v. *Department of Interior*,
  134 F.3d 1095 (D.C. Cir. 1998)............................................9

*NFIB* v. *Department of Labor*,
  142 S. Ct. 661 (2022)............................................................16

*NRDC* v. *EPA*,
  755 F.3d 1010 (D.C. Cir. 2014)..........................................10

*NRDC* v. *Thomas*,
  805 F.2d 410 (D.C. Cir. 1986)............................................18

*Sierra Club* v. *EPA*,
  551 F.3d 1019 (D.C. Cir. 2008)............................................8

*Truck Trailer Mfrs. Ass'n, Inc.* v. *EPA*,
  17 F.4th 1198 (D.C. Cir. 2021) ......................................28, 29

*Twin Rivers Paper Co. LLC* v. *SEC*,
  934 F.3d 607 (D.C. Cir. 2019)..............................................6

*West Virginia* v. *EPA*,
  142 S. Ct. 2587 (2022)..........................................2, 11, 13, 14

**Statutes:**

42 U.S.C.
  § 7521..............................................3, 5, 6, 23, 25, 27, 28
  § 7525..............................................................................19, 21
  § 7541..............................................................................20, 21
  § 7545......................................................................................24
  § 7607....................................................................................7, 9

Motor Vehicle Air Pollution Control Act of 1965,
    Pub. L. No. 89-272, § 101, 79 Stat. 992 ......................................29

Clean Air Act Amendments of 1990
    Pub. L. 101-549, § 223, 104 Stat. 2399......................................30

Infrastructure Investment and Jobs Act of 2021,
    Pub. L. No. 117-58, 135 Stat. 429 (2021)...................................12

**Regulations:**

40 C.F.R. § 80.22 (1973) .........................................................37

40 C.F.R. § 86.1865-12 ...........................................................22

40 C.F.R. § 86.1866-12 .......................................................15, 27

48 Fed. Reg. 33,456 (July 21, 1983) .........................................2

71 Fed. Reg. 2,810 (Jan. 17, 2006) .....................................20, 21

75 Fed. Reg. 25,324 (May 7, 2010).......................................7, 21

76 Fed. Reg. 57,106 (Sept. 15, 2011)........................................8

77 Fed. Reg. 62,624 (Oct. 15, 2012).........................................7

86 Fed. Reg. 74,434 (Dec. 30, 2021)................1, 7, 14, 15, 27, 30, 33

**Congressional Materials:**

S. Rep. No. 91-1196 (1970).....................................................31

**Other Authorities:**

*American Heritage Dictionary* (1st ed. 1969)............................28

EPA, *EPA Finalizes Greenhouse Gas Standards for Passenger
    Vehicles, Paving Way for a Zero-Emissions Future* (Dec. 20,
    2021), https://bit.ly/3wJFsTD ...........................................1

Gloria Helfland & Reid Dorsey-Palmateer, *The Energy
    Efficiency Gap in EPA's Benefit-Cost Analysis of Vehicle
    Greenhouse Gas Regulations*, 6 J. Benefit Cost Anal. 432
    (2015). ...................................................................35

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ...........26

# GLOSSARY

APA            Administrative Procedure Act

EPA            U.S. Environmental Protection Agency

NHTSA          National Highway Traffic Safety Administration

*2027-2032*    *Multi-Pollutant Emissions Standards for Model Years 2027*
*Proposed*     *and Later Light-Duty and Medium-Duty Vehicles* (proposed
*Standards*    Apr. 12, 2023)

**INTRODUCTION AND SUMMARY OF ARGUMENT**

When EPA promulgated these emission standards, it heralded the rule as a "giant step forward" in "paving the way toward an all-electric, zero-emissions transportation future." EPA, *EPA Finalizes Greenhouse Gas Standards for Passenger Vehicles, Paving Way for a Zero-Emissions Future* (Dec. 20, 2021), https://bit.ly/3wJFsTD. Now that EPA has to defend its standards in court, it insists that the rule is no different from its prior rules, is "technology-neutral," and has only an "incidental" effect on electric vehicles. Br. 55, 78. The agency had it right before. These standards take a giant step toward electrifying the Nation's fleet by mandate—a step that Congress itself has never taken and that EPA has not previously attempted. As EPA itself explained, "[c]ompliance with the final standards *will necessitate* … further deployment" of electric vehicles. 86 Fed. Reg. 74,434, 74,493 (Dec. 30, 2021) (emphasis added).

EPA first tries to avoid judicial review altogether, but its threshold arguments fail. Petitioners fall within the zone of interests of Section 202 of the Clean Air Act, which is aimed not only at promoting clean air but also at protecting economic activity. Petitioners' suit is timely, as EPA's new electric-vehicle-mandating standards are fundamentally different from prior rules.

And EPA's exhaustion arguments fail because commenters raised the relevant arguments before the agency with reasonable specificity and because EPA was required to examine its fundamental assumptions regardless.

On the merits, EPA argues that its standards do not present a major question. The rule's $300-billion price tag, political significance, and societal impact indicate otherwise. If that were somehow not enough, invoking the same novel power it asserts here, EPA recently proposed new standards that would effectively force *67% electric-vehicle penetration* by 2032. *Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles* (proposed Apr. 12, 2023) (*2027-2032 Proposed Standards*). EPA tries to distinguish this case from *West Virginia* v. *EPA*, 142 S. Ct. 2587 (2022), but the parallels are clear: EPA is again claiming newfound authority to force a dramatic shift in the Nation's energy policy.

No clear congressional authorization exists for EPA to decide that major question. Rather, Section 202 and other related provisions of Title II squarely foreclose EPA from setting standards that apply on a fleetwide-average basis. EPA tries to avoid Section 202's unambiguous requirements by pointing to the statute's reference to a "class" of vehicles, but that term does not answer the question, as EPA previously recognized. *See* 48 Fed. Reg. 33,456, 33,458 (July

21, 1983). Provision after provision of Title II—about testing, certifications, warranties, and penalties—reinforces the lack of authority for fleetwide averaging. EPA asks this Court to misread or ignore those provisions.

Even if Congress had authorized EPA to use fleetwide averaging generally, it did not authorize EPA to force electrification. EPA may set standards for a "class or classes of … vehicles or … engines" that "cause, or contribute to" air pollution. 42 U.S.C. § 7521(a)(1). But that language most naturally means that EPA can set standards for a group of vehicles only if all vehicles in that group cause or contribute to pollution. Nor does EPA's authority to set standards for "systems" or "devices" that "prevent or control" pollution, *id.*, authorize it to force electrification, as EPA claims for the first time here. Electric vehicles are not systems or devices that prevent or control pollution; they are an entirely different type of vehicle that EPA treats as never emitting the relevant pollutant in the first place.

Finally, EPA fails to justify its arbitrary decisionmaking. EPA asserts that it was reasonable to treat upstream emissions differently for purposes of standards and compliance, but it gives no good reason why. EPA likewise fails to justify its cost-benefit analysis, instead asking this Court to trust the agency's belief in a market failure it cannot explain. And EPA offers only

unpersuasive *post hoc* rationalizations to explain its decision not to consider alternatives. Whether for a lack of statutory authority, a lack of reasoned decision-making, or both, the rule should be vacated.

## ARGUMENT

### I. Petitioners' Arguments Are Properly Before The Court.

#### A. Petitioners Are Within The Zone Of Interests.

Although EPA does not contest private petitioners' Article III standing, it argues that they fall outside the "zone of interests" protected by Section 202(a). Br. 31-34. That is incorrect.

1. The zone-of-interests analysis, particularly in the APA context, is "not meant to be especially demanding," and the "benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209, 225 (2012) (citation omitted). The test excludes only those plaintiffs whose "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (internal quotation marks omitted).

Petitioners easily satisfy that standard. The Clean Air Act "seeks to further clean air while at the same time still allowing some productive

economic activity, even though that economic activity may result in some emissions of pollutants." *Energy Future Coal.* v. *EPA*, 793 F.3d 141, 145 (D.C. Cir. 2015) (Kavanaugh, J.). Section 202 reflects those dual goals by authorizing EPA to set emission standards but expressly requiring the agency to account for economic considerations like compliance costs. 42 U.S.C. § 7521(a)(3)(A). As businesses that sell fuel and consumers that buy cars, petitioners are well suited to "police" the interest in productive economic activity "that the statute protects." *Amgen, Inc.* v. *Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004) (citation omitted). Indeed, this Court has already held that both renewable and conventional fuel producers, who are directly regulated by other provisions of the Clean Air Act, fall within the zone of interests of other Title II provisions concerning emission standards. *See Energy Future Coal.*, 793 F.3d at 145; *Ethyl Corp.* v. *EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002). There is no reason for a different result here.

2. EPA's contrary arguments lack merit. It contends (at 32) that petitioners' "pecuniary" interests fall outside the zone of interests. But "[p]arties motivated by purely commercial interests routinely satisfy the zone of interests test." *Amgen*, 357 F.3d at 109. EPA relies on *Delta Construction Co.* v. *EPA*, 783 F.3d 1291 (D.C. Cir. 2015), which held that a manufacturer's

interest in "increasing the regulatory burden on *others*" fell outside the Clean Air Act's zone of interests.  *Id.* at 1300 (emphasis added) (citation omitted).  The fuel producers do not seek to increase any competitor's burden; they challenge regulations that curtail their own ability to sell their products.  The other cases on which EPA relies (at 33 n.6) are even further afield.  *See, e.g.*, *Grocery Mfrs. Ass'n* v. *EPA*, 693 F.3d 169, 179 (D.C. Cir. 2012) (food distributors' interest in suppressing demand for suppliers did not fall within the Clean Air Act's zone of interests); *Twin Rivers Paper Co. LLC* v. *SEC*, 934 F.3d 607, 618 (D.C. Cir. 2019) (paper manufacturers' preference for paper disclosure did not fall within the securities laws' zone of interests).

Turning to the consumer petitioners, EPA argues that consumer choice among different vehicles is not within Section 202(a)'s zone of interests.  Br. 33-34.  Section 202(a), however, reflects Congress's concern for consumer interests.  For example, its requirement that EPA consider manufacturers' compliance costs ensures that consumers will not be left with unreasonably expensive vehicles to purchase.   42 U.S.C. § 7521(a)(2).   Even EPA acknowledged that it considers "per consumer" "technology cost" when exercising its "standards-setting authority under CAA Section 202(a)."

86 Fed. Reg. at 74,451. The consumer petitioners thus police the statute's interest in economic activity from the demand side.

## B. Petitioners' Arguments Are Timely.

EPA agrees (at 35) that the petitions for review were all timely filed "within sixty days from the date" notice of the final rule "appear[ed] in the Federal Register." 42 U.S.C. § 7607(b)(1). EPA nonetheless asserts that petitioners' statutory arguments are time-barred because the agency is pursuing its novel policy of mandating electric vehicles through a "framework"—*i.e.*, averaging electric vehicles into fleetwide-average standards—"that [was] established years ago." Br. 35. But EPA's prior greenhouse-gas rules treated electric vehicles as voluntary *compliance flexibilities*. *See, e.g.*, 75 Fed. Reg. 25,324, 25,407 (May 7, 2010); 77 Fed. Reg. 62,624, 62,628 (Oct. 15, 2012). Here, for the first time, EPA has set greenhouse-gas standards so stringent that manufacturers cannot meet them with conventional vehicles alone but must increase the share of electric vehicles in their overall production. *See* pp. 13-14, *infra*; Pet. Br. 24-26. That new policy choice fundamentally transforms the regulatory "approach." *Medical Waste Inst.* v. *EPA*, 645 F.3d 420, 427 (D.C. Cir. 2011). Petitioners

challenge this unprecedented attempt to effectively mandate electrification, effectuated through fleetwide averaging.

Moreover, petitioners would not have had standing to challenge EPA's prior fleetwide-average greenhouse-gas standards. Those standards were all established in joint rules with NHTSA—which, unlike EPA, has authority to set fleetwide-average standards. *See* Pet. Br. 9. Because the two agencies ensured that their standards were "effectively identical," 76 Fed. Reg. 57,106, 57,124-57,125 (Sept. 15, 2011), any injury a petitioner might have tried to trace to EPA's standards could equally have been ascribed to NHTSA's standards. Petitioners thus could not have demonstrated "either that EPA's standards caused their purported injury or that a favorable decision … would redress it." *Delta Constr. Co.*, 783 F.3d at 1296 (dismissing for lack of standing a challenge to EPA's portion of 2010 and 2011 joint rules). Here, by contrast, EPA and NHTSA have acted separately, and petitioners have challenged both agencies' rules.

Further, EPA constructively reopened the issues, making the present challenge timely. *See Sierra Club* v. *EPA*, 551 F.3d 1019, 1026 (D.C. Cir. 2008). Where prior rulemakings "did not give [petitioners] adequate … incentive to contest the agency's decision," the decision is "constructively reopened" by the

new rule. *National Ass'n of Mfrs.* v. *Department of Interior*, 134 F.3d 1095, 1104 (D.C. Cir. 1998). Here, EPA's novel use of its preexisting "framework" to mandate electric vehicles "significantly alters the stakes of judicial review" and thus constructively reopens the issues. *Kennecott Utah Copper Corp.* v. *Department of Interior*, 88 F.3d 1191, 1226-1227 (D.C. Cir. 1996).

## C. Petitioners' Arguments Are Preserved.

EPA also wrongly contends (at 38-40) that petitioners forfeited their challenge to EPA's statutory authority. Petitioners challenge the rule on the ground that "EPA lacks statutory authority to set greenhouse-gas emission standards that effectively mandate electric vehicles." Pet. Br. 21-62 (capitalization altered). Contrary to EPA's assertion, commenters (including petitioners) made that argument to the agency. *See, e.g.*, Valero Comment at 8 ("[EPA's] policy encouraging zero emissions vehicles at the expense of internal combustion engine vehicles is an overreach of its authority inconsistent with the statutory design of the CAA."); AFPM Comment at 6 n.33 ("EPA has arbitrarily created an EV subsidy program that is beyond the authority granted to EPA by Congress."); *id.* at 2 n.9 ("EPA does not cite any provision of the CAA that authorizes [a trading] program."). These comments raised the relevant challenges "with reasonable specificity." 42 U.S.C.

§ 7607(d)(7)(B); *see Appalachian Power Co.* v. *EPA*, 135 F.3d 791, 817 (D.C. Cir. 1998) ("[T]he word 'reasonable' cannot be read out of the statute in favor of a hair-splitting approach.").

Regardless, the statutory authority issue is properly before the Court under the "'key assumption' doctrine." *American Fuel & Petrochemical Mfrs.* v. *EPA*, 937 F.3d 559, 589 (D.C. Cir. 2019). "[A]n agency has the 'duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule' and therefore ... 'must justify that assumption even if no one objects to it during the comment period.'" *Id.* (citations omitted). "[T]he key assumption doctrine applies to aspects of a rule that are foundational to its existence," including all "assumptions regarding the agency's statutory authority." *Id.*; *see NRDC* v. *EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014) (holding EPA's statutory authority a key assumption). Here, EPA's rule rests on the premise that the agency has statutory authority to use fleetwide-average standards and to mandate electric vehicles. EPA's exhaustion arguments cannot shield that key premise from judicial review.

## II. EPA Lacks Authority To Set Greenhouse-Gas Emission Standards That Effectively Mandate Electrification.

### A. This Case Presents A Major Question Requiring Clear Congressional Authorization.

The major-questions doctrine applies for three reasons. First, EPA's electrification-forcing standards will have dramatic economic consequences. Pet. Br. 24-28. Second, the standards will have significant political consequences. *Id.* at 28-34. Third, EPA asserts a newfound authority with staggering implications. *Id.* at 34-37.

#### 1. EPA claims a power of vast economic significance.

EPA strains to argue that its standards do not present a question of "vast economic … significance." *West Virginia*, 142 S. Ct. at 2605 (citation omitted). Starting with the rule's costs, EPA downplays its $300-billion price tag by breaking down the cost to a per-vehicle number. Br. 59-60. But the major-questions doctrine asks about the rule's significance to the "national economy," so the aggregate cost is what matters. *West Virginia*, 142 S. Ct. at 2609 (citation omitted).

EPA also asks this Court to ignore the rule's other obvious economic implications based on a supposed lack of record evidence. Br. 57. For example, EPA would ignore the job losses the rule will cause, *see* Pet. Br. 26-28, because the agency did not calculate all of them, *see* EPA Br. 59. But

EPA did not find those job losses because it did not look for them. By EPA's own admission, it "did not examine job shifts in non-regulated sectors, such as petroleum refineries," because those effects would be "difficult to predict." *Id.* The Court should not brush aside widespread and significant consequences of EPA's rule because the agency chose not to examine them.

### 2. EPA claims a power of vast political significance.

EPA insists that its rule is not politically significant because the agency itself assessed national security, electric-grid reliability, and other political issues, and found that the benefits outweighed the harms. Br. 58-59. As the State petitioners explain, that is the basic problem here. That EPA, an environmental agency, is making judgments so far outside its purview reinforces that this is a major question. *See* State Reply Br. 5-6.

EPA tries to minimize the political significance of this rule by insisting that Congress has supported electric-vehicle development and related infrastructure. *See, e.g.*, Br. 8-10. Congress is indeed aware of and actively legislating on electrification—through incentives and pilot programs instead of mandates, and alongside support for other emerging technologies. *See, e.g.*, Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021). But Congress's deliberate approach to the issue makes it *less* likely,

not more, that it would have long ago delegated authority to EPA to mandate electric vehicles nationwide. *See West Virginia*, 142 S. Ct. at 2614.

### 3. EPA claims a newfound power to shift America's energy policy.

EPA contends that even if the rule is economically and politically significant, that alone does not trigger the major-questions doctrine. *See* Br. 56-57. That is wrong, but regardless EPA asserts an "unheralded power representing a transformative expansion in its regulatory authority." *West Virginia*, 142 S. Ct. at 2610 (internal quotation marks omitted). Just as in *West Virginia*, EPA is claiming the power to shift the Nation's energy policy by reverse-engineering its preferred balance of technologies through emission standards. In *West Virginia*, it attempted to force a shift from coal-fired plants to wind- and solar-powered plants; here, it attempts to force a shift from liquid-fuel vehicles to electric vehicles.

a. EPA contends that it "broke no new legal ground" in this rule but merely "tighten[ed] existing emission standards under its longstanding and oft-invoked authority." Br. 48. Hardly. Before the rule, EPA set greenhouse-gas vehicle emission standards for vehicles, and some automakers chose to comply in part by producing electric vehicles. Now, EPA has set standards that—by design—"driv[e]" electric-vehicle production and promote a market-

penetration rate double what it would be without the rule. 86 Fed. Reg. at 74,484; RIA 4-27 tbls. 4-27 & 4-28.

EPA mischaracterizes petitioners' argument as a challenge to the "degree" of permissible "stringency" in the rules. Br. 49, 51. Petitioners do not argue that EPA can require some, but lower, electric-vehicle penetration; they challenge EPA's authority to set standards that, for the first time, *require* the substitution of electric vehicles for liquid-fuel vehicles—a difference in kind, not degree. *See* Pet. Br. 37. The same was true in *West Virginia*. There, EPA set emission limits that would have required "restructuring the Nation's overall mix of electricity generation, to transition from 38% coal to 27% coal by 2030." 142 S. Ct. at 2607. The Supreme Court recognized that the asserted authority had dramatic implications: EPA "could go further, perhaps forcing coal plants … to cease making power altogether." *Id.* at 2612. Here, too, EPA effectively claims the power to ban liquid-fuel vehicles altogether and mandate electric ones. Indeed, EPA has already taken a further step in that direction in its newest proposed rule, relying on the same assertion of statutory authority as here to require 67% electric-vehicle penetration by 2032. *See 2027-2032 Proposed Standards* 39 (departing from "feasibility assessments in past rulemakings [that] were predominantly based on advancements in ICE

technologies" and instead relying on "the increasing availability of zero and near-zero tailpipe emissions technologies"); *see also id.* at 294.

EPA also faults petitioners for focusing only on electric vehicles that it treats as "zero-emission" (including "plug-in" hybrid vehicles), and not certain other categories of vehicles that eliminate some but not all greenhouse-gas emissions (such as "strong" and "mild" hybrid vehicles). Br. 49-50. But EPA itself distinguishes among those categories and treats only the former as emitting zero carbon dioxide. 40 C.F.R. § 86.1866-12(a). The rule repeatedly contrasts the electric vehicles that are the focus of petitioners' challenge with combustion-engine vehicles running on "advanced gasoline technologies," "*including mild and strong hybrids*." 86 Fed. Reg. at 74,497 (emphasis added); *see id.* at 74,484, 74,493. Thus, petitioners' challenge tracks EPA's own classifications.

b. All of EPA's efforts to distinguish its standards from the Clean Power Plan in *West Virginia* come up short. Br. 52-56. First, EPA contends that it is merely "regulat[ing] the same source[s] ... that it has always regulated": "motor vehicles." *Id.* at 52 (quoting *West Virginia*, 142 S. Ct. at 2610). That impermissibly raises the level of generality. In *West Virginia*, the Court recognized that a shift from power sources that use one type of fuel

(coal) to those that use another type (wind and solar) was meaningful. The Court did not simply conceive of EPA as regulating the same broad category of "power sources." EPA's standards here likewise force a shift from vehicles powered by one type of fuel to those powered by a different type.

Second, EPA argues that it has regulatory authority over electric vehicles, whereas in *West Virginia* it "had no authority" over the favored sources. Br. 52-53. But a rule can trigger the major-questions doctrine even when the agency has *some* authority to regulate its objects. *E.g., NFIB* v. *Department of Labor*, 142 S. Ct. 661 (2022). More fundamentally, EPA presumes that it has authority to set emission standards that force automakers to produce electric vehicles. As petitioners have explained, it does not. *See* pp. 24-32, *infra*; Pet. Br. 51-62. The statute does not mention electric vehicles— as one would expect if Congress had actually provided EPA such authority. And as explained below (at 27-30), electric vehicles are not "systems" or "devices" that "prevent or control" pollution.

Finally, EPA disputes (at 54-55) that its rule mandates electrification. EPA insists it did not mandate "which technology, let alone how much of it, to use." Br. 55. EPA is doubly wrong. Far from being technology-neutral, the rule heavily advantages electric vehicles by affording them a unique credit

multiplier for compliance purposes, which in turn pushes automakers to comply using electrification. *See* Pet. Br. 13. EPA's characterization is also inconsistent with its own findings. The rule recognizes that compliance will *require* further electrification, at penetration rates far beyond what they would be without the rule. *See* pp. 13-14, *supra*. That has been the plan all along: to "pav[e] the way toward an all-electric, zero-emissions transportation future." *EPA Finalizes Greenhouse Gas Standards*, *supra*.

## B. EPA Lacks Clear Statutory Authority To Use Fleetwide Averaging To Mandate Electric Vehicles.

### 1. The Clean Air Act does not authorize EPA to set emission standards using fleetwide averaging.

Although EPA must show clear congressional authorization for so significant a rule, Title II provides no such authority. In fact, it forecloses EPA from using fleetwide averaging to compel production of electric vehicles. Title II contemplates emission standards that apply to vehicles *individually*, not to fleets on average. Only vehicle-specific standards are compatible with the certification, warranty, remediation, and penalty provisions that, together with Section 202, form an interlocking regulatory scheme. Pet. Br. 39-51.

a. EPA first attacks a straw man. It argues that Section 202(a) allows fleetwide averaging because, by directing EPA to regulate with respect

to "classes" of vehicles, it "authorizes EPA to set standards for a group of vehicles—like a fleet."  Br. 63.  But petitioners have never questioned EPA's authority to "set standards for a group of vehicles," assuming the vehicles emit the relevant pollutant.  *See* Section II.B.2, *infra*.  Rather, the issue is whether EPA's standards must apply to each vehicle within the group, *individually*, or may apply to the group collectively, *on average*.  The terms "class" and "classes" shed no light on that question—as EPA previously acknowledged.  *See* 48 Fed. Reg. at 33,458.

b.     Only vehicle-specific standards "produce[] a substantive effect that is compatible with the rest of the law."  *Koons Buick Pontiac GMC, Inc.* v. *Nigh*, 543 U.S. 50, 60 (2004) (citation omitted).   Contrary to EPA's contention (at 64), *NRDC* v. *Thomas*, 805 F.2d 410 (D.C. Cir. 1986), did not decide that other provisions of Title II permit averaging.  Rather, the Court expressly reserved that question for "future proceedings."  *Id.* at 425 n.24.

This Court should consider that question now and conclude that those other provisions do *not* allow averaging.  Start with Title II's testing and certification provisions, which require EPA to test "any new motor vehicle or new motor vehicle engine … to determine whether such vehicle or engine conforms with the regulations prescribed under [Section 202]."  42 U.S.C.

§ 7525(a)(1).  Petitioners identified two ways in which fleetwide averaging is incompatible with these provisions.  First, the singular terms "vehicle" and "engine," along with "any" and "such," indicate that conformity with all Section 202 standards is determined by testing *individual* vehicles.  Second, fleetwide averaging makes it impossible for EPA to determine compliance with Section 202 standards *before* issuing a certificate of conformity.  *See* Pet. Br. 44-45.

EPA fails to respond to the first argument, and its response to the second concedes the essential point.  EPA acknowledges that averaging "shifts some elements of the compliance demonstration to after the model year ends" and after certificates of conformity are issued, but wrongly contends that "[n]othing in the statute precludes this shift."  Br. 70.  The statute is explicit that EPA may "issue a certificate of conformity" for a new vehicle or engine only "[i]f such vehicle or engine conforms to [the regulations prescribed under Section 202]."  42 U.S.C. § 7525(a)(1).  This requires a determination that a vehicle meets all applicable Section 202 standards *before* it receives a certificate—the very thing EPA concedes is impossible with fleetwide-average standards.   Indeed, EPA has previously recognized that "*[b]efore* a manufacturer may introduce a new motor vehicle into commerce, the

manufacturer must obtain an EPA certificate of conformity indicating compliance with *all* applicable emissions standards." 71 Fed. Reg. 2,810, 2,810 (Jan. 17, 2006) (emphases added).

EPA's effort to reconcile fleetwide averaging with Title II's warranty provision similarly ignores the statute's language. Section 207 requires manufacturers to warrant that "each new motor vehicle and motor vehicle engine … conform[s] *at the time of sale* with applicable regulations under [Section 202]." 42 U.S.C. § 7541(a)(1) (emphasis added). EPA does not dispute that manufacturers cannot give this warranty regarding fleetwide-average standards because compliance with such standards can be determined only at year's end, not "at the time of sale." Instead, EPA argues that the warranty is "based on the automaker's compliance plan and ability to manufacture vehicles meeting particular emission specifications." Br. 69. Whatever the value of that forward-looking and predictive approach, it is not what the statute requires.

The existence of vehicle-specific in-use standards does not save the rule. *See* EPA Br. 72. As noted, Title II requires certifying *before sale*, and warranting *at the time of sale*, that a given vehicle conforms with "*all* applicable emission standards" under Section 202. 71 Fed. Reg. at 2810

(emphasis added); *see* 42 U.S.C. §§ 7525(a)(1), 7541(a)(1). Yet, as EPA essentially admits, that is not possible for fleetwide-average standards, even though they are "applicable emission standards" under Section 202. Thus, the fact that *in-use* standards may satisfy Title II's requirements is no answer to the objection that *fleetwide-average* standards do not. *Cf.* 75 Fed. Reg. at 25,473 ("[T]he in-use $CO_2$ standard under the greenhouse gas program … is separate from the fleet-average standard.").

EPA further fails to reconcile fleetwide averaging with Title II's remediation provision, which contemplates that conformity with emission standards will be determined on a vehicle-by-vehicle basis. Under that provision, a manufacturer is responsible if "*a* motor vehicle"—*i.e.*, an individual vehicle—"fails to conform to the applicable regulations under [Section 202]," 42 U.S.C. § 7541(h)(1) (emphasis added). EPA does not dispute that such a determination is impossible where nonconformity is tied to a fleet on average.

EPA's attempt to square fleetwide averaging with Title II's penalties provision likewise fails. EPA notes that when a manufacturer does not meet its fleetwide-average standard, EPA will designate as nonconforming some number of vehicles corresponding to the amount by which the manufacturer

exceeded the standard. *See* 40 C.F.R. § 86.1865-12(j)(4)(iv). The problem is that these specific vehicles may not actually be nonconforming in any real sense. If a manufacturer incorrectly predicts the mix of vehicles it ends up producing, all its vehicles may meet the standards applicable to them individually, while the fleet collectively exceeds its fleetwide-average standard. In that circumstance, EPA will nevertheless designate some individual vehicles as nonconforming simply to fit within its convoluted penalty scheme. *See id.* ("EPA will designate as nonconforming those vehicles in test groups with the highest certification emission values first."). If Title II actually permitted fleetwide-average standards, EPA's contorted conversion of fleet-level problems into vehicle-level violations would not be necessary.

c. EPA similarly ignores that the specific emission standards mandated by Section 202 are incompatible with fleetwide averaging. For example, it argues that the standard mandated in Section 202(b)(1) "accords with fleet-average standards because the phrase 'such vehicles and engines' can refer naturally to a group or fleet of vehicles." Br. 66. But that is not what the phrase refers to *in Section 202(b)(1)*. In context, "such" refers to the antecedent "light-duty vehicles and engines manufactured during model years 1977 through 1979." 42 U.S.C. § 7521(b)(1)(A). And EPA fails to explain how

Section 202(b)(1)'s requirement that "emissions from such vehicles … may not exceed 1.5 grams per vehicle mile of hydrocarbons and 15.0 grams per vehicle mile of carbon monoxide" could be satisfied by vehicles that exceed those thresholds but are nevertheless permitted under its fleetwide-averaging approach. *Id.*

EPA's assertion (at 68) that the phased-in standards required by Section 202(g) "align[] with" fleetwide averaging is equally unfounded. That provision directed EPA to promulgate standards requiring increasing percentages of each manufacturer's vehicles—specifically, 40% in 1994, 80% in 1995, and 100% in 1996—to meet certain emission standards. *See* 42 U.S.C. § 7521(g)(1)-(2). The provision is plainly incompatible with averaging. If 40% of a fleet must meet the standard, four out of every ten vehicles must meet the standard. If 40% of a fleet must meet the standard *on average*, perhaps only two or three out of ten need to actually meet the standard, so long as they comfortably surpass it—which would be completely inconsistent with the statutory language. Averaging is likewise irreconcilable with the requirement that 100% of model-year-1996 vehicles "comply with the levels specified" in the Act, *id.* § 7521(g)(1), as the entire point of averaging is that some vehicles will not comply.

Finally, EPA has no persuasive answer to the fact that Congress knew how to base regulation on "average annual aggregate emissions," 42 U.S.C. § 7545(k)(1)(B)(v)(II), when it wanted to. Had Congress intended to authorize averaging under Section 202, it would have said so, as it did in EPCA, rather than enacting provision after provision that is incompatible with fleetwide-average standards.

## 2. At a minimum, EPA may not mandate electrification.

Even if the statute clearly authorized fleetwide averaging in some circumstances, it does not clearly authorize the use of fleetwide averaging—or any other statutory tool—to mandate electrification. EPA lacks statutory authority to mandate electrification because Section 202 focuses on vehicles that actually emit relevant pollutants, and the statutory structure and context confirm the plain text. Pet. Br. 51-62.

### a. The text focuses on vehicles that emit the relevant pollutants.

EPA has two textual counterarguments. First, it contends that Section 202(a)'s discussion of a "class or classes of new motor vehicles" means that EPA can set emission standards for vehicles that do not emit the relevant pollutant—here, electric vehicles. Second, EPA argues that Section 202(a) specifically authorizes it to mandate electric vehicles, which it says are

"designed as complete systems or incorporate devices to prevent or control such pollution." 42 U.S.C. § 7521(a)(1). Both arguments fail.

i. Section 202 authorizes EPA to set standards "applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [its] judgment cause, or contribute to" air pollution. 42 U.S.C. § 7521(a)(1). EPA argues (at 76) that the "cause, or contribute" clause must modify "class or classes," rather than "vehicles" or "engines," and that because it can set standards for a "class or classes" of vehicles, it can set a fleetwide-average standard applying across all light-duty vehicles, only some of which emit the relevant pollutant.

EPA's arguments that "cause … pollution" modifies the whole "class" do not withstand scrutiny. EPA primarily contends that its reading is necessary to give effect to the words "class or classes of … vehicles." Br. 76. But even if every vehicle or engine must emit the relevant pollutant, EPA's authority to act on a classwide basis is far from superfluous. It authorizes EPA to set different standards for different groups of pollutant-emitting vehicles.

EPA also argues that the grammatical rule of the last antecedent does not apply because Section 202 does not contain a "list of terms or phrases followed by a limiting clause." Br. 76-77 (citation omitted). But that

interpretive canon also applies to sentences not in list form. *See, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Outside of lists, the canon is sometimes called the "nearest-reasonable-referent canon" rather than the last-antecedent canon, but the principle is the same: a "postpositive modifier normally applies only to the nearest reasonable referent." Antonin Scalia & Bryan A. Garner, *Reading Law* 152 (2012). Here, because the nearest reasonable referent—"vehicles" or "engines"—makes perfect sense in context, the canon applies with full force.

In any event, even if EPA were right that the "class or classes" of vehicles or engines must cause air pollution, the result is the same: when we refer to a class of objects that does something, we ordinarily mean that all the members of the class do that thing. *See* Pet. Br. 56. EPA argues that "the phrase 'class or classes' is most naturally read to mean functional groups, like cars and trucks with transporting capacities," some of which do cause or contribute to air pollution. Br. 77. But the statute does not say "class or classes" in isolation. It specifies a "class or classes of new motor vehicles or new motor vehicle engines, *which in [EPA's] judgment cause, or contribute to* air pollution." 42 U.S.C. § 7521(a)(1) (emphasis added). Congress's choice to define a "class" by a certain characteristic—here, causing or contributing

to such pollution—implies that *all* members of the class share that characteristic. EPA has no response to that basic point.

Finally, EPA contends (at 78) that electric vehicles actually *do* cause or contribute to greenhouse-gas pollution. EPA explains, for example, that "[p]lug-in hybrids … emit greenhouse gases," as "do battery electric vehicles, through leaks in their air-conditioning systems." Br. 78. But the key point is that in setting these standards, the agency has chosen to deem both plug-in hybrids and battery electric vehicles to have zero carbon-dioxide emissions. *See* 40 C.F.R. § 86.1866-12(a); 86 Fed. Reg. at 74,446. Accordingly, the carbon-dioxide standards reflect EPA's "judgment" that these types of vehicles do not "cause, or contribute to" the relevant pollution. If EPA now recognizes that treating these vehicles as "zero-emission" is counterfactual, then its rule premised on that treatment is arbitrary and capricious. *See* pp. 32-33, *infra*. By contrast, if EPA stands by its zero-emission designation, then it must abide by the statutory consequences.

ii.     For the first time ever, EPA also argues (at 40-46) that the statute affirmatively authorizes it to mandate the production of electric vehicles because the statute authorizes it to prescribe pollution-emission controls, whether "designed as complete systems" or "devices to prevent or control such

pollution." 42 U.S.C. § 7521(a)(1). But neither the plain language nor the statutory history supports EPA's newfound authority to replace combustion-engine vehicles with an all-electric fleet. Electric vehicles are not "systems" or "devices" that "prevent or control" pollution; they are just different kinds of vehicles that EPA treats as not emitting the relevant pollutant in the first place.

For starters, electric vehicles are not "designed as complete systems" to prevent or control air pollution because they do not have "built-in pollution control" or prevention. *Truck Trailer Mfrs. Ass'n, Inc.* v. *EPA*, 17 F.4th 1198, 1202 (D.C. Cir. 2021). To "prevent" something means to "keep [it] from happening" or "impede" it. *American Heritage Dictionary* 1038 (1st ed. 1969). To "control" means to "hold in restraint" or "check." *Id.* at 290. Thus, a vehicle with "built-in pollution control" or prevention is one that has a self-contained mechanism to block or capture pollution that would otherwise be emitted. Electric vehicles, by contrast, are designed to run on an entirely different power system, not to limit or control pollution from a carbon-dioxide-emitting engine.

Nor do electric vehicles incorporate "add-in devices for pollution control" or prevention. *Truck Trailer Mfrs.*, 17 F.4th at 1202. The component

parts of an electric vehicle, such as their batteries, are not add-in devices that block the emission of pollution or minimize pollution that would otherwise occur. They are integral to the basic functioning of the vehicle, which does not emit the relevant pollutant in the first place.

EPA also notes that the statutory definition of "motor vehicles" does not expressly exclude electric vehicles. Br. 42. EPA draws a negative implication from two other statutory terms, "nonroad vehicles" and "nonroad engines," which are defined as having an internal-combustion engine. *Id.* (citing 42 U.S.C. § 7550(10), (11)). But the statutory history refutes that negative implication. The relevant "motor vehicle" definition was introduced to the Clean Air Act in 1965 and has remained unchanged since. Pub. L. No. 89-272, § 101, 79 Stat. 992, 995 (1965). In 1965, the ordinary vehicle on the road had an internal-combustion engine, so there was no need for Congress to specify that the term meant anything else. By contrast, Congress added the reference to "nonroad vehicles" in 1990, when other types of power were being explored and it made sense to clarify which type of engine was covered. *See* Pub. L. No. 101-549, § 223, 104 Stat. 2399, 2503 (1990); *see also id.* § 229, 104 Stat. 2511 (establishing pilot program for "clean fuel vehicles" including those powered

by "electricity"). There is nothing to read into Congress's omission of that qualifier 25 years earlier.

### b. The statutory structure and history are consistent with the plain text.

Statutory structure and history likewise foreclose EPA's electric-vehicle mandate. EPA emphasizes that the statute permits standards that are technology-forcing, as long as they are technologically feasible. *See, e.g.*, Br. 40-45. Petitioners do not dispute that EPA's standards may "require manufacturers to adopt nascent technology." Pet. Br. 59 (internal quotation marks omitted). Previous EPA standards promoted the adoption of fuel injection and catalytic converters. *See id.* at 59-60. Those are the types of technology—preventing or controlling emissions from combustion engines—that Congress authorized EPA to require, if feasible. Here, however, EPA is forcing the adoption of technology that its own rule recognizes is different in kind. *See* pp. 13-14, *supra*. Forced electrification inflicts economic, social, and political costs far different from those caused by the "advanced gasoline technologies" that EPA historically has promoted. 86 Fed. Reg. at 74,497.

EPA also turns to legislative history, emphasizing that in 1970 when Congress amended the Clean Air Act to target criteria pollutants, it considered "unconventional energy sources" like steam and natural-gas

pistons. *See* Br. 44. EPA relies on a Senate Report that addressed emissions associated with those sources. *See* S. Rep. No. 91-1196, at 27 (1970). But the report nowhere suggested that EPA would have authority to *require* automakers to shift to those technologies. Moreover, according to the report, all of those technologies emitted some pollutants. *Id.* EPA's reliance (at 41, 43, 44) on this Court's decision in *International Harvester Co.* v. *Ruckelshaus*, 478 F.2d 615 (D.C. Cir. 1973), adds nothing. *International Harvester* merely observed that legislative history shows "Congress expected the Clean Air Amendments to force the industry to broaden the scope of its research—to study new types of engines and new control systems." *Id.* at 635. That some Members of Congress expected the industry to *study* new types of engines does not mean that Congress authorized EPA to mandate a wholesale shift from the internal-combustion engine.

### c. Related provisions confirm the lack of statutory authorization.

EPA has no good response to related statutes that further demonstrate that Congress did not authorize the agency to force electrification. Pet. Br. 60-62. EPA tries to dismiss the 1990 Clean Air Act amendments as just "another example" of Congress's encouraging electrification. Br. 81. But once again, Congress's limited approval of electric vehicles *hurts* EPA's position.

When Congress chose to set standards focused on electric vehicles, it did so on a regionally targeted, pilot basis only. It did not bury a nationwide program in Section 202, at EPA's sole discretion.

EPA likewise tries to downplay the 1992 Energy Policy Act, which expressly blocked NHTSA from considering electric vehicles in setting nationwide standards. Br. 81. Although EPA tries to distance itself from NHTSA, the agencies' mandates "overlap," and they should discharge their obligations in a way that "avoid[s] inconsistency." *Massachusetts* v. *EPA*, 549 U.S. 497, 532 (2007). EPA alternatively suggests that if Congress meant to exclude electric vehicles from EPA's consideration, it should have amended the Clean Air Act in 1992 to parallel the language it applied to NHTSA. But there was no need to do so because the Clean Air Act already excluded electric vehicles. *See* Pet. Br. 61.

## III. EPA's Rule Is Arbitrary And Capricious.

### A. EPA Arbitrarily Calculated The Emissions Of Electric Vehicles.

In setting its standards and determining compliance with them, EPA arbitrarily treated electric vehicles as though they emit zero emissions. *See* Pet. Br. 62-64. EPA freely admits that electric vehicles *do* produce upstream emissions, and that these upstream emissions matter. After all, EPA

considers upstream emissions when determining the rule's impact on total emissions. *See id.* at 63. But EPA argues that ignoring electric vehicles' upstream emissions for compliance purposes is reasonable because the agency treats "upstream emissions of all vehicles, electrified or not, the same way." EPA Br. 82.

That is precisely what makes the rule *unreasonable*. Electric vehicles are responsible for five to six times more upstream carbon-dioxide emissions than conventional vehicles, *see* Fig. 5-1 at RIA 5-2, and those upstream emissions account for 100% of an electric vehicle's emissions from use, *see* 86 Fed. Reg. at 74,446. By contrast, upstream emissions represent only a small portion of conventional vehicles' total emissions. As a result, EPA's across-the-board failure to consider upstream emissions for purposes of compliance means that its rule considers most of gasoline-powered vehicles' emissions, but *none* from electric vehicles. Treating "upstream emissions of all vehicles, electrified or not, the same way," EPA Br. 82, arbitrarily puts a thumb on the scale against conventional vehicles in favor of electric vehicles.

**B.      EPA's Cost-Benefit Analysis Is Unsound.**

1.      EPA asserts (at 90-92) that the rule will result in $320 billion in fuel savings and that this benefit is not offset by *any* consumer costs from performance "trade-offs."  That conclusion is flawed in at least two ways.

First, EPA concedes that it has no explanation for consumers' supposed failure to act in their own best interests with respect to fuel savings—the "energy efficiency gap."  It asks the Court to just trust "EPA's own experience" that the gap exists.  Br. 91.  This Court recently rejected a similar assertion regarding energy-efficiency standards for heating boilers.  "Instead of producing evidence of some market failure in this specific market, the [agency] essentially said it did the best it could with the data it had." *American Pub. Gas Ass'n* v. *Department of Energy*, 22 F.4th 1018, 1027 (D.C. Cir. 2022).  Here too, the agency's "lackadaisical response" cannot "justify assuming a purchaser's decisions will not align with its economic interests." *Id.*

Second, the supposed existence of a market failure does not justify the benefits EPA claims, without knowing the *magnitude* of the market failure. EPA's assertion (at 91-92) that there are *no* "hidden costs" or performance trade-offs from mandating greater fuel efficiency imputes a staggering

amount of irrationality to American consumers, and misrepresents the record to boot. The studies EPA cites establish only that the "newest … engines have much flatter tradeoffs than earlier" engines, RIA 8-3, the same conclusion reached by the unpublished paper the rule cites, *see* Pet. Br. 67-68. Nor does EPA cite any study finding that "automakers have improved fuel economy without adversely affecting other vehicle attributes." EPA Br. 91 (citing RIA 8-3). One study addressed this point, but that study was only an analysis (and *critique*) of EPA's own prior cost-benefit analysis. *See* Gloria Helfland & Reid Dorsey-Palmateer, *The Energy Efficiency Gap in EPA's Benefit-Cost Analysis of Vehicle Greenhouse Gas Regulations*, 6 J. Benefit Cost Anal. 432, 450-451 (2015).

2.  EPA also failed to reasonably explain its electricity-cost projections. EPA projected very low electricity costs that almost immediately proved inaccurate. *See* Pet. Br. 68-69. EPA concedes that its only "expla[nation]" was a two-word citation to "AEO 2021," the Department of Energy's long-term Annual Energy Outlook 2021. EPA did not explain which figures it relied on, or why they were better than the alternatives submitted by commenters.

The *post hoc* rationalizations EPA offers now—that it was deferring to the Department of Energy's expertise and that it was "reasonable to use" this projection "because it projects prices through 2050," Br. 92—are improper. *See DHS* v. *Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). Nor can EPA "pass[] the entire issue off onto a different agency. Administrative law does not permit such a dodge." *Delaware Dep't of Nat. Res. & Env't Control* v. *EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015). Agencies must adequately explain their choices. *See id.* Merely saying "AEO 2021" falls short.

## C. EPA's Refusal To Consider The Efficiency Benefits Of Higher-Octane Liquid Fuels Was Unreasonable.

EPA does not dispute that raising the minimum octane standard for gasoline would achieve many of the benefits EPA claimed to want. Instead, it argues that it ignored the issue because (1) the rule had a short lead time and (2) there are "unresolved questions about EPA's authority over octane." Br. 93-94. But these are again *post hoc* rationalizations. *Regents*, 140 S. Ct. at 1909. Regardless, improvements from higher octane standards would not need to be instantaneous to be relevant to this rule, which covers model years "2023 *and later*." And EPA's uncertainty over its authority does not absolve it of the duty to provide a reasoned explanation. Contrary to EPA's assertion, multiple commenters cited EPA's previous statements about its authority over

octane.  *See* Comment of Ten State Corn Growers Associations at 8-9 & n.21; *see also* 40 C.F.R. § 80.22 (1973).  The agency's unexplained refusal to even consider fuel-quality solutions was thus arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should set aside EPA's rule.[*]

APRIL 18, 2023

Respectfully submitted,

s/ Jeffrey B. Wall

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel & Petrochemical Manufacturers and Energy Marketers of America*

C. BOYDEN GRAY
JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY & ASSOCIATES, PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(317) 513-0622
buschbacher@boydengray

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Washington, DC 20006-5215
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable Fuels Company, LLC*

MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

---

[*]  EPA requests (at 94 n.30) additional briefing on remedies, but makes no arguments why vacatur is inappropriate.  This Court should disregard EPA's request, which is a transparent attempt to evade this Court's word limits.

associates.com

*Counsel for Clean Fuels Development Coalition, ICM, Inc., Illinois Corn Growers Association, Indiana Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, and Valero Renewable Fuels Company, LLC*

DEVIN WATKINS
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street, NW
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Competitive Enterprise Institute, Anthony Kreucher, Walter M. Kreucher, James Leedy, Marc Scribner, and Domestic Energy Producers Alliance*

*Counsel for Iowa Soybean Association, Minnesota Soybean Growers Association, South Dakota Soybean Association, and Diamond Alternative Energy, LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Valero Renewable Fuels Company, LLC and Diamond Alternative Energy, LLC*

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(f) and (g), along with the Court's September 22, 2022 Order because it contains 7,499 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5) and (6) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall

JEFFREY B. WALL

APRIL 18, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 18th day of April, 2023, I electronically filed the foregoing Initial Reply Brief for Petitioners with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

s/ Jeffrey B. Wall
JEFFREY B. WALL

APRIL 18, 2023