**ORAL ARGUMENT NOT YET SCHEDULED**
No. 22-1031 (and consolidated cases)

# In the United States Court of Appeals for the District of Columbia Circuit

---

STATE OF TEXAS, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ADVANCED ENERGY UNITED, ET AL.,
*Intervenors.*

---

On Petition for Review from the United States Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0208)

---

## PRIVATE PETITIONERS' ADDENDUM OF STATUTES AND STANDING DECLARATIONS

---

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel & Petrochemical Manufacturers and Energy Marketers of America*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable Fuels Company, LLC*

(Additional counsel listed on the following page)

C. BOYDEN GRAY
JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY & ASSOCIATES,
PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(317) 513-0622
buschbacher@boydengray
associates.com

*Counsel for Clean Fuels
Development Coalition, ICM, Inc.,
Illinois Corn Growers Association,
Indiana Corn Growers
Association, Kansas Corn Growers
Association, Kentucky Corn
Growers Association, Michigan
Corn Growers Association,
Missouri Corn Growers
Association, and Valero Renewable
Fuels Company, LLC*

DEVIN WATKINS
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street, NW
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Competitive Enterprise
Institute, Anthony Kreucher,
Walter M. Kreucher, James Leedy,
Marc Scribner, and Domestic
Energy Producers Alliance*

MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street NW
Washington, DC 20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

*Counsel for Illinois Soybean
Association, Iowa Soybean
Association, Indiana Soybean
Alliance, Inc., Michigan Soybean
Association, Minnesota Soybean
Growers Association, North
Dakota Soybean Growers
Association, Ohio Soybean
Association, South Dakota
Soybean Association, and
Diamond Alternative Energy, LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Diamond Alternative
Energy, LLC, and Valero
Renewable Fuels Company, LLC*

# TABLE OF CONTENTS

Page

PRIMARY STATUTES ...................................................................1a

    A.   42 U.S.C. § 7521 (excerpt) .................................................1a

    B.   42 U.S.C. § 7522 ..............................................................14a

    C.   42 U.S.C. § 7524 ..............................................................18a

    D.   42 U.S.C. § 7525 (excerpt) ...............................................22a

    E.   42 U.S.C. § 7541 (excerpt) ...............................................29a

    F.   49 U.S.C. § 32902 (excerpt) .............................................36a

STANDING DECLARATIONS ......................................................37a

    A.   Deepak Garg, Vice President of the Fuels Regulatory and Planning and HSE Assurance division for Valero Renewable Fuels Company, LLC and Diamond Alternative Energy, LLC ...................................................................37a

    B.   Susan W. Grissom, Chief Industry Analyst for American Fuel & Petrochemical Manufacturers .........................................45a

    C.   Trevor Hinz, Director of Government and Industry Relations of ICM, Inc. ...................................................50a

    D.   Lane Howard, Associate Director of Market Development of the Missouri Corn Growers Association ..................................54a

    E.   Courtney Kingery, Chief Executive Officer of the Indiana Corn Growing Association .............................................58a

    F.   Anthony Kreucher .....................................................62a

    G.   Walter M. Kreucher......................................................64a

    H.   Kent Lassman, President and CEO of the Competitive Enterprise Institute.......................................................72a

I.      Kirk Leeds, Chief Executive Officer for the Iowa Soybean
        Association ........................................................................74a

J.      James Leedy ..........................................................................77a

K.      Dave Loos, Director of Biofuels and Research of the
        Illinois Corn Growers Association ................................79a

L.      Josh Roe, Vice President of Market Development and
        Policy of the Kansas Corn Growers Association .........83a

M.      Marc Scribner ......................................................................87a

N.      Jerry Simmons, President and CEO of the Domestic
        Energy Producers Alliance.............................................89a

O.      Jennifer M. Swenton, Director of Optimization & Planning
        for Valero...............................................................................94a

P.      James E. Zook, Executive Director of the Michigan Corn
        Growers Association .......................................................99a

# PRIMARY STATUTES

A.  42 U.S.C. § 7521 provides in pertinent part:

**Emission standards for new motor vehicles or new motor vehicle engines**

## (a) Authority of Administrator to prescribe by regulation

Except as otherwise provided in subsection (b)—

(1) The Administrator shall by regulation prescribe (and from time to time revise) in accordance with the provisions of this section, standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.  Such standards shall be applicable to such vehicles and engines for their useful life (as determined under subsection (d), relating to useful life of vehicles for purposes of certification), whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution.

(2) Any regulation prescribed under paragraph (1) of this subsection (and any revision thereof) shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period.

(3)(A) In general.—

(i) Unless the standard is changed as provided in subparagraph (B), regulations under paragraph (1) of this subsection applicable to emissions of hydrocarbons, carbon monoxide, oxides of nitrogen, and particulate matter from classes or categories of heavy-duty vehicles or engines manufactured during or after model year 1983 shall contain standards which reflect the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standards apply, giving appropriate consideration to cost, energy, and safety factors associated with the application of such technology.

(ii)  In establishing classes or categories of vehicles or engines for purposes of regulations under this paragraph, the Administrator may base such classes or categories on gross vehicle weight, horsepower, type of fuel used, or other appropriate factors.

(B)  Revised standards for heavy duty trucks.—

(i) On the basis of information available to the Administrator concerning the effects of air pollutants emitted from heavy-duty vehicles or engines and from other sources of mobile source related pollutants on the public health and welfare, and taking costs into account, the Administrator may promulgate regulations under paragraph (1) of this subsection revising any standard promulgated under, or before the date of, the enactment of the Clean Air Act Amendments of 1990 (or previously revised under this subparagraph) and applicable to classes or categories of heavy-duty vehicles or engines.

(ii) Effective for the model year 1998 and thereafter, the regulations under paragraph (1) of this subsection applicable to emissions of oxides of nitrogen ($NO_x$) from gasoline and diesel-fueled heavy duty trucks shall contain standards which provide that such emissions may not exceed 4.0 grams per brake horsepower hour (gbh).

(C) Lead time and stability.—Any standard promulgated or revised under this paragraph and applicable to classes or categories of heavy-duty vehicles or engines shall apply for a period of no less than 3 model years beginning no earlier than the model year commencing 4 years after such revised standard is promulgated.

(D) Rebuilding practices.—The Administrator shall study the practice of rebuilding heavy-duty engines and the impact rebuilding has on engine emissions.  On the basis of that study and other information available to the Administrator, the Administrator may prescribe requirements to control rebuilding practices, including standards applicable to emissions from any rebuilt heavy-duty engines (whether or not the engine is past its statutory useful life), which in the Administrator's judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare taking costs into account.  Any regulation shall take effect after a period the Administrator finds necessary to permit the development and

application of the requisite control measures, giving appropriate consideration to the cost of compliance within the period and energy and safety factors.

(E) Motorcycles.—For purposes of this paragraph, motorcycles and motorcycle engines shall be treated in the same manner as heavy-duty vehicles and engines (except as otherwise permitted under section 7525(f)(1)[1] of this title) unless the Administrator promulgates a rule reclassifying motorcycles as light-duty vehicles within the meaning of this section or unless the Administrator promulgates regulations under subsection (a) applying standards applicable to the emission of air pollutants from motorcycles as a separate class or category. In any case in which such standards are promulgated for such emissions from motorcycles as a separate class or category, the Administrator, in promulgating such standards, shall consider the need to achieve equivalency of emission reductions between motorcycles and other motor vehicles to the maximum extent practicable.

(4)(A) Effective with respect to vehicles and engines manufactured after model year 1978, no emission control device, system, or element of design shall be used in a new motor vehicle or new motor vehicle engine for purposes of complying with requirements prescribed under this subchapter if such device, system, or element of design will cause or contribute to an unreasonable risk to public health, welfare, or safety in its operation or function.

(B) In determining whether an unreasonable risk exists under subparagraph (A), the Administrator shall consider, among other factors, (i) whether and to what extent the use of any device, system, or element of design causes, increases, reduces, or eliminates emissions of any unregulated pollutants; (ii) available methods for reducing or eliminating any risk to public health, welfare, or safety which may be associated with the use of such device, system, or element of design, and (iii) the availability of other devices, systems, or elements of design which may be used to

---

[1] Section 7525(f)(1) of this title, referred to in subsec. (a)(3)(E), was redesignated section 7525(f) of this title by Pub. L. 101–549, title II, §230(8), Nov. 15, 1990, 104 Stat. 2529.

conform to requirements prescribed under this subchapter without causing or contributing to such unreasonable risk. The Administrator shall include in the consideration required by this paragraph all relevant information developed pursuant to section 7548 of this title.

(5)(A) If the Administrator promulgates final regulations which define the degree of control required and the test procedures by which compliance could be determined for gasoline vapor recovery of uncontrolled emissions from the fueling of motor vehicles, the Administrator shall, after consultation with the Secretary of Transportation with respect to motor vehicle safety, prescribe, by regulation, fill pipe standards for new motor vehicles in order to insure effective connection between such fill pipe and any vapor recovery system which the Administrator determines may be required to comply with such vapor recovery regulations. In promulgating such standards the Administrator shall take into consideration limits on fill pipe diameter, minimum design criteria for nozzle retainer lips, limits on the location of the unleaded fuel restrictors, a minimum access zone surrounding a fill pipe, a minimum pipe or nozzle insertion angle, and such other factors as he deems pertinent.

(B) Regulations prescribing standards under subparagraph (A) shall not become effective until the introduction of the model year for which it would be feasible to implement such standards, taking into consideration the restraints of an adequate leadtime for design and production.

(C) Nothing in subparagraph (A) shall (i) prevent the Administrator from specifying different nozzle and fill neck sizes for gasoline with additives and gasoline without additives or (ii) permit the Administrator to require a specific location, configuration, modeling, or styling of the motor vehicle body with respect to the fuel tank fill neck or fill nozzle clearance envelope.

(D) For the purpose of this paragraph, the term "fill pipe" shall include the fuel tank fill pipe, fill neck, fill inlet, and closure.

(6) Onboard vapor recovery.—Within 1 year after November 15, 1990, the Administrator shall, after consultation with the Secretary of Transportation regarding the safety of vehicle-based ("onboard") systems for the control of vehicle refueling emissions, promulgate standards under

this section requiring that new light-duty vehicles manufactured beginning in the fourth model year after the model year in which the standards are promulgated and thereafter shall be equipped with such systems.  The standards required under this paragraph shall apply to a percentage of each manufacturer's fleet of new light-duty vehicles beginning with the fourth model year after the model year in which the standards are promulgated.  The percentage shall be as specified in the following table:

Implementation Schedule for Onboard Vapor Recovery Requirements

| Model year commencing after standards promulgated | Percentage* |
| --- | --- |
| Fourth | 40 |
| Fifth | 80 |
| After Fifth | 100 |

*Percentages in the table refer to a percentage of the manufacturer's sales volume.

The standards shall require that such systems provide a minimum evaporative emission capture efficiency of 95 percent.  The requirements of section 7511a(b)(3) of this title (relating to stage II gasoline vapor recovery) for areas classified under section 7511 of this title as moderate for ozone shall not apply after promulgation of such standards and the Administrator may, by rule, revise or waive the application of the requirements of such section 7511a(b)(3) of this title for areas classified under section 7511 of this title as Serious, Severe, or Extreme for ozone, as appropriate, after such time as the Administrator determines that onboard emissions control systems required under this paragraph are in widespread use throughout the motor vehicle fleet.

\*    \*    \*

**(b) Emissions of carbon monoxide, hydrocarbons, and oxides of nitrogen; annual report to Congress; waiver of emission standards; research objectives**

(1)(A) The regulations under subsection (a) applicable to emissions of carbon monoxide and hydrocarbons from light-duty vehicles and engines manufactured during model years 1977 through 1979 shall contain standards which provide that such emissions from such vehicles and engines may not exceed 1.5 grams per vehicle mile of hydrocarbons and 15.0 grams per vehicle mile of carbon monoxide. The regulations under subsection (a) applicable to emissions of carbon monoxide from light-duty vehicles and engines manufactured during the model year 1980 shall contain standards which provide that such emissions may not exceed 7.0 grams per vehicle mile. The regulations under subsection (a) applicable to emissions of hydrocarbons from light-duty vehicles and engines manufactured during or after model year 1980 shall contain standards which require a reduction of at least 90 percent from emissions of such pollutant allowable under the standards under this section applicable to light-duty vehicles and engines manufactured in model year 1970. Unless waived as provided in paragraph (5),[2] regulations under subsection (a) applicable to emissions of carbon monoxide from light-duty vehicles and engines manufactured during or after the model year 1981 shall contain standards which require a reduction of at least 90 percent from emissions of such pollutant allowable under the standards under this section applicable to light-duty vehicles and engines manufactured in model year 1970.

(B) The regulations under subsection (a) applicable to emissions of oxides of nitrogen from light-duty vehicles and engines manufactured during model years 1977 through 1980 shall contain standards which provide that such emissions from such vehicles and engines may not exceed 2.0 grams per vehicle mile. The regulations under subsection (a) applicable to emissions of oxides of nitrogen from light-duty vehicles and engines manufactured during the model year 1981 and thereafter shall contain

---

[2] Paragraph (5) of subsec. (b), referred to in subsec. (b)(1)(A), related to waivers for model years 1981 and 1982, and was repealed by Pub. L. 101–549, title II, §230(3), Nov. 15, 1990, 104 Stat. 2529.

standards which provide that such emissions from such vehicles and engines may not exceed 1.0 gram per vehicle mile. The Administrator shall prescribe standards in lieu of those required by the preceding sentence, which provide that emissions of oxides of nitrogen may not exceed 2.0 grams per vehicle mile for any light-duty vehicle manufactured during model years 1981 and 1982 by any manufacturer whose production, by corporate identity, for calendar year 1976 was less than three hundred thousand light-duty motor vehicles worldwide if the Administrator determines that—

(i) the ability of such manufacturer to meet emission standards in the 1975 and subsequent model years was, and is, primarily dependent upon technology developed by other manufacturers and purchased from such manufacturers; and

(ii) such manufacturer lacks the financial resources and technological ability to develop such technology.

(C) The Administrator may promulgate regulations under subsection (a)(1) revising any standard prescribed or previously revised under this subsection, as needed to protect public health or welfare, taking costs, energy, and safety into account. Any revised standard shall require a reduction of emissions from the standard that was previously applicable. Any such revision under this subchapter may provide for a phase-in of the standard. It is the intent of Congress that the numerical emission standards specified in subsections (a)(3)(B)(ii), (g), (h), and (i) shall not be modified by the Administrator after November 15, 1990, for any model year before the model year 2004.

(2) Emission standards under paragraph (1), and measurement techniques on which such standards are based (if not promulgated prior to November 15, 1990), shall be promulgated by regulation within 180 days after November 15, 1990.

(3) For purposes of this part—

(A)(i) The term "model year" with reference to any specific calendar year means the manufacturer's annual production period (as determined by the Administrator) which includes January 1 of such calendar year.

If the manufacturer has no annual production period, the term "model year" shall mean the calendar year.

(ii) For the purpose of assuring that vehicles and engines manufactured before the beginning of a model year were not manufactured for purposes of circumventing the effective date of a standard required to be prescribed by subsection (b), the Administrator may prescribe regulations defining "model year" otherwise than as provided in clause (i).

(B) Repealed.  Pub. L. 101–549, title II, §230(1), Nov. 15, 1990, 104 Stat. 2529.

(C) The term "heavy duty vehicle" means a truck, bus, or other vehicle manufactured primarily for use on the public streets, roads, and highways (not including any vehicle operated exclusively on a rail or rails) which has a gross vehicle weight (as determined under regulations promulgated by the Administrator) in excess of six thousand pounds. Such term includes any such vehicle which has special features enabling off-street or off-highway operation and use.

(3)[3] Upon the petition of any manufacturer, the Administrator, after notice and opportunity for public hearing, may waive the standard required under subparagraph (B) of paragraph (1) to not exceed 1.5 grams of oxides of nitrogen per vehicle mile for any class or category of light-duty vehicles or engines manufactured by such manufacturer during any period of up to four model years beginning after the model year 1980 if the manufacturer demonstrates that such waiver is necessary to permit the use of an innovative power train technology, or innovative emission control device or system, in such class or category of vehicles or engines and that such technology or system was not utilized by more than 1 percent of the light-duty vehicles sold in the United States in the 1975 model year. Such waiver may be granted only if the Administrator determines—

(A) that such waiver would not endanger public health,

---

[3] So in original. Probably should be "(4)".

8a

(B) that there is a substantial likelihood that the vehicles or engines will be able to comply with the applicable standard under this section at the expiration of the waiver, and

(C) that the technology or system has a potential for long-term air quality benefit and has the potential to meet or exceed the average fuel economy standard applicable under the Energy Policy and Conservation Act [42 U.S.C. 6201 et seq.] upon the expiration of the waiver.

No waiver under this subparagraph[4] granted to any manufacturer shall apply to more than 5 percent of such manufacturer's production or more than fifty thousand vehicles or engines, whichever is greater.

\*      \*      \*

**(g) Light-duty trucks up to 6,000 lbs. GVWR and light-duty vehicles; standards for model years after 1993**

(1) NMHC, CO, and NO$_x$

Effective with respect to the model year 1994 and thereafter, the regulations under subsection (a) applicable to emissions of nonmethane hydrocarbons (NMHC), carbon monoxide (CO), and oxides of nitrogen (NO$_x$) from light-duty trucks (LDTs) of up to 6,000 lbs. gross vehicle weight rating (GVWR) and light-duty vehicles (LDVs) shall contain standards which provide that emissions from a percentage of each manufacturer's sales volume of such vehicles and trucks shall comply with the levels specified in table G. The percentage shall be as specified in the implementation schedule below:

---

[4] So in original. Probably should be "paragraph".

Table G—Emission Standards for NMHC, CO, and $NO_x$ from Light-Duty Trucks of up to 6,000 Lbs. GVWR And Light-Duty Vehicles

| Vehicle type | Column A (5 yrs/50,000 mi) | | | Column B (10 yrs/100,000 mi) | | |
|---|---|---|---|---|---|---|
| | NMHC | CO | $NO_x$ | NMHC | CO | $NO_x$ |
| LDTs (0–3,750 lbs. LVW) and light-duty vehicles | 0.25 | 3.4 | 0.4* | 0.31 | 4.2 | 0.6* |
| LDTs (3,751–5,750 lbs. LVW) | 0.32 | 4.4 | 0.7** | 0.40 | 5.5 | 0.97 |

Standards are expressed in grams per mile (gpm).

For standards under column A, for purposes of certification under section 7525 of this title, the applicable useful life shall be 5 years or 50,000 miles (or the equivalent), whichever first occurs.

For standards under column B, for purposes of certification under section 7525 of this title, the applicable useful life shall be 10 years or 100,000 miles (or the equivalent), whichever first occurs.

*In the case of diesel-fueled LDTs (0–3,750 lvw) and light-duty vehicles, before the model year 2004, in lieu of the 0.4 and 0.6 standards for $NO_x$, the applicable standards for $NO_x$ shall be 1.0 gpm for a useful life of 5 years or 50,000 miles (or the equivalent), whichever first occurs, and 1.25 gpm for a useful life of 10 years or 100,000 miles (or the equivalent) whichever first occurs.

**This standard does not apply to diesel-fueled LDTs (3,751–5,750 lbs. LVW).

Implementation Schedule for Table G Standards

| Model year | Percentage* |
| --- | --- |
| 1994 | 40 |
| 1995 | 80 |
| after 1995 | 100 |

*Percentages in the table refer to a percentage of each manufacturer's sales volume.

(2) PM Standard

Effective with respect to model year 1994 and thereafter in the case of light-duty vehicles, and effective with respect to the model year 1995 and thereafter in the case of light-duty trucks (LDTs) of up to 6,000 lbs. gross vehicle weight rating (GVWR), the regulations under subsection (a) applicable to emissions of particulate matter (PM) from such vehicles and trucks shall contain standards which provide that such emissions from a percentage of each manufacturer's sales volume of such vehicles and trucks shall not exceed the levels specified in the table below. The percentage shall be as specified in the Implementation Schedule below.

PM Standard for LDTs of up to 6,000 lbs. GVWR

| Useful life period | Standard |
| --- | --- |
| 5/50,000 | 0.08 gpm |
| 10/100,000 | 0.10 gpm |

The applicable useful life, for purposes of certification under section 7525 of this title and for purposes of in-use compliance under section 7541 of this title, shall be 5 years or 50,000 miles (or the equivalent), whichever first occurs, in the case of the 5/50,000 standard.

The applicable useful life, for purposes of certification under section 7525 of this title and for purposes of in-use compliance under section 7541 of this title, shall be 10 years or 100,000 miles (or the equivalent), whichever first occurs in the case of the 10/100,000 standard.

Implementation Schedule for PM Standards

| Model year | Light-duty vehicles | LDTs |
|---|---|---|
| 1994 | 40%* | |
| 1995 | 80%* | 40%* |
| 1996 | 100%* | 80%* |
| after 1996 | 100%* | 100%* |

*Percentages in the table refer to a percentage of each manufacturer's sales volume.

\*     \*     \*

**(m) Emissions control diagnostics**

(1) Regulations

Within 18 months after November 15, 1990, the Administrator shall promulgate regulations under subsection (a) requiring manufacturers to install on all new light duty vehicles and light duty trucks diagnostics systems capable of—

(A) accurately identifying for the vehicle's useful life as established under this section, emission-related systems deterioration or malfunction, including, at a minimum, the catalytic converter and oxygen sensor, which could cause or result in failure of the vehicles to comply with emission standards established under this section,

(B) alerting the vehicle's owner or operator to the likely need for emission-related components or systems maintenance or repair,

12a

(C) storing and retrieving fault codes specified by the Administrator, and

(D) providing access to stored information in a manner specified by the Administrator.

The Administrator may, in the Administrator's discretion, promulgate regulations requiring manufacturers to install such onboard diagnostic systems on heavy-duty vehicles and engines.

(2) Effective date

The regulations required under paragraph (1) of this subsection shall take effect in model year 1994, except that the Administrator may waive the application of such regulations for model year 1994 or 1995 (or both) with respect to any class or category of motor vehicles if the Administrator determines that it would be infeasible to apply the regulations to that class or category in such model year or years, consistent with corresponding regulations or policies adopted by the California Air Resources Board for such systems.

(3) State inspection

The Administrator shall by regulation require States that have implementation plans containing motor vehicle inspection and maintenance programs to amend their plans within 2 years after promulgation of such regulations to provide for inspection of onboard diagnostics systems (as prescribed by regulations under paragraph (1) of this subsection) and for the maintenance or repair of malfunctions or system deterioration identified by or affecting such diagnostics systems. Such regulations shall not be inconsistent with the provisions for warranties promulgated under section 7541(a) and (b) of this title.

(4) Specific requirements

In promulgating regulations under this subsection, the Administrator shall require—

(A) that any connectors through which the emission control diagnostics system is accessed for inspection, diagnosis, service, or

13a

repair shall be standard and uniform on all motor vehicles and motor vehicle engines;

(B) that access to the emission control diagnostics system through such connectors shall be unrestricted and shall not require any access code or any device which is only available from a vehicle manufacturer; and

(C) that the output of the data from the emission control diagnostics system through such connectors shall be usable without the need for any unique decoding information or device.

(5) Information availability

The Administrator, by regulation, shall require (subject to the provisions of section 7542(c) of this title regarding the protection of methods or processes entitled to protection as trade secrets) manufacturers to provide promptly to any person engaged in the repairing or servicing of motor vehicles or motor vehicle engines, and the Administrator for use by any such persons, with any and all information needed to make use of the emission control diagnostics system prescribed under this subsection and such other information including instructions for making emission related diagnosis and repairs. No such information may be withheld under section 7542(c) of this title if that information is provided (directly or indirectly) by the manufacturer to franchised dealers or other persons engaged in the repair, diagnosing, or servicing of motor vehicles or motor vehicle engines. Such information shall also be available to the Administrator, subject to section 7542(c) of this title, in carrying out the Administrator's responsibilities under this section.

B.      42 U.S.C. § 7522 provides:

**Prohibited Acts**

**(a) Enumerated prohibitions**

The following acts and the causing thereof are prohibited—

(1) in the case of a manufacturer of new motor vehicles or new motor vehicle engines for distribution in commerce, the sale, or the offering for sale, or the introduction, or delivery for introduction, into commerce, or (in the case of any person, except as provided by regulation of the Administrator), the importation into the United States, of any new motor vehicle or new motor vehicle engine, manufactured after the effective date of regulations under this part which are applicable to such vehicle or engine unless such vehicle or engine is covered by a certificate of conformity issued (and in effect) under regulations prescribed under this part or part C in the case of clean-fuel vehicles (except as provided in subsection (b));

(2)(A) for any person to fail or refuse to permit access to or copying of records or to fail to make reports or provide information required under section 7542 of this title;

(B) for any person to fail or refuse to permit entry, testing or inspection authorized under section 7525(c) of this title or section 7542 of this title;

(C) for any person to fail or refuse to perform tests, or have tests performed as required under section 7542 of this title;

(D) for any manufacturer to fail to make information available as provided by regulation under section 7521(m)(5) of this title;

(3)(A) for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser; or

(B) for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use; or

(4) for any manufacturer of a new motor vehicle or new motor vehicle engine subject to standards prescribed under section 7521 of this title or part C—

(A) to sell or lease any such vehicle or engine unless such manufacturer has complied with (i) the requirements of section 7541(a) and (b) of this title with respect to such vehicle or engine, and unless a label or tag is affixed to such vehicle or engine in accordance with section 7541(c)(3) of this title, or (ii) the corresponding requirements of part C in the case of clean fuel vehicles unless the manufacturer has complied with the corresponding requirements of part C[1]

(B) to fail or refuse to comply with the requirements of section 7541(c) or (e) of this title, or the corresponding requirements of part C in the case of clean fuel vehicles[2]

(C) except as provided in subsection (c)(3) of section 7541 of this title and the corresponding requirements of part C in the case of clean fuel vehicles, to provide directly or indirectly in any communication to the ultimate purchaser or any subsequent purchaser that the coverage of any warranty under this chapter is conditioned upon use of any part, component, or system manufactured by such manufacturer or any person acting for such manufacturer or under his control, or conditioned upon service performed by any such person, or

(D) to fail or refuse to comply with the terms and conditions of the warranty under section 7541(a) or (b) of this title or the corresponding requirements of part C in the case of clean fuel vehicles with respect to any vehicle; or

(5) for any person to violate section 7553 of this title, 7554 of this title, or part C of this subchapter or any regulations under section 7553 of this title, 7554 of this title, or part C.

No action with respect to any element of design referred to in paragraph (3) (including any adjustment or alteration of such element) shall be treated

---

[1] So in original.  Probably should be followed by a comma.

[2] So in original.  Probably should be followed by a comma.

as a prohibited act under such paragraph (3) if such action is in accordance with section 7549 of this title.  Nothing in paragraph (3) shall be construed to require the use of manufacturer parts in maintaining or repairing any motor vehicle or motor vehicle engine.  For the purposes of the preceding sentence, the term "manufacturer parts" means, with respect to a motor vehicle engine, parts produced or sold by the manufacturer of the motor vehicle or motor vehicle engine.  No action with respect to any device or element of design referred to in paragraph (3) shall be treated as a prohibited act under that paragraph if (i) the action is for the purpose of repair or replacement of the device or element, or is a necessary and temporary procedure to repair or replace any other item and the device or element is replaced upon completion of the procedure, and (ii) such action thereafter results in the proper functioning of the device or element referred to in paragraph (3).  No action with respect to any device or element of design referred to in paragraph (3) shall be treated as a prohibited act under that paragraph if the action is for the purpose of a conversion of a motor vehicle for use of a clean alternative fuel (as defined in this subchapter) and if such vehicle complies with the applicable standard under section 7521 of this title when operating on such fuel, and if in the case of a clean alternative fuel vehicle (as defined by rule by the Administrator), the device or element is replaced upon completion of the conversion procedure and such action results in proper functioning of the device or element when the motor vehicle operates on conventional fuel.

**(b) Exemptions; refusal to admit vehicle or engine into United States; vehicles or engines intended for export**

(1) The Administrator may exempt any new motor vehicle or new motor vehicle engine, from subsection (a), upon such terms and conditions as he may find necessary for the purpose of research, investigations, studies, demonstrations, or training, or for reasons of national security.

(2) A new motor vehicle or new motor vehicle engine offered for importation or imported by any person in violation of subsection (a) shall be refused admission into the United States, but the Secretary of the Treasury and the Administrator may, by joint regulation, provide for deferring final determination as to admission and authorizing the delivery of such a motor vehicle or engine offered for import to the owner or consignee thereof upon such terms and conditions (including the furnishing

of a bond) as may appear to them appropriate to insure that any such motor vehicle or engine will be brought into conformity with the standards, requirements, and limitations applicable to it under this part. The Secretary of the Treasury shall, if a motor vehicle or engine is finally refused admission under this paragraph, cause disposition thereof in accordance with the customs laws unless it is exported, under regulations prescribed by such Secretary, within ninety days of the date of notice of such refusal or such additional time as may be permitted pursuant to such regulations, except that disposition in accordance with the customs laws may not be made in such manner as may result, directly or indirectly, in the sale, to the ultimate consumer, of a new motor vehicle or new motor vehicle engine that fails to comply with applicable standards of the Administrator under this part.

(3) A new motor vehicle or new motor vehicle engine intended solely for export, and so labeled or tagged on the outside of the container and on the vehicle or engine itself, shall be subject to the provisions of subsection (a), except that if the country which is to receive such vehicle or engine has emission standards which differ from the standards prescribed under section 7521 of this title, then such vehicle or engine shall comply with the standards of such country which is to receive such vehicle or engine.

C.    42 U.S.C. § 7524 provides:

**Civil penalties**

**(a) Violations**

Any person who violates sections[1] 7522(a)(1), 7522(a)(4), or 7522(a)(5) of this title or any manufacturer or dealer who violates section 7522(a)(3)(A) of this title shall be subject to a civil penalty of not more than $25,000. Any person other than a manufacturer or dealer who violates section 7522(a)(3)(A) of this title or any person who violates section 7522(a)(3)(B) of this title shall be subject to a civil penalty of not more than $2,500. Any such violation with respect to paragraph (1), (3)(A), or (4) of section 7522(a) of this title shall

---

[1] So in original. Probably should be "section".

constitute a separate offense with respect to each motor vehicle or motor vehicle engine.  Any such violation with respect to section 7522(a)(3)(B) of this title shall constitute a separate offense with respect to each part or component. Any person who violates section 7522(a)(2) of this title shall be subject to a civil penalty of not more than $25,000 per day of violation.

**(b) Civil actions**

The Administrator may commence a civil action to assess and recover any civil penalty under subsection (a) of this section, section 7545(d) of this title, or section 7547(d) of this title.  Any action under this subsection may be brought in the district court of the United States for the district in which the violation is alleged to have occurred or in which the defendant resides or has the Administrator's principal place of business, and the court shall have jurisdiction to assess a civil penalty.  In determining the amount of any civil penalty to be assessed under this subsection, the court shall take into account the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as justice may require.  In any such action, subpoenas for witnesses who are required to attend a district court in any district may run into any other district.

**(c) Administrative assessment of certain penalties**

(1) Administrative penalty authority

In lieu of commencing a civil action under subsection (b), the Administrator may assess any civil penalty prescribed in subsection (a) of this section, section 7545(d) of this title, or section 7547(d) of this title, except that the maximum amount of penalty sought against each violator in a penalty assessment proceeding shall not exceed $200,000, unless the Administrator and the Attorney General jointly determine that a matter involving a larger penalty amount is appropriate for administrative penalty assessment.  Any such determination by the Administrator and the Attorney General shall not be subject to judicial review.  Assessment of a civil penalty under this subsection shall be by an order made on the record after opportunity for a hearing in accordance with sections 554 and 556 of

title 5.  The Administrator shall issue reasonable rules for discovery and other procedures for hearings under this paragraph.  Before issuing such an order, the Administrator shall give written notice to the person to be assessed an administrative penalty of the Administrator's proposal to issue such order and provide such person an opportunity to request such a hearing on the order, within 30 days of the date the notice is received by such person.  The Administrator may compromise, or remit, with or without conditions, any administrative penalty which may be imposed under this section.

(2) Determining amount

In determining the amount of any civil penalty assessed under this subsection, the Administrator shall take into account the gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as justice may require.

(3) Effect of Administrator's action

(A) Action by the Administrator under this subsection shall not affect or limit the Administrator's authority to enforce any provision of this chapter; except that any violation,

(i) with respect to which the Administrator has commenced and is diligently prosecuting an action under this subsection, or

(ii) for which the Administrator has issued a final order not subject to further judicial review and the violator has paid a penalty assessment under this subsection,

shall not be the subject of civil penalty action under subsection (b).

(B) No action by the Administrator under this subsection shall affect any person's obligation to comply with any section of this chapter.

20a

(4) Finality of order

An order issued under this subsection shall become final 30 days after its issuance unless a petition for judicial review is filed under paragraph (5).

(5) Judicial review

Any person against whom a civil penalty is assessed in accordance with this subsection may seek review of the assessment in the United States District Court for the District of Columbia, or for the district in which the violation is alleged to have occurred, in which such person resides, or where such person's principal place of business is located, within the 30-day period beginning on the date a civil penalty order is issued.  Such person shall simultaneously send a copy of the filing by certified mail to the Administrator and the Attorney General.  The Administrator shall file in the court a certified copy, or certified index, as appropriate, of the record on which the order was issued within 30 days.  The court shall not set aside or remand any order issued in accordance with the requirements of this subsection unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or unless the Administrator's assessment of the penalty constitutes an abuse of discretion, and the court shall not impose additional civil penalties unless the Administrator's assessment of the penalty constitutes an abuse of discretion.  In any proceedings, the United States may seek to recover civil penalties assessed under this section.

(6) Collection

If any person fails to pay an assessment of a civil penalty imposed by the Administrator as provided in this subsection—

(A) after the order making the assessment has become final, or

(B) after a court in an action brought under paragraph (5) has entered a final judgment in favor of the Administrator,

the Administrator shall request the Attorney General to bring a civil action in an appropriate district court to recover the amount assessed (plus interest at rates established pursuant to section 6621(a)(2) of title 26 from the date of the final order or the date of the final judgment, as the case may

be).  In such an action, the validity, amount, and appropriateness of the penalty shall not be subject to review.  Any person who fails to pay on a timely basis the amount of an assessment of a civil penalty as described in the first sentence of this paragraph shall be required to pay, in addition to that amount and interest, the United States' enforcement expenses, including attorneys fees and costs for collection proceedings, and a quarterly nonpayment penalty for each quarter during which such failure to pay persists.  The nonpayment penalty shall be in an amount equal to 10 percent of the aggregate amount of that person's penalties and nonpayment penalties which are unpaid as of the beginning of such quarter.

D.    42 U.S.C. § 7525 provides in pertinent part:

**Motor vehicle and motor vehicle engine compliance testing and certification**

**(a)  Testing and issuance of certificate of conformity**

(1)  The Administrator shall test, or require to be tested in such manner as he deems appropriate, any new motor vehicle or new motor vehicle engine submitted by a manufacturer to determine whether such vehicle or engine conforms with the regulations prescribed under section 7521 of this title.  If such vehicle or engine conforms to such regulations, the Administrator shall issue a certificate of conformity upon such terms, and for such period (not in excess of one year), as he may prescribe.  In the case of any original equipment manufacturer (as defined by the Administrator in regulations promulgated before November 15, 1990) of vehicles or vehicle engines whose projected sales in the United States for any model year (as determined by the Administrator) will not exceed 300, the Administrator shall not require, for purposes of determining compliance with regulations under section 7521 of this title for the useful life of the vehicle or engine, operation of any vehicle or engine manufactured during such model year for more than 5,000 miles or 160 hours, respectively, unless the Administrator, by regulation, prescribes otherwise.  The Administrator shall apply any adjustment factors that the Administrator deems appropriate to assure that each vehicle or engine will comply during its

useful life (as determined under section 7521(d) of this title) with the regulations prescribed under section 7521 of this title.

(2)  The Administrator shall test any emission control system incorporated in a motor vehicle or motor vehicle engine submitted to him by any person, in order to determine whether such system enables such vehicle or engine to conform to the standards required to be prescribed under section 7521(b) of this title.  If the Administrator finds on the basis of such tests that such vehicle or engine conforms to such standards, the Administrator shall issue a verification of compliance with emission standards for such system when incorporated in vehicles of a class of which the tested vehicle is representative.  He shall inform manufacturers and the National Academy of Sciences, and make available to the public, the results of such tests.  Tests under this paragraph shall be conducted under such terms and conditions (including requirements for preliminary testing by qualified independent laboratories) as the Administrator may prescribe by regulations.

(3)(A) A certificate of conformity may be issued under this section only if the Administrator determines that the manufacturer (or in the case of a vehicle or engine for import, any person) has established to the satisfaction of the Administrator that any emission control device, system, or element of design installed on, or incorporated in, such vehicle or engine conforms to applicable requirements of section 7521(a)(4) of this title.

(B) The Administrator may conduct such tests and may require the manufacturer (or any such person) to conduct such tests and provide such information as is necessary to carry out subparagraph (A) of this paragraph.  Such requirements shall include a requirement for prompt reporting of the emission of any unregulated pollutant from a system, device, or element of design if such pollutant was not emitted, or was emitted in significantly lesser amounts, from the vehicle or engine without use of the system, device, or element of design.

(4)(A) Not later than 12 months after November 15, 1990, the Administrator shall revise the regulations promulgated under this subsection to add test procedures capable of determining whether model year 1994 and later model year light-duty vehicles and light-duty trucks, when properly maintained and used, will pass the inspection methods and

procedures established under section 7541(b) of this title for that model year, under conditions reasonably likely to be encountered in the conduct of inspection and maintenance programs, but which those programs cannot reasonably influence or control.  The conditions shall include fuel characteristics, ambient temperature, and short (30 minutes or less) waiting periods before tests are conducted.  The Administrator shall not grant a certificate of conformity under this subsection for any 1994 or later model year vehicle or engine that the Administrator concludes cannot pass the test procedures established under this paragraph.

(B) From time to time, the Administrator may revise the regulations promulgated under subparagraph (A), as the Administrator deems appropriate.

(5)(A) A motor vehicle engine (including all engine emission controls) may be installed in an exempted specially produced motor vehicle if the motor vehicle engine is from a motor vehicle that is covered by a certificate of conformity issued by the Administrator for the model year in which the exempted specially produced motor vehicle is produced, or the motor vehicle engine is covered by an Executive order subject to regulations promulgated by the California Air Resources Board for the model year in which the exempted specially produced motor vehicle is produced, and—

(i) the manufacturer of the engine supplies written instructions to the Administrator and the manufacturer of the exempted specially produced motor vehicle explaining how to install the engine and maintain functionality of the engine's emission control system and the on-board diagnostic system (commonly known as "OBD"), except with respect to evaporative emissions;

(ii) the manufacturer of the exempted specially produced motor vehicle installs the engine in accordance with such instructions and certifies such installation in accordance with subparagraph (E);

(iii) the installation instructions include emission control warranty information from the engine manufacturer in compliance with section 7541 of this title, including where warranty repairs can be made, emission control labels to be affixed to the vehicle, and the certificate of conformity number for the applicable vehicle in which the engine was

originally intended or the applicable Executive order number for the engine; and

(iv) the manufacturer of the exempted specially produced motor vehicle does not produce more than 325 such vehicles in the calendar year in which the vehicle is produced.

(B) A motor vehicle containing an engine compliant with the requirements of subparagraph (A) shall be treated as meeting the requirements of section 7521 of this title applicable to new vehicles produced or imported in the model year in which the exempted specially produced motor vehicle is produced or imported.

(C) Engine installations that are not performed in accordance with installation instructions provided by the manufacturer and alterations to the engine not in accordance with the installation instructions shall—

(i) be treated as prohibited acts by the installer under section 7522 of this title and any applicable regulations; and

(ii) subject to civil penalties under section 7524(a) of this title, civil actions under section 7524(b) of this title, and administrative assessment of penalties under section 7524(c) of this title.

(D) The manufacturer of an exempted specially produced motor vehicle that has an engine compliant with the requirements of subparagraph (A) shall provide to the purchaser of such vehicle all information received by the manufacturer from the engine manufacturer, including information regarding emissions warranties from the engine manufacturer and all emissions-related recalls by the engine manufacturer.

(E) To qualify to install an engine under this paragraph, and sell, offer for sale, introduce into commerce, deliver for introduction into commerce or import an exempted specially produced motor vehicle, a manufacturer of exempted specially produced motor vehicles shall register with the Administrator at such time and in such manner as the Administrator determines appropriate. The manufacturer shall submit an annual report to the Administrator that includes—

(i) a description of the exempted specially produced motor vehicles and engines installed in such vehicles;

(ii) the certificate of conformity number issued to the motor vehicle in which the engine was originally intended or the applicable Executive order number for the engine; and

(iii) a certification that it produced all exempted specially produced motor vehicles according to the written instructions from the engine manufacturer, and otherwise that the engine conforms in all material respects to the description in the application for the applicable certificate of conformity or Executive order.

(F) Exempted specially produced motor vehicles compliant with this paragraph shall be exempted from—

(i) motor vehicle certification testing under this section; and

(ii) vehicle emission control inspection and maintenance programs required under section 7410 of this title.

(G)(i) Except as provided in subparagraphs (A) through (F), a person engaged in the manufacturing or assembling of exempted specially produced motor vehicles shall be considered a manufacturer for purposes of this chapter.

(ii) Nothing in this paragraph shall be construed to exempt any person from the prohibitions in section 7522(a)(3) of this title or the requirements in sections 7542, 7525(c), or 7521(m)(5) of this title.

(H) In this paragraph:

(i) The term "exempted specially produced motor vehicle" means a light-duty vehicle or light-duty truck produced by a low-volume manufacturer and that-

(I) is intended to resemble the body of another motor vehicle that was manufactured not less than 25 years before the manufacture of the exempted specially produced motor vehicle; and

(II) is manufactured under a license for the product configuration, trade dress, trademark, or patent, for the motor vehicle that is intended to be replicated from the original manufacturer, its successors or assignees, or current owner of such product configuration, trade dress, trademark, or patent rights.

(ii) The term "low-volume manufacturer" means a motor vehicle manufacturer, other than a person who is registered as an importer under section 30141 of title 49, whose annual worldwide production, including by a parent or subsidiary of the manufacturer, if applicable, is not more than 5,000 motor vehicles.

**(b) Testing procedures; hearing; judicial review; additional evidence**

(1) In order to determine whether new motor vehicles or new motor vehicle engines being manufactured by a manufacturer do in fact conform with the regulations with respect to which the certificate of conformity was issued, the Administrator is authorized to test such vehicles or engines. Such tests may be conducted by the Administrator directly or, in accordance with conditions specified by the Administrator, by the manufacturer.

(2)(A)(i) If, based on tests conducted under paragraph (1) on a sample of new vehicles or engines covered by a certificate of conformity, the Administrator determines that all or part of the vehicles or engines so covered do not conform with the regulations with respect to which the certificate of conformity was issued and with the requirements of section 7521(a)(4) of this title, he may suspend or revoke such certificate in whole or in part, and shall so notify the manufacturer. Such suspension or revocation shall apply in the case of any new motor vehicles or new motor vehicle engines manufactured after the date of such notification (or manufactured before such date if still in the hands of the manufacturer), and shall apply until such time as the Administrator finds that vehicles and engines manufactured by the manufacturer do conform to such regulations and requirements. If, during any period of suspension or revocation, the Administrator finds that a vehicle or engine actually conforms to such regulations and requirements, he shall issue a certificate of conformity applicable to such vehicle or engine.

(ii) If, based on tests conducted under paragraph (1) on any new vehicle or engine, the Administrator determines that such vehicle or engine does not conform with such regulations and requirements, he may suspend or revoke such certificate insofar as it applies to such vehicle or engine until such time as he finds such vehicle or engine actually so conforms with such regulations and requirements, and he shall so notify the manufacturer.

(B)(i) At the request of any manufacturer the Administrator shall grant such manufacturer a hearing as to whether the tests have been properly conducted or any sampling methods have been properly applied, and make a determination on the record with respect to any suspension or revocation under subparagraph (A); but suspension or revocation under subparagraph (A) shall not be stayed by reason of such hearing.

(ii) In any case of actual controversy as to the validity of any determination under clause (i), the manufacturer may at any time prior to the 60th day after such determination is made file a petition with the United States court of appeals for the circuit wherein such manufacturer resides or has his principal place of business for a judicial review of such determination. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Administrator or other officer designated by him for that purpose. The Administrator thereupon shall file in the court the record of the proceedings on which the Administrator based his determination, as provided in section 2112 of title 28.

(iii) If the petitioner applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(iv) Upon the filing of the petition referred to in clause (ii), the court shall have jurisdiction to review the order in accordance with chapter 7 of title 5 and to grant appropriate relief as provided in such chapter.

\*     \*     \*

E.     42 U.S.C. § 7541 provides in pertinent part:

**Compliance by vehicles and engines in actual use**

**(a) Warranty; certification; payment of replacement costs of parts, devices, or components designed for emission control**

(1) Effective with respect to vehicles and engines manufactured in model years beginning more than 60 days after December 31, 1970, the manufacturer of each new motor vehicle and new motor vehicle engine shall warrant to the ultimate purchaser and each subsequent purchaser that such vehicle or engine is (A) designed, built, and equipped so as to conform at the time of sale with applicable regulations under section 7521 of this title, and (B) free from defects in materials and workmanship which cause such vehicle or engine to fail to conform with applicable regulations for its useful life (as determined under section 7521(d) of this title). In the case of vehicles and engines manufactured in the model year 1995 and thereafter such warranty shall require that the vehicle or engine is free from any such defects for the warranty period provided under subsection (i).

(2) In the case of a motor vehicle part or motor vehicle engine part, the manufacturer or rebuilder of such part may certify that use of such part will not result in a failure of the vehicle or engine to comply with emission standards promulgated under section 7521 of this title. Such certification shall be made only under such regulations as may be promulgated by the Administrator to carry out the purposes of subsection (b). The Administrator shall promulgate such regulations no later than two years following August 7, 1977.

(3) The cost of any part, device, or component of any light-duty vehicle that is designed for emission control and which in the instructions issued pursuant to subsection (c)(3) of this section is scheduled for replacement

during the useful life of the vehicle in order to maintain compliance with regulations under section 7521 of this title, the failure of which shall not interfere with the normal performance of the vehicle, and the expected retail price of which, including installation costs, is greater than 2 percent of the suggested retail price of such vehicle, shall be borne or reimbursed at the time of replacement by the vehicle manufacturer and such replacement shall be provided without cost to the ultimate purchaser, subsequent purchaser, or dealer. The term "designed for emission control" as used in the preceding sentence means a catalytic converter, thermal reactor, or other component installed on or in a vehicle for the sole or primary purpose of reducing vehicle emissions (not including those vehicle components which were in general use prior to model year 1968 and the primary function of which is not related to emission control).

\*     \*     \*

**(c) Nonconforming vehicles; plan for remedying nonconformity; instructions for maintenance and use; label or tag**

Effective with respect to vehicles and engines manufactured during model years beginning more than 60 days after December 31, 1970—

(1) If the Administrator determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used, do not conform to the regulations prescribed under section 7521 of this title, when in actual use throughout their useful life (as determined under section 7521(d) of this title), he shall immediately notify the manufacturer thereof of such nonconformity, and he shall require the manufacturer to submit a plan for remedying the nonconformity of the vehicles or engines with respect to which such notification is given. The plan shall provide that the nonconformity of any such vehicles or engines which are properly used and maintained will be remedied at the expense of the manufacturer. If the manufacturer disagrees with such determination of nonconformity and so advises the Administrator, the Administrator shall afford the manufacturer and other interested persons an opportunity to present their views and evidence in support thereof at a public hearing. Unless, as a result of such hearing the Administrator withdraws such determination of nonconformity, he shall, within 60 days after the

completion of such hearing, order the manufacturer to provide prompt notification of such nonconformity in accordance with paragraph (2).

(2) Any notification required by paragraph (1) with respect to any class or category of vehicles or engines shall be given to dealers, ultimate purchasers, and subsequent purchasers (if known) in such manner and containing such information as the Administrator may by regulations require.

(3)(A) The manufacturer shall furnish with each new motor vehicle or motor vehicle engine written instructions for the proper maintenance and use of the vehicle or engine by the ultimate purchaser and such instructions shall correspond to regulations which the Administrator shall promulgate. The manufacturer shall provide in boldface type on the first page of the written maintenance instructions notice that maintenance, replacement, or repair of the emission control devices and systems may be performed by any automotive repair establishment or individual using any automotive part which has been certified as provided in subsection (a)(2).

(B) The instruction under subparagraph (A) of this paragraph shall not include any condition on the ultimate purchaser's using, in connection with such vehicle or engine, any component or service (other than a component or service provided without charge under the terms of the purchase agreement) which is identified by brand, trade, or corporate name; or directly or indirectly distinguishing between service performed by the franchised dealers of such manufacturer or any other service establishments with which such manufacturer has a commercial relationship, and service performed by independent automotive repair facilities with which such manufacturer has no commercial relationship; except that the prohibition of this subsection may be waived by the Administrator if—

(i) the manufacturer satisfies the Administrator that the vehicle or engine will function properly only if the component or service so identified is used in connection with such vehicle or engine, and

(ii) the Administrator finds that such a waiver is in the public interest.

(C) In addition, the manufacturer shall indicate by means of a label or tag permanently affixed to such vehicle or engine that such vehicle or

engine is covered by a certificate of conformity issued for the purpose of assuring achievement of emissions standards prescribed under section 7521 of this title. Such label or tag shall contain such other information relating to control of motor vehicle emissions as the Administrator shall prescribe by regulation.

(4) Intermediate in-use standards.—

(A) Model years 1994 and 1995.—For light-duty trucks of up to 6,000 lbs. gross vehicle weight rating (GVWR) and light-duty vehicles which are subject to standards under table G of section 7521(g)(1) of this title in model years 1994 and 1995 (40 percent of the manufacturer's sales volume in model year 1994 and 80 percent in model year 1995), the standards applicable to NMHC, CO, and $NO_x$ for purposes of this subsection shall be those set forth in table A below in lieu of the standards for such air pollutants otherwise applicable under this subchapter.

Table A—Intermediate In-Use Standards LDTS up to 6,000 lbs. GVWR and Light-Duty Vehicles

| Vehicle type | NMHC | CO | $NO_x$ |
|---|---|---|---|
| Light-duty vehicles | 0.32 | 3.4 | 0.4* |
| LDT's (0–3,750 LVW) | 0.32 | 5.2 | 0.4* |
| LDT's (3,751–5,750 LVW) | 0.41 | 6.7 | 0.7* |

*Not applicable to diesel-fueled vehicles.

(B) Model years 1996 and thereafter.—

(i) In the model years 1996 and 1997, light-duty trucks (LDTs) up to 6,000 lbs. gross vehicle weight rating (GVWR) and light-duty vehicles which are not subject to final in-use standards under paragraph (5) (60 percent of the manufacturer's sales volume in model year 1996 and 20 percent in model year 1997) shall be subject to the standards set forth in table A of subparagraph (A) for NMHC,

CO, and $NO_x$ for purposes of this subsection in lieu of those set forth in paragraph (5).

(ii) For LDTs of more than 6,000 lbs. GVWR—

(I) in model year 1996 which are subject to the standards set forth in Table H of section 7521(h) of this title (50%);

(II) in model year 1997 (100%); and

(III) in model year 1998 which are not subject to final in-use standards under paragraph (5) (50%);

the standards for NMHC, CO, and $NO_x$ for purposes of this subsection shall be those set forth in Table B below in lieu of the standards for such air pollutants otherwise applicable under this subchapter.

Table B—Intermediate In-Use Standards LDTs More Than 6,000 Lbs. GVWR

| Vehicle type | NMHC | CO | $NO_x$ |
|---|---|---|---|
| LDTs (3,751–5,750 lbs. TW) | 0.40 | 5.5 | 0.88* |
| LDTs (over 5,750 lbs. TW) | 0.49 | 6.2 | 1.38* |

*Not applicable to diesel-fueled vehicles.

(C) Useful life.—In the case of the in-use standards applicable under this paragraph, for purposes of applying this subsection, the applicable useful life shall be 5 years or 50,000 miles or the equivalent (whichever first occurs).

(5) Final in-use standards.—(A) After the model year 1995, for purposes of applying this subsection, in the case of the percentage specified in the implementation schedule below of each manufacturer's sales volume of light-duty trucks of up to 6,000 lbs. gross vehicle weight rating (GVWR) and light duty[1] vehicles, the standards for NMHC, CO, and $NO_x$ shall be as

---

[1] So in original. Probably should be "light-duty".

provided in Table G in section 7521(g) of this title, except that in applying the standards set forth in Table G for purposes of determining compliance with this subsection, the applicable useful life shall be (i) 5 years or 50,000 miles (or the equivalent) whichever first occurs in the case of standards applicable for purposes of certification at 50,000 miles; and (ii) 10 years or 100,000 miles (or the equivalent), whichever first occurs in the case of standards applicable for purposes of certification at 100,000 miles, except that no testing shall be done beyond 7 years or 75,000 miles, or the equivalent whichever first occurs.

LDTs up to 6,000 Lbs. GVWR and Light-Duty Vehicle Schedule for Implementation of Final In-Use Standards

| Model year | Percent |
| --- | --- |
| 1996 | 40 |
| 1997 | 80 |
| 1998 | 100 |

(B) After the model year 1997, for purposes of applying this subsection, in the case of the percentage specified in the implementation schedule below of each manufacturer's sales volume of light-duty trucks of more than 6,000 lbs. gross vehicle weight rating (GVWR), the standards for NMHC, CO, and $NO_x$ shall be as provided in Table H in section 7521(h) of this title, except that in applying the standards set forth in Table H for purposes of determining compliance with this subsection, the applicable useful life shall be (i) 5 years or 50,000 miles (or the equivalent) whichever first occurs in the case of standards applicable for purposes of certification at 50,000 miles; and (ii) 11 years or 120,000 miles (or the equivalent), whichever first occurs in the case of standards applicable for purposes of certification at 120,000 miles, except that no testing shall be done beyond 7 years or 90,000 miles (or the equivalent) whichever first occurs.

LDTs of More Than 6,000 Lbs. GVWR Implementation Schedule for Implementation of Final In-Use Standards

| Model year | Percent |
|---|---|
| 1998 | 50 |
| 1999 | 100 |

(6) Diesel vehicles; in-use useful life and testing.—(A) In the case of diesel-fueled light-duty trucks up to 6,000 lbs. GVWR and light-duty vehicles, the useful life for purposes of determining in-use compliance with the standards under section 7521(g) of this title for NO$_x$ shall be a period of 10 years or 100,000 miles (or the equivalent), whichever first occurs, in the case of standards applicable for purposes of certification at 100,000 miles, except that testing shall not be done for a period beyond 7 years or 75,000 miles (or the equivalent) whichever first occurs.

(B) In the case of diesel-fueled light-duty trucks of 6,000 lbs. GVWR or more, the useful life for purposes of determining in-use compliance with the standards under section 7521(h) of this title for NO$_x$ shall be a period of 11 years or 120,000 miles (or the equivalent), whichever first occurs, in the case of standards applicable for purposes of certification at 120,000 miles, except that testing shall not be done for a period beyond 7 years or 90,000 miles (or the equivalent) whichever first occurs.

\*       \*       \*

**(h) Dealer certification**

(1) If at any time during the period for which the warranty applies under subsection (b), a motor vehicle fails to conform to the applicable regulations under section 7521 of this title as determined under subsection (b) of this section such nonconformity shall be remedied by the manufacturer at the cost of the manufacturer pursuant to such warranty as provided in subsection (b)(2)(without regard to subparagraph (C) thereof).

(2) Nothing in section 7543(a) of this title shall be construed to prohibit a State from testing, or requiring testing of, a motor vehicle after the date

of sale of such vehicle to the ultimate purchaser (except that no new motor vehicle manufacturer or dealer may be required to conduct testing under this paragraph).

F.    49 U.S.C. § 32902 provides in pertinent part:

**Average fuel economy standards**

(a) Prescription of Standards by Regulation.—At least 18 months before the beginning of each model year, the Secretary of Transportation shall prescribe by regulation average fuel economy standards for automobiles manufactured by a manufacturer in that model year.  Each standard shall be the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year.

\*    \*    \*

(h) Limitations.—In carrying out subsections (c), (f), and (g) of this section, the Secretary of Transportation—

(1) may not consider the fuel economy of dedicated automobiles;

(2) shall consider dual fueled automobiles to be operated only on gasoline or diesel fuel; and

(3) may not consider, when prescribing a fuel economy standard, the trading, transferring, or availability of credits under section 32903.

ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| STATE OF OHIO, et al., <br><br> *Petitioners,* <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> *Respondents.* | No. 22-1081 (and consolidated cases) |

## DECLARATION OF DEEPAK GARG

I, Deepak Garg, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am a Vice President leading the Fuels Regulatory and Planning and HSE Assurance division servicing Valero Renewable Fuels Company, LLC ("Valero Renewables") and Diamond Alternative Energy, LLC ("Diamond Alternative"). I am responsible for a wide range of compliance and business matters relating to Valero Renewables and Diamond Alternative's production and sale of renewable fuels such as ethanol and renewable diesel. My responsibilities include analyzing market and economic impacts of regulatory and statutory changes on the liquid fuels production industry, including the impacts on renewable fuels.

1

2.     I have extensive experience in ensuring the Valero family of companies' cost-effective compliance with the requirements of the federal Renewable Fuel Standard, which requires so-called "obligated parties" to blend certain percentages of renewable fuels into transportation fuels or to purchase an equivalent number of "Renewable Identification Numbers" credits, or RINs, to meet an EPA-specified Renewable Volume Obligation.

3.     In addition, I have extensive experience with California's Low Carbon Fuel Standard ("LCFS") program. The LCFS is designed to reduce greenhouse gas emissions by setting a carbon intensity ("CI") benchmark for transportation fuels consumed in the State, which decreases over time. Under this program, each fuel is assigned a CI value based on a model produced by the California Air Resources Board ("CARB"). The CI value is intended to represent the GHG emissions associated with the feedstocks from which the fuel was produced, the fuel production and distribution activities, and the use of the finished fuel. Fuels below the benchmark generate LCFS credits, while fuels above the benchmark generate deficits. The lower the fuel's CI score compared to the benchmark, the greater number of credits generated. Each producer or importer of fuel must demonstrate that the overall mix of fuels it supplies for use in California meets the CI benchmarks for each compliance period. A producer or importer with a fuel mix that is above the CI benchmark

2

38a

must purchase LCFS credits sufficient to meet the CI benchmark.

4.     Valero Renewables is an independent ethanol producer owning and operating 12 ethanol plants with a combined production capacity of around 1.6 billion gallons per year. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage and net greenhouse gas emissions. Across the United States, refiners add ethanol to gasoline to raise its octane rating to a level suitable for use in most vehicles, with the result that approximately 10% of the final product consists of ethanol, and to meet federal renewable mandates. According to the U.S. Department of Energy, "[t]he U.S. ethanol industry has sufficient capacity to produce more than 17 billion gallons of ethanol and reduce GHG emissions by an estimated 42.7 million metric tons ($CO_2$-eq) per year, which is approximately 2% of total U.S. transportation emissions. Valeri Sarisky-Reed, *Ethanol vs. Petroleum-Based Fuel Carbon Emissions*, DOE Bioenergy Technologies Office (June 23, 2022), shorturl.at/hrMV7. "The United States has more than 200 ethanol plants supporting nearly 70,000 jobs, many in rural areas." *Id.* On average, Valero Renewables sells more than 70 percent of its total ethanol production domestically.

5.     Diamond Alternative is a part owner of the Diamond Green Diesel

3

renewable diesel production facility in St. Charles Parish, Louisiana. Diamond Green Diesel currently produces over 700 million gallons of renewable diesel per year at its St. Charles production facility, making it America's largest renewable diesel plant, and is expected to produce over 1.2 billion gallons of renewable diesel per year once its newly-constructed production facility in Port Arthur, Texas begins production later this year or early next year.  On average, Diamond Green Diesel sells approximately 65 percent of its total renewable diesel production domestically.

6.    Renewable diesel is made from sustainable low-carbon feedstocks, such as used cooking oil, inedible animal fats derived from processing meat fats, soy bean oil, and inedible corn oil. Its chemical composition is nearly identical to that of petroleum-based diesel, making it a "drop-in" fuel that can be stored, distributed, and used interchangeably with petroleum-derived diesel, but its production results in up to 80% fewer greenhouse gas emissions for the finished fuel.

7.    I am generally aware of the United States Environmental Protection Agency's ("EPA") issuance of a final rule titled, "Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards," 86 Fed. Reg. 74,434 (Dec. 30, 2021). It is my understanding that, according to EPA, the rule will have significant impacts on fuel consumption: EPA expects the rule to result in reduced fuel consumption of more than 360 billion gasoline equivalent gallons, with

4

"[t]he largest changes . . . com[ing] from gasoline." 86 Fed. Reg. at 74503. Because nearly all gasoline in the United States contains 10% ethanol, the decrease in demand for gasoline caused by the rule necessarily leads to a corresponding reduction in demand for the ethanol that Valero Renewables produces, as well as valuable LCFS credits.

8.    Although gasoline is expected to see the largest changes, the rule will also reduce demand for the renewable diesel produced by Diamond Alternative. Indeed, EPA expects that, as a result of its rulemaking, "[t]he increased penetration of electrified vehicle technologies, and especially BEV technology ..., [will result] in less technology application on conventional, non-electrified gasoline and diesel vehicles." EPA, Revised 2023 and Later Model Year Light Duty Vehicle GHG Emissions Standards: Regulatory Impact Analysis at 5-22, EPA-420-R-21-028, https://www.regulations.gov/document/EPA-HQ-OAR-2021-0208-0849. EPA further states in its Regulatory Impact Analysis that, as of Model Year 2020 (the last year of data provided), the percentage of light-duty vehicles with diesel powertrains, even if only a relatively small part of the light-duty market, was otherwise increasing. *Id.* at 2-9. But with an expected reduction in fuel consumption of more than 360 billion "gasoline equivalent gallons," including other liquid fuels such as diesel, that trend is likely to reverse as a result of EPA's rule, if not entirely eliminated.

5

9.    EPA's rule also impacts revenues Valero Renewables and Diamond Alternative obtain through their participation in the LCFS and RFS programs.

10.    Ethanol produced by Valero Renewables and renewable diesel produced by Diamond Alternative have CI scores that are lower than traditional petroleum-based transportation fuels. Therefore, these fuels generate LCFS credits that have significant monetary value and are an important part of the business planning and economics for the renewable fuels facilities, as they generate hundreds of millions of dollars in revenue annually.  Both Valero Renewables and Diamond Alternative rely on credit revenue to provide a return on investment, and decreased demand for renewable fuels in the United States would undermine these expectations.  By way of example, the economics underlying the significant investment in the Port Arthur renewable diesel facility were driven, in large part, by the expectation of LCFS credit values.

11.    Likewise, Valero Renewables and Diamond Alternative rely on revenue from RIN sales. As demand for liquid transportation fuels decreases domestically, so do the RIN revenues these businesses generate.

12.    In theory, the impacts of such reduction in demand can be mitigated to some extent through exports to foreign markets, but such mitigation efforts come with increased costs and capacity limitations, as well as other market complications.

6

As an initial matter, foreign markets are not currently positioned to take on a significant and sudden influx of product from the United States' renewable fuels industry as a whole that would be necessary to offset EPA's expected reduction in domestic liquid fuel demand resulting from its rule, which would result in non-economical margins beyond a certain threshold. However, even if foreign markets could take on such increased product supply in its entirety, the movement of such product would nevertheless require the incurrence of additional transportation costs and would also be limited by dock, vessel, rail, and permitting constraints. To the extent capital investment might improve such constraints and allow for increased product movements, that would require significant expenditures by Valero Renewables, Diamond Alternative, and third parties over whom they have no control, and would further depend on business analyses and forecasts to justify said investment. Moreover, such sales would be ineligible for domestic credits under the RFS and LCFS programs, which as stated above are an integral part of the business planning and economics for these renewable fuels facilities.

13.    In short, the subject rulemaking is projected by EPA to force a rapid expansion of the new vehicle market share for electric vehicles and a corresponding reduction in domestic liquid fuel demand. Such a reduction in demand would negatively impact the business operations and profitability of Valero Renewables and

7

Diamond Alternative as described herein.

14.  These economic impacts are not speculative. Indeed, as stated above, EPA itself projects that, "[t]hrough 2050," the rule will reduce fuel consumption by more than 360,000 million gasoline equivalent gallons, "reaching a 15 percent reduction in annual U.S. gasoline consumption in 2050," 86 Fed. Reg. at 74,503.

15.  All these injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: November 3, 2022

_____
Deepak Garg

8

44a

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF TEXAS, ET AL.,

                           Petitioners,

     v.

ENVIRONMENTAL PROTECTION AGENCY
AND MICHAEL S. REGAN, IN HIS OFFICIAL
CAPACITY AS ADMINISTRATOR OF THE
U.S. ENVIRONMENTAL PROTECTION
AGENCY,

                          Respondents,

ADVANCED ENERGY ECONOMY, ET AL.,

                          Intervenors.

Case No. 22-1031
and consolidated
cases

**<u>DECLARATION OF SUSAN W. GRISSOM</u>**

I, Susan W. Grissom, declare under penalty of perjury that the following is true and correct, to the best of my knowledge:

1.     I am the Chief Industry Analyst for American Fuel & Petrochemical Manufacturers ("AFPM"), responsible for analyzing market and economic impacts of regulatory and statutory changes on the refining and petrochemical manufacturing industries. I have extensive experience analyzing and directing the analysis of energy markets.

2.    AFPM is a national trade association representing nearly all American refining and petrochemical companies. Our 25 refining company members own and operate 86% of U.S. domestic petroleum refining capacity. Many of them also produce biofuels. These companies provide jobs, contribute to economic and national security, and enable the production of products used by families and businesses throughout the United States.

3.    The refining industry supports nearly 1.8 million jobs in 42 States, plus the District of Columbia. All told, the refining industry contributes more than $305 billion to the United States economy.

4.    EPA recently promulgated a rule establishing new light-duty vehicle greenhouse-gas emission standards for model years 2023 through 2026. *See* 86 Fed. Reg. 74,434 (Dec. 30, 2021). EPA's rule requires automobile manufacturers to produce vehicle fleets for sale in the United States that, on average, use considerably less gasoline and diesel fuel. EPA's standards limit the amount of carbon dioxide that automakers' fleets may emit. *See id.* at 74,447 ("EPA is finalizing revised standards for MYs 2023–2026 that are projected to result in an industry-wide average target for the light-duty fleet of 161 g/mile of $CO_2$ in MY 2026," a

2

"[c]umulative reduction" of "27.1[%]" for cars and 28.3[%] for light trucks."). And because "[t]he amount of [tailpipe] $CO_2$ emissions is essentially constant per gallon combusted of a given type of fuel," 75 Fed. Reg 25,324, 25,327 (May 7, 2010), "any rule that limits tailpipe $CO_2$ emissions is effectively identical to a rule that limits fuel consumption," *Delta Const. Co.* v. *EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015).

5.    Further, the rule effectively requires manufacturers to produce and sell more vehicles that use no liquid fuel at all. According to EPA, the standards are "achiev[able]" for manufacturers that increase their production of electric vehicles "up to about 17 percent in MY 2026." 86 Fed. Reg. at 74,485; *see id.* at 74,438 (explaining that the standards "are achievable primarily through the application of advanced gasoline vehicle technologies but with a growing percentage of electric vehicles"); *id.* at 74,493 ("Compliance with the final standards will necessitate greater implementation and pace of technology penetration through MY 2026 ..., including further deployment of [electric-vehicle] technologies.").

6.    EPA's rule depresses the demand for petroleum and renewable liquid fuels in the United States and thereby harms AFPM's member

companies such as Flint Hills Resources, Hunt Refining, Marathon Petroleum, PBF Energy, Phillips 66, Placid Refining, and Valero Energy. A refining company's bottom line depends on the market's demand for transportation fuel. AFPM's members suffer economic injury, therefore, when EPA imposes emission standards that result in vehicles using less fuel per mile or force greater adoption of vehicles that do not operate on gasoline, diesel, or renewable liquid fuel at all.

7.     These economic harms are not speculative. EPA itself estimated that its rule "will result in significant reductions of the consumption of petroleum." 86 Fed. Reg. at 74,521; *see also* EPA, Revised 2023 and Later Model Year LightDuty Vehicle GHG Emissions Standards: Regulatory Impact Analysis 5-15 (Dec. 2021) ("The revised standards will reduce not only greenhouse gas emissions but also fuel consumption."). According to EPA's own projections, the rule will reduce U.S. gasoline consumption by 15% from 2020 levels by 2045, will reduce gasoline consumption by 361 billion gallons through 2050, and will reduce oil consumption by 6.8 billion barrels. *Id.* at 5-16; *see also* 86 Fed. Reg. at 74,443 (projecting the rule will reduce consumer spending on fuel by "$150 billion to $320 billion exclusive of fuel taxes").

8.    The reduced demand for transportation fuels caused by EPA's greenhouse-gas emission standards results in lost sales for AFPM member companies and requires them to expend resources changing feedstock and product slates, diverting fuel to other markets, and remedying supply-chain distortions.

9.    For these reasons, EPA's rule financially injures AFPM's member companies that produce gasoline, diesel, and renewable liquid fuels that are blended into gasoline and diesel for sale in the United States.

Dated: 11/3/2022

Susan W. Grissom

5

ORAL ARGUMENT NOT YET SCHEDULED

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF TEXAS, et al.,

*Petitioner,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondent.*

No. 22-1031 (and consolidated cases)

**DECLARATION OF TREVOR HINZ OF ICM, INC. IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, Trevor Hinz, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am the Director of Government and Industry Relations of ICM, Inc. ("ICM"), a Kansas corporation that is a global leader in developing biorefining capabilities, especially for the production of ethanol. Plants using ICM technology collectively produce 8.8 billion gallons annually. No other company serves more ethanol producers in the world. For over 25 years, we have been advancing the biofuel industry, protecting the environment, while helping American farmers and businesses enrich their communities and drive value back into U.S. agriculture. Today we offer a range of products and services designed to maximize productivi-

1

50a

ty, diversify revenue, and yield valuable feed co-products.

2.     I am familiar with all aspects of ICM's work and with the market for ethanol that is produced by our customers and service clients.

3.     The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

4.     Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

5.     The United States Environmental Protection Agency promulgated a final agency action entitled *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74,434 (Dec. 30, 2021). The final rule sets increasingly stringent greenhouse-gas standards for light-duty vehi-

cles for model years beginning with 2023. *Id.* at 74,434. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional vehicles which consume liquid fuels. *See, e.g., id.* at 74,438.

6.    By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See Id.* at 74,503 ("Through 2050, our rule will reduce gasoline consumption by more than 360,000 million gallons."). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of millions of gallons.

7.    While these standards are in effect, they will drive down demand for ethanol.

8.    Because ICM provides the technology and services necessary for the production of ethanol, a decrease in ethanol demand necessarily means a destruction in demand of our technologies and services.

9.    These injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: October 31, 2022

Trevor Hinz

4

ORAL ARGUMENT NOT YET SCHEDULED

**IN THE UNITED STATES COURT OF APPEALS FOR THE DIS-
TRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| STATE OF TEXAS, et al., <br><br> *Petitioner,* <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> *Respondent.* | No. 22-1031 (and consolidated cases) |

**DECLARATION OF LANE HOWARD OF MISSOURI CORN GROWERS
ASSOCIATION IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, Lane Howard, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am the Associate Director of Market Development of the Missouri Corn Growers Association, a nonprofit trade association based in Missouri with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.    I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3.  Missouri is one of the nation's leading corn producing states, with a net production of around 550 million bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4.  The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

5.  Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

6.  The United States Environmental Protection Agency promulgated a final agency action entitled *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74,434 (Dec. 30, 2021). The

2

final rule sets increasingly stringent greenhouse-gas standards for light-duty vehicles for model years beginning with 2023. *Id.* at 74,434. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional vehicles which consume liquid fuels. *See, e.g., id.* at 74,438.

7.    By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See Id.* at 74,503 ("Through 2050, our rule will reduce gasoline consumption by more than 360,000 million gallons."). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of millions of gallons.

8.    This demand destruction harms the Missouri Corn Growers Association and its members by decreasing demand for the corn they grow.

9.    These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

10.    These injuries would be substantially ameliorated if EPA's decision were set aside.

3

Dated: October 31, 2022

_____
Lane Howard

4

57a

<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF TEXAS, et al.,

       *Petitioner,*

  v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

       *Respondent.*

No. 22-1031 (and consolidated cases)

## DECLARATION OF COURTNEY KINGERY OF INDIANA CORN GROWING ASSOCIATION IN SUPPORT OF PETITIONERS' OPENING BRIEF

I, Courtney Kingery, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am the Chief Executive Officer of the Indiana Corn Growing Association (Association), a nonprofit trade association based in Indiana with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.    I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3.    Indiana is one of the nation's leading corn producing states, with a net production of more than 1 billion bushels of corn annually. Approximately 45% this corn is used as a feedstock for ethanol production.

4.    Indiana is the fifth largest ethanol producing state in the United States. The fourteen ethanol plants in Indiana can transform approximately 420 million bushels of corn annually into high quality ethanol.  Indiana corn farmers who sell to ethanol plants received approximately $0.20 per bushel more for their corn compared to Indiana farmers who sell into other markets.  The ethanol industry supports over 700 workers in Indiana.

5.    Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

6.    The United States Environmental Protection Agency promulgated a final

2

agency action entitled *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74,434 (Dec. 30, 2021). The final rule sets increasingly stringent greenhouse-gas standards for light-duty vehicles for model years beginning with 2023. *Id.* at 74,434. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional combustion-engine vehicles which consume liquid fuels. *See, e.g., id.* at 74,438.

7.    By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See Id.* at 74,503 ("Through 2050, our rule will reduce gasoline consumption by more than 360,000 million gallons."). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of millions of gallons.

8.    This demand destruction harms the Indiana Corn Growing Association and its members by decreasing demand for the corn they grow. This also harms Indiana Corn Growing Association members by decreasing the price they will receive for the corn they sell.

9.    These financial harms affect our Association members and also redound to the Association itself, which will lose funding it uses to pursue its mission of

3

advocating for the interests of its members.

    10.   All these injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: November 3, 2022

_Courtney B. Kingery_
Courtney B. Kingery

4

No. 22-1032

And Consolidated Cases

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

COMPETITIVE ENTERPRISE INSTITUTE et al.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*


**Declaration of Anthony Kreucher**

I, Anthony Kreucher, hereby state as follows:

1.    I reside at 8369 Elmhurst St., Canton, Michigan 48187.

2.    I teach at a Catholic high school in southwest Detroit which focuses on underserved students. I drive to and from school each weekday in my car, a Ford Escape with about 115,000 miles on it. Between my commute and the other travelling that I do, I drive about 2,000 miles per month in this car.

3.    I have been looking for a new car for about the last four years. I would prefer a car with a conventional engine, rather than a hybrid or electric model. The hybrid and electric models are more expensive than conventional cars, and finding recharging stations for electric cars can be very difficult. Also, I think their environmental benefits are greatly overstated.

4.    I have not yet bought another car due to their high prices, which I believe are believe are partly the result of the new EPA emission rule that is being challenged in

this lawsuit. I hope to find a car within the next year or two that I can afford on my relatively low teacher's salary. I would greatly prefer a new car but, if that turns out to be unaffordable, I would consider getting a used car with relatively low mileage on it. I believe that if the EPA emission rule were withdrawn or at least made less stringent, this would make buying a car easier for me in both the near future and in coming years.

Pursuant to 28 USC 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Anthony Kreucher

Date  9/27/22

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

COMPETITIVE ENTERPRISE INSTITUTE,
ANTHONY KREUCHER, WALTER M.
KREUCHER, JAMES LEEDY, MARC
SCRIBNER, and the DOMESTIC ENERGY
PRODUCERS ALLIANCE,

          Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY,

          Respondent.

Case No. 22-1032
(Consolidated with 22-1031,
22-1033, 22-1034, 22-1035,
22-1036, 22-1038)

**Declaration of Walter M. Kreucher**

I, Walter M. Kreucher, hereby declare as follows:

1.     I reside at 3241 Erie Drive, Orchard Lake, Michigan 48324.

2.     I make this declaration in both my capacity as an individual petitioner in this action, and as an expert in fleet-wide Environmental Protection Agency (EPA) auto regulations such as the one at issue in this case: Final Rule, Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards, 86 Fed. Reg. 74434 (Dec. 30, 2021).

3.     I lease two cars annually from Ford Motor Company, where I worked for over three decades and from which I retired in 2004. One of these two cars is for me and the other is for my wife. My current car is a Ford Bronco Sport, a mid-sized SUV. My wife drives a Ford Edge.

**64a**

4.     The 2021 Ford Bronco Sport, like the Ford Edge, is a mid-sized SUV. My wife needs a large vehicle with a high seat to allow her nonagenarian parents to get into and out of the vehicle, since she is the primary driver for her parents to the doctor's office for their medical needs. I have tried two different plug-in hybrids in the past and find that there is limited trunk space for luggage; in fact, their trunks cannot even hold a single set of golf clubs.

5.     In recent years, stringent emission standards have restricted our vehicle choices and increased their prices. I used to lease a Ford Fusion, which is a mid-sized sedan. I actually prefer sedans to SUVs. The Ford Fusion I drove was equipped with a conventional engine. However, in later years, the Fusion became available only as a hybrid car. I stopped leasing it because of its higher price and limited trunk space. Back in 2017, the Ford Fusion hybrid sedan listed (MSRP) for $25,295. In 2018, the price went up to $26,245, by 2019 the price was $27,555 and in 2020, the price was $28,000. In my opinion, the major factor in Ford's decision to stop manufacturing all Fusions whatsoever, with or without conventional engines, was the need to comply with the federal fuel economy standards.

6.     For similar reasons, Ford began discontinuing sedans and all other passenger cars in 2021 (except for the Mustang). If there was stability in the standards at the more lenient joint standards previously adopted in 2020 by the federal government, this situation might have been alleviated somewhat.  Moreover, it is likely that our car-buying choices would be even broader, and car prices would be even lower, if EPA and the National Highway Traffic Safety Administration (NHTSA) had adopted standards that were even more lenient than those 2020 standards.  The new EPA regulations at issue in this case will further worsen this situation.

7.     I based these conclusions on two grounds: a) my extensive experience as a regulatory compliance officer for Ford Motor Company and as an environmental consultant; and b) the agencies' own statements in their joint 2020 Final Rule and in the newer EPA rule issued in 2021.

8.     My professional experience is detailed in my attached CV. My three decades of work for Ford encompassed all aspects of managing corporate compliance and planning concerning federal regulations. This ranged from analyzing the economic and marketing aspects of planned and anticipated standards to dealing with the impacts of fuel prices on both a short-term and long-term basis. Similarly, as an environmental consultant since leaving Ford, I have advised clients on a range of EPA regulatory matters. My clients included NHTSA, VOLPE, and Environmental Defense.

9.     In addition, since 2018 I have authored and published an annual *Advanced Automotive Technology Buying Guide*—a detailed examination of the costs and benefits of battery-powered cars, plug-in and non-plug-in hybrids, and diesel-powered vehicles that are available to consumers. In the 2022 model year, the average cost premium (including fuel cost and the social benefits) of an electric vehicle was over $21,000 above the cost of its gasoline counterpart, even after factoring in the Federal tax credit of $7500. The price of gasoline would have to exceed $8.49 per gallon for the average electric vehicle sold in the 2022 Model Year to save the customer money over the life of the vehicle. In California, because of its higher electricity prices, the price of gasoline would have to exceed $10.65 per gallon. These calculations are based on the May 2022 cost of gasoline and electricity.

10.     In addition, I believe battery-powered cars would face an immense problem regarding the availability of charging stations. These stations are relatively scarce right now, and even when they are available, recharging is a far lengthier process than refilling with fuel. If electric car sales increase according to EPA plans, existing charging stations will be overwhelmed. This prospect accounts for the reluctance of many car buyers to purchase electric vehicles, but EPA's Final Rule contains practically no information on dealing with this issue. As a June 9, 2020 proposal from the Administration indicates, the setting of standards for these charging stations is still in its infancy. White House, *Fact Sheet: Biden-Harris Administration Proposes New Standards for National Electric Vehicle Charging Network,* https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/09/fact-sheet-biden-harris-administration-proposes-new-standards-for-national-electric-vehicle-charging-network/

11.     Based on my professional experience, standards such as those issued by EPA have a major impact on the automotive choices available to consumers and on the purchase prices of various models. This impact has downstream effects on the prices of used cars as well. The impact is greatest on larger vehicles, which consumers prefer when fuel prices are low or are expected to drop. The preference is because of the greater utility, safety and other advantages that consumers see in such vehicles.

12.     These conclusions are amply supported in EPA's new Final Rule itself. In describing the costs of the Rule, EPA makes clear that the increased per-vehicle cost that the rule will increase. 86 Fed. Reg. 74520 (EPA expects an "increase in the upfront costs of the vehicles"). EPA's "estimate of the average per-vehicle cost increase for a MY 2026 vehicle is $1,000 compared to the No Action scenario. Average per-vehicle costs are projected to rise from $330 in MY 2023 to $1,000 in MY 2026." 86 Fed. Reg. 74434, 74497. More importantly, EPA claims that the prior rule "placed disproportionate weight on . . . reducing upfront costs for vehicle buyers" and has now put more weight on emission reductions. 86 Fed. Reg. 74437. EPA admits that these

new standards create greater burdens on the upfront vehicle buyer in exchange for greater emissions reductions and fuel savings for the secondary market. *Id.* These cost increases then ripple out throughout the market, which harms petitioners. *See also, e.g.,* 86 Fed. Reg. 74445 ("The increase in up-front new vehicle costs has the potential to increase the prices of used vehicles, to make credit more difficult to obtain, and to make the least expensive new vehicles less desirable compared to used vehicles.").

13.    EPA's Final Rule also admits that "[p]ricing strategy is a well-documented approach to shifting a manufacturer's sales mix to achieve compliance." 86 Fed. Reg. 74495. It cites to a General Motors article about a "pricing strategy model it uses to make decisions on how best to motivate consumers into purchasing alternate vehicles that help achieve fleetwide CAFE compliance." *Id.* at 74495-96 and n.174. That article notes that manufacturers' "most effective tool [to ensure compliance] in the short term is price, and they can use it to shift customer demand to more fuel-efficient vehicles." Biller and Swann, *Pricing for Environmental Compliance in the Auto Industry* 119 (2006). Consumers who wish to buy the vehicles that EPA is forcing manufactures to make more expensive are harmed. This increase in costs is in addition to the average vehicle price increase caused by the regulations.

14.    The Final Rule also suggests that less stringent standards offer consumers such benefits as greater safety. In EPA's words, its rule "applied the same historical relationships between mass, size, and fatality risk that were established and documented in the SAFE rulemaking." 86 FR 74508. As EPA and NHTSA's joint final rule in 2020 noted: "Another factor weighing toward reduced stringency is safety. As discussed previously, reduced stringency results in less pressure on manufacturers to reduce mass in vehicles, which, for smaller passenger cars, has negative safety implications when involved in accidents with heavier vehicles. Further, as vehicle prices decrease compared to the previous standards, more consumers will be able to afford newer vehicles, which are significantly safer." Final Rule: The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks, 85 Fed. Reg. 24174, 25119. *See also id.* at 25185 ("Less-stringent standards remain better for safety and are projected to save thousands of lives and prevent tens of thousands of hospitalizations ….").

15.    For the foregoing reasons, it is my expert opinion that, in general, consumers will be adversely affected by the Rule's stringency and by its promotion of electric vehicles. My conclusions regarding the emission rule's impact on vehicle choices and vehicle prices apply both to my own car-leasing situation and to the vehicle choices and prices facing the other individual petitioners in this action.

Pursuant to 28 USC 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

_Walter M. Kreucher_
Walter M. Kreucher

_September 1, 2022_
Date

Environmental Consultants of Michigan, LLC

## Walter M. Kreucher

Walter has over thirty years of experience overseeing vehicle regulatory and legislative issues related to fuel economy, fuel quality, and alternative fuels.

He ran a major inter-industry research project and dealt directly with the Chief Executive Officers of the largest automotive and petroleum companies in the world.

Retired from Ford Motor Company April, 2004

**Area of Expertise**

- Corporate Average Fuel Economy, vehicle testing, fuel economy compliance, and modeling
- Fuel Economy Regulations
- Life Cycle Analysis of Fuels
- Fuel Quality

**Work Experience**

Environmental Consultants of Michigan, LLC.

Providing consulting services to groups and organization outside the automobile industry on fuel economy and fuel related regulatory and legislative matters, management issues, and other business matters.

- o Worked as a consultant to NHTSA on CAFE rulemaking after retiring from Ford
- o Provided a peer review of the CAFE Effects Model to VOLPE
- o Worked as a consultant to Environmental Defense Fund to improve their understanding of the inner workings of CAFE

1973 – 2004    Ford Motor Company    Dearborn, MI

Vehicle Energy Planning Manager

- o Managed CAFE compliance, fuel quality and alternative fuel regulatory efforts.
- o Negotiated CAFE regulatory and legislative matters.
  - — Developed and implemented a strategy that resulted in the CAFE reform movement.
  - — Developed position papers and background material to support Congressional debates
  - — Developed Hybrid Electric Vehicle Tax Credit incorporated into the Energy Policy Act
- o Provided technical support on fuel economy and fuel quality matters.
  - — Key negotiator in the first ever gasoline quality standards (California and Federal)
- o Co-Chairman of primary technical committee for the Auto/Oil Air Quality Improvement Research Program; a $40 million joint research program that developed data demonstrating that gasoline quality improvements could reduce vehicle emissions and improve air quality.
  - — Worked with the CEO's of fourteen oil companies and the big three automobile companies.
- o Developed responses to various vehicle related regulations
- o Monitored vehicle certification testing
- o Helped develop the first CAFE reporting procedures for Ford.

**Education**

1973    University of Michigan

B.S.E., Materials and Metallurgical Engineering

1984    University of Detroit

M.B.A Finance Major

Member Beta Gamma Sigma, National Honor Society of top Business School Graduates

**Publications**

**Description of Auto/Oil Air Quality Improvement Research Program**

Vaughn R. Burns, Jack D. Benson, Albert M. Hochhauser, Williarn J. Koehl, Walter M. Kreucher, Robert M. Reuter

**Economic, Environmental and Energy Life-Cycle Assessment of Coal Conversion to Automotive Fuels in China**

Walter M. Kreucher, Weijian Han, Dennis Schuetzle, Zhu Qiming, Zhang Alin, Zhao Ruilan, Sun Baiming, Malcolm A. Weiss

**Economic, Environmental and Energy Life-Cycle Inventory of Automotive Fuels**

Walter M. Kreucher

**The Relationship between Gasoline Composition and Vehicle Hydrocarbon Emissions: A Review of Current Studies and Future Research Needs**

Dennis Schuetzle , Walter Siegl, Trescott E. Jensen , Mark A. Dearth , E. William Kaiser , Robert Gorse, Walter Kreucher , Edward Kulik

**So You Want to Buy an Electric Vehicle - 2022**

This buying guide examines the costs and benefits of battery electric vehicles that are available in the United States in the 2022 model year

Walter Kreucher

**2021 Advanced Automotive Technology Buying Guide**

This buying guide examines the costs and benefits of battery electric, plug-in hybrid electric, hybrid, and diesel-powered vehicles that are available in the United States in the 2021 model year.

Walter Kreucher

**2020 Advanced Automotive Technology Buying Guide**

This buying guide examines the costs and benefits of battery electric, plug-in hybrid electric, hybrid, and diesel-powered vehicles that are available in the United States in the 2020 model year.

Walter Kreucher

**2019 Advanced Automotive Technology Buying Guide**

Thinking about buying an electric vehicle, a hybrid, a diesel? Wondering if it will be cost effective? This guide looks at the cost of buying the vehicle, the fuel savings, and even the environmental benefits using the latest government data and methodology. Don't purchase a new car or truck without reading this book.

Walter Kreucher

**2018 Advanced Technology Buying Guide**

This book guides buyers of battery electric vehicles, plug-in hybrid electric vehicles, hybrid electric vehicles, and diesel vehicles in assessing the costs and benefits of the advanced technologies.

Walter Kreucher

**Hybrid Buying Guide**

A review of the top twenty 2012 Model Year hybrid electric vehicles, including the true cost to own and EPA fuel economy.

Walter Kreucher

No. 22-1032

And Consolidated Cases

————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

COMPETITIVE ENTERPRISE INSTITUTE et al.,

*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

**Declaration of Kent Lassman**

I, Kent Lassman, hereby declare:

1. I am an adult resident of the City of Alexandria, Virginia.

2. I am President and CEO of the Competitive Enterprise Institute (CEI), a nonprofit organization headquartered and incorporated in the District of Columbia. I have held that position since April, 2016, and am fully familiar with CEI's structure, programs and activities.

3. CEI is a nonprofit, nonpartisan public policy organization dedicated to advancing the principles of limited government, free enterprise, and individual liberty. CEI's focus is on economic overregulation in areas ranging from technology and finance to energy and the environment.

4. CEI is governed by a nine-member Board of Directors, each serving a three-year term.

5. I personally plan to buy a car within the next 18 months. I believe that EPA's new-vehicle emission rules will adversely impact my vehicle choices in terms of both price and range of models. Specifically, I believe that I will

have fewer choices and face higher prices due to these standards, because I will be seeking a car based on its safety, size and passenger capacity. I believe EPA's rules are aimed at significantly increasing the production and sales of electric vehicles, but I do not wish to buy an electric vehicle due to concerns about price and the availability and practicability of charging stations.

6. I believe that these adverse effects would be alleviated, at least in part, if EPA had adopted less stringent emission rules that were not aimed at promoting electric vehicle sales.

7. A number of CEI's other Directors have expressed similar concerns to me about these adverse impacts of EPA's rules.

8. For these reasons, I believe that CEI's participation as a petitioner in this case represents the interests of its Board in the deregulatory goals of this organization.

Pursuant to 28 USC 1746, I hereby declare under penalty of perjury under the laws of the District of Columbia and the United States that the foregoing is true and correct.

Kent Lassman

September 19, 2022
Date

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| THE STATE SOYBEAN ASSOCIATIONS OF THE STATES OF ILLINOIS, IOWA, INDIANA, MICHIGAN, MINNESOTA, NORTH DAKOTA, OHIO, and SOUTH DAKOTA, and DIAMOND ALTERNATIVE ENERGY, LLC, | |
| Petitioners, | Case No. 22-1033 |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | |
| Respondent. | |

## DECLARATION OF KIRK LEEDS

1. My name is Kirk Leeds. I am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge. I am submitting this Declaration on behalf of the Petitioners' opening brief in the above-captioned matter.

2. I have been a member of the Iowa Soybean Association ("Association") for 33 years. I am currently the Association's Chief Executive Officer. The Association is a non-profit, nonpartisan advocacy organization that represents the interests of the state's soybean industry.

3. Bio-based diesel is produced in the United States and can either be blended with traditional petroleum diesel or used as a direct substitution. Engines burning bio-based diesel can emit fewer pollutants than engines burning petroleum diesel, and compared to petroleum diesel, bio-based diesel reduces carbon dioxide emissions on average by 74% when considering the entire lifecycle.

4. Most of the bio-based diesel in the United States is made from soybean oil, and around 30% of the soybean oil produced in the United States is used to for that purpose.

5. In 2022, 1.18 billion gallons of biodiesel were consumed in the United States. 645 million gallons – over half of the total – were produced from soybean oil. In 2022, another 1.316 billion gallons of renewable diesel were consumed in the United States. 171 million gallons – over ten percent were produced from soybean oil. *See* Figure 1.

| Row Labels | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Biodiesel | 226,965,817.33 | 1,081,561,958.67 | 1,057,190,175.33 | 1,571,199,896.67 | 1,488,742,096.67 | 1,589,954,020.67 | 2,307,295,814.67 | 2,050,184,932.67 | 2,030,618,730.67 | 1,898,538,467.33 | 2,034,392,125.33 | 1,913,100,734.00 | 1,180,229,204.00 | 20,429,973,974.00 |
| All Other Feedstock | 14,752,896.00 | 49,585,621.33 | 63,695,263.33 | 98,407,643.33 | 114,735,686.67 | 141,158,576.00 | 287,630,679.33 | 230,044,412.67 | 250,360,211.33 | 451,875,822.00 | 443,808,561.33 | 467,762,090.67 | 264,249,884.00 | 2,878,067,348.00 |
| Biogenic Waste Oils/Fats/Gre | 106,821,876.00 | 369,777,840.67 | 369,948,096.67 | 459,438,352.00 | 335,330,317.33 | 307,144,720.67 | 312,613,053.33 | 268,120,412.67 | 308,327,252.67 | 243,664,933.33 | 216,129,822.00 | 228,415,313.33 | 124,645,277.33 | 3,650,477,268.00 |
| Biogenic Waste Oils/Fats/Gre | 4,459,586.00 | 26,379,051.33 | 6,041,465.33 | 33,545,712.67 | 52,439,301.33 | 83,556,355.33 | 125,470,778.00 | 116,005,572.00 | 169,721,631.33 | 2,659,556.00 | | | | 620,279,009.33 |
| Canola Oil | 5,223,361.33 | 57,647,200.67 | 91,821,238.00 | 78,486,983.33 | 196,774,522.00 | 161,237,334.00 | 288,954,695.33 | 195,410,352.67 | 170,633,004.67 | 198,092,899.33 | 255,025,824.00 | 256,846,164.00 | 145,982,991.33 | 2,102,136,570.67 |
| Non-food grade corn oil | 2,497,806.67 | 10,957,798.67 | 15,987,904.00 | 86,307,222.00 | 100,728,103.33 | 76,760,789.33 | 70,966,933.33 | 116,815,802.67 | 94,272,096.00 | 16,338.67 | | 40,692.00 | | 575,351,486.67 |
| Soybean Oil | 93,210,291.33 | 567,214,446.00 | 509,696,208.00 | 815,013,983.33 | 688,734,166.00 | 820,096,245.33 | 1,221,659,675.33 | 1,123,688,380.00 | 1,037,304,534.67 | 1,002,228,918.00 | 1,119,427,918.00 | 960,036,474.00 | 645,351,051.33 | 10,603,662,291.33 |
| Non-ester Renewable Diesel | 8,776,588.31 | 62,041,298.25 | 102,674,061.53 | 416,685,583.86 | 487,892,741.32 | 513,144,640.77 | 591,173,655.29 | 602,724,105.29 | 615,331,399.41 | 912,510,627.94 | 968,988,647.54 | 1,316,442,369.85 | 1,553,816,333.97 | 7,752,202,053.34 |
| All Other Feedstock | 8,057,507.72 | 31,751,885.31 | 47,368,265.06 | 268,429,366.22 | 373,174,999.55 | 302,253,037.83 | 431,451,247.06 | 423,739,766.47 | 447,932,969.41 | 592,199,429.12 | 615,820,956.36 | 780,409,174.56 | 610,643,448.09 | 4,933,240,052.75 |
| Biogenic Waste Oils/Fats/Gre | 719,080.59 | 30,289,412.94 | 55,305,796.47 | 142,029,489.41 | 104,389,472.94 | 210,367,980.59 | 148,758,077.06 | 178,961,437.65 | 146,178,602.35 | 242,652,224.12 | 263,133,360.59 | 364,383,616.47 | 396,268,595.29 | 2,283,437,146.47 |
| Soybean Oil | | | | 6,226,728.24 | 10,328,268.82 | 523,622.35 | 10,964,331.18 | 22,901.18 | 21,219,827.65 | 77,658,974.71 | 90,026,330.59 | 171,649,578.82 | 146,904,290.59 | 535,524,854.12 |
| Grand Total | 235,742,405.64 | 1,143,603,256.92 | 1,159,864,236.86 | 1,987,885,480.53 | 1,976,634,837.98 | 2,103,098,661.44 | 2,898,469,469.96 | 2,652,909,037.96 | 2,645,950,130.08 | 2,811,049,095.27 | 3,003,380,772.87 | 3,229,543,103.85 | 2,734,045,537.97 | 28,182,176,027.34 |

**Figure 1.** Envtl. Protection Agency, RINs Generated Transactions, *available at* https://www.epa.gov/fuels-registration-reporting-and-compliance-help/rins-generated-transactions.

2

6. EPA's new emissions standards for light-duty vehicles can only be met by averaging emissions from internal combustion engine vehicles with the emissions from zero-emission vehicles that do not run on liquid fuels. Therefore, this rule will reduce the demand for all liquid fuels, including bio-based diesel, which will in turn reduce the demand for the feedstocks used to produce renewable fuels, such as soybeans.

7. A reduced demand for bio-based diesel would result in great economic harm to the Association's members, as it would undermine their ability to sell soybeans at a profit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

Date: October 24, 2022                    Respectfully submitted,

_____

Kirk Leeds

*Chief Executive Officer for the Iowa Soybean Association*

3

No. 22-1032

And Consolidated Cases

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

COMPETITIVE ENTERPRISE INSTITUTE et al.,

*Petitioners*,

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

**Declaration of James Leedy**

I, James Leedy, hereby state as follows:

- I, my wife and our four children reside at 3005 E. Lakewood St., Mesa, AZ 85213.

- I currently own a 2012 minivan with about 148,000 miles on it; a large SUV that's over 50 years old; and a 2020 1/2 ton pickup truck.

- Within the next 3 years I expect to buy a car for my twin sons. Because this will be their first car, it will be a used model, probably a large, heavy sedan.

- The most important criteria for me in choosing a car are safety, affordability and size. I believe that, other things being equal, size and safety generally go hand-in-hand.

- In my experience, cars have become extremely expensive in recent

1

years. This is true for both new and used cars. I believe one major reason for this has been the effect of the federal government's automotive fuel economy standards. I believe that the new EPA emission rules being challenged in this case will make this effect even worse, and will further restrict the vehicle models that we can choose from.

- I do not wish to buy a hybrid or electric vehicle. Hybrids generally cost more than comparable non-hybrid models, and I have concerns about the lifespan of their batteries, which are extremely expensive, and very damaging to the environment. Electric vehicles generally cost even more, and the difficulty in finding recharging facilities would greatly restrict our ability to take the long road trips that our family enjoys.

- Less stringent EPA emission standards would make it easier for us to buy the car we'd like for our sons.

Pursuant to 28 USC section 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

James Leedy

Date: 9/20/2022

2

<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF TEXAS, et al.,

*Petitioner,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondent.*

No. 22-1031 (and consolidated cases)

**DECLARATION OF DAVE LOOS OF ILLINOIS CORN GROWERS ASSOCIATION IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, Dave Loos, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.     I am the Director of Biofuels and Research of the Illinois Corn Growers Association, a nonprofit trade association based in Illinois with a membership of 5,000 corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.     I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3.    Illinois is one of the nation's leading corn producing states, with a net production of more than 2 billion bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4.    The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

5.    Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

6.    The United States Environmental Protection Agency promulgated a final agency action entitled *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74,434 (Dec. 30, 2021). The

2

final rule sets increasingly stringent greenhouse-gas standards for light-duty vehicles for model years beginning with 2023. *Id.* at 74,434. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional vehicles which consume liquid fuels. *See, e.g., id.* at 74,438.

7.    By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See Id.* at 74,503 ("Through 2050, our rule will reduce gasoline consumption by more than 360,000 million gallons."). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of millions of gallons.

8.    While these standards are in effect, they will drive down demand for ethanol.

9.    This demand destruction harms the Illinois Corn Growers Association and its members by decreasing demand for the corn they grow.

10.    These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

3

11.    All these injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: October 31, 2022

Dave Loos

4

<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS FOR THE DIS-TRICT OF COLUMBIA CIRCUIT**

STATE OF TEXAS, et al.,

*Petitioner,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondent.*

No. 22-1031 (and consolidated cases)

**DECLARATION OF JOSH ROE OF KANSAS CORN GROWERS ASSOCI-ATION IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, Josh Roe, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am the Vice President of Market Development and Policy of the Kansas Corn Growers Association, a nonprofit trade association based in Kansas with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.    I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3.    Kansas is one of the nation's leading corn producing states, with a net production of around 800 million bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4.    The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

5.    Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

6.    The United States Environmental Protection Agency promulgated a final agency action entitled *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74,434 (Dec. 30, 2021). The

final rule sets increasingly stringent greenhouse-gas standards for light-duty vehicles for model years beginning with 2023. *Id.* at 74,434. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional vehicles which consume liquid fuels. *See, e.g., id.* at 74,438.

7.      By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See Id.*   at 74,503 ("Through 2050, our rule will reduce gasoline consumption by more than 360,000 million gallons."). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of millions of gallons.

8.      This demand destruction harms the Kansas Corn Growers Association and its members by decreasing demand for the corn they grow.

9.      These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

10.    These injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: October 31, 2022

_____

Josh Roe

4

No. 22-1032

And Consolidated Cases

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

COMPETITIVE ENTERPRISE INSTITUTE et al.,

*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent.*

**Declaration of Marc Scribner**

I, Marc Scribner, hereby state as follows:

1.      I live at 811 Quintana Place NW, Washington DC 20011.

2.      I do not currently own a car.  I plan to buy one in the next one to two years to use for personal travel both in the DC area and for longer road trips

3.      Depending on vehicle prices and availability, I hope to buy either a full-size sedan or a cross-over model.  Safety and luggage capacity are the most important factors for me, as well as the ability to fold down the rear seats so that I can move large, boxed items.  For safety reasons, I do not plan to buy a compact or any vehicle smaller than that.

4.      I am on a limited budget.  I would prefer to buy a new car for reliability and safety reasons, but if new cars that meet my criteria are too expensive, I may buy a used car instead.

5.     I do not wish to buy a hybrid or electric car.  Hybrid cars generally cost more than similar conventional models, and the price difference for electric cars and similar conventional models is even greater.  Moreover, charging an electric car would be a major problem.  Because of space and parking limitations it would be extremely difficult for me to regularly charge an electric car at my home, and I do not want to deal with the uncertainty and trouble of finding and using a charging station while on the road.

6.     In my view, EPA's new vehicle emission rules will raise vehicle prices and restrict the range of models that are available to me.  I believe that my car-buying situation would be improved if these rules were withdrawn or at least made more lenient.

Pursuant to 28 USC section 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Marc Scribner

9/19/2022

Date

No. 22-1032

And Consolidated Cases

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

COMPETITIVE ENTERPRISE INSTITUTE et al.,

Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

**DECLARATION OF JERRY R. SIMMONS**

I, Jerry Simmons, hereby declare as follows:

1.  I am an adult resident of Tulsa, Oklahoma.

2.  I make this declaration in my capacity as President and CEO of the Domestic Energy Producers Alliance (DEPA), a petitioner in this action, and in support of DEPA's participation in this case. DEPA asserts standing in its own right as an organization, and on behalf of the energy producer associations and individual companies that are its members;

3.  DEPA is a nonprofit, nonstock corporation organized under the laws of the State of Oklahoma and headquartered in Tulsa, Oklahoma. Its purpose is to advocate policies and regulations that assist the clean, safe and efficient development of oil and gas in order to produce reliable, affordable energy.

4.  DEPA has several hundred individual member companies, all of them engaged in various aspects of on-shore domestic oil and gas production. These companies range from mom-and-pop operations to large domestic producers with over a thousand employees each.

1

5. In addition to the individual companies which belong to DEPA, DEPA's membership also consists of 28 state oil and gas associations representing thousands of U.S. upstream, downstream service and drilling contractors. Finally, there are 10 national collaborating associations that belong to DEPA, each of them working on behalf of specific segments of the domestic oil and gas industry.

6. The oil and gas industry in which DEPA's individual member companies work can be divided into upstream, midstream, and downstream segments, as well as service and drilling contractors.

7. **Upstream businesses** consist of companies involved in the exploration and production of oil and gas. These are the firms that search for reservoirs of the raw materials and then drill to extract those materials. Exploration and production is a technologically intensive segment characterized by high risks and high investment capital, as well as the long periods of time that it takes time to locate and drill. Virtually all of the cash flow and income of exploration and production companies are directly related to oil and gas production.

8. **Midstream businesses** are those that are focused on transportation. They are responsible for moving the extracted raw materials to refineries to process the oil and gas. They are characterized by shipping, trucking, pipelines, and storing raw materials. They are generally subject to a high degree of regulation, particularly on pipeline transmission. These midstream companies naturally depend on the success of upstream firms to stay in business.

9. **Downstream businesses** are the refineries. The companies that run these complex facilities are responsible for removing impurities and for converting the oil and gas to products for the general public, such as gasoline, jet fuel, heating oil, and asphalt. Downstream companies also produce the petroleum base chemicals used by not only by vehicles, but also for manufacturing of all sorts of plastic, glass, steel, medicine, textiles, etc. To make these products, refineries have a variety of units such as storage tanks, pipelines, water cooling towers and much more.

10. One of DEPA's national collaborating organizations is the **National Association of Royalty Owners**, which represents millions of royalty-owning members. There are over twelve million individuals who own subsurface mineral rights in the US and who receive royalty payments from oil and gas companies when those companies engage in production on these owners'

2

properties. Oil and gas production does not take place in every state of the US, but royalty owners live, work and vote in every state. These individual royalty owners depend on the oil and gas industry for their mineral production, since they do not have the knowledge, expertise, or financial ability to explore, drill and produce the oil and gas themselves. Many small family-owned oil and gas companies are also royalty owners, but typically individual royalty owners have never worked for an oil and gas company. Royalty owners rely on the royalties they receive to supplement their earnings or retirement.

11. **Drilling and service companies** make up another segment of DEPA's membership. They perform vital work for the exploration and production companies described in paragraph 6, since the latter do not usually own or service their drilling equipment. Instead, they hire contract drilling companies to drill wells for them. These contract drilling companies usually charge for their services based on the amount of time they work for an exploration and production company. Drilling activity (rig count) is directly tied to the activity level of the upstream companies. Therefore, any downturn in consumption of refined products such as gasoline will result in less drilling activity and fewer rigs operating.

12. Once a well is drilled, a series of activities are involved in generating and maintaining its production over time. These activities are called well servicing; they include such activities as geologic record-keeping, sealing and piping the borehole, hydraulic fracturing of the well, and maintenance. Oil drilling and oil servicing thus represent two different business activities within the oil and gas industry. The revenue of service companies, which are often family businesses, is tied to the activity level in the oil and gas industry.

13. As EPA admits, its new emission rules are expressly designed to reduce gasoline consumption. In its words,

> "The final standards will reduce … fuel consumption. Reducing fuel consumption is a significant means of reducing GHG [greenhouse gas] emissions from the transportation fleet. ….
> "The largest changes in fuel consumption come from gasoline …."

EPA, Final Rule, 86 Fed. Reg. 74,434, 74,503 (2021).

14. This reduction in gasoline consumption will directly and adversely impact DEPA's members.  Evidence of the real-life effects of such a drop in consumption comes from the 2020 pandemic, when many forms of travel dropped by almost 100%.  This caused U.S. oil prices to plunge into negative numbers for the first time on record. For example, in a matter of hours on April 20, 2020, the May 2020 contract futures price for West Texas Intermediate plummeted from $18 a barrel to around negative $37 a barrel. Companies were actually paying contract buyers to take their product.

15. The less dramatic but more longstanding effects of even this relatively short-term drop in consumption included:
    a. Insufficient storage issues;
    b. Flaring of natural gas – if gas cannot be piped out to be used or stored properly, it must be wasted by burning;
    c. Throttling back pumps, leading to a permanent production drop. Because the formations are not airtight once the suction momentum is started in a well, slowing the pumps means not getting back to the same pressure.  The end result is that the world loses product which can no longer be extracted, and the company loses money on that foregone product;
    d. When or if demand returns, there is a long turn-around time to ramp production back up.
    e. Future production is hampered because it isn't economically feasible. As a result, national energy security is hampered, there is a new higher bar for manufacturing and product costs, and there is a new higher standard cost to consumers.
    f. When demand is dramatically decreased it causes manpower issues. A year of decreased demand means incoming college students who might consider petroleum geology, petroleum engineering or similar degree programs go into a different field. This results in a shortage of qualified professionals when they are needed, and those who are available must be paid a premium to stay.

16. In short, DEPA's member companies will suffer a major drop in both business and revenues.  DEPA's member associations will lose member companies and membership dues.  And DEPA itself will suffer similar losses as an organization, forcing it to cut back its staff and activities.

Pursuant to 28 USC 1746, I hereby declare under penalty of perjury under the laws of the District of Columbia and the United States that the foregoing is true and correct.

Jerry R. Simmons

9-13-22

Date

<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| STATE OF OHIO, et al., | |
| *Petitioners,* | |
| v. | No. 22-1081 (and consolidated cases) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| *Respondents.* | |

**DECLARATION OF JENNIFER M. SWENTON**

I, Jennifer M. Swenton, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.      I am the Director of Optimization & Planning in the Optimization Planning and Economics division for Valero. In this role, I am responsible for a wide range of planning and economic business matters regarding Valero's operating strategies for its West Coast, Mid-Continent, and North Atlantic refinery assets. My responsibilities include management oversight of the planning and economics teams for these Valero assets, and through my background, I also have significant technical and operational experience from several of Valero's refineries. I am also generally familiar with the planning, economics, and operations of Valero's Gulf Coast refinery assets.

2.      I am generally aware of the United States Environmental Protection Agency's ("EPA") issuance of a final rule entitled, "Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards," 86 Fed. Reg. 74,434 (Dec. 30, 2021). It is my understanding that EPA repeatedly acknowledged that its rule mandates electrification.

Page **1** of 5

94a

As EPA explained, "[c]ompliance with the final standards will necessitate … further deployment of [electric-vehicle] technologies." 86 Fed. Reg. at 74,493. More specifically, I understand that EPA explained the final standards "are achievable primarily through the application of advanced gasoline vehicle technologies *but with a growing percentage of electric vehicles*." *Id.* at 74,438 (emphasis added). And it "project[ed] that during the four-year ramp up of the stringency of the greenhouse-gas standards, the standards can be met with gradually increasing sales of plug-in electric vehicles in the U.S. from about 7 percent market share in [model year] 2023 … up to about 17 percent in [model year] 2026." *Id.* According to EPA, the rule will have significant impacts on fuel consumption: EPA expects the rule to result in reduced fuel consumption of more than 360 billion gasoline equivalent gallons, with "[t]he largest changes . . . com[ing] from gasoline." 86 Fed. Reg. at 74503.

3.    As a result of this projected displacement, EPA's rulemaking will cause financial injury to Valero's refining business segment, which would otherwise not occur in the absence of the rule.

**A.    Valero's Overall Business Strategy**

4.    Valero has twelve U.S. domestic refineries: two on the West Coast in California, three in the Mid-Continent region, and seven in the Gulf Coast region. Unlike some other oil and gas companies, Valero does not explore for or produce crude, i.e., it does not drill for oil.  Instead, it purchases crude from third parties.

5.    Valero a l s o  does not operate any retail motor fuel stations.  It sells motor fuel (i.e., gasoline and diesel) at the wholesale and bulk sale levels.  Valero sells motor fuels at the wholesale level under several different channels of trade, including unbranded contract, unbranded "spot," and branded motor fuel sales. Bulk sales are made to clear the

remaining refined product length from Valero's refineries to manage inventories.

**B.     Reduction in Nationwide Fuel Demand**

6.     A significant reduction in nationwide gasoline demand, as contemplated by EPA's rule, will negatively impact Valero's business and operations. More specifically, the reduction in demand for gasoline and diesel attributable to the projected market share increase of so-called "zero-emission vehicles" will result in the need for refineries to operate at lower capacities and/or to move additional gasoline and/or gasoline components to other markets. The former option naturally has a direct impact on the profitability and long-term viability of such refineries, while the latter is limited to logistical constraints and economic margins.

7.     Moreover, because Valero's refineries must maintain a relatively high operating rate to remain stable, a significant reduction in domestic market demand risks potential refinery shutdowns and even permanent closures. In this regard, one need only consider the impact of the COVID-19 pandemic on the refining sector, which experienced negative financial margins and multiple third-party refinery closures due to the reduction in gasoline demand. However, even if operating capacity is maintained at or above the minimum operating threshold, any reduction in market demand would negatively impact the profitability of Valero's refineries, which are currently operating at close to maximum capacity (outside of required maintenance events) post-COVID as a result of normal or near-normal market demand and a reduced market supply of gasoline stemming from third-party refinery closures.

8.     In theory, the impacts of EPA's expected reduction in domestic demand can be mitigated to some extent through exports to Latin America and other foreign markets, but

such mitigation efforts come with increased costs, logistical complications, and capacity limitations. In this regard, gasoline sales from Valero's refineries to foreign markets may be possible primarily via the shipping industry, which as an initial matter, requires the incurrence of additional transportation costs. Additionally, not all of Valero's refineries have access to marine docks. Two of Valero's Mid-Continent refineries are entirely landlocked, with limited and/or no access to export markets via pipeline, rail, or trucking. The third Mid-Continent refinery can only be accessed by barge, as opposed to large ocean-going vessels, which limits its export capacity as well. Valero's West Coast operations face similar logistical limitations due to limited dock space, vessel, and permitting constraints.

9.      To the extent capital investment might improve such constraints and allow for increased gasoline movements, that would nevertheless require significant expenditures by both Valero and third parties over whom Valero has no control, and would depend on business analyses and forecasts to justify said investment. And even if, for example, existing third-party pipelines to Valero's Mid-Continent refineries were reverse-engineered so as to allow for product to be transported to the Gulf Coast, there are nevertheless additional costs associated with such pipeline use, as well as scheduling and forecasting complications, including competition with other Mid-Continent refiners for limited transportation throughput capacity.

10.      Such exports would also require Valero's West Coast refineries to compete with barrels from the Gulf Coast, the Far East, and Europe, which have lower operating and feedstock costs, and are therefore better equipped to compete in such markets. Additionally, California is one of the most expensive operating environments for refineries, and it is not at all clear these refineries would be competitive in the markets for conventional gasoline

blends, as opposed to specialty blends such as CARBOB (California) and AZRBOB (Arizona).

11.     Even for Valero's Gulf Coast refineries, which are better equipped and geographically advantaged for exporting product, a large increase in foreign sales to offset domestic demand reduction would still result in logistical and permitting complications, and possibly the incurrence of additional transportation costs depending on the terms of sale. In this regard, it is unclear what the supply of and demand for gasoline and diesel in such foreign markets would look like in the scenario presented by EPA's rule—i.e., a scenario in which the domestic refining industry as a whole is forced to quickly and significantly increase exports. Valero currently exports, on average, less than ten percent of its domestic gasoline production.

12.     In short, EPA projects that the subject rule will force a rapid expansion of the new vehicle market share for electric vehicles and a corresponding reduction in nationwide liquid fuel demand. Such a reduction in demand will negatively impact Valero's business operations and profitability as described herein. These economic impacts are not speculative. Indeed, as EPA explained, "[t]hrough 2050," the rule will reduce fuel consumption by more than 360,000 million gasoline equivalent gallons, "reaching a 15 percent reduction in annual U.S. gasoline consumption in 2050," 86 Fed. Reg. at 74,503.

13.     All these injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: November 3, 2022

_____

Jennifer M. Swenton

<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| STATE OF TEXAS, et al.,<br><br>　　　　　　*Petitioner,*<br><br>　v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>　　　　　　*Respondent.* | No. 22-1031 (and consolidated cases) |

**DECLARATION OF JAMES E ZOOK OF MICHIGAN CORN GROWERS ASSOCIATION IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, James E. Zook, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.　　I am the Executive Director of the Michigan Corn Growers Association, a nonprofit trade association based in Michigan with a membership of approximately 1,400 corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.　　I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3.    Michigan is one of the nation's leading corn producing states, with a net production of around 350 million bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4.    The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

5.    Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

6.    The United States Environmental Protection Agency promulgated a final agency action entitled *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74,434 (Dec. 30, 2021). The final rule sets increasingly stringent greenhouse-gas standards for light-duty

2

vehicles for model years beginning with 2023. *Id.* at 74,434. Automakers cannot feasibly comply with the standards unless they dramatically increase their production of electric vehicles and decrease the production of conventional vehicles which consume liquid fuels. *See, e.g., id.* at 74,438.

7.    By design, EPA's emission standards will reduce the demand for liquid fuels and their components by displacing an increasing number of combustion-engine vehicles with electric and hybrid vehicles that use little to no liquid fuel. *See Id.* at 74,503 ("Through 2050, our rule will reduce gasoline consumption by more than 360,000 million gallons."). Because ethanol is blended into nearly every gallon of gasoline sold in the United States, this rule will reduce ethanol consumption by tens of millions of gallons.

8.    While these standards are in effect, they will drive down demand for ethanol.

9.    This demand destruction harms the Michigan Corn Growers Association and its members by decreasing demand for the corn they grow.

10.    These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

11.    These injuries would be substantially ameliorated if EPA's decision

3

were set aside.


Dated: October 31, 2022

James E. Zook