# In the United States Court of Appeals for the District of Columbia Circuit

STATE OF TEXAS, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN
HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ADVANCED ENERGY UNITED, ET AL.,
*Intervenors.*

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0208)

## SUPPLEMENTAL BRIEF FOR PRIVATE PETITIONERS

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel &
Petrochemical
Manufacturers and Energy
Marketers of America*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable
Fuels Company, LLC*

(Additional counsel listed on
the following page)

JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(317) 513-0622
mbuschbacher@boydengray.com

*Counsel for Clean Fuels
Development Coalition, ICM, Inc.,
Illinois Corn Growers Association,
Indiana Corn Growers
Association, Kansas Corn Growers
Association, Kentucky Corn
Growers Association, Michigan
Corn Growers Association,
Missouri Corn Growers
Association, and Valero Renewable
Fuels Company, LLC*

DEVIN WATKINS
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street, NW
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Competitive Enterprise
Institute, Anthony Kreucher,
Walter M. Kreucher, James Leedy,
Marc Scribner, and Domestic
Energy Producers Alliance*

MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street NW
Washington, DC 20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

*Counsel for Illinois Soybean
Association, Iowa Soybean
Association, Indiana Soybean
Alliance, Inc., Michigan Soybean
Association, Minnesota Soybean
Growers Association, North
Dakota Soybean Growers
Association, Ohio Soybean
Association, South Dakota
Soybean Association, and
Diamond Alternative Energy, LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Diamond Alternative
Energy, LLC, and Valero
Renewable Fuels Company, LLC*

**TABLE OF CONTENTS**

Page

GLOSSARY ................................................................................................ iv

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ............................................................................................. 4

I.   *Ohio* Does Not Affect Petitioners' Standing ................................ 4

II.  *Loper Bright* Confirms That EPA Lacks Statutory Authority
For Its Rule ....................................................................................... 8

    A.   *Loper Bright* Confirms That EPA Is Not Entitled To
*Chevron* Deference .............................................................. 9

    B.   *Loper Bright* Confirms That EPA's Current Interpretation
Merits No Special Weight ................................................... 11

CONCLUSION ......................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bennett* v. *Spear,*
520 U.S. 154 (1997)...................................................................5

*Chevron U.S.A. Inc.* v. *NRDC,*
467 U.S. 837 (1984)..........................................................3, 8, 9, 10

*Competitive Enter. Inst.* v. *FCC,*
970 F.3d 372 (D.C. Cir. 2020).................................................5, 8

*Delta Const. Co.* v. *EPA,*
783 F.3d 1291 (D.C. Cir. 2015)....................................................7

*Department of Commerce* v. *New York,*
588 U.S. 752 (2019).....................................................................5

*Energy Future Coal.* v. *EPA,*
793 F.3d 141 (D.C. Cir. 2015)..................................................5, 6

*King* v. *Burwell,*
576 U.S. 473 (2015).....................................................................9

*Loper Bright Enterprises* v. *Raimondo,*
144 S. Ct. 2244 (2024)..........................1, 2, 3, 8, 9, 10, 11, 14

*Ohio* v. *EPA,*
98 F.4th 288 (D.C. Cir. 2024) ...........................1, 2, 4, 5, 8

*Skidmore* v. *Swift & Co.,*
323 U.S. 134 (1944)...................................................................11

*West Virginia* v. *EPA,*
597 U.S. 697 (2022)...............................................................9, 14

**Statutes**

Pub. L. No. 91-604, 84 Stat. 1690 (1970) ............................12

**Regulations**

45 Fed. Reg. 14496 (Mar. 5, 1980) ......................................12

46 Fed. Reg. 21628 (Apr. 13, 1981) .....................................12

48 Fed. Reg. 33456 (July 21, 1983) ......................................12

50 Fed. Reg. 10606 (Mar. 15, 1985) ...................................................................12

54 Fed. Reg. 22652 (May 25, 1989) ..........................................................12, 13

75 Fed. Reg. 25324 (May 7, 2010) ...................................................................13

# GLOSSARY

| | |
|---|---|
| App. | Private Petitioners' Addendum of Statutes and Standing Declarations (Doc. 1996978) |
| EPA | U.S. Environmental Protection Agency |
| EPA Br. | EPA's Final Answering Brief (Doc. 1996730) |
| Private Pet. Br. | Final Brief for Private Petitioners (Doc. 1996915) |
| Private Pet. Reply Br. | Final Reply Brief for Private Petitioners (Doc. 1996916) |
| Private Pet. Supp. Br. | Proposed Supplemental Brief for Private Petitioners (Doc. 2017860) |

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court has requested supplemental briefing on two issues: (1) "to what extent, if any, the court's decision in *Ohio* v. *EPA*, 98 F.4th 288 (D.C. Cir. 2024), is relevant to petitioners' standing"; and (2) "to what extent, if any, the court's decision in *Loper Bright Enterprises* v. *Raimondo*, 144 S. Ct. 2244 (2024), is relevant to the issues of statutory interpretation presented in these cases." July 29 Order, Doc. 2067052. On the first, *Ohio* does not affect private petitioners' standing, which is both self-evident and confirmed by agency findings. On the second, *Loper Bright* confirms that EPA has exceeded its authority.

To begin with *Ohio*, no party has ever questioned petitioners' Article III standing to challenge EPA's vehicle-emission rule, before or after *Ohio*. Petitioners include entities that produce or sell liquid fuels and the raw materials used to produce them, along with associations whose members include such entities. They are plainly injured by EPA's rule, which EPA itself found would reduce demand for their products. Vacating the rule would redress those petitioners' injuries by removing a regulatory impediment to the sale of their products, allowing them to compete in the marketplace and to sell at least one additional gallon of liquid fuel. Petitioners also include four

individuals and a nonprofit whose board members will be harmed in their individual ability to purchase affordable vehicles powered by liquid fuel. Vacating the rule would likewise redress their injuries by allowing automakers to make more and more affordable internal-combustion-engine vehicles.

This Court's decision in *Ohio* does not cast doubt on any of that. In *Ohio*, this Court concluded that a group of fuel producers lacked standing to challenge a different EPA action regulating vehicle emissions because those petitioners supposedly had not shown that EPA's action would have any real-world effect on the use of liquid fuel. 98 F.4th at 302. That decision is the subject of a pending petition for certiorari. *See Diamond Alternative Energy, LLC* v. *EPA*, No. 24-7 (U.S. 2024). But whatever the right answer on the record in *Ohio*, the record here is clear. EPA made numerous factual findings as to the hundreds of billions of gallons of liquid fuel that will no longer be purchased as a result of the rule for decades into the future. Because petitioners have a straightforward economic injury that will be at least partially redressed if the regulations are vacated, there are no standing concerns.

Unlike this Court's decision in *Ohio*, the Supreme Court's decision in *Loper Bright* does bear on this case, in two ways. First, *Loper Bright*

overruled *Chevron U.S.A. Inc.* v. *NRDC*, 467 U.S. 837 (1984). To be sure, this should never have been a *Chevron* case. The rule here implicates a major question, eliminating any possible deference to the agency's sweeping claim of authority. And even apart from major questions, the Clean Air Act unambiguously forecloses EPA's reading of the statute, taking deference off the table. Nevertheless, the agency invoked *Chevron* in a cursory request for deference in its brief. *Loper Bright* establishes that that request must be rejected.

Second, *Loper Bright* confirms that EPA's interpretation merits no other special weight or respect even outside the *Chevron* framework. *Loper Bright* makes clear that agency interpretations are most deserving of respect if they were issued contemporaneously with the relevant statute and have remained consistent over time. EPA's current interpretation is neither. Its treatment of electric vehicles is novel, and its reliance on fleetwide-averaging tools to reverse engineer a de facto electrification mandate contradicts interpretations EPA issued much closer to the passage of the Clean Air Act.

**ARGUMENT**

## I. *Ohio* Does Not Affect Petitioners' Standing.

This Court first asked the parties to address "to what extent, if any, the court's decision in *Ohio* . . . is relevant to petitioners' standing." July 29 Order, Doc. 2067052. *Ohio* concerned EPA's decision in March 2022 to reinstate California's Clean Air Act preemption waiver, which permits California to set its own "Advanced Clean Car" rules for vehicle emissions including, at least according to EPA, standards that mandate "zero-emission vehicles" and regulate greenhouse-gas emissions from vehicles. *See Ohio*, 98 F.4th at 298. This Court found that the petitioners in that case, which also produce liquid fuel, had not established the redressability prong of standing because they had not provided record evidence that "automobile manufacturers are likely to respond to a decision by this Court by changing their fleets in a way that alleviates their injuries." *Id.* at 302.

No party, including EPA, has contested private petitioners' Article III standing in this case, either before or after this Court's *Ohio* decision. That is because on this record it is clear that EPA's rule is affecting auto manufacturers' behavior and therefore that private petitioners have standing.

A.    As a threshold matter, petitioners' standing is self-evident.  First, a ruling in petitioners' favor would "remove a regulatory hurdle" to using liquid fuel, which this Court has found is by itself "enough to demonstrate redressability."  *Energy Future Coal.* v. *EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015) (Kavanaugh, J.); *see Bennett* v. *Spear*, 520 U.S. 154, 169 (1997) (standing can be based on the "determinative or coercive effect" of the challenged regulation "upon the action of someone else").  After all, petitioners "seek an opportunity to compete in the marketplace," *Energy Future Coal.*, 793 F.3d at 144, an opportunity that EPA's rule significantly restricts.

Second, to establish standing a plaintiff may rely on "the *predictable effect* of Government action on the decisions of third parties," and need not supply affidavits detailing how third parties will behave.  *Department of Commerce* v. *New York*, 588 U.S. 752, 768 (2019) (emphasis added); *Competitive Enter. Inst.* v. *FCC*, 970 F.3d 372, 383-384 (D.C. Cir. 2020) (Katsas, J.).  Here, the "predictable effect" of EPA's rule regulating vehicle emissions is obvious:  automakers will produce and sell more vehicles that do not use liquid fuel at all or at least use less of it.  And as petitioners explained in their standing declarations, "the reduced demand for transportation fuels … results in lost sales for" petitioners and their members that produce liquid

fuels.  App. 49a.  To the extent the *Ohio* decision would require any more of petitioners, it is wrong.[*]

B.    Even if additional record evidence were required, the record here is replete with evidence of the sort that the Court in *Ohio* found lacking.  The record is full of EPA's acknowledgments of—and, indeed, celebration of—the logical and intended effects of its rule on liquid-fuel consumption.  For example, EPA's final rule explained that its standards would play an "important role in the transition from the current fleet" to one that would produce fewer greenhouse gases.  J.A. 14.  What it meant was that its standards would "necessitate greater" electrification, resulting in a vehicle market that would be 17% electric—"driven" by "the increased stringency of our final standards"—as opposed to the 7% rate that would occur without those standards.  J.A. 51, 60.  Perhaps most explicitly, EPA found that the rule would "reduce gasoline consumption by more than 360,000 million gallons—reaching a 15 percent reduction in annual U.S. gasoline consumption" by 2050.

---

[*]    The pending petition for certiorari explains that *Ohio* conflicts with a long line of cases, such as *Energy Future Coalition*, that have found standing based on either the removal of a regulatory hurdle or "the predictable effect of Government action on the decisions of third parties," without requiring the kind of record evidence that this Court in *Ohio* demanded.  *See* Petition for Writ of Certiorari, *Diamond Alternative Energy, LLC* v. *EPA*, No. 24-7 (U.S. July 2, 2024).

J.A. 70.  And EPA estimated that one of the rule's central "benefits" would be American drivers' spending billions of dollars less on liquid fuel.  J.A. 10.  EPA also found that its rule would increase the average cost of a vehicle, *see* J.A. 11, which would harm individual petitioners.  EPA made these calculations using a baseline "no action" scenario that accounted for multiple factors affecting automaker behavior, including other regulations and market forces.  J.A. 43, 217, 882-885.

Although EPA contended for the first time at oral argument that it is *theoretically* possible for automakers to comply with its new standards without producing more electric vehicles—a claim that is false on its own terms, *see* Private Pet. Supp. Br. 6-8—EPA has never disputed that automakers *will* in practice respond by producing more electric vehicles.  *See* J.A. 51, 60.  In any event, even if an automaker chose a compliance strategy focused on internal-combustion-engine vehicles, those vehicles would need to become more fuel-efficient to satisfy EPA's standards, since the only practical way to reduce greenhouse-gas emissions is to improve fuel economy.  *See Delta Const. Co.* v. *EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) ("[A]ny rule that limits tailpipe [greenhouse gas] emissions is effectively identical to a rule that limits

fuel consumption.") (citation omitted). Thus any "compliance pathway[]" would depress demand for petitioners' products. J.A. 41.

The record evidence as to the intended and predictable result of EPA's rules on fuel use makes this case distinguishable from *Ohio*. The *Ohio* decision repeatedly faulted the fuel producers in that case for failing to cite "record evidence" regarding how regulated entities would respond to the challenged action. 98 F.4th at 303 (citation omitted). While that sort of evidence should not be necessary given the obvious effects of a regulation designed to force reductions in the use of liquid fuel, the record here includes the evidence that the *Ohio* panel (wrongly) demanded. EPA's "own factfinding" and "evidence in the administrative record" conclusively establish the "likely reaction of third parties." *Competitive Enter. Inst.*, 970 F.3d at 382. In this case, that reaction is to sell more electric vehicles, which lowers the demand for petitioners' products.

## II. *Loper Bright* Confirms That EPA Lacks Statutory Authority For Its Rule.

Unlike *Ohio*, *Loper Bright* is relevant to this case in two respects. First, and most obviously, *Loper Bright* overruled *Chevron*. Although this case was never an appropriate candidate for *Chevron* deference, *Loper Bright* removes any doubt on that front. Second, *Loper Bright* clarifies the circumstances

under which agency interpretations may still be entitled to special weight, but those circumstances are inapplicable here, confirming that EPA's interpretation merits no special respect.

## A. *Loper Bright* Confirms That EPA Is Not Entitled To *Chevron* Deference.

Even before the Supreme Court decided *Loper Bright*, *Chevron* was not the appropriate framework to decide this case for two reasons.  First, EPA's rule implicates a major question, which takes *Chevron* off the table.  *See West Virginia* v. *EPA*, 597 U.S. 697, 723 (2022). As private petitioners have explained, EPA has claimed a power of vast economic and political significance:  the authority to effectively mandate the electrification of the nation's vehicle fleet.  *See* Private Pet. Br. 21-36.  The Supreme Court had made clear long before *Loper Bright* that *Chevron* deference is inappropriate for cases implicating such major questions.  *See King* v. *Burwell*, 576 U.S. 473, 485-486 (2015).  Instead, the opposite presumption applies:  the agency can act only if it has clear authorization from Congress.  *West Virginia*, 597 U.S. at 723.

Second, even if this case did not implicate a major question, EPA's interpretation still would not have merited *Chevron* deference because the relevant provisions of the Clean Air Act are unambiguous.  According to the

plain text of Section 202, EPA cannot set fleetwide average standards, but must regulate on a vehicle-by-vehicle basis. *See* Private Pet. Br. 38. Under *Chevron*, a court could defer to an agency interpretation only if, after exhausting all "traditional tools of statutory construction," it found the authorizing statute genuinely ambiguous. 467 U.S. at 843 n.9. Here, the text, history, structure, and nearby provisions of the statute unambiguously foreclose EPA's attempt to use fleetwide averaging to effectively mandate electrification. *See* Private Pet. Br. 38-61.

Nevertheless, EPA did invoke *Chevron* in this case. On multiple occasions, EPA suggested in passing that this Court could uphold its interpretation if it is "reasonable," even if "traditional tools of statutory interpretation" do not "show that the agency's interpretation is 'the best one.'" Br. 25; *see id.* at 82 ("[A]t a minimum, EPA's construction of [its authority under the Clean Air Act] is reasonable and may be sustained as such."). After *Loper Bright*, that is not the proper standard. Today, when it comes to "statutory interpretation, if it is not the best, it is not permissible." *Loper Bright*, 144 S. Ct. at 2266. EPA's interpretation of the Clean Air Act is not the best one—let alone a clearly correct reading as the major-questions doctrine requires—so the Court should set aside the agency's rule.

## B. *Loper Bright* Confirms That EPA's Current Interpretation Merits No Special Weight.

*Loper Bright* also confirms that EPA's interpretation merits no other special weight. *Loper Bright* contemplates that a court may grant an agency interpretation respect under *Skidmore* v. *Swift & Co.*, 323 U.S. 134 (1944), based on its "power to persuade." 144 S. Ct. at 2267 (citation omitted). EPA's novel interpretation is not entitled to such *Skidmore* respect.

Under *Skidmore*, a court may look to an agency interpretation for "guidance," but only to the extent it is persuasive—an inquiry that turns on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." 323 U.S. at 140. *Loper Bright* reaffirmed that agency interpretations are owed most respect when they were "issued roughly contemporaneously with enactment of the statute and remained consistent over time." 144 S. Ct. at 2258. EPA's interpretation of the Clean Air Act in this case does not fit the bill. EPA now contends that the Act authorizes it to set emission standards using fleetwide averaging, *see* Br. 62-75, and to include electric vehicles in those averages, *id.* at 75-79. Neither of those interpretations reflects contemporaneous, consistent agency practice.

Start with fleetwide averaging in general. EPA now asserts that the Clean Air Act affirmatively authorizes averaging and related programs for credit banking and trading, but that was not its position when the issue first arose in the 1980s. In 1980, a decade after the relevant language was added to the Clean Air Act, *see* Pub. L. No. 91-604, 84 Stat. 1690 (1970), and roughly five years after Congress created the separate Corporate Average Fuel Economy program, EPA rejected comments calling for the agency to permit fleetwide averaging. It explained that "Sections 202 and 207 assume individual vehicle compliance with the applicable standards," as does "the structure of Title II of the Clean Air Act." 45 Fed. Reg. 14496, 14502 (Mar. 5, 1980). The next year, EPA reversed course and announced its intent to permit averaging. *See* 46 Fed. Reg. 21628, 21628 (Apr. 13, 1981). But even then, EPA made clear that it allowed averaging not because the statute provided affirmative authorization for it to do so, but rather because it thought that the statute was *silent* about averaging and did not expressly prohibit the practice. *See, e.g.*, 48 Fed. Reg. 33456, 33458 (July 21, 1983) ("Congress did not specifically contemplate an averaging program when it enacted the Clean Air Act."); 50 Fed. Reg. 10606, 10636 (Mar. 15, 1985) ("[A]veraging is neither required by the statute nor required of manufacturers."); 54 Fed. Reg. 22652, 22665 (May

25, 1989) ("[T]he statute does not explicitly address EPA's authority to allow averaging."); *see also id.* at 22666 (accepting the contention that "the statutory language [is] ambiguous" and thus could "leave room for" averaging being "within the Agency's discretion"). Both EPA's original view that the statute forbids averaging and its later view that the statute is silent or perhaps ambiguous on averaging are inconsistent with its present view, seemingly adopted for the first time in this case.

EPA's present reliance on the averaging of electric vehicles in setting greenhouse-gas standards is also of recent vintage. EPA first included electric vehicles in its greenhouse-gas standards in 2010—long after Congress enacted the relevant provisions of the Clean Air Act. At the time, it allowed automakers to treat electric vehicles as emitting zero grams/mile of greenhouse gases and to average those "zeroes" in their fleetwide average, but still set standards achievable by internal-combustion-engine vehicles. *See* 75 Fed. Reg. 25324, 25341 (May 7, 2010). In 2021, this rule marked a break from even that practice. Here, for the first time, carmakers *must* average in some electric-vehicle "zeroes," either by producing those vehicles or buying credits from other manufacturers that do, in order to comply with the more stringent standards. *See* Private Pet. Br. 14-15; Private Pet. Supp. Br. 6-8; *see*

*also West Virginia*, 597 U.S. at 713, 725-726 (prior standards where regulated sources "could have complied" without using renewable energy were "no precedent for" Clean Power Plan which required "sector-wide shift" to renewables).  In short, EPA's position here is a far cry from the sort of longstanding, consistent agency interpretation that *Loper Bright* contemplates may merit meaningful weight.

In addition, *Loper Bright* recognizes that a statute may specifically authorize an agency to "exercise a degree of discretion" by "expressly delegat[ing] to an agency the authority to give meaning to a particular statutory term" or using "a term or phrase that leaves agencies with flexibility."  144 S. Ct. at 2263 (citations omitted).  But the Clean Air Act does not include any language delegating to EPA the power to define any relevant terms, and EPA has not claimed otherwise.

Finally, even if there were some sort of delegation, it would not be a blank check.  Where a law expressly delegates some discretion, a court must still "fix[] the boundaries of the delegated authority and ensur[e] the agency has engaged in reasoned decisionmaking within those boundaries."  *Loper Bright*, 144 S. Ct. at 2263 (citations omitted).  Here, any delegation of authority to set "standards" for "classes" of vehicles does not conceivably permit EPA

to set those standards on an average as opposed to individual basis or to average in vehicles that do not, according to EPA, emit the relevant pollutant. *See* Private Pet Br. 36-61; Private Pet. Reply Br. 17-32.  In other words, even if there were a delegation of some sort to EPA to set emission "standards" for "classes" of vehicles, its current boundless interpretation of those terms would be impermissible.

## CONCLUSION

For the foregoing reasons, and the reasons in private petitioners' previous submissions, this Court should set aside EPA's rule.

Respectfully submitted,

s/ Jeffrey B. Wall

JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(317) 513-0622
mbuschbacher@boydengray.com

*Counsel for Clean Fuels
Development Coalition, ICM, Inc.,
Illinois Corn Growers Association,
Indiana Corn Growers Association,
Kansas Corn Growers Association,
Kentucky Corn Growers Association,
Michigan Corn Growers
Association, Missouri Corn Growers
Association, and Valero Renewable
Fuels Company, LLC*


DEVIN WATKINS
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street, NW
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Competitive Enterprise
Institute, Anthony Kreucher, Walter
M. Kreucher, James Leedy, Marc
Scribner, and Domestic Energy
Producers Alliance*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Washington, DC 20006-5215
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable Fuels
Company, LLC*

ERIC D. MCARTHUR
DANIEL J. FEITH
JEREMY D. ROZANSKY
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel &
Petrochemical Manufacturers and
Energy Marketers of America*


MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW PITTMAN
LLP
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

*Counsel for Iowa Soybean Association,
Minnesota Soybean Growers Association,
South Dakota Soybean Association, and
Diamond Alternative Energy, LLC*

Brittany M. Pemberton
Bracewell LLP
2001 M Street NW, Suite 900
Washington, DC  20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Valero Renewable Fuels
Company, LLC and Diamond
Alternative Energy, LLC*

August 19, 2024

# CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(f) and (g) and this Court's order of July 29, 2024, because it contains 3,056 words.

This brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 19, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 19th day of August, 2024, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 19, 2024