ORAL ARGUMENT NOT YET SCHEDULED

**No. 22-1031**
Consolidated with Nos. 22-1032, 22-1033, 22-1034, 22-1035,
22-1036, and 22-1038

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

––––––

STATE OF TEXAS, ET AL.,

*Petitioners,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN,
ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY,

*Respondents,*

––––––

ADVANCED ENERGY ECONOMY, ET AL.,

*Intervenors.*

––––––

On Petitions for Review of a Final Action
of the United States Environmental Protection Agency

––––––

**PROOF BRIEF FOR STATE PETITIONERS**

––––––

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

RYAN S. BAASCH
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov

WESLEY S. WILLIAMS
Assistant Attorney General

Counsel for the State of Texas

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A)  Parties**

The States of Texas, Alabama, Alaska, Arkansas, Arizona, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, and Utah ("State Petitioners")[1] are petitioners in this case (No. 22-1031). In addition to the State Petitioners, the following are petitioners in the consolidated petitions for review: Competitive Enterprise Institute, Anthony Kreucher, Walter M. Kreucher, James Leddy, Marc Scribner, and Domestic Energy Producers Alliance (22-1032); The Illinois Soybean Association, Iowa Soybean Association, Indiana Soybean Alliance, The Michigan Soybean Association, The Minnesota Soybean Growers Association, The North Dakota Soybean Growers Association, The Ohio Soybean Association, South Dakota Soybean Association, and Diamond Alternative Energy, LLC (22-1033); American Fuel & Petrochemical Manufacturers (22-1034); State of Arizona (22-1035); Clean Fuels Development Coalition, ICM, Inc., Illinois Corn Growers Association, Indiana Corn Growers Association, Kansas Corn Growers Association, Kentucky Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, and Valero Renewable Fuels Company, LLC (22-1036); and Energy Marketers of America (22-1038).

The following are intervenors in support of Respondents: National Coalition for Advanced Transportation, Clean Air Council, American Lung Association,

---

[1] Arizona filed its own petition for review regarding the same agency action. Case No. 22-1035. Arizona is joining in the submissions of the other State Petitioners.

National Parks Conservation Association, Clean Wisconsin, Alliance for Automotive Innovation, New York Power Authority, National Grid USA, Calpine Corporation, Advanced Energy Economy, Power Companies Climate Coalition, Natural Resources Defense Council, Public Citizen, Environmental Defense Fund, Sierra Club, Union of Concerned Scientists, Conservation Law Foundation, Environmental Law and Policy Center, the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin, the Commonwealths of Massachusetts and Pennsylvania, the District of Columbia, the Counties of Denver and San Francisco, and the Cities of Denver, Los Angeles, New York, and San Francisco.

No amici have appeared in this matter as of this filing.

**(B)   Ruling Under Review**

The ruling under review is EPA's "Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards, 86 Fed. Reg. 74,434 (Dec. 20, 2021) (effective date Feb. 28, 2022).

**(C)   Related Cases**

This case has not been before this Court or any other court. State Petitioners are aware of related cases pending in this Court challenging the previous iteration of the EPA greenhouse gas standards being challenged here. The designated lead case for those related cases is *Competitive Enterprise Institute, et al. v. EPA et al.* (20-1145).

The cases consolidated with that case are *State of California et al. v. EPA et al.* (20-1167); *Natural Resources Defense Council et al v. EPA et al.* (20-1168); *Environmental Defense Fund et al. v. EPA et al.* (20-1169); *South Coast Air Quality et al. v. EPA et al.* (20-1173); *National Coalition for Advanced Transportation v. EPA et al.* (20-1174); *Advanced Energy Economy v. EPA et al.* (20-1176) and *Calpine Corporation et al v. EPA et al.* (20-1777). State Petitioners are not aware of any related cases currently pending in this Court other than the cases mentioned in Section A, above, which have already been consolidated with this case.

/s/ Ryan S. Baasch
Ryan S. Baasch

# TABLE OF CONTENTS

Page

Certificate as to Parties, Rulings, and Related Cases ...................................i

Table of Contents ........................................................................................iv

Table of Authorities .....................................................................................vi

Glossary .......................................................................................................xi

Introduction ..................................................................................................1

Statement of Jurisdiction ..............................................................................4

Issues Presented ...........................................................................................4

Statutes and Regulations ..............................................................................4

Statement of the Case ...................................................................................4

    A.  Federal Guidance for Agency Cost-Benefit Analyses .........................5

    B.  The Federal Government Develops Estimates for the Social Cost of Greenhouse Gases. ...........................................................................6

    C.  EPA's Changing Measurement of the Social Cost of Greenhouse Gases. ................................................................................................ 10

Summary of the Argument...........................................................................11

Standard of Review .................................................................................... 12

Standing ..................................................................................................... 12

Argument ................................................................................................... 14

    I.  EPA Lacks Authority to Promulgate the Standards. ............................. 14

    A.  The Standards are invalid under the major questions doctrine because they greatly diminish grid reliability. ....................................15

        1.  Actions diminishing grid reliability present a major question. .......15

        2.  EPA's Standards Threaten to Significantly Diminish Electric Grid Reliability. .......................................................................... 18

        3.  The Clean Air Act Confers No Clear Authorization for EPA to Take Action That Diminishes Electric Grid Reliability............20

B.  The Standards are invalid under the major questions doctrine because they jeopardize national security. ......................................... 22

II.  EPA's Standards Are Arbitrary and Capricious. .................................... 24

Conclusion .............................................................................................. 28

Certificate of Compliance ...................................................................... 33

Certificate of Service............................................................................... 34

Table of Authorities

Page(s)

**Cases:**

*Air All. Houston v. EPA*,
  906 F.3d 1049 (D.C. Cir. 2018)........................................................13

*Ala. Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021) .......................................................... 15, 17

*Americans for Clean Energy v. EPA*,
  864 F.3d 691 (D.C. Cir. 2017) ........................................................ 23

*ANR Storage Co. v. FERC*,
  904 F.3d 1020 (D.C. Cir. 2018) ...................................................... 26

*City of Tacoma, Wash. v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006) ........................................................ 26

*Corrosion Proof Fittings v. EPA*,
  947 F.2d 1201 (5th Cir. 1991) ........................................................ 25

*Ctr. for Biological Diversity v. NHTSA*,
  538 F.3d 1172 (9th Cir. 2008)........................................................ 6

*Del. Dep't of Nat. Res. and Env't Control v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015) ...................................................... 19, 21

*Delta Constr. Co. v. EPA*,
  783 F.3d 1291 (D.C. Cir. 2015)........................................................13

*EarthReports, Inc. v. FERC*,
  828 F.3d 949 (D.C. Cir. 2016) ...................................................... 7, 8

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016)........................................................ 25

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)........................................................15

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ........................................................17-18

*Hearth, Patio, & Barbecue Ass'n v. EPA*,
  11 F.4th 791 (D.C. Cir. 2021) ........................................................ 12

*Louisiana v. Biden*,
  2022 WL 866282 (5th Cir. Mar. 16, 2022) ........................................ 9

*Louisiana v. Biden*,
  585 F. Supp. 3d 840 (W.D. La. 2022) ................................... 9

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ........................................................ 1, 14

*MCI Telecomms Corp. v. AT&T*,
  512 U.S. 218 (1994) ............................................................ 16

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
  463 U.S. 29 (1983) ......................................................... 24-25

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ........................................ 27

*Nat'l Fuel Gas Supply Corp. v. FERC*,
  468 F.3d 831 (D.C. Cir. 2006) ......................................... 27

*New York v. FERC*,
  783 F.3d 946 (2d Cir. 2015) .............................................. 22

*NRDC v. Herrington*,
  768 F.2d 1355 (D.C. Cir. 1985) ....................................... 26

*Ormet Primary Aluminum Corp. v. Ohio Power Co.*,
  207 F.3d 687 (4th Cir. 2000) ........................................... 21

*Owner-Operator Indep. Drivers Ass'n v. FMCSA*,
  494 F.3d 188 (D.C. Cir. 2007) ......................................... 27

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
  461 U.S. 190 (1983) .................................................. 13-14, 17

*RJR Nabisco, Inc. v. Eur. Cmty.*,
  136 S. Ct. 2090 (2016) ....................................................... 25

*Rumsfeld v. FAIR*,
  547 U.S. 47 (2006) ............................................................ 13

*S.C. Pub. Serv. Auth. v. FERC*,
  762 F.3d 41 (D.C. Cir. 2014) ....................................... 15, 22

*Sierra Club v. Ga. Power Co.*,
  180 F.3d 1309 (11th Cir. 1999) ........................................ 16

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ...................................... 17, 21

vii

*Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*,
  805 F.2d 351 (10th Cir. 1989) ............................................................16
*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ............................... 1, 2, 3, 12, 14, 15, 16, 17, 20, 22, 23, 24
*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) .......................................................................13

**Statutes, Regulations, and Federal Register Materials:**

16 U.S.C. § 824o(a)(3) ......................................................................... 22
42 U.S.C.:
  § 7401(b)(1) ................................................................................ 25
  § 7415 ..................................................................................... 25
  § 7521 ................................................................................... 1, 12
  § 7607(b)(1) ................................................................................. 4
  § 7607(d)(9)(A) ............................................................................ 12
  § 7651b(b) ................................................................................. 21
  § 7651b(d) ................................................................................. 21
  § 7651b(d)(2) .............................................................................. 21
  § 7651g(h)(3) .............................................................................. 21
  § 13271 ................................................................................... 18
  §§ 13281-86 ............................................................................... 18
  §§ 13291-96 ............................................................................... 18
Pub. L. No. 102-486, 106 Stat. 2776 .......................................................... 18
Tex. Tax Code:
  § 202.052(a) ............................................................................... 13
  § 202.353 ................................................................................. 13
46 Fed. Reg. 13193 (Feb. 17, 1981) ............................................................ 5
82 Fed Reg. 16,093 (Mar. 28, 2017) ........................................................... 8
85 Fed. Reg. 24,174 (Apr. 30, 2020) ........................................................ 1, 10
86 Fed. Reg. 74,434 (Dec. 30, 2021) .................... ii, 2, 4, 10, 11, 13, 18, 20, 26, 27
86 Fed. Reg. 7037 (Jan. 20, 2021)....................................................2, 8, 9, 10

viii

**Other Authorities:**

Department of Energy, Grid Integration Tech Team and Integrated Systems Analysis Tech Team, *Summary Report on EVs at Scale and the U.S. Electric Power System*, 2-3 (Nov. 2019), https://bit.ly/3RVuWjA .................................. 20

Federal Reserve Bank of Dallas, *Your Texas Economy* (Aug. 22, 2022), https://bit.ly/3ds6kjs ...........................................................................13

H.R. Rep. No. 109-215, pt. 1 (2005) ......................................................... 23

Interagency Working Group on Social Cost of Carbon, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866,* (July 2015), https://bit.ly/3D5ebh3................................ 7

Interagency Working Group on Social Cost of Carbon, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866,* (Feb. 2010), https://bit.ly/2RNRoBh ................................................................... 7

Interagency Working Group on the Social Cost of Greenhouse Gases, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide, Interim Estimates under Executive Order 13990* (Feb. 2021), https://bit.ly/3nc5gB3 .................................................................. 9

Interagency Working Group on Social Cost of Greenhouse Gases, *Addendum to Technical Support Document for Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866: Application of the Methodology to Estimate the Social Cost of Methane and Social Cost of Nitrous Oxide* (Aug. 2016), https://bit.ly/3yP6Lfr................................... 7

OMB, Circular A-4 (Sept. 17, 2003), https://bit.ly/3BJ8rZL ..................... 5

OMB, Circular A-4, Regulatory Analysis, 68 Fed. Reg. 58366-01 (Oct. 9, 2003) ..................................................................................... 5

OMB, Draft 2003 Report to Congress on the Costs and Benefits of Federal Regulations, 68 Fed. Reg. 5492 (Feb. 3, 2003).................................. 5, 6

S. Rep. No. 109-78 (2005)........................................................................ 23

Texas Comptroller of Public Accounts, A Field Guide to the Taxes of Texas (Jan. 2022), https://bit.ly/3Uh3ApE ...................................... 13

Texas Comptroller of Public Accounts, *Monthly State Revenue Watch: General Revenue-Related Funds* (Sept. 2022), https://bit.ly/3ROvMil........................................................................13

U.S.-Canada Power System Outage Task Force, *Final Report on the August 14, 2003 Blackout in the United States and Canada: Causes and Recommendations* (Apr. 2004), https://bit.ly/3sLBrL8................................16

x

## GLOSSARY

| | |
|---|---|
| EPA | United States Environmental Protection Agency |
| EV(s) | Electric Vehicle(s) |
| FERC | Federal Energy Regulatory Commission |
| FY(s) | Fiscal Year(s) |
| GHG(s) | Greenhouse Gas(es) |
| NHTSA | National Highway Traffic Safety Administration |
| OMB | United States Office of Management and Budget |
| SC-GHG | Social Cost of Greenhouse Gases |

## Introduction

In June 2022 the Supreme Court ended EPA's plan to "substantially restructure the American energy market" in pursuit of the agency's unauthorized climate goals. *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022). This case is a re-run of *West Virginia*, except here EPA seeks to substantially restructure the American automobile market in pursuit of unauthorized climate goals. EPA's action should fail for the same reason as in *West Virginia*—under no plausible reading of the Clean Air Act was EPA given authority to perform this restructuring.

Section 202 of the Clean Air Act charges EPA with promulgating "standards" about the volume of air pollutants that motor vehicles may lawfully emit. 42 U.S.C. § 7521. After *Massachusetts v. EPA*, 549 U.S. 497 (2007), EPA began including greenhouse gases in these standards. And in 2020 it promulgated carbon dioxide emissions standards that imposed relatively manageable compliance burdens on car manufacturers. Those standards were set to govern for car model years 2022-2026. 85 Fed. Reg. 24,174 (Apr. 30, 2020).

After President Biden's inauguration EPA radically shifted course. On his first day in office, President Biden promulgated an Executive Order emphasizing a new climate agenda. The President singled out EPA's 2020 standards as one of a handful of existing rules that he wanted revisited. And he directed a then-defunct "Interagency Working Group" to reconstitute itself for the purpose of providing monetized estimates of the "social cost" of a unit of greenhouse gases. *See infra* at

1

8-9. As promulgated, those estimates presuppose that the "social cost" of each unit of a greenhouse gas emission is enormous. And President Biden stacked the regulatory deck by directing EPA to rewrite its emission standards in a way that accounts for those extraordinary estimates. 86 Fed. Reg. 7037, 7040 (Jan. 20, 2021).

EPA responded by promulgating substantially more stringent emissions standards (the "Standards") for vehicle carbon dioxide emissions. And the Standards also do something wholly new: they functionally force vehicle manufacturers to start shifting their fleet production to an ever-increasing share of electric vehicles. They do that by measuring not whether an *individual* vehicle complies with the emission standards, but a manufacturer's fleet *as a whole* complies, after averaging the emissions from vehicles fleet-wide. And that averaging counts electric vehicle emissions as a zero. The Standards are so stringent that, in EPA's own words, they will "necessitate" that manufacturers "further deploy[]" electric vehicles to comply under the fleet-averaging. 86 Fed. Reg. 74,434, 74,493 (Dec. 30, 2021). EPA anticipates that the Standards will force 17% of new car sales in 2026 to be electric.

EPA had no authority to promulgate the Standards and functionally force vehicle manufacturers to produce more electric vehicles. One of the many reasons why is that the Standards will place enormous new strain on the electric grid, threatening the grid's reliability altogether. EPA previously recognized that the agency has no power to take action that would "threaten the reliability of the grid." *West Virginia*, 142 S. Ct. at 2596. Instead, action that substantially burdens grid

2

reliability is a major question, implicating an arena where administrative agencies cannot act without "clear congressional authorization" *Id.* at 2609. EPA has none here. To the contrary, Congress has emphasized that *maintaining* grid reliability is a priority of the highest order. *See infra* at 22. Indeed, in the instances (not present here) where Congress has actually authorized EPA to take action that would affect the grid, it has emphasized that EPA must not jeopardize electric reliability. *See infra* at 21.

Another reason this case presents a major question is that it jeopardizes national security. An overwhelming share of the materials required to produce electric vehicles are in China and other hostile countries. The State Petitioners have long partnered with the federal government to *enhance* energy security and diminish our reliance on hostile foreign actors. And Congress has expressly legislated on that topic. It is implausible that Congress would have empowered EPA *sub silentio* in the Clean Air Act to jeopardize this goal by forcing vehicle manufacturers to *increase* reliance on foreign actors.

In addition, the Standards are arbitrary and capricious because their stringency was materially informed by the flawed "social cost" of greenhouse gas estimates. Among other things, those "social costs" include the costs that greenhouse gases ostensibly impose *on the world*, not just the United States. But EPA had no authority to promulgate Standards based on extra-territorial concerns. EPA also failed to reasonably explain why it was appropriate to use this new "social cost" analysis when its previous rulemaking did not. And the "social cost" analysis also

3

resulted in EPA comparing apples to oranges in its cost-benefit analysis, because it myopically used certain mathematical presumptions to inflate the "social cost" of greenhouse gases that it did not apply to other parts of its cost-benefit analysis.

This Court should vacate the Standards.

## STATEMENT OF JURISDICTION

EPA's Standards were published in the Federal Register on December 30, 2021. 86 Fed. Reg. 74,434 (effective date February 28, 2022). The State Petitioners' petition for review was timely filed on February 28, 2022, invoking this Court's jurisdiction under 42 U.S.C. § 7607(b)(1).

## ISSUES PRESENTED

1.    Whether the Standards violate the major questions doctrine by severely threatening the reliability of the electric grid and jeopardizing national security without clear congressional authorization.

2.    Whether the Standards' reliance on the Interagency Working Group's social cost of greenhouse gases rule renders the Standards arbitrary and capricious.

## STATUTES AND REGULATIONS

All applicable statutes, etc., are contained in the Brief for Private Petitioners.

## STATEMENT OF THE CASE

The State Petitioners adopt the private party Petitioners' statement of the case. The State Petitioners supplement that statement with background on EPA's evolving process for evaluating the costs and benefits of its emissions standards,

which provides important context for the State Petitioners' arbitrary and capricious challenge.

## A.    Federal Guidance for Agency Cost-Benefit Analyses

For decades, federal agencies have been required to conduct a cost-benefit analysis when proposing significant, systemic regulations. For example, President Reagan's Executive Order 12291 instructed regulatory agencies to refrain from taking action unless "the potential benefits to society . . . outweigh the potential costs." 46 Fed. Reg. 13193 (Feb. 17, 1981). Since 2003, the foundational guidance for agency cost-benefit analyses is OMB's "Circular A-4." Circular A-4 ensures that federal agencies use a "standardiz[ed]" way of "measur[ing] and report[ing]" the "benefits and costs of Federal regulatory actions." OMB, *Circular A-4*, 1 (Sept. 17, 2003) https://bit.ly/3BJ8rZL. Circular A-4 was peer reviewed and subject to public comment. *See* OMB, Circular A-4, Regulatory Analysis, 68 Fed. Reg. 58366-01 (Oct. 9, 2003); *see also* OMB, Draft 2003 Report to Congress on the Costs and Benefits of Federal Regulations, 68 Fed. Reg. 5492 (Feb. 3, 2003).

As relevant here, Circular A-4 contains two important instructions. First, Circular A-4 instructs agencies how to use "discount rates." This tool is important when the "[b]enefits and costs" of agency action do not "take place in the same time period." Circular A-4 at 31. As a reflection of societal values, "[b]enefits or costs that occur sooner are generally more valuable." *Id.* at 32. To account for this, "a discount factor should be used to adjust the estimated benefits and costs for differences in timing." *Id.* "The further in the future the benefits and costs are

5

expected to occur," the less they should count for in a cost-benefit analysis. *Id.* The higher the discount rate, the more the future benefit or cost is reduced in today's dollars. Circular A-4 recommends that agencies use two separate discount rates—7 percent and 3 percent. *Id.* at 33-34. The 7 percent rate is based on the rate of return for private capital in the U.S. economy—it "approximates the opportunity cost of capital." *Id.* at 33. And the 3 percent rate is based on an approximation of societal preferences, such as how the "average saver" values a present benefit over a future one. *Id.* at 33-34. Second, the "analysis should focus on benefits and costs that accrue to citizens and residents of the United States"—not to foreigners. *Id*. at 15.

### B.    The Federal Government Develops Estimates for the Social Cost of Greenhouse Gases.

**1.**    No statute requires agencies to consider the "social cost" of greenhouse gases. In 2008, however, the Ninth Circuit faulted a federal agency for failing to do so. *Ctr. for Biological Diversity v. NHTSA*, 538 F.3d 1172 (9th Cir. 2008). That case involved NHTSA's adoption of fuel economy standards. When establishing the proper standard, the agency took into consideration the "costs and benefits" of such standard. *Id.* at 1192. The Ninth Circuit concluded the standards were arbitrary and capricious because the agency failed to weigh the "benefit of carbon emissions reduction" when establishing the optimal standard. *Id.* at 1198. The court concluded that the agency must "monetize or quantify the value of carbon emissions reduction." *Id.* at 1201.

In response to the *NHTSA* decision, the federal government convened an "Interagency Working Group" to establish numerical estimates for the "social cost of carbon" for incorporation into agency cost-benefit analyses. *See* Interagency Working Group on Social Cost of Carbon, *Response to Comments: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866*, at 1 (July 2015), https://bit.ly/3D5ebh3 (describing this history). The numerical estimates, however, departed from Circular A-4's guidance in two important ways. Specifically, the Interagency Working Group rejected the 3 and 7 percent discount rates in favor of discount rates of 2.5, 3, and 5 percent. Interagency Working Group on Social Cost of Carbon, *Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866*, at 1 (Feb. 2010), https://bit.ly/2RNRoBh. The Working Group also determined that global, rather than purely domestic, costs should be included. *Id.* at 3-4. In 2016, the Working Group devised numerical estimates for the social cost of two other greenhouse gases—methane and nitrous oxide. Interagency Working Group on Social Cost of Greenhouse Gases, *Addendum to Technical Support Document for Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866: Application of the Methodology to Estimate the Social Cost of Methane and Social Cost of Nitrous Oxide* (Aug. 2016), https://bit.ly/3yP6Lfr.

The Interagency Working Group's estimates generated significant scrutiny. For example, FERC concluded that multiple flaws counseled against using the estimates. For one, there was "lack of consensus on the appropriate discount rate." *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016). Second, the

7

estimates do "not measure the actual incremental impacts of a project on the environment." *Id.* And third, "there are no established criteria identifying [what] monetized values" should be considered for various regulatory purposes. *Id.* This Court upheld the FERC's "finding [that] the tool [is] inadequately accurate." *Id.*

**2.**    On March 28, 2017, President Trump issued Executive Order 13783, which dissolved the Interagency Working Group and rescinded the social cost of greenhouse gas estimates. 82 Fed Reg. 16,093, 16,095 (Mar. 28, 2017). The Executive Order did not, however, instruct agencies to stop "monetizing the value of changes in greenhouse gas emissions resulting from regulations." *Id.* at 16,096. Instead, it instructed agencies to return to the Circular A-4 framework, specifically "with respect to the consideration of domestic versus international impacts and the consideration of appropriate discount rates." *Id.* That meant no more consideration of *global* costs, and a return to the 3 and 7 percent discount rates. The Executive Order explained that Circular A-4 was the gold standard because it "was issued after peer review and public comment and has been widely accepted for more than a decade as embodying the best practices for conducting regulatory cost-benefit analysis." *Id.*

**3.**    On January 20, 2021, President Biden issued Executive Order 13990, titled "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis." 86 Fed. Reg. 7037 (Jan. 20, 2021). The Executive Order's purpose was to "reduce greenhouse gas emissions" and "bolster resilience to the impacts of climate change." *Id.* at 7037. And it declared that it was "essential

8

for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses." *Id.* at 7040. The Executive Order re-established an Interagency Working Group tasked with creating a social cost of carbon, methane, and nitrous oxide. *Id.* And it directed that those calculations take "global damages into account." *Id.*

On February 26, 2021, the Interagency Working Group released "interim" values for the social cost of these three greenhouse gases. *See* Interagency Working Group on the Social Cost of Greenhouse Gases, *Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide, Interim Estimates under Executive Order 13990* (Feb. 2021), https://bit.ly/3nc5gB3.

**4.**    A coalition of States challenged the Interagency Working Groups' resulting social cost of greenhouse gas estimates. On February 11, 2022, a district court concluded that the estimates were unlawful on multiple grounds, including that they were substantively arbitrary and capricious. *Louisiana v. Biden*, 585 F. Supp. 3d 840, 866-67 (W.D. La. 2022). The court enjoined the defendants (including EPA) from adopting, employing, treating as binding, or relying upon the social cost of greenhouse gas estimates. *Id.* at 852, 870. On March 16, 2022, the Fifth Circuit stayed the injunction pending appeal on standing grounds because the plaintiffs were not challenging a specific use of the estimates. *Louisiana v. Biden*, 2022 WL 866282, at *2, *3 (5th Cir. Mar. 16, 2022).

### C.    EPA's Changing Measurement of the Social Cost of Greenhouse Gases.

In its 2020 rulemaking, EPA considered the social cost of carbon in its cost-benefit analysis (but not methane or nitrous oxide). 85 Fed. Reg. 24,174, 24,732 (Apr. 30, 2020). EPA followed the Circular A-4 guidance, and as a result calculated only the *domestic* social cost of carbon and used discount rates of 3 and 7 percent. *Id.* at 24,733. EPA's resulting estimates for the social cost of carbon "occurring in the year 2020 were $1 and $8 (in 2016$) per metric ton of $CO_2$ emissions . . . and these values were projected to increase to $2 and $10 (again in 2016$) by the year 2050." *Id.*

The previous rulemaking, however, was one of 10 specific regulations that President Biden directed his administration to revisit. *See* 86 Fed. Reg. 7037. EPA's current Standards significantly revised the prior ones. *Compare* 86 Fed. Reg. at 74,440 (current Standards' emissions targets for cars and light-duty trucks of 132 Carbon Dioxide grams per mile (g/mi) and 187 g/mi, respectively, in 2026); *with* 85 Fed. Reg. at 24,183 (prior standards of 204 g/mi and 284 g/mi). And its cost-benefit analysis was a significant building block for those new standards. *See* 86 Fed. Reg. at 74,499 (explaining EPA "finds it is appropriate to place greater weight on the importance of reducing [greenhouse gas] emissions" now than versus the 2020 rulemaking).

The cost-benefit analysis, in turn, was performed differently in multiple significant respects. EPA wholesale adopted the Interagency Working Group's analysis and so considered a "global perspective" for the social cost of greenhouse gases. Regulatory Impact Analysis (RIA) at 3-31, JA___. EPA also used the 5, 3, and

10

2.5 percent discount rates. RIA 3-33, JA___. These changes had massive ramifications. *See, e.g.*, RIA 3-32 n.n, JA___ ("[T]he discount rate has a large influence on the present value of future damages."). All told, EPA—adopting the Interagency Working Group's estimates—quantified the social cost of carbon in 2020 as between $14 and $74 per metric ton (using 2018 dollars). RIA 3-34, JA___. And it projected those values to increase to $31, $82, and $113 by 2050 (using 2018 dollars). RIA 3-34, JA___. It also projected enormous costs for methane and nitrous oxide. RIA 3-35, JA___.

"EPA recognize[d] there are a number of limitations and uncertainties with respect to quantifying the benefits of [greenhouse gas] reductions." 86 Fed. Reg. at 74,498; *see also* 86 Fed. Reg. at 74,504 (EPA conceding the "models" are flawed in multiple respects). Nevertheless, based on its revised consideration of the social cost of greenhouse gases, EPA projects that its revised Standards will result in breathtaking monetized "benefits" by reducing greenhouse gas emissions, to the tune of **$31 billion to $390 billion** in present value. 86 Fed. Reg. at 74,511. As noted *supra*, the previous rulemaking—using the Circular A-4 cost-benefit framework—calculated that the benefits of greenhouse gas emission reductions were comparatively minor.

## SUMMARY OF THE ARGUMENT

I.  EPA had no authority to promulgate the Standards. The Standards undercut multiple highly significant State interests, and present a major question for several related reasons. Most notably, the Standards threaten grid reliability—a matter of

11

tremendous economic and political significance, and one that also implicates a sharp division of federal and State regulatory authority. EPA therefore needed "clear congressional authorization" before it could do something that so greatly burdens the electric grids. *West Virginia*, 142 S. Ct. at 2609. Section 202 of the Clean Air Act confers nothing close to that level of authority. The Standards also present a major question because they jeopardize national security by forcing the country, against Congress's long-expressed will, to become *more* reliant on hostile foreign actors.

II.  The Standards are arbitrary and capricious. EPA was not allowed to consider "global costs" of greenhouse gas emissions. It was also obligated, but failed, to acknowledge its sharp change in cost-benefit analysis from the 2020 rulemaking, and to *reasonably* explain the change. President Biden's mere say-so is not a sufficient explanation. And EPA's use of the Interagency Working Group's estimates introduced multiple internal inconsistencies to the agency's cost-benefit analysis.

## STANDARD OF REVIEW

Under the Clean Air Act, this Court must hold unlawful EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A); *Hearth, Patio, & Barbecue Ass'n v. EPA*, 11 F.4th 791, 805 (D.C. Cir. 2021).

## STANDING

The State Petitioners' standing is plain for at least two reasons.

First, the Standards will have significant adverse effects on multiple industries that State fiscs rely on for revenue, and so produce a "pocketbook injury that is

12

incurred by the state itself." *Air All. Houston v. EPA*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018). Texas's injuries are exemplary. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006) ("one party with standing is sufficient"). Texas is the top producer of oil and natural gas in the United States. Federal Reserve Bank of Dallas, *Your Texas Economy*, 12 (Aug. 22, 2022), https://bit.ly/3ds6kjs. Oil produced in Texas is subject to a tax rate of 4.6 percent of the market value. Tex. Tax Code § 202.052(a). In FYs 2017-2021, this resulted in over $16 billion in revenues. Texas Comptroller of Public Accounts, *Monthly State Revenue Watch: General Revenue-Related Funds* (Sept. 2022), https://bit.ly/3ROvMil. Under Texas law, an oil production tax is used to fund schools and Texas's general revenue fund. *See* Texas Comptroller of Public Accounts, *A Field Guide to the Taxes of Texas*, 14 (Jan. 2022), https://bit.ly/3Uh3ApE; *see also* Tex. Tax Code § 202.353. But the Standards are "expected to reduce U.S. gasoline consumption by . . . roughly 15 percent." 86 Fed. Reg. at 74,498; *see also* Response to Comments (RTC) 19-17, JA___ ("[T]he net effect of the [Standards] is now a decrease in revenue for U.S. exporters of crude oil and products[.]"); *Delta Constr. Co.* v. *EPA*, 783 F.3d 1291, 1294 (D.C. Cir. 2015) ("[A]ny rule that limits tailpipe [carbon-dioxide] emissions is effectively identical to a rule that limits fuel consumption."). That necessarily injures Texas. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448-49 (1992) (standing for state where "tax revenues" suffer as a result of law's effect on "extraction and sale of coal").

Second, the States have standing to protect their quasi-sovereign interest in managing their electrical grids. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res.*

*Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983) ("[n]eed for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States"). The States' standing here resembles, but is substantially more apparent than, Massachusetts' standing in *Massachusetts v. EPA*, where the State was given "special solicitude" to challenge EPA's action. Like Massachusetts there, the States here challenge an EPA order under the Clean Air Act. 549 U.S. at 520. And whereas Massachusetts there sought to guard against potential future erosion of its coastline, *id.* at 522-23, here the States seek to defend against imminent strain on their electric grids. *See infra* at 18-20.

**ARGUMENT**

## I.    EPA Lacks Authority to Promulgate the Standards.

EPA's Standards implicate the major questions doctrine for multiple independent reasons. The State Petitioners agree with the reasons articulated in the Private Petitioners' brief, explaining the enormous economic and political implications of EPA's Standards. In addition to their outsized impact on industry, however, the Standards have a substantial impact on the States in their quasi-sovereign capacity as energy regulators, because the Standards will place significant strain on electric grids nationwide. In addition, while the States have long been partners in the federal government's role of decreasing energy reliance on foreign actors, the Standards undercut that longtime goal. On neither subject does EPA have even a colorable delegation from Congress, much less the "clear congressional authorization" required. *West Virginia*, 142 S. Ct. at 2609.

14

### A. The Standards are invalid under the major questions doctrine because they greatly diminish grid reliability.

#### 1. Actions diminishing grid reliability present a major question.

In certain cases "there may be reason to hesitate before accepting a reading of a statute that would, under more ordinary circumstances, be upheld." *West Virginia*, 142 S. Ct. at 2609 (cleaned up). In those cases, an administrative agency must have more than just a "plausible textual" argument. *Id.* Instead, it must "point to clear congressional authorization for the power it claims." *Id.* Statutory readings that would give an agency authority to significantly diminish electric grid reliability are in that category of cases for at least three reasons.

**a.** Actions materially diminishing grid reliability pose major questions because they have substantial "economic and political significance." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Start with the economic significance. In 2008—well before electric vehicles had achieved meaningful market penetration—"the electric industry was reporting that an estimated $298 billion of investment in new electric transmission facilities would be needed between 2010 and 2030 to maintain current levels of reliable electric services across the United States." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 51 (D.C. Cir. 2014). That dollar figure alone puts grid reliability in "major question" territory. *Compare Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (rule with approximate "$50 billion" cost was a major question because it had "vast 'economic and political

15

significance.'") (citation omitted). And EPA's forced vehicle electrification will necessarily require even greater investment to ensure reliability. *See infra* at 18-20.

The political significance is also overwhelming. "Modern society has come to depend on reliable electricity as an essential resource for national security; health and welfare; communications; finance; transportation; food and water supply; heating, cooling, and lighting; computers and electronic; commercial enterprise; and even entertainment and leisure." U.S.-Canada Power System Outage Task Force, *Final Report on the August 14, 2003 Blackout in the United States and Canada: Causes and Recommendations* 5 (Apr. 2004), https://bit.ly/3sLBrL8. And consumers "have grown to expect that electricity will almost always be available when needed at the flick of a switch." *Id.* That is why courts have repeatedly concluded that the public interest strongly disfavors legal action that could threaten grid reliability. *See, e.g.*, *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999) (it is "critical" that there be a reliable, "steady supply of electricity during the summer months," "especially in the form of air conditioning to the elderly, hospitals, and day care centers"); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 357 (10th Cir. 1989). Rules with substantially less political salience qualify as major questions. *See MCI Telecomms Corp. v. AT&T*, 512 U.S. 218 (1994) (requirement for telephone carriers to file rates with FCC).

EPA seems to know this. After all, in *West Virginia* it attempted to resist the major questions label by arguing that its action there did *not* "threaten the reliability of the grid." 142 S. Ct. at 2596. EPA lost that case because its action crossed the

16

major questions line anyways—it would have "substantially restructure[d] the American energy market." *Id.* at 2610. But it is telling that even EPA recognized that grid reliability was off-limits. That is the exact line it has crossed here, and it logically presents an even more pronounced major question than the one at issue in *West Virginia*.

**b.** Agency action diminishing grid reliability also presents a major question because it "significantly alter[s] the balance between federal and state power." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (alternative standard for triggering major questions doctrine). As explained in more detail *infra* at 18-20, EPA's forced vehicle electrification will undeniably require greater energy generation throughout the electric grid. But the "[n]eed for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States." *PG&E*, 461 U.S. at 205. Likewise, the "economic aspects of electrical generation have been regulated for many years and in great detail by the states." *Id.* at 206. As a result, State regulators have "the greatest knowledge regarding questions of grid reliability." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016).[2] Congress would not have authorized EPA to intrude into this traditional State responsibility without saying so clearly. *Cf. Gonzales v. Oregon*, 546 U.S. 243, 270

---

[2] Issues impacting the electrical grid are of particularly significant import to Texas. "While all the other states in the Union have extensive interconnections with neighboring states, nearly 90% of Texas is covered by a single isolated grid with limited connections to external power supplies." *Texas*, 829 F.3d at 431.

(2006) (major question drug prescriptions for assisted suicide because of the impact it would have on States' power "to regulate the practice of medicine generally").

    **c.**    Congress has also explicitly recognized the interconnectedness of electric vehicles and the grid. For example, in Title VI of the Energy Policy Act of 1992, Congress dealt in significant detail with "electric motor vehicles." 42 U.S.C. § 13271; Pub. L. No. 102-486, 106 Stat. 2776. Subtitle A authorized an "Electric Motor Vehicle Commercial Demonstration Program." 42 U.S.C. §§ 13281-86. And Subtitle B authorized an "Electric Motor vehicle Infrastructure and Support Systems Development Program." *Id.* §§ 13291-96. Congress wanted the two—vehicle development, and electric infrastructure—to be treated together. *See id.* § 13291(c) (programmatic "activities [regarding infrastructure] shall be coordinated with activities [regarding the vehicles]"). And Congress recognized that grid investment and reliability was essential to the success of electric vehicles. *See id.* § 13292(c) (emphasizing "cost recovery for electric utilities who invest in infrastructure capital-related expenditures").

### 2. EPA's Standards Threaten to Significantly Diminish Electric Grid Reliability.

As the Private Petitioners' brief explains, EPA is forcing the nationwide vehicle fleet to reach 17% electrification by 2026. *See* 86 Fed. Reg. at 74,485. EPA admits that this increased vehicle electrification will "lead to increased electricity demand." *See* RTC 12-83, JA___. And "[t]he grid is critical to consumer confidence in electric vehicles." RTC 12-40, JA___.

18

But the record amply underscores that the grid cannot accommodate this demand without massive new investment. "[T]here is a critical need for complementary federal policies to support a fast transition to EVs . . . [including regarding] a modernized and more sophisticated electric grid." RTC 12-36, JA___. And "[c]areful planning will be necessary for high powered public chargers to ensure accessibility while also considering other factors such as grid upgrades to meet the power demand." *Id.* at 12-61, JA___. Along similar lines, "exponential growth in charging infrastructure" will be required. *Id.*; *see also, e.g.*, *Stellantis Comments* 24, JA___. Charging infrastructure is enormously expensive for States. *Cf id.* at 27, JA___. Even States who have intervened *on EPA's side* here recognize the challenge. RTC 12-44, JA___ (Maryland asserting that "[d]espite all of [its] work [enhancing its grid], studies suggest that Maryland will still need significant investment in chargers if it is to support expected 2030 EV sales").

EPA claims "the grid is *generally* expected to be capable of serving *near term* electricity needs for an increase in EVs." RTC 12-87, JA___ (emphasis added). But this projection—already qualified nearly to the point of meaninglessness—is entitled to no weight. "[G]rid reliability . . . is not the province of EPA"—it is entrusted at the federal level to FERC. *Del. Dep't of Nat. Res. and Env't Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015). And there is no indication that FERC "was involved in this rulemaking or submitted their views to EPA." *Id.* (concluding EPA action was arbitrary and capricious on this ground). EPA in any event admits that "the impact of this electricity demand on the grid infrastructure will depend on several factors,

19

such as the time of day when vehicles are charged, and the advent of vehicle-to-grid (V2G) services." RTC 12-83, JA___. In other words, EPA does not know.

In addition, EPA cited only highly limited authority for its projection. One authority was a mere news article, which in turn cited the CEO of a single public utility. RTC 12-87, n.47, JA___. The other was a Department of Energy report, RTC 12-87, n.46, JA___, that, while generally optimistic about the grid, nevertheless illustrates that there are serious reliability concerns. That report projected that, if even just **12%** of new vehicle sales are electric in **2030**, then **8 additional Terawatt** hours of incremental energy generation would be required to accommodate them. Department of Energy, Grid Integration Tech Team and Integrated Systems Analysis Tech Team, *Summary Report on EVs at Scale and the U.S. Electric Power System*, 2-3 (Nov. 2019), https://bit.ly/3RVuWjA. But the report also admits that, over the preceding decade, the grid has averaged "less than **5 [Terawatt hours]** added each year." *Id.* at 3. If the grid will struggle to accommodate electric vehicles in 2030 when just 12% of new vehicle sales are electric—and the Department of Energy's math indicates that it will—then necessarily it will struggle to accommodate electric vehicles in **2026** when the Standards functionally force **17%** of new vehicle sales to be electric. *See* 86 Fed. Reg. at 74,485.

### 3. The Clean Air Act Confers No Clear Authorization for EPA to Take Action That Diminishes Electric Grid Reliability.

EPA had no "clear congressional authorization," *West Virginia*, 142 S. Ct. at 2609, to take this action. Nothing in Section 202 permits EPA to take action with

20

this drastic an impact on the electric grid. *See, e.g.*, *Del. Dep't*, 785 F.3d at 18 ("[G]rid reliability is not a subject of the Clean Air Act."); *Texas*, 829 F.3d at 432. Two particular statutory features underscore that point.

*First*, in the instances where Congress has authorized EPA to take action that could indirectly impact the grid, it has specifically identified the grid as an issue of concern and instructed EPA *not* to jeopardize grid reliability. For example, in 1990 Congress amended the Clean Air Act to reduce acid rain by "prescrib[ing] limits for emission of sulphur dioxide and nitrogen oxides from specified electric utility plants." *Ormet Primary Aluminum Corp. v. Ohio Power Co.*, 207 F.3d 687, 689 (4th Cir. 2000). The amendments required emissions permits. *Id.* And also empowered EPA to promulgate implementing regulations. 42 U.S.C. § 7651b(b), (d). But Congress put specific limits on EPA's authority—instructing it not to do anything that would jeopardize "electric reliability." *Id.* § 7651b(d)(2). And while failure to obtain a permit can result in a range of consequences, such failure cannot be "construed as requiring termination of operation of an electric utility" because that would jeopardize Congress's textually expressed goal of "ensur[ing] reliability of electric power." 42 U.S.C. § 7651g(h)(3).

Unlike Title IV, though, nothing in Clean Air Act section 202 even mentions the electric grid. That should be fatal for EPA. It is nonsensical that Congress would explicitly limit how EPA's actions could affect the grid when it expressly authorized the agency to directly regulate electric utilities, as it did in Title IV, but would nevertheless *sub silentio* grant it unqualified authority to wreak havoc on grid

21

reliability using regulatory authority originally enacted to deal with internal combustion engine vehicles.

*Second*, it would make no sense for Congress to have granted EPA unbounded authority to take action undermining grid reliability because Congress has separately expressed a national policy in affirmatively *promoting* grid reliability. Specifically, in response to the devastating "large-scale blackout in the summer of 2003," Congress "expanded FERC's regulatory authority" so that it could "adopt and enforce mandatory technical reliability standards for facilities that make up the national grid." *New York v. FERC*, 783 F.3d 946, 950 (2d Cir. 2015). The entire objective was to "facilitate the planning of a *reliable* grid." *S.C. Pub. Serv. Auth.*, 762 F.3d at 90. Notably, however, not even FERC was granted authority to require the actions that would be required to accommodate EPA's Standards. Specifically, Congress withheld from FERC the power to require electric utilities to "enlarge such facilities or . . . construct new transmission capacity or generation capacity." 16 U.S.C. § 824o(a)(3). And this legislation demonstrates that EPA has no "expertise" in this topic, so "Congress presumably" would not have tasked it with taking action so deeply implicating this topic. *West Virginia*, 142 S. Ct. at 2612-13.

**B.    The Standards are invalid under the major questions doctrine because they jeopardize national security.**

The Standards are also invalid under the major questions doctrine because they demonstrably jeopardize U.S. national security by greatly increasing our reliance on electric vehicle inputs which are in the possession of foreign actors.

22

Congress's repeated attention to an issue can show that the issue presents a major question. *See West Virginia*, 142 S. Ct. at 2614; *id.* at 2621 n.4 (Gorsuch, J., concurring). And Congress has repeatedly indicated that energy independence is indeed a major question, among other things because it is bound up with national security. "Energy security is critical in a world of growing demand and regional political instability. Dependance on any single source of energy, especially from a foreign country, leaves America vulnerable to price shocks and supply shortages." H.R. Rep. No. 109-215, pt. 1, at 169 (2005); S. Rep. No. 109-78, at 1, 6 (2005) ("reliance on foreign sources . . . has created profound concerns in the Congress over the nation's energy security"). And Congress has repeatedly legislated to "move the United States toward greater energy independence and security." *Americans for Clean Energy v. EPA*, 864 F.3d 691, 697 (D.C. Cir. 2017) (referencing Energy Independence and Security Act of 2007).

The Standards compromise that goal because the electric vehicle penetration that EPA is requiring depends on critical raw materials and processes available only outside the United States, principally controlled by foreign adversaries. It is well-established that China dominates the world's lithium-ion battery manufacturing capacity and the mining, processing, as well as the refining of key inputs for electric vehicles such as lithium, cobalt, nickel, and graphite. *Ohio Attorney General et al. Comments* 10, JA___; *Missouri Attorney General et al. Comments* 15-16, JA___; *Alliance for Automotive Innovation Comments* 5, JA___ ("At present, most critical minerals necessary for the production of advanced EV motors and batteries are mined and

23

processed outside of the United States, primarily in China."). And of the more than 200 lithium-ion "megafactories" planned between now and 2030, 149 will be in China, while only 11 are planned for North America. *US Chamber Comments* 3-5, JA___. Electric vehicles also demand substantial copper, cobalt and nickel. *Id.* But about 60% of the world cobalt comes from one country—the Democratic Republic of Congo. RTC 12-17, JA___. Chinese companies have purchased a controlling interest in 70% of Congo's copper-cobalt mines. RTC 12-17 – 18, JA___. Further, China controls 90 percent of the supply of rare-earth magnets, which work to power electric vehicles. *Ohio Attorney General et al. Comments* 10, JA___. There is also well-documented history of China using its rare-earth-minerals dominance as a geopolitical weapon, leading the automakers' alliance to warn EPA that "dependence on China for such a crucial raw material is risky." RTC 12-21, JA___.

The Clean Air Act confers no "clear congressional authorization" for EPA to take actions implicating such weighty issues. *West Virginia*, 142 S. Ct. at 2610. And it is implausible that Congress would have indirectly authorized EPA to do this under the guise of vehicle emission standards.

## II.    EPA's Standards Are Arbitrary and Capricious.

1.     EPA's reliance on the Interagency Working Group's social cost of greenhouse gases rule renders the Standards arbitrary and capricious in multiple ways.

*First*, the Standards are arbitrary and capricious because EPA "has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n v.*

24

*State Farm*, 463 U.S. 29, 43 (1983). EPA considered the *global* cost of greenhouses gases. *See supra* at 10-11. But EPA's mandate is to consider only domestic costs. *See* 42 U.S.C. § 7401(b)(1) (Clean Air Act's purpose is to "enhance the quality of *the Nation's* air resources" (emphasis added)). And "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *See RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2100 (2016); *see also Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1209 (5th Cir. 1991). In certain parts of the Clean Air Act, Congress actually did "clearly express" its intent that EPA consider foreign effects. *See* 42 U.S.C. § 7415 (directing EPA to take account of how "air pollution" may affect "public health or welfare in a *foreign* country"). But not in section 202.

*Second*, the Standards are arbitrary and capricious because EPA changed positions without "display[ing] awareness" that it was doing so, much less providing the requisite "reasoned explanation" for its change. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). EPA's 2020 rulemaking adhered to Circular A-4's instructions for cost-benefit analyses. *See supra* at 9-10. But, in the proceedings below, EPA abandoned those instructions in favor of aggressively monetizing greenhouse gas emissions with new discount rates and a focus on global costs. *See supra* at 10-11. This chnage made a huge difference to the bottom line numbers. EPA admitted that if it "[a]ppl[ied] the same estimates that were used in the" previous rulemaking to the greenhouse gas emission reductions projected under the current Standards, then the "benefit" from the reductions in 2023 would be just $37 million.

RIA 3-39 n.q, JA___ (using a 3 percent discount rate). But under the new methodology, the benefit for 2023 alone is $**270 million**. 86 Fed. Reg at 74,511. Stated differently, EPA's different methodology results in an over 700% increase in the alleged "benefit" of its revised Standards. The only reason for the changed analysis appears to be President Biden's command. *See supra* at 8-9. But EPA was not allowed to just "blindly adopt[]" this new methodology based on the President's say-so. *City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006). It was obligated to explain, at a minimum, why its prior mode of analysis was no longer applicable. *See NRDC v. Herrington*, 768 F.2d 1355, 1414 (D.C. Cir. 1985) ("The major consequences of the discount rate made it particularly important that [the agency] fix the rate carefully and explain its decision intelligbly").

*Third*, EPA's cost-benefit analysis is "internally inconsistent." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018) (vacating agency order as arbitrary and capricious). Although EPA used the Interagency Working Group's discount rates and global focus for assessing the costs of greenhouse gases, the rest of its cost-benefit analysis employed the different Circular A-4 methodology. *See* 86 Fed. Reg. at 74,444, tbl. 4 n.c. This inconsistency resulted in a comparison of apples (the costs of greenhouse gases) to oranges (the costs and benefits of the other components of EPA's analysis).

2.    EPA will presumably retreat to its preamble defense that it was "not required to do formal cost benefit," and so any flaws in the analysis should not result in vacatur. *See* 86 Fed. Reg. at 74,498. EPA's premise is questionable at best, but

26

even if EPA is right about its regulatory obligations, it is well established that "*when an agency decides* to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) (Garland, J.) (emphasis added); *Owner-Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 206 (D.C. Cir. 2007) (Garland, J.) (vacating standards governing truck drivers' working hours because "cost-benefit analysis" was flawed). EPA may also claim that the heavy weight it placed on the cost of greenhouse gases was "not material" to its promulgation of the Standards. *See* 86 Fed. Reg. at 74,498. But this Court "ordinarily vacate[s] . . . unless [it] is *certain* [the agency] would have adopted [the flawed rule] even absent the flawed rationale." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (emphasis added). EPA cannot clear that bar here. As noted *supra* at 11, 25-26, EPA's revised greenhouse gas cost estimation resulted in stunning changes to the agency's projected "benefits" under the Standards. EPA emphasized how important those numbers were to the final Standards. *See* 86 Fed. Reg. at 74,500 ("Our projection that the estimated benefits exceed the estimated costs of the program reinforces our view that the final standards represent an appropriate weighing of the statutory factors and other relevant considerations."). EPA even declared that the "reductions in emissions that would result" from its Standards were "[a]n essential factor" supporting its regulatory action here. *Id.* at 74,498. EPA cannot reasonably walk back the centrality of those costs now.

## CONCLUSION

The State Petitioners' petition for review should be granted and the Standards should be vacated.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

STEVE MARSHALL
Attorney General of Alabama
*/s/ Edmund G. Lacour, Jr.*
EDMUND G. LACOUR JR.
Solicitor General
Office of the Alabama Attorney
General
501 Washington Ave.
P.O. Box 300152
Montgomery, AL 36130
Tel: (334) 242-7300
Edmund.lacour@AlabamaAG.gov

*Counsel for Petitioner the State of
Alabama*

JUDD E. STONE II
Solicitor General

*/s/ Ryan S. Baasch*
RYAN S. BAASCH
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov

WESLEY S. WILLIAMS
Assistant Attorney General

*Counsel for Petitioner the State of Texas*

TREG R. TAYLOR
Attorney General of Alaska
*/s/ Garrison Todd*
GARRISON TODD
Assistant Attorney General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Tel.: (901) 269-5100
Garrison.Todd@alaska.gov

*Counsel for Petitioner the State of Alaska*

28

MARK BRNOVICH
Attorney General of Arizona
*/s/ Drew C. Ensign*
DREW C. ENSIGN
Deputy Solicitor General
2005 N. Central Ave.
Phoenix, AZ 85004
Tel.: (602) 542-5025
Drew.Engsign@azag.gov

*Counsel for Petitioner the State of Arizona*

LESLIE RUTLEDGE
Attorney General of Arkansas
*/s/ Nicholas J. Bronni*
NICHOLAS J. BRONNI
Solicitor General
DYLAN L. JACOBS
Deputy Solicitor General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Tel.: (501) 682-2007
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Petitioner the State of Arkansas*

THEODORE E. ROKITA
Indiana Attorney General
*/s/ Thomas M. Fisher*
THOMAS M. FISHER
Solicitor General
Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Tel.: (317) 232-6255
Tom.Fisher@atg.in.gov

*Counsel for Petitioner the State of Indiana*

DANIEL CAMERON
Attorney General of Kentucky
*/s/ Brett R. Nolan*
BRETT R. NOLAN
Office of the Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
Tel.: (502) 696-5300
Brett.Nolan@ky.gov

*Counsel for Petitioner the State of Kentucky*

29

JEFF LANDRY
Attorney General of Louisiana
*/s/ Elizabeth B. Murrill*
ELIZABETH B. MURRILL
Solicitor General
SCOTT ST. JOHN
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel.: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Petitioner the State of Louisiana*

LYNN FITCH
Attorney General of Mississippi
*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Tel.: (601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for Petitioner the State of Mississippi*

ERIC S. SCHMITT
Attorney General
*/s/ D. John Sauer*
D. JOHN SAUER
Solicitor General
Office of the Missouri Attorney General
Supreme Court Building
P.O. Box 899
Jefferson City, Missouri 65102
Tel.: 573-751-8870
Fax: 573-751-0774
John.Sauer@ago.mo.gov

*Counsel for Petitioner the State of Missouri*

AUSTIN KNUDSEN
Montana Attorney General
*/s/ David M.S. Dewhirst*
DAVID M.S. DEWHIRST
Solicitor General
CHRISTIAN B. CORRIGAN
Assistant Solicitor General
215 North Sanders Street
Helena, MT 59601
Tel.: (406) 444-2026
David.Dewhirst@mt.gov
Christian.Corrigan@mt.gov

*Counsel for Petitioner the State of Montana*

DOUGLAS J. PETERSON
Attorney General of Nebraska
*/s/ James A. Campbell*
JAMES A. CAMPBELL
Solicitor General of Nebraska
Office of the Nebraska Attorney
General
2115 State Capitol
Lincoln, NE 68509
Tel.: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Petitioner the State of Nebraska*

DAVE YOST
Ohio Attorney General
*/s/ Benjamin M. Flowers*
Ohio Solicitor General
30 E. Broad St., Fl. 17
Columbus, OH 4315
Tel.: (614) 466-8980
bflowers@OhioAGO.gov

*Counsel for Petitioner the State of Ohio*

JOHN M. O'CONNOR
Oklahoma Attorney General
*/s/ Bryan Cleveland*
Bryan Cleveland
Deputy Solicitor General
313 N.E. 21st St.
Oklahoma City, OK 73105
Tel.: (405) 521-3921
Bryan.Cleveland@oag.ok.gov

*Counsel for Petitioner the State of Oklahoma*

ALAN WILSON
Attorney General of South Carolina
*/s/ James Emory Smith, Jr.*
JAMES EMORY SMITH, JR.
Deputy Solicitor General
P.O. Box 11549
Columbia, S.C. 29211
Tel.: (803) 734-3642
esmith@scag.gov

*Counsel for Petitioner the State of South Carolina*

31

SEAN D. REYES
Utah Attorney General
*/s/ Melissa A. Holyoak*
MELISSA A. HOLYOAK
Solicitor General
350 N. State Street, Suite 230
Salt Lake City, UT 84114
melissaholyoak@agutah.gov

*Counsel for Petitioner the State of Utah*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the Federal Rule of Appellate Procedure 32(f) and (g), and this Court's September 22, 2022 Order, because it contains 6,996 words, as counted by the Microsoft Word software to produce this brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1). This brief also complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5) and (6) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Ryan S. Baasch*
Ryan S. Baasch

33

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing State Petitioners' opening brief to be filed on November 3, 2022 using the Court's CM/ECF system and that service was accomplished upon counsel of record by the Court's system.

*/s/ Ryan S. Baasch*
Ryan S. Baasch