ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1031 (and consolidated cases)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF TEXAS, ET AL.,

*Petitioners*,

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

*ADVANCED ENERGY ECONOMY, ET AL.,*

*Intervenors.*

_____

On Petition for Review of Final Action by the United States Environmental Protection Agency

_____

***BRIEF OF AMICI CURIAE TEXAS OIL & GAS ASSOCIATION, LOUISIANA MID-CONTINENT OIL & GAS ASSOCIATION, THE PETROLEUM ALLIANCE OF OKLAHOMA, TEXAS INDEPENDENT PRODUCERS AND ROYALTY OWNERS ASSOCIATION, TEXAS ASSOCIATION OF MANUFACTURERS, TEXAS ROYALTY COUNCIL AND AMERICAN ROYALTY COUNCIL IN SUPPORT OF PETITIONERS***

JAMES K. VINES
Fontaine Law Group
1128 Crater Hill Drive
Nashville, Tennessee 37215
(615) 218-8029
jvines1128@gmail.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), *amici curiae* Texas Oil & Gas Association, Louisiana Mid-Continent Oil & Gas Association, The Petroleum Alliance of Oklahoma, Texas Independent Producers and Royalty Owners Association, Texas Association of Manufacturers, Texas Royalty Council, and American Royalty Council certify as follows:

**A.  Parties and *amici***

Texas Oil & Gas Association, Louisiana Mid-Continent Oil & Gas Association, The Petroleum Alliance of Oklahoma, Texas Independent Producers and Royalty Owners Association, Texas Association of Manufacturers, Texas Royalty Council, and American Royalty Council are participating as *amici curiae* before this Court in support of Petitioners. All other parties appearing to date in this Court are referenced in the Petition of (and subsequent Briefs of) Petitioners States of Texas, Alabama, Alaska, Arkansas, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, and Utah, and of consolidated Petitioners Competitive Enterprise Institute, Illinois Soybean Association, American Fuel and Petrochemical Manufacturers, State of Arizona, Clean

Fuels Development Association, et al., and Energy Marketers of America, as noted in the Related cases section, below.

### B.  Ruling under review

The ruling under review is the final action taken by Respondents United States Environmental Protection Agency and Michael S. Regan, Administrator, United States Environmental Protection Agency, entitled *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74,434 (December 30, 2021) ("Greenhouse Gas Tailpipe Standards").

### C.  Related cases

Six other cases in the U.S. Court of Appeals for the District of Columbia Circuit involve challenges to the same agency action challenged here in No. 22-1031. These are: *Competitive Enterprise Institute et al. v. EPA,* No. 22-1032; *Illinois Soybean Association et al. v. EPA*, No. 22-1033; *American Fuel and Petrochemical Manufacturers* v. EPA, No. 22-1034; *State of Arizona v. EPA et al.*, No. 22-1035; *Clean Fuels Development Association, et al.*, No. 22-1036; and *Energy Marketers of America* v. EPA, No. 22-1038. The Court consolidated review of these six cases under lead case No. 22-1031, *Texas v. EPA*, Clerk's Order, Doc. No. 1937271 (March 2, 2022).

*Amici* believe two additional pending cases before the Court are related to this action. These are: <u>*State of Ohio*</u> v. EPA, No 22-1081 and <u>*National Resources Defense Council v. NHTSA*</u>, No. 22-1080.  These two cases challenge other actions by EPA and NHTSA implementing the same Presidential Executive Order, Exec. Order No. 14037, *Strengthening American Leadership in Clean Cars and Trucks,* 86 Fed. Reg. 43583 (Aug. 5, 2021), that motivated EPA's rule in the Greenhouse Gas Tailpipe Standards final agency action. These two other final agency actions cause nearly identical harm to Amici's interests and suffer from the same constitutional defects asserted here.

# RULE 29 STATEMENTS

All identified parties have consented to the filing of this *amicus* brief.

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 29(b), undersigned counsel states that:

(1) *Amicus curiae* Texas Oil & Gas Association is a non-profit, tax-exempt organization incorporated in Texas.  Texas Oil & Gas Association has no parent corporation, and no publicly held company has 10% or greater ownership in the Texas Oil & Gas Association.

(2) *Amicus curiae* Louisiana Mid-Continent Oil & Gas Association is a non-profit, tax-exempt organization incorporated in Louisiana. Louisiana Mid-Continent Oil & Gas Association has no parent corporation, and no publicly held company has 10% or greater ownership in Louisiana Mid-Continent Oil & Gas Association.

(3) *Amicus curiae* The Petroleum Alliance of Oklahoma is a non-profit organization incorporated in Oklahoma. The Petroleum Alliance of Oklahoma has no parent corporation and no publicly

held company has 10% or greater ownership in The Petroleum Alliance of Oklahoma.

(4)    *Amicus curiae* Texas Independent Producers and Royalty Owners Association is a non-profit, tax-exempt organization incorporated in Texas. Texas Independent Producers and Royalty Owners Association has no parent corporation, and no publicly held company has 10% or greater ownership in Texas Independent Producers and Royalty Owners Association.

(5)    *Amicus curiae* Texas Association of Manufacturers is a non-profit, tax-exempt organization incorporated in Texas. Texas Association of Manufacturers has no parent corporation, and no publicly held company has 10% or greater ownership in Texas Association of Manufacturers.

(6)    *Amicus curiae* Texas Royalty Council is a non-profit, tax-exempt organization incorporated in Texas. Texas Royalty Council has no parent corporation, and no publicly held company has 10% or greater ownership in Texas Royalty Council.

(7)    *Amicus curiae* American Royalty Council is a non-profit, tax-exempt organization incorporated in Oklahoma. American

Royalty Council has no parent corporation, and no publicly held company has 10% or greater ownership in American Royalty Council.

Pursuant to Circuit Rule 29(d), *amici* here are unaware of other entities or individuals participating as *amici* to represent the concerns of Texas', Louisiana's, and Oklahoma's:

- upstream, midstream and downstream sectors of the oil and gas industry;

- royalty owners; and

- manufacturing and supply chain businesses that depend on refined oil and gas products to supply these states and the nation with "every day" products essential to modern life.

Texas, Louisiana, and Oklahoma are the first, second and sixth largest crude oil producers in the United States. These three states are similarly prominent in natural gas production and refining capacity. Oil and gas production, transport, and refining in just these three states substantially impacts not only these states' interests but the national interests, as well, across a broad range of factors. This brief will address how the rulemaking under review here impacts these three leading oil and gas producing states and the nation.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no counsel for any party authored this brief in whole or in part

and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

TABLE OF CONTENTS

INTERESTS OF THE AMICI CURIAE ....................................……..........1

SUMMARY OF ARGUMENT ........................................................... 12
..

ARGUMENT ................................................................................13

I.      Introduction ...........................................................................13

II.     U.S. EPA's Greenhouse Gas Tailpipe Standards Rulemaking
        Is A Decision Of Such A Magnitude And Consequence – A
        Major Question Of National Policy - That It Would Require
        A Clear Delegation Of Authority From Congress And No
        Such Delegation Exists...............................................................19

        A.     EPA's Action Clearly Appropriates A Major Question
               Of National Policy .........................................................19

        B.     EPA's Greenhouse Gas Tailpipe Rule – An
               Action Materially Addressing A Clear Question Of
               National Policy - Fails Constitutionally Under The
               Major Questions Doctrine ...............................................22

III.    Even If A Clear Delegation Of Authority From Congress For
        U.S. EPA's Greenhouse Gas Tailpipe Rule Were Found
        Any Such Delegation Would Fail For Non-compliance With
        The Intelligible Principle Requirement Of The
        Non-Delegation Doctrine ........................................……...........25

CONCLUSION .....................................................................……......27

# TABLE OF AUTHORITIES

**CASES**                                                                 PAGES

*GUNDY V. UNITED STATES,* 142 S. CT. 2587 (2022) ………….………... ……26

*WEST VIRGINIA V. EPA*, 142 S. CT. 2587 (2022) ……………………. 18, 22,23,24

**STATUTES**

42 U.S.C § 42 U.S.C. 7521(a) (Clean Air Act § 202(a)) ............................................24

42 U.S.C., ch. 152 §17001 *et seq*. (Energy Independence and Security Act)…13

**REGULATIONS**

86 Fed. Reg. 74,434 (December 30, 2021) (EPA 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Standards) ....... ii, iii, 13, 14, 16, 17, 24, 27

87 Fed. Reg. 14,332 (Mar. 14, 2022) (EPA final action on California Waiver Reinstatement) ......................................................................................... 14, 15

87 Fed. Reg. 25,710 (May 2, 2022)(NHTSA Corporate Average Fuel Economy Standards for Model Years 2024-2026 Passenger Cars and Light Trucks…………………………………………………………….…………………………14,15

**OTHER AUTHORITIES**

86 Fed. Reg. 43,583 (Aug. 10, 2021), Exec. Order 14,037, *Strengthening American Leadership in Clean Cars and Trucks* ...................................... .iii, 13, 14

*2022 [Texas Independent Producers and Royalty Owners Association] STATE OF ENERGY REPORT* at https://infogram.com/tipro-2022-state-of-energy-report-1h7j4dv1kpgnv4n?live..................................................................7

*An Empty Attack on the Nondelegation Doctrine, American Enterprise Institute Op-Ed (Peter J. Wallison, April 22, 2021) at https://www.aei.org/op-eds/an-empty-attack-on-the-nondelegation-doctrine/* .......................................26

*ICF International, Inc. - The Economic Impact of the Oil and Natural Gas Industry in Louisiana* (Oct. 5, 2020) at

https://www.lmoga.com/assets/uploads/documents/LMOGA-ICF-Louisiana-Economic-Impact-Report-10.2020.pdf ................................................ .4

*INFOGRAPHIC: Products Made from Oil and Natural Gas* at https://www.energy.gov/fecm/downloads/infographic-products-made-oil-and-natural-gas ............................................................................................8, 9

*Manufacturing Matters* at https://manufacturetexas.org/manufacturing-matters ................................................................................................................................ .8

*OKLAHOMA'S OIL AND GAS ECONOMY,*  Prepared for: Oklahoma Energy Resources Board (January 2022) at  http://oerb.com/wp-content/uploads/2022/02/RegTrk-OK-Oil-Gas-Final-Draft-20220201.pdf ............................................................................................................................ .5

*[Texas Oil & Gas Association] Annual Economic Impact Report 2022* at https://issuu.com/txoga/docs/1-11-22_txoga_economic_impact_report_2021 ................................................................ .1

S. 3664, 115th Cong. § 2 (2018) at: https://www.congress.gov/bill/115th-congress/senate-bill/3664; ............................................................................…..…..25

S. 1487, 116th Cong. §1 (2019) at: https://www.congress.gov/bill/116th-congress/senate-bill/1487; ............................................................................….…..25

H.R. 2767, 116th Cong. § 1 (2019) at: https://www.congress.gov/bill/116th-congress/house-bill/2764; ............................................................................…..…..25

H.R 8635, 116th Cong. § 2 (2020) at  https://www.congress.gov/bill/116th-congress/house-bill/8635; ............................................................................…..…...25

S. 4823, 116th Cong. § 2 (2020) at:  https://www.congress.gov/bill/116th-congress/senate-bill/4823 ............................................................................…...…....25

## GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| NHTSA | National Highway Traffic Safety Administration |

## STATUTES AND REGULATIONS

All applicable statutes and regulations and their pertinent parts are set forth in the Petitioners' briefs and addenda to those briefs.

## INTERESTS OF THE *AMICI CURIAE*

*Texas Oil & Gas Association* is a business association representing the interests of the oil and gas industry of the United States' leading oil and gas producing State, Texas. All of Texas Oil & Gas Association's member companies and the dependent sectors of Texas' economy are subject to material adverse consequences from the regulatory actions addressed in this appeal. The Texas oil and gas industry comprises 20 separate major business and employment sectors in the Texas economy.[1] In the most recent years for which composite annual data is available, 2020 and 2021, Texas continued to be the number one oil and gas producing state of the world's number one oil and gas producing nation. Texas' oil and gas industry contributed $344 billion to the state's economy amounting to 10 percent of total direct and 22 percent of indirect state gross domestic product. Texas' downstream sector operates 31 percent of U.S. refining capacity while the upstream sector accounts for 43 percent of all US crude production at 4.9 million barrels per

---

[1] Texas oil & gas industry economic data in this section comes from: [Texas Oil & Gas Association] Annual Economic Impact Report 2022 at  https://issuu.com/txoga/docs/1-11-22_txoga_economic_impact_report_2021

day. In FY 2021, the industry employed 422,122 Texans. Every direct job in the Texas oil and natural gas industry creates an additional 2.2 jobs elsewhere in the Texas economy. In total, direct oil and natural gas employment plus the industry's spending capital goods, electricity, construction, services and supplies generates a total of 1.37 million Texas jobs. Texas oil and gas employers paid an average of $108,988 per job in 2021 while other private sectors in the state averaged $63,027. Texas' oil and gas industry paid $15.8 billion in state and local taxes and state royalties in Fiscal Year 2021. This revenue from oil and natural gas production, pipelines, refineries and liquid natural gas facilities translates into about $43 million each day that pay for schools, universities, roads, first responders and essential services. Since 2007, when Texas Oil & Gas Association first started compiling this data, the Texas oil and natural gas industry has paid more than $178.7 billion in state and local taxes and state royalties. Oil and natural gas royalties to state funds, particularly the Permanent University Fund and Permanent School Fund, widely support Texas public education. Of the state's oil and natural gas royalties, 99 percent were deposited into these education funds with the Permanent University Fund receiving $979 million and the Permanent School Fund receiving over $1.1 billion. Texas independent school districts also directly received $1.84 billion in property

2

taxes from mineral properties producing oil and natural gas, pipelines, and gas utilities.  The Texas oil and gas industry is the funding source for the state's Economic Stabilization (a/k/a "Rainy Day") Fund. The Rainy Day Fund also supports substantial educational funding in Texas. The sum of all Rainy Day appropriations since inception totals $18.2 billion. Without the direct funding from taxes paid by the Texas oil and natural gas industry, numerous state funding priority items would not have received the substantial dollars allocated to meet essential needs.

*Louisiana Mid-Continent Oil & Gas Association* is a business association representing the interests of the oil and gas industry of the second largest oil producing and fourth largest gas producing State in the nation, Louisiana. The State ranks second in the nation in crude oil refining capacity. All of Louisiana Mid-Continent Oil & Gas Association's member companies and the dependent sectors of Louisiana's economy are subject to material adverse consequences from the regulatory actions addressed in this appeal. In the most recent year for which composite annual data is available, 2019, Louisiana supported the production of 738 million barrels of crude oil and liquid condensate, 3.81 trillion cubic feet of dry (or pipeline quality) natural

gas, and 102.4 million barrels of natural gas plant liquids.[2] At the point of first sale, these production volumes amounted to a total value of $55.5 billion. Recently constructed liquid natural gas export operations also provided $7.1 billion in output value in the state. The Louisiana oil and gas industry provided $73.0 billion dollars of direct, indirect, and related state income. State and local tax revenues also provided $4.5 billion to the state economy throughout the supply chain. In the eleven economic sectors throughout Louisiana representing "direct" oil and gas activity, there were a total of 94,200 private sector employees. Additionally, sectors that provided intermediate goods and services to the eleven direct oil and gas sectors employed 50,800 "indirect" employees. The spending of income earned by these employees led to 84,100 additional jobs in Louisiana in 2019. And, there were also approximately 20,700 related jobs among sole proprietorships, partnerships, and independent contractors across the industry. Therefore, a total of 249,800 private sector employees received wages or salaries in 2019 supported by oil and gas activity.  For every direct employee in the oil and gas industry in the state, there are 1.43 additional

---

[2] Louisiana oil & gas industry economic data in this section is from ICF International, Inc. - The Economic Impact of the Oil and Natural Gas Industry in Louisiana (Oct. 5, 2020) at:
https://www.lmoga.com/assets/uploads/documents/LMOGA-ICF-Louisiana-Economic-Impact-Report-10.2020.pdf

employees supporting the state economy through related industry spending and industry employees' spending.

*The Petroleum Alliance of Oklahoma* is a business association representing the oil and gas industry of one the largest oil and gas producing states, Oklahoma. All of The Petroleum Alliance of Oklahoma's member companies and the dependent sectors of Oklahoma's economy are subject to material adverse consequences from the regulatory actions addressed in this appeal. According to the U.S. Energy Information Administration, Oklahoma is the 5th largest producer of natural gas and the 6th largest producer of crude oil in the nation with more than 1.48 billion in proved crude oil reserves and more than 30 trillion cubic feet of natural gas reserves. Oklahoma exports two-thirds of its energy production each year to other states. The Oklahoma oil and gas industry directly contributed $19 billion to state gross domestic product in 2021.[3] There are more than 4000 oil and gas businesses located in almost every county in Oklahoma. They provided $16.5 billion in income to Oklahoma households or 25 percent of all state household earnings. The oil and natural gas industry is both the largest private-sector employer and

---

[3]Oklahoma oil & gas industry economic data in the section is from OKLAHOMA'S OIL AND GAS ECONOMY, Prepared for: Oklahoma Energy Resources Board (January 2022) at  http://oerb.com/wp-content/uploads/2022/02/RegTrk-OK-Oil-Gas-Final-Draft-20220201.pdf

the largest taxpayer providing $1 of every $4 in tax revenue. The industry employs more than 85,000 direct employees with average earnings of $137,000 per year and estimates 145,000 are employed in related and linked jobs. The industry contributed $2.66 billion in business taxes; $720 million in severance tax revenue; and $410 million in ad valorem taxes. State royalty payments exceeded $1.9 billion. In Oklahoma, the oil and gas industry is the only major source of earmarked funding for education and county roads. The earmarked funds for education totaled $2.1 billion over the last decade and were $204 million in 2021. Earmarked funds for county roads and bridges totaled $62.5 million in 2021. The industry is responsible for more than half of Oklahoma's real annual gross state domestic product growth every year.

*Texas Independent Producers and Royalty Owners Association* is one of the country's largest oil-and-gas trade associations. Texas Independent Producers and Royalty Owners Association advocates to preserve the ability for independents to explore for and produce oil and natural gas. All of Texas Independent Producers and Royalty Owners Association's member companies and individual members, and the dependent sectors of Texas' economy, are subject to material adverse consequences from the regulatory actions addressed in this appeal. The organization's nearly 3000 members

6

include small family-owned businesses and the largest publicly traded independent oil and gas producers, in addition to large and small royalty owners. In 2021, 37 percent of all oil and gas jobs nationwide were located in Texas.[4] Texas had the highest oil and gas payroll in the country in 2021, totaling $41 billion. Texas led the country in the number of oil and gas businesses with over 12,000 establishments. Oil production in Texas exceeded 1.7 billion barrels in 2021 and natural gas production was over 10.7 trillion cubic feet in the same year. The Texas oil and natural gas industry purchased U.S. goods and services in the amount of $166 billion, 81 percent of which came from Texas businesses, further illustrating the significant economic contributions from the industry across virtually all business sectors in state. Mineral owners also play an integral role in the United States oil and natural gas industry. There are more than 600,000 royalty owners in Texas including farmers, ranchers, individuals, and families who lease the mineral rights beneath their land and in turn receive royalties each year.

---

[4] Texas Independent Producers and Royalty Owners Association data on oil and gas production and royalty owners in this section is from STATE OF ENERGY REPORT at: https://infogram.com/tipro-2022-state-of-energy-report-1h7j4dv1kpgnv4n?live

*Texas Association of Manufacturing* is the leading manufacturing association in Texas, representing small and large companies in every industrial sector. All of Texas Association of Manufacturer's member companies and the dependent sectors of Texas' economy are subject to material adverse consequences from the regulatory actions addressed in this appeal. Texas has been the number one exporting state in the nation for nearly 20 years, exporting $203 billion in manufactured goods in 2020 as well as the leading business creation, relocation, and expansion destination in the world.[5]  Texas manufacturers are the State's biggest job creators, and account for 13.07 percent of the total economic output in the state—more than $241 billion as of 2019. Texas manufacturers employ more than 881,000 Texans in jobs that pay an average of over $90,100 annually.  Each manufacturing job created also provides an average of five additional jobs in Texas communities.  Texas' oil and gas and manufacturing sectors are mutually dependent on one another. For instance, according to the U.S. Department of Energy, "refined products made from oil & natural gas make the manufacturing of over 6000 everyday products and high-tech devices possible."[6]  The Department of Energy's  Infographic lists over 160 examples

---

[5] Texas Association of Manufacturer's economic data in this section is from *Manufacturing Matters* at https://manufacturetexas.org/manufacturing-matters

[6] *INFOGRAPHIC: Products Made from Oil and Natural Gas* at:

of consumer product and health care necessities including "Antiseptics ... Cell phones ... Clothing ... Hearing aids ... Heart valves ... Laptops ... Motorcycle helmets ... Pharmaceuticals ... Shoes ... Soft contact lenses ... Synthetic rubber ... Wind turbine blades." The nation simply cannot do without these 6000-plus manufactured products that are dependent on oil & gas refined products as production raw materials.

*Texas Royalty Council* is a grassroots entity dedicated to representing and advancing the interests of Texas royalty owners and energy professionals. The Texas Royalty Council was organized to monitor, advocate, and educate royalty owners, elected officials, and the energy industry on issues affecting royalty owners in Texas. Texas Royalty Council's primary focus is to promote the exploration and production of Texas oil, natural gas, and minerals while maximizing the return on the value of Texas' natural resources. All of the Texas-based royalty owners and energy professionals represented by Texas Royalty Council are subject to material adverse consequences from the regulatory actions addressed in this appeal.

*American Royalty Council* represents royalty owners and energy professionals across the United States and is dedicated to advancing domestic

---

https://www.energy.gov/fecm/downloads/infographic-products-made-oil-and-natural-gas

oil and natural gas production by creating best business practices through dialogue, communication, and education. American Royalty Council encourages, promotes, and supports energy issues on a local, state, and national level through educational efforts on the grassroots level in all 435 congressional districts on the importance of the oil and natural gas industry. This teaching and advocacy necessarily encompasses the importance of the nation's leading oil and gas states. Each year oil and gas production pays billions of dollars in royalties to both individuals and the government. The monies also go to several federal preservation and conservation funds, American Indian tribes, and the states. Any serious damage to the industry's critical mass in states like Texas, Louisiana, and Oklahoma would cause serious consequential damages to the industry and its beneficiaries across the nation. The royalty owners and energy professionals across the nation represented by American Royalty Council are subject to material adverse consequences from the regulatory actions addressed in this appeal.

The oil and gas industry is unquestionably the foundation for the economies of the states reflected by *amici.* Public welfare in these states is undeniably dependent on the industry in the immediate and long-term futures. The rulemaking under consideration here - part of an expressed

Executive Branch effort to drastically reduce or even eliminate internal combustion engine powered vehicles across the nation and replace them with electric vehicles or "zero-emission" vehicles - is a clear and present danger to these states and the nation's prosperity and survival.

## SUMMARY OF ARGUMENT

EPA's Greenhouse Gas Tailpipe Standards, purportedly promulgated under Title II of the federal Clean Air Act, reflect an intentional Executive Branch attempt to mandate shifts away from vehicles powered by internal combustion engines to electric vehicles, or so called "zero-emission" vehicles. The rule expressly seeks to eliminate 50 percent of the market for new vehicles powered by internal combustion engines in less than a decade.  The consequential massive damage to the Texas, Louisiana, and Oklahoma economies and public welfare, along with the negative national ripple effects, clearly illustrate that the objective of the Rule encompasses a Major Question of national policy. Since there is absolutely no clear congressional authorization in the Clean Air Act for EPA to take such a sweeping action, the rule fails constitutionally under the Major Question doctrine and should be struck down. Even in the unlikely event the Court were to find some faint trace of congressional authorization for EPA's action, there is no clear intelligible principle in the legislation to guide EPA's execution of that delegation. As such, the delegation, and the rule, would fail for violation of the constitutional Non-delegation Doctrine.

**ARGUMENT**

## I.   INTRODUCTION

This appeal challenges EPA's final agency action in *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74,434 (December 30, 2021) ("Greenhouse Gas Tailpipe Standards"). This rulemaking, a final agency action purportedly under the Clean Air Act, 42 U.S.C. §§ 7401-7671q, is one of three concerted actions taken by EPA and NHTSA to implement the President's Executive Order 14,037 of August 5, 2021, *Strengthening American Leadership in Clean Cars and Trucks,* 86 Fed. Reg. 43,583 (Aug. 10, 2021).

Executive Order 14,037 directs EPA, using the Clean Air Act "to establish new multi-pollutant emissions standards, including for [greenhouse gas] emissions, for light- and medium-duty vehicles beginning with model year 2027 and extending through and including at least model year 2030. " Exec. Order 14,037 sec. 2. (a), 86 Fed. Reg. 43,583. The order separately directs NHTSA, via delegation from the Secretary of Transportation and using the Energy Independence and Security Act of 2007, 42 U.S.C., ch. 152 § 17001 *et seq*., "to establish new fuel economy standards for passenger cars and light-duty trucks beginning with model year 2027 and extending through and including at least

13

model year 2030," Exec. Order 14037 sec. 2. (b), consistent with the greenhouse gas reduction objectives set out in this and earlier, related Executive Orders. 86 Fed. Reg. 43,583. The order explains that all of these actions – agency rules with the force of law – are in support of the overall target of having "50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles[.]" *Id.* These zero-emission vehicles are intended to primarily include "battery electric, plug-in hybrid electric, or fuel cell electric vehicles." *Id.*

To implement the President's instructions, EPA and NHTSA, finalized three separate rulemakings: (1) EPA's Greenhouse Gas Tailpipe Standards addressed in this appeal; (2) EPA's C*alifornia State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*, Fed. Reg., 87 Fed. Reg. 14,332 (Mar. 14, 2022) ("California Waiver Reinstatement Rulemaking"), currently under appeal in *Ohio v. EPA*, No. 22-1081 (D.C. Cir.); and (3) *NHTSA's Corporate Average Fuel Economy Standards for Model Years 2024-2026 Passenger Cars and Light Trucks*, 87 Fed. Reg. 25,710 (May 2, 2022) ("Corporate Average Fuel Economy 2024-26 Rule"), subject of the pending appeal in *NRDC v. NHTSA*, No. 22-1080 (D.C. Cir.) Each of these rules, in its own way, mandates a reduction in internal combustion engine vehicles and their replacement in the new vehicle markets with electric vehicles or so called "zero-emission"

vehicles.[7]

As noted, *amici* believe pending actions in this Court Nos. 22-1081 (addressing EPA's California Waiver Reinstatement Rulemaking), 22-1080 (addressing NHTSA's Corporate Average Fuel Economy 2024-26 Rule), and 22-1031 (the instant appeal, addressing EPA's Greenhouse Gas Tailpipe Standards) are related appeals as they, together, challenge the concerted actions of Executive Branch agencies responding to agency-wide instructions from the President.

The consequences of these three rulemakings would be an abrupt, government-mandated transformation of the nation's vehicle fleet away from internal combustion engine vehicles towards electric vehicles, or so-called "zero-emission" vehicles. Each of the three rulemakings *individually* lead to this result and, *in concert*, the three rulemakings accomplish a force multiplier for achieving the desired end of eliminating vehicles with internal combustion engines and replacing them with electric vehicles, or so called zero-emission vehicles.

---

[7] *Amici* point out that use of the phrase "zero-emission" is materially misleading to consumers and the public on the true environmental emission impact of these vehicles. The complete life-cycle environmental impact of the so called zero-emission vehicles, including their manufacturing processes, associated mining and raw material inputs, and electricity generation has not been shown to be materially different than for the complete life-cycle of internal combustion engine powered vehicles. Their life-cycle environmental impact is certainly not zero emissions.

EPA's Greenhouse Gas Tailpipe Standards rule establishes emission control obligations that can be met only by averaging tailpipe emissions from internal combustion engine vehicles with those of electric vehicles and by ignoring the lifecycle carbon emissions associated with electric vehicle battery production and power generation. EPA projects that the rule will decrease liquid fuels consumption by billions of gallons. 86 Fed. Reg. at 74,498. EPA's stated objective in this rule is "achieving 40 to 50 percent sales of zero emissions vehicles by 2030." *Id.* at 74,486.

EPA, with NHTSA, is attempting to wield an unlawful power to unilaterally phase out the internal combustion engine. These three rulemakings presume authority to ultimately ban sales of internal combustion engine vehicles and, in the meantime, to require auto manufacturers to make and sell electric vehicles in increasingly large volumes and reduce consumer choice. Congress never authorized the electric vehicle mandate that the Executive Branch has directed.

EPA repeatedly conceded that its emissions standards cannot feasibly be met unless manufacturers significantly increase production of electric vehicles. *Id*. EPA's justification for the rule repeatedly states that "compliance" with the rule is fully feasible at a "reasonable cost" for manufacturers. *See, e.g.*, *id*. at 74,494. But EPA turns a blind eye to the feasibility or reasonableness of the rule

to the oil and gas industry, the several related and heavily impacted economic sectors, and consumers. Likewise, EPA asserts there are positive, or neutral, "Energy Security Impacts" of the rule, *id.* at 74,507, related to crude oil sourcing, but says nothing about the national security dangers of the sourcing of critical raw materials for so called "zero-emission" vehicles from problematic nations and regions.

EPA's stated intention is for the new standards to be met by mandating increasing sales of electric vehicles (including plug-in hybrid vehicles) from approximately 4 percent market share today to an approximate 7 percent market share in Model Year 2023 and nearly 17percent in Model Year 2026, *id.* at 74,519, which far exceeds the electric vehicle penetration that would otherwise occur. Electric vehicle sales must quadruple to meet 2026 standards.[8] EPA considers no other options for compliance with the rule.

EPA signaled that it intends to aggressively ratchet up its emission standards in future rulemakings to further mandate electrification. The ultimate target is "an all-electric, zero-emissions transportation future." Administrator

---

[8] In stringency, the rule accelerates the rate of stringency increases set forth in the Safer Affordable Fuel-Efficient standards from roughly 1.5 percent year-over-year rate to nearly 10 percent from Model Year 2022 to Model Year 2023, followed by a 5 percent stringency increase in Model Year 2024, 6.6 percent in Model Year 2025, and 10 percent in Model Year 2026. Estimated fleet-wide target $CO_2$ levels corresponding to the final standards go from 202 g/mile for Model Year 2023 to 161 g/mile for Model Year 2026. 86 Fed. Reg. at 74,434-74,435; *see also, id.*, Table 9 at 74,449.

Regan explained that the standards are a "giant step forward" in "paving the way toward an all-electric, zero-emissions transportation future." *See* EPA Finalizes Greenhouse Gas Standards for Passenger Vehicles, Paving Way for a Zero-Emissions Future, (Dec. 20, 2021), https://bit.ly/3wJFsTD.

Whether U.S. citizens and businesses can continue to use the vehicles of their choice or whether the government should mandate an abrupt shift to electric vehicles is, of course, a Major Question of National Policy. This would be an as great, or even greater, change to the national economy and infrastructure, not to mention the national culture and world standing, than the attempted EPA "Clean Power Plan" recently struck down for lack of Congressional authorization in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022). At a minimum, the impact would be radical and lead to massive transformations in the vehicle manufacturing industry, the oil and gas industry, and the public power generation industry. The destructive ripple effects in other indirect industry sectors would be massive and probably immeasurable.

There is no demonstrable Congressional authorization for any of these three rulemakings by EPA and NHTSA, either individually or collectively. Accordingly, they fail under the Separation of Powers required under the Constitution. *Amici* here address the part the Greenhouse Gas Tailpipe

18

Standards rule plays in this unconstitutional trinity and urge the Court to strike down the rule under the Major Questions doctrine.

## II. EPA's Greenhouse Gas Tailpipe Standards Rulemaking Is A Decision Of Such Magnitude And Consequence – A Major Question Of National Policy - That It Would Require A Clear Delegation Of Authority From Congress And No Such Delegation Exists.

### A. EPA's Action Clearly Appropriates A Major Question Of National Policy.

EPA and NHTSA have faithfully adhered to their charge in Executive Order 14,037 of mandating the elimination of internal combustion engine vehicle sales for 50 percent of the new vehicle market by 2030 and replacing that 50 percent of the market with electric-powered vehicles. Each of the three related rulemakings (i.e., two by EPA, one by NHTSA) materially contributes in its own way to accomplishing this mandated goal. EPA's Greenhouse Gas Tailpipe Standards rule does its role by setting emissions standards for which compliance is possible only by eliminating increasingly larger portions of the new vehicle market for vehicles powered by internal combustion engines.

Whether the resulting destruction of major portions of the conventional fuel markets is appropriate or desired is plainly a Major Question of National Policy. EPA's and the Executive Branch's appropriation

19

of that major question openly violates the constitutional separation of powers obligation. Congress has never authorized any agency under the Clean Air Act to mandate such a monumental transformation of a multiple economic sectors affecting the national interest.

The Greenhouse Gas Tailpipe Standards rule would have the intended consequence of decreasing demand for gasoline for up to half of the new vehicle market.   This gasoline demand destruction will have a direct catastrophic impact on *amici and amici's* home states as well as on the national economy due to the national interdependence on *amici's* states' oil and gas and related industries. EPA would effectively have *amici's* states give up, among numerous other economic necessities, massive levels of income, various critical state tax bases, and education funding.

The Executive Branch threatens to irreversibly alter the U.S. vehicles market to the detriment of the American public—and especially consumers. To comply with these electric vehicle mandates, U.S. auto manufacturers and dealers must increase the price of internal combustion engine vehicles to make up for losses on electric vehicles which must be priced artificially low to make up for sluggish electric vehicle demand. Electric vehicle subsidies

force purchasers of gasoline-powered vehicles to cross-subsidize electric vehicle purchasers.

Likewise, the Greenhouse Gas Tailpipe Standards rule undermines the U.S. oil and biofuels industries as well as the manufacturing industry. These sectors provide billions of dollars to the economy and millions of American jobs up and down the supply chain through jobs in extracting, refining, farming, blending, transporting (via pipeline, truck, and rail) and selling oil, biofuel, and finished fuel like gasoline and diesel. The severe downturn in refining would seriously constrain the manufacture of thousands of critical consumer products, including vital health care products and medicines and countless consumer necessities.

Furthermore, gasoline and diesel refining drives production of virtually all other petroleum-based products. This includes asphalt which is critical to resolving the nation's transportation infrastructure crisis. The amount of asphalt produced is a function of the amount of overall petroleum refined. Regulations that force refiners to scale back transportation fuel production necessarily reduce asphalt production too. The oil and gas industry's process infrastructure is not designed or built to pick and choose

21

between elements of the crude refining process; getting rid of gasoline and keeping other selected refinery products such asphalt is simply not feasible.

Citizens and businesses who use internal combustion engine powered vehicles will be made worse off from more expensive vehicles and fuel. Those who form the fuel supply chain—biofuel producers, pipelines, terminals, tank trucks service stations, and convenience store owners—will lose their investments or have their work or customers dry up.[9]

EPA's electric vehicle mandating rule also has major implications for national security policy. Electrification of the motor vehicle fleet represents an erosion of U.S. energy security because China presently controls most of the sources or critical minerals needed to produce electric vehicle batteries.

**B. EPA's California Reinstatement Rulemaking – An Action Materially Addressing A Clear Question Of National Policy - Fails Constitutionally Under The Major Question Doctrine.**

The Major Question doctrine is an established part of the canon for judicial review of agency rulemaking.

As for the major questions doctrine "label"…it took hold because it refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem:

---

[9] While *amici* cannot speak directly for them, the United States military and the nation's commercial aviation industry inevitably rely on the ongoing vitality of *amici's* oil and gas industries. EPA's disregard for that threat to national defense and the commercial airline transport sector is more proof that EPA exceeded its authority on key questions of major national policy in the Greenhouse Gas Tailpipe Standards rulemaking.

agencies asserting *highly consequential* power beyond what Congress could reasonably be understood to have granted. Scholars and jurists have recognized the common threads between those decisions. *So have we.*

<u>West Virginia</u> v. <u>EPA</u>, 142 S. Ct. 2587, 2609 (2022) (emphasis added).

In reviewing EPA's Clean Power Plan, the Supreme Court observed: EPA's "point, after all, was to compel the transfer of power generating capacity from existing sources to wind and solar." <u>West Virginia</u>, 142 S.Ct. at 2604. The Court noted that: "EPA explained that taking any of these steps would implement a sector-wide shift in electricity production from coal to natural gas and renewables." <u>West Virginia</u>, 142 S.Ct. at 2603.  The unmissable analogy here is that EPA's "point, after all" in the Greenhouse Gas Tailpipe Standards Rule is to mandate a major change in the market to electric vehicles. As a result, *Amici's* members, here, are not so much facing a mere "shift" in their sectors as an intentional destruction of major portions of their businesses. Their home states are facing a "highly consequential" destruction of their most significant economic base.   The negative fallout from this will be felt nationwide and abroad.

"A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body." <u>West Virginia,</u> 142 S.Ct. at 2616. "[T]he Government

must – under the major questions doctrine – point to 'clear congressional authorization' to regulate in that matter.'" _West Virginia,_ 142 S.Ct. at 2614. There is obviously no congressional authorization for EPA to utilize the Clean Air Act's authority to destroy key industrial sectors and the prosperity of the millions of citizens who depend on those sectors.

> EPA states that:
>
> Statutory authority for this final rule is found in [Clean Air Act] section 202(a) (which authorizes _standards for emissions of pollutants from new motor vehicles_ which emissions cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare), 202(d), 203–209, 216, and 301[.]

86 Fed. Reg. at 74,521 (emphasis added; internal citations omitted).

The sole subject of these portions of the Clean Air Act is "standards" for the "emissions of pollutants" for "new motor vehicles." There is simply no manipulation of the English language or the imagination to support the notion that Congress authorized EPA, via the Greenhouse Gas Tailpipe Standards rule to roil the states' and national economies or initiate the destruction of the century-old oil and gas industry that would result from this rule. EPA's authority to establish "standards for emissions of pollutants from new motor vehicles" is limited by its terms to _technical_ enhancements to a single class of _products._ There is not so much as a faint trace of congressional authorization, much less any clear statement of authorization,

24

for those technical enhancements to radically transform multiple industries and national and state economies. Indeed, Congressional attempts to legislate federal mandates for electric vehicles have failed on at least five separate occasions.[10]

### III.   Even If A Clear Delegation Of Authority From Congress For EPA's "California Reinstatement Rule" Were Found Any Such Delegation Would Fail For Non-compliance With The Intelligible Principle Requirement Of The Non-Delegation Doctrine

The Major Question doctrine, as noted, tasks the Court with looking for a demonstrable delegation of Congressional authority supporting agency action. A separate constitutional question arises if a delegation is found as to whether the delegation is unconstitutional because the delegation violates the Non-Delegation Doctrine. For decades, the federal courts have used the "intelligible principle" rule to determine whether Congressional delegations of authority to agencies pass constitutional muster. Under the rule, Congress may delegate its authority to an agency to engage in legislative-like regulatory action if the delegation contains "intelligible principles" or a "discernable standard" for the agency to follow in implementing the

---

[10] See, S. 3664, 115th Cong. § 2 (2018) at: https://www.congress.gov/bill/115th-congress/senate-bill/3664;
S. 1487, 116th Cong. §1 (2019) at: https://www.congress.gov/bill/116th-congress/senate-bill/1487;
H.R. 2767, 116th Cong. § 1 (2019) at: https://www.congress.gov/bill/116th-congress/house-bill/2764;
H.R 8635, 116th Cong. § 2 (2020) at https://www.congress.gov/bill/116th-congress/house-bill/8635;
S. 4823, 116th Cong. § 2 (2020) at:  https://www.congress.gov/bill/116th-congress/senate-bill/4823

Congressional will. _Gundy v. U.S.,_ 139 S.Ct. 2116, 2138-2141 (J. Gorsuch dissenting). For years, the federal courts have given only perfunctory scrutiny to the intelligible principle requirement, *see* _id.,_ finding an intelligible principle in literally every instance of federal court review of Congressional delegation over at least the last 75 years.

It has become apparent recently that an emerging majority of sitting justices of the U.S. Supreme Court plan to take a fresh look at the Non-delegation Doctrine and intelligible principle rule. _Id._ at 2131; _see also_ *An Empty Attack on the Nondelegation Doctrine,* American Enterprise Institute Op-Ed (Peter J. Wallison, April 22, 2021) at https://www.aei.org/op-eds/an-empty-attack-on-the-nondelegation-doctrine/. Their aim is application of the doctrine and rule with much more rigor than the increasingly perfunctory application federal courts have traditionally given the rule.

Here, in the unlikely event the Court were to find some trace of a Congressional delegation of authority for EPA's Greenhouse Gas Tailpipe Standards rule, the obvious faintness of that trace would strongly suggest that the delegation fails the intelligible principle rule if the rule is applied with any rigor. *Amici* respectfully urge this Court, as the leading U.S. appellate court on administrative law, to rigorously scrutinize any delegation detected

for an intelligible principle to guide EPA's execution of the delegation.  In that event, *Amici* are confident an intelligible principle would be found lacking.

## CONCLUSION

For the foregoing reasons, this Court should grant the petitions of the State and Private petitioners and set aside EPA's *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards,* published in the Federal Register at 86 Fed. Reg. 74,434 (Dec. 30, 2021).

Respectfully Submitted,

  / s / *James K. Vines*

JAMES K. VINES

Fontaine Law Group
1128 Crater Hill Drive
Nashville, Tennessee 37215
(615) 218-8029
jvines1128@gmail.com

NOVEMBER 10, 2022

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD COUNT
## LIMITATIONS

I, James K. Vines, counsel for *amici curiae* Texas Oil & Gas Association, Louisiana Mid-Continent Oil & Gas Association, The Petroleum Alliance of Oklahoma, Texas Independent Producers and Royalty Owners Association, Texas Association of Manufacturers, Texas Royalty Council, American Royalty Council, and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Revised Brief is proportionately spaced, has a typeface of 14 points or more, and contains 5468 words.

*/s/ James K. Vines*
James K. Vines

NOVEMBER 10, 2022

## CERTIFICATE OF SERVICE

I, James K. Vines, counsel for *amici curiae* Texas Oil & Gas Association, Louisiana Mid-Continent Oil & Gas Association, The Petroleum Alliance of Oklahoma, Texas Independent Producers and Royalty Owners Association, Texas Association of Manufacturers, Texas Royalty Council, and American Royalty Council, and a member of the Bar of this Court, certify that, on November 10, 2022, a copy of the attached brief was filed electronically through the CM/ECF system with the Clerk of this Court. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ James K. Vines*
JAMES K. VINES

NOVEMBER 10, 2022