No. 22-1031

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATES OF TEXAS, ALABAMA, ALASKA, ARKANSAS, ARIZONA, INDIANA,
KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA,
OHIO, OKLAHOMA, SOUTH CAROLINA, AND UTAH,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND
MICHAEL S. REGAN, ADMINISTRATOR,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents*.

**BRIEF OF AMICI CURIAE STATE OF WEST VIRGINIA
AND 5 OTHER STATES IN SUPPORT OF PETITIONERS**

PATRICK MORRISEY
  *Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY
GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
lindsay.s.see@wvago.gov

LINDSAY S. SEE
  *Solicitor General*
  *Counsel of Record*

MICHAEL R. WILLIAMS
  *Senior Deputy Solicitor General*

*Counsel for* Amicus Curiae *State of West Virginia*
[additional counsel listed after signature page]

# TABLE OF CONTENTS

Interests of the *Amici Curiae*...................................................................1

Introduction.................................................................................................1

Summary Of The Argument.......................................................................4

Argument.....................................................................................................5

I.    The Final Rule undermines America's energy security and
      independence......................................................................................6

      A.    The Final Rule will make America more energy
            dependent.................................................................................7

            1.    The United States is dependent on foreign
                  countries for battery and motor production for
                  electric vehicles ........................................................7

            2.    Domestic production will not meet the increased
                  demands for batteries and magnets that the
                  Final Rule requires...................................................11

      B.    The Final Rule will undermine American energy security
            as to electricity production...................................................17

            1.    The Final Rule will increase demand and strain on
                  the already vulnerable power grid.........................18

            2.    This increased demand, combined with present
                  administration policies, will destabilize the grid.................20

II.   The Final Rule will force a decrease in renewable fuel
      consumption, frustrating the Renewable Fuel Standards program .....24

Conclusion.................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alon Refin. Krotz Springs, Inc. v. EPA*,
  936 F.3d 628 (D.C. Cir. 2019)..............................................................2

*Am. Petroleum Inst. v. EPA*,
  862 F.3d 50 (D.C. Cir. 2017)...............................................................14

*ATF v. FLRA*,
  464 U.S. 89 (1983)...............................................................................25

*Belmont Mun. Light Dep't v. FERC*,
  38 F.4th 173 (D.C. Cir. 2022) .............................................................18

*Cobell v. Norton*,
  240 F.3d 1081 (D.C. Cir. 2001)............................................................5

*Columbia Falls Aluminum Co. v. EPA.*,
  139 F.3d 914 (D.C. Cir. 1998).............................................................14

*Gen. Motors Corp. v. United States*,
  496 U.S. 530 (1990)...............................................................................1

*Growth Energy v. EPA*,
  5 F.4th 1 (D.C. Cir. 2021) ...................................................................24

*Int'l Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983)...............................................................3

*Manhattan Gen. Equip. Co. v. Comm'r*,
  297 U.S. 129 (1936).............................................................................26

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v.
  State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).....................................................................4, 5, 11

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Nat'l Cable Television Ass'n, Inc. v. FCC,*
    479 F.2d 183 (D.C. Cir. 1973)..................................................5

*Pennsylvania v. ICC,*
    561 F.2d 278 (D.C. Cir. 1977)................................................25

*Safe Extensions, Inc. v. FAA,*
    509 F.3d 593 (D.C. Cir. 2007)...............................................23

*Sinclair Wyo. Ref. Co. v. EPA,*
    887 F.3d 986 (10th Cir. 2017)...........................................24, 25

**Statutes**

5 U.S.C. § 706 ...........................................................................5

10 U.S.C. § 4872 .....................................................................11

42 U.S.C. § 7545 .....................................................................24

42 U.S.C. § 13401 .....................................................................1

42 U.S.C. § 13571 .....................................................................1

42 U.S.C. § 15927 .....................................................................1

42 U.S.C. § 17285 .....................................................................2

Energy Independence and Security Act of 2007,
    Pub. L. No. 110-140, 121 Stat. 1492 ......................................2

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

**Regulations**

Defense Federal Acquisition Regulation Supplement:
Restriction on the Acquisition of Certain Magnets and
Tungsten (DFARS Case 2018-D054), 84 Fed. Reg. 18,156
(Apr. 30, 2019) ..................................................................................11

Final List of Critical Minerals 2018,
86 Fed. Reg. 23,295 (May 18, 2018) ...................................................7

Revised 2023 and Later Model Year Light-Duty Vehicle
Greenhouse Gas Emissions Standard,
86 Fed. Reg. 74,434 (Dec. 30, 2021) ...............................1, 2, 3, 6, 24

**Other Authorities**

Aaron Schwabach, *A Hole in the Bottom of the Sea: Does the
Unclos Part Xi Regulatory Framework for Deep Seabed
Mining Provide Adequate Protection Against Strip-Mining
the Ocean Floor?*, 40 VA. ENV'T L.J. 39 (2022)..................................8

Aleh Cherp & Jessica Jewell, *The Concept of Energy Security:
Beyond the Four As*, 75 ENERGY POL'Y 415 (2014) ....................6, 12

Alex Brown, *Electric Cars Will Challenge State Power Grids*,
PEW CHARITABLE TRS. (Jan. 9, 2020) .............................................20

Alexandra B. Klass, *Evaluating Project Need for Natural Gas
Pipelines in an Age of Climate Change: A Spotlight on FERC
and the Courts*, 39 YALE J. ON REG. 658 (2022)..............................22

Andrew I. Gavil, *Exclusionary Distribution Strategies by
Dominant Firms: Striking A Better Balance*,
72 ANTITRUST L.J. 3 (2004).............................................................12

iv

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

Becky Norton, *Economic Markets and Technological Advancements*, 7 FIU L. REV 29 (2011)........................................6

Bradley Berman, *Battery Experts Provide Deeper Explanations for Chevy Bolt Fires*, AUTOWEEK (Nov. 15, 2021) ........................................17

Caroline Downey, *Biden Vows to Shut Down Coal Plants 'All Across America,'* THE NAT'L REV. (Nov. 5, 2022, 10:12 AM)......................22

*Celebrating Ten Years of the Renewable Fuel Standard*, RENEWABLE FUELS ASS'N (Aug. 6, 2015)........................................26

*Charts: China's Overseas Copper Mining Scramble*, MINING.COM (June 29, 2021, 11:25 AM) ........................................10

Christoph Steitz & Ken Klayman, *CATL planning EV battery production in United States, vetting sites*, REUTERS (May 6, 2022, 5:00 AM) ........................................16

COBALT INSTITUTE, COBALT MARKET REPORT OF 2021 (May 2022)........................................14, 15

David B. Spence, *Regulation and the New Politics of (Energy) Market Entry*, 95 NOTRE DAME L. REV. 327 (2019)........................................6

*Electric Cars Could Break The Grid If Future Drivers Stick To Today's Routines*, NATURE (Sept. 27, 2022) ........................................20

Eli Leland, *So You Want To Build A Battery Factory*, MEDIUM: BATTERIES ARE COMPLICATED (July 16, 2021)........................................17

EPA, REVISED 2023 AND LATER MODEL YEAR LIGHT-DUTY VEHICLE GREENHOUSE GAS EMISSION STANDARDS: RESPONSE TO COMMENTS ........................................11

# TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*EPA Takes Action to Reset and Strengthen the RFS Program*,
  EPA.GOV (June 3, 2022)................................................................26

F. Todd Davidson, et al., *Is America's Power Grid Ready For
  Electric Cars?*, CITYLAB (Dec. 7, 2018) ..........................................19

*FOTW #1217, and December 20, 2021: Thirteen New Electric
  Vehicle Battery Factories Plants Are Planned in the U.S.
  Within the Next Five Years*, U.S. DEP'T
  OF ENERGY (Dec. 20, 2021)............................................................16

Gina S. Warren, *Hotboxing the Polar Bear: The Energy and
  Climate Impacts of Indoor Marijuana Cultivation*, 101 B.U.
  L. REV. 979 (2021)........................................................................18

Hampden Macbeth, *Nuclear Chaos: The Exelon-Phi Merger and
  What It Means for Nuclear Power in the United States and
  the EPA's Carbon Emission Rules,* 28 GEO. ENV'T
  L. REV. 731 (2016)........................................................................22

INTERNATIONAL ENERGY AGENCY, THE ROLE OF CRITICAL
  MINERALS IN CLEAN ENERGY TRANSITIONS 153 (2021).............................10

Isabelle Huber, Commentary, *Indonesia's Nickel Industrial
  Strategy*, CTR. FOR STRATEGIC & INT'L STUDIES (Dec. 8, 2021)................10

Jacqueline Holman, *Cobalt, Lithium to Move Into Deficit by
  2024, 2025*, S&P GLOBAL (Apr. 28, 2021, 2:22 PM) ........................9

Jakob Fieischmann, et al., *Unlocking Growth in Battery Cell
  Manufacturing for Electric Vehicles*,
  MCKINSEY & CO. (Oct. 25, 2021) ...................................................15

Jakob Puckett, *Joe Biden's War On Fossil Fuels*, REAL CLEAR
  ENERGY (July 18, 2022)..................................................................22

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

James Downing, *Federal Funding Will Speed Up Grid
    Modernization, Utility Officials Say*, CQ CQ ROLL CALL
    (Oct. 12, 2022), 2022 WL 6905896.................................................19

Jessica Alcott Xylem, *Electrification and Critical Minerals*,
    AM. SEC. PROJECT (Apr. 7, 2022) ..................................................7

Joshua S. Hill, *EVs May Face Production Delays from 2027 as
    Lithium Mining Lags*, THE DRIVEN (Apr. 16, 2021)......................9

Justin W. Evans, *A New Energy Paradigm for the Twenty-First
    Century: China, Russia, and America's Triangular Security
    Strategy*, 39 IND. L. REV. 627 (2006) ............................................7

Katy Liebel, *International Oil Companies: Largest Carbon
    Emitters Turned Low-Carbon Leaders*,
    59 HOUS. L. REV. 175 (2021)........................................................23

Kirk Siegler & Eric Whitney, *In Idaho, America's First, and
    Only, Cobalt Mine in Decades is Opening*,
    NPR (Oct. 8, 2022, 5:02 AM)...................................................14, 15

Lauren Fricke, *The Long-Term Problem with Electric Vehicle
    Batteries: A Policy Recommendation to Encourage
    Advancement for Scalable Recycling Practices*,
    12 SEATTLE J. TECH., ENV'T & INNOVATION L. 27 (2022)............8

Luis Avelar, *The Road to An EV Future Still Has a Few
    Potholes. Here's How To Fix Them*,
    WORLD ECON. FORUM (Jan. 31, 2022).....................................18, 19

Major Gen. John Wharton, *Why Electric Vehicle Manufacturing
    is a National Security Imperative*,
    INT'L BUS. TIMES (July 10, 2022, 3:38 PM).....................................8

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

Matthew Hutton & Thomas Hutton, *Legal and Regulatory Impediments to Vehicle-to-Grid Aggregation*, 36 WM. & MARY ENV'T L. & POL'Y REV. 337 (2012)......................................18

Michael Burger, *Recovering from the Recovery Narrative: On Glocalism, Green Jobs and Cyborg Civilization*, 46 AKRON L. REV. 909 (2013)............................................................2

Michael D. Miller, *Rethinking Electric Vehicle Incentives*, 29 COLO. NAT. RES., ENERGY & ENV'T L. REV. 373 (2018).........................23

Michael Schuman, *The Electric-Car Lesson That China Is Serving Up For America*, THE ATLANTIC (May 21, 2011) ..........................12

Mitra V. Yazdi, *The Digital Revolution and the Demise of Democracy*, 23 TUL. J. TECH. & INTELL. PROP. 61 (2021) ............................8

Nichola Groom & Tina Bellon, *EV Rollout Will Require Huge Investments In Strained U.S. Power Grids*, REUTERS (Mar. 5, 2021, 7:07 AM) ................................................19

Oliver Milman, *There's Lithium in Them Thar Hills*, THE GUARDIAN (Oct. 18, 2022, 6:00 PM) ........................................15

*The Raw-Materials Challenge: How The Metals And Mining Sector Will Be At The Core Of Enabling The Energy Transition*, MCKINSEY & CO. (Jan. 10, 2022) .................................16

*Renewable Fuel Standard*, RENEWABLE FUELS ASS'N, https://bit.ly/3TWyRxa (last visited Nov. 7, 2022)........................24

S. Rep. No. 109-78 (2005) ...............................................................2, 26

Sam Kalen, *Mining Our Future Critical Minerals: Does Darkness Await Us?*, 51 ENV'T L. REP. 11,006 (2021)................................10

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

Sean Carberry, *United States Seeking Alternatives to Chinese Cobalt*, NAT'L DEF. MAG. (Aug. 3, 2022) ...........................................9

Steve Peoples, *In Intimate Moment, Biden Vows To 'End Fossil Fuel'*, AP NEWS (Sept. 6, 2019) ...........................................................22

*The Twin Challenges of Increased Electrification*, ENERGY FAIRNESS (Oct. 28, 2011)...................................................18

U.S. DEP'T OF COM., A FEDERAL STRATEGY TO ENSURE SECURE AND RELIABLE SUPPLIES OF CRITICAL MINERALS (2019)............................7

U.S. DEP'T OF COM., BUREAU OF INDUS. AND SEC., OFF. OF TECH. EVALUATION, THE EFFECT OF IMPORTS OF NEODYMIUM-IRON-BORON (NdFeB) PERMANENT MAGNETS ON THE NATIONAL SECURITY (2022) ...................................10, 11, 16

U.S. DRIVE, GRID INTEGRATION TECH TEAM & INTEGRATED SYSTEMS ANALYSIS TECH TEAM, SUMMARY REPORT ON EVS AT SCALE AND THE U.S. ELECTRIC POWER SYSTEM (2019)..................21, 22

*U.S. EPA Expected to Propose Electric Cars be Eligible for Renewable Fuel Credits*, REUTERS (Oct. 5, 2022, 2:50 PM) .......................25

*What is Vehicle-to-Grid Technology and How Does It Work?*, EVCONNECT (Dec. 20, 2021) ...........................................................23

THE WHITE HOUSE, BUILDING RESILIENT SUPPLY CHAINS, REVITALIZING AMERICAN MANUFACTURING, AND FOSTERING BROAD-BASED GROWTH: 100-DAY REVIEWS UNDER EXECUTIVE ORDER 14017 (2021) (June 2021) ............................8, 9

WHITE HOUSE, INTERIM NATIONAL SECURITY STRATEGIC  GUIDANCE (2021) .......................................................12

ix

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

Will Englund, *Plug-In Cars Are The Future. The Grid Isn't Ready*, WASH. POST. (Oct. 13, 2021) ...............................................................19

Zachary Robock, *Economic Solutions to Nuclear Energy's Financial Challenges*
5 MICH. J. ENV'T & ADMIN. L. 501 (2016) ......................................................22

## INTERESTS OF *AMICI CURIAE*

The *amici* States of West Virginia, Kansas, South Dakota, Tennessee, Virginia, and Wyoming support responsible environmental regulation. After all, "the States and the Federal Government [are] partners in the struggle against air pollution." *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). But an overbroad, top-down regulatory scheme that tries to force people into electric vehicles while disregarding that mandate's serious consequences does no one any good. And that is what the Court has before it with EPA's 2023 light-duty vehicle emissions rule. *See* Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standard, 86 Fed. Reg. 74,434 (Dec. 30, 2021) ("Final Rule"). Petitioners have already explained the Final Rule's many failings. In this brief, the *amici* States further explain how the agency arbitrarily and capriciously ignored specific harms that federal statutes required EPA to consider and that directly threaten the States' security and stability.

## INTRODUCTION

Congress has declared over and over that energy security and independence are central pieces of our national policy. Congress promotes "energy security … that result[s] from the increased use of coal." 42 U.S.C. § 13571(1). It endeavors to "strengthen national energy security by reducing dependence on imported oil." *Id.* § 13401(1). It encourages the development of "oil shale, tar sands," and similar domestic resources to reduce America's "growing dependence" on "unstable sources of foreign oil." *Id.* § 15927(b)(1).

1

And it endorses fuels, like ethanol, that "reduce the dependence of the United States on energy imported from volatile regions of the world that are politically unstable" while "safeguard[ing] [our] economy and security." *Id.* § 17285(4).

The entire Energy Independence and Security Act of 2007, in fact, was designed to "move the United States toward greater energy independence and security." Pub. L. No. 110-140, 121 Stat. 1492. And that law further strengthened the existing Renewable Fuels Program, which was also aimed at "improving the nation's 'energy independence and security.'" *Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 666 (D.C. Cir. 2019); *see also*, *e.g.*, S. Rep. No. 109-78, at 1 (2005) (explaining that a predecessor statute addressed "profound concerns in the Congress over the Nation's energy security"); Michael Burger, *Recovering from the Recovery Narrative: On Glocalism, Green Jobs and Cyborg Civilization*, 46 AKRON L. REV. 909, 919 (2013) (cataloguing "[s]everal federal statutes" that "inscribe the nation's pursuit of energy security [and] energy independence … into law"). So in many ways, Congress has made it unmistakably clear that actions affecting our nation's energy policy must account for energy security and independence.

Despite all that, EPA does only a little hand-waving about these key issues in the Final Rule. The rule forces auto manufacturers to produce more electric vehicles based on fear of gasoline's environmental consequences. 86 Fed. Reg. at 74,445, 74,459, 74,4485. But EPA never engaged with one of the obvious implications of its choice: Forcing increased electric-vehicle

manufacturing, *see* Private Pets.' Br. 14-16, will make the United States more beholden to foreign interests, who control both the rare-earth materials and the electrical components that electric vehicles require.  At the same time, the Final Rule actively undermines the production of renewable liquid fuels, like ethanol, further weakening America's energy independence.  And it generates still other energy-security threats by overburdening an electrical grid that other administration policies have already taxed.

Rather than conduct a full-bodied analysis of the Final Rule's energy-security-related implications, EPA concluded that the rule would advance energy security and independence by focusing on a single item: an assumed reduction in petroleum imports.  86 Fed. Reg. at 74,507.  EPA predicted billions in benefits would follow from this supposed fact.  *Id.* at 74,498.  Yet as the State Petitioners explain, *see* State Pets.' Br. 23-24, the agency rejected out of hand all other security-and-independence-related considerations that commenters raised, including those that Congress has made clear must count.  As a result, the States will find themselves more vulnerable to the whims of foreign powers and more susceptible to energy reliability crises across the board.

On these issues, the Final Rule involves every tell of unreasoned decisionmaking.  EPA needed to give "thoughtful consideration" to the "comments received[] and formulate[] a judgment which rationally accommodates the facts capable of ascertainment and the policies slated for effectuation."  *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d

795, 822 (D.C. Cir. 1983).  It did not.  Because EPA "failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), the Court should vacate the Final Rule.

## SUMMARY OF THE ARGUMENT

**I.**     The Final Rule undermines America's energy independence and security.  If the Final Rule goes into effect—and EPA's "electrify now" mandate takes hold—then the United States will become irresponsibly tied to politically fraught nations that largely control the mining, processing, and manufacturing operations tied to electric vehicle batteries and motors.  EPA seemed to recognize the dependence that follows from increased vehicle electrification, but speculated that more domestic production will come online to fix the problem.  Yet no evidence suggests that stateside solutions will be available fast enough to close the gap.  Here and now, data shows that the United States will be unable anytime soon to mine and process enough minerals or manufacture enough energy components to meet the demand the Final Rule creates.  And even if it could, the Final Rule will overwhelm a power grid that the present administration is simultaneously weakening through aggressive baseload production regulation.  EPA did not adequately consider any of these concerns, and the record does not support its decision to set them aside.

**II.**    The Final Rule also disregards the Renewable Fuel Program's express mandate.  Under that program, Congress tasked EPA with working

to increase domestic production of renewable fuels. But by mandating electric vehicles, the Final Rule will curtail the United States' liquid fuel consumption. Decreased consumption will naturally decrease fuel production, too. So the Final Rule will directly frustrate the Renewable Fuel Program. Even so, EPA refused to address that problem, wrongly declaring it outside the scope of its rulemaking. Again, reasoned decisionmaking requires more.

## ARGUMENT

The Court's task is a familiar one. Under the Administrative Procedure Act, reviewing courts must set aside any final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem" or "when its explanation … runs counter to the evidence before [it]." *State Farm*, 463 U.S. at 43. Although the Court shows the agency deference, it does not "turn a blind eye when government officials fail to discharge their duties." *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001). For instance, the APA "does not exclude review of the underlying facts and assumptions upon which the agency acted." *Nat'l Cable Television Ass'n, Inc. v. FCC*, 479 F.2d 183, 193 n.27 (D.C. Cir. 1973).

This standard may be commonplace, but the Final Rule's analysis is extraordinary. In one part of the Final Rule, EPA touts a supposed billion-dollar energy-security benefit while shutting its eyes to substantial evidence that this "benefit" is an enormous cost in disguise: The rule ties Americans' fortunes to unsteady nation-states and irresponsibly piles on to an energy grid

already under stress.  In another part of the rule, EPA ignores the blatant conflict between Congress's desire for more renewable liquid fuel production and the Final Rule's decrease in that production.  That conflict sends the Final Rule headlong into the Energy Independence and Security Act.  The Court should not endorse this dual-headed threat to America's energy security.

## I.    The Final Rule undermines energy security and independence.

Energy security—that is, "the assurance of reliable supplies of energy, the ability to protect those supplies, and the ability to deliver enough energy to meet operational needs"—is "critical for national security."  Becky Norton Dunlop, *Economic Markets and Technological Advancements*, 7 FIU L. REV. 29, 35 (2011).  By securing the "low vulnerability" of "vital energy systems," Aleh Cherp & Jessica Jewell, *The Concept of Energy Security: Beyond the Four As*, 75 ENERGY POL'Y 415, 418 (2014), America can protect both our nation's continued safety and its future economic growth.  Reasoned environmental policy, then, must account for energy security.  *See* David B. Spence, *Regulation and the New Politics of (Energy) Market Entry*, 95 NOTRE DAME L. REV. 327, 335 (2019) (explaining how American energy policy has balanced affordability, reliability, and environmental performance).

EPA recognized as much in the Final Rule, characterizing "energy security impacts" as a "[k]ey economic input" to its risk-benefit analysis.  86 Fed. Reg. at 74,443.  But then it botched its approach to the issue, finding that the Final Rule was "beneficial from an energy security perspective" because by  purportedly  reducing  gasoline  consumption  it  would  "avoid[] …

macroeconomic disruption." *Id.* at 74,498.  By ignoring the other aspects of this "multi-faceted" issue, EPA issued an arbitrary and capricious rule.  *See* Justin W. Evans, *A New Energy Paradigm for the Twenty-First Century: China, Russia, and America's Triangular Security Strategy*, 39 IND. L. REV. 627, 627 (2006).  It unreasonably overlooked at least two important energy-security consequences: increased dependence on foreign sources to power electric vehicles and increased vulnerability of our country's power grids.

### A.     The Final Rule will make America more energy dependent.

Electric vehicles require minerals and magnets.  By forcing a quick transition to electric vehicles when domestic sources are unable to meet even current demand for those elements, the Final Rule will make automakers unreasonably dependent on foreign-controlled supply.

### 1.     The United States is dependent on foreign countries for electric vehicles' battery and motor production.

Batteries for electric vehicles contain minerals like lithium, cobalt, copper, and nickel, as well as rare earths like neodymium.  Jessica Alcott Xylem, *Electrification and Critical Minerals*, AM. SEC. PROJECT (Apr. 7, 2022), https://bit.ly/3FXkbu3.  The Final Rule creates greater need for these minerals through forced electric-vehicle production.  In doing so, it generates substantial energy-security risks.

Take cobalt, for example.  The Department of the Interior has designated it a critical mineral, and the United States is import-reliant to supply it.  Final List of Critical Minerals 2018, 86 Fed. Reg. 23,295 (May 18,

7

2018); U.S. Dep't of Com., A Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals (2019), https://bit.ly/3Uz0igR. Many of the world's cobalt reserves are in the Democratic Republic of the Congo. *See* The White House, Building Resilient Supply Chains, Revitalizing American Manufacturing, and Fostering Broad-Based Growth: 100-Day Reviews under Executive Order 14017, https://bit.ly/WH100day (June 2021). Unfortunately, the DRC has a "history of political instability and poor infrastructure." Aaron Schwabach, *A Hole in the Bottom of the Sea: Does the Unclos Part Xi Regulatory Framework for Deep Seabed Mining Provide Adequate Protection Against Strip-Mining the Ocean Floor?*, 40 Va. Env't L.J. 39, 47 (2022). Even that description might be an understatement—the DRC's cobalt mining "is tied to armed conflict, illegal mining, human rights abuses, and harmful environmental practices." Lauren Fricke, *The Long-Term Problem with Electric Vehicle Batteries: A Policy Recommendation to Encourage Advancement for Scalable Recycling Practices*, 12 Seattle J. Tech., Env't & Innovation L. 27, 36 (2022).

Worse yet, China dominates the cobalt industry, "with 84 percent of the DRC's 2019 cobalt exports" destined there. *Building Resilient Supply Chains*, *supra*, at 104. This dominance allows China to control the global supply of battery-ready cobalt. Major Gen. John Wharton, *Why Electric Vehicle Manufacturing is a National Security Imperative*, Int'l Bus. Times (July 10, 2022, 3:38 PM), https://bit.ly/3fIM0vr. Armed "with such leverage, China can begin to exert the same kind of global influence that the United

States and its Middle Eastern allies have sought to impose as a result of their domination in the oil and gas industries." Mitra V. Yazdi, *The Digital Revolution and the Demise of Democracy*, 23 TUL. J. TECH. & INTELL. PROP. 61, 77 (2021). China's control of the global cobalt supply thus gives it the "ability to deny access to cobalt," which risks "'creat[ing] a national security vulnerability.'" Sean Carberry, *United States Seeking Alternatives to Chinese Cobalt*, NAT'L DEF. MAG. (Aug. 3, 2022), https://bit.ly/3Ug8OSo. And with cobalt supply deficits projected as soon as 2024, this vulnerability seems well on its way. Jacqueline Holman, *Cobalt, Lithium to Move Into Deficit by 2024, 2025*, S&P GLOBAL (Apr. 28, 2021, 2:22 PM), http://bit.ly/3zjCsO8.

These security problems are no secret. Recently, the White House graded cobalt "the lowest 'quality' supply chain score" because of the "alleged mining conditions in the Democratic Republic of Congo" and "cobalt refining in China." *Building Resilient Supply Chains*, *supra*, at 96. Yet the Final Rule tells American manufacturers they must entangle themselves even deeper in this political and economic mess.

Cobalt is just one example of how increasing the need for the minerals that make up electric-vehicle batteries threatens major energy-security concerns. Lithium is another; one study predicts a "serious lithium supply deficit" starting in 2027. Joshua S. Hill, *EVs May Face Production Delays from 2027 as Lithium Mining Lags*, THE DRIVEN (Apr. 16, 2021), https://perma.cc/5PXS-NUSG. Nickel is a problem, too—only one nickel mine operates domestically, and an Indonesian government that is often hostile to

foreign involvement in its nickel industry controls the majority of the world's supply. *See* Isabelle Huber, Commentary, *Indonesia's Nickel Industrial Strategy*, CTR. FOR STRATEGIC & INT'L STUDIES (Dec. 8, 2021), http://bit.ly/3FjwDUF (discussing Indonesia's nickel ore export ban). Rare-earth elements present another headache, as China "produces almost all of the world's rare earths used in EV batteries." Sam Kalen, *Mining Our Future Critical Minerals: Does Darkness Await Us?*, 51 ENV'T L. REP. 11,006, 11,007 (2021); *accord* INTERNATIONAL ENERGY AGENCY, THE ROLE OF CRITICAL MINERALS IN CLEAN ENERGY TRANSITIONS 153 (2021), https://bit.ly/3FkuWGE; *see also* Private Pets.' Br. 30-31. Even humble copper poses problems: China has been tightening its "stranglehold on the electric vehicle supply chain" by snatching up copper assets across the globe. *Charts: China's Overseas Copper Mining Scramble*, MINING.COM (June 29, 2021, 11:25 AM), http://bit.ly/3NdATqS.

Nor are batteries the only component of electric vehicles with latent national security risks flowing from the Final Rule's forced demand increase. Neodymium-Iron-Boron (NdFeB) magnet motors are used in "up to 95 percent of electric vehicles." U.S. DEP'T OF COM., BUREAU OF INDUS. AND SEC., OFF. OF TECH. EVALUATION, THE EFFECT OF IMPORTS OF NEODYMIUM-IRON-BORON (NDFEB) PERMANENT MAGNETS ON THE NATIONAL SECURITY 39 (2022), https://bit.ly/NdFeB. But the United States is "[100] percent dependent on imports of sintered NdFeB magnets and is highly dependent on imports of bonded NdFeB magnets." *Id.* at 96. And China is—again—the

10

leading importer here, providing the United States with 75 percent of its sintered NdFeB magnets. *Id.* So here too, the Final Rule necessarily increases the United States' dependence on China, which in turn threatens national security. *Id.* at 98. In fact, Congress has also recognized the threat of foreign NdFeB magnets to national security by statutorily barring our military from purchasing these very magnets from China and certain other nations. *See* 10 U.S.C. § 4872; 84 Fed. Reg. 18,156 (Apr. 30, 2019). But the Final Rule ignores this known national-security risk and instead compels our country's automotive fleet to do the opposite: import the magnets from China. *See also* State Pets.' Br. 3 (noting that Final Rule forces increasing dependency on China).

### 2. Domestic production cannot meet the increased demands for batteries and magnets that the Final Rule requires.

Several commenters urged EPA to take seriously the energy-security concerns presented by the Final Rule's increased, forced reliance on foreign-sourced inputs like these. *See* EPA, REVISED 2023 AND LATER MODEL YEAR LIGHT-DUTY VEHICLE GREENHOUSE GAS EMISSION STANDARDS: RESPONSE TO COMMENTS, 12-11 to -22, 19-1 to -16, https://bit.ly/3MRy6mK ("EPA Resp."). EPA's two answers are facially contradictory and inconsistent with the record. *State Farm*, 463 U.S. at 43.

**a.** EPA first declared that "energy security" considerations were "not intended to include security risks associated with the manufacture and

11

importation of different types of vehicles and vehicle components." EPA Resp. at 19-18. EPA focused instead on only price, *id.*, and (apparently) thought concerns over limited supply and China's market control had nothing to do with it. Both parts of EPA's logic are wrong.

As to the first, Congress has consistently said that energy independence is a central part of energy security. *See supra* pgs. 1-2. And that understanding reflects a long-known prerequisite for energy security: availability. *See* Cherp, *supra*, at 417. It is impossible to assure availability if only hostile or unstable foreign actors control the flow of key energy inputs.

Similar reasoning shows the flaw in the second part of EPA's rationale. If a single party controls a commodity's sale, that party is a monopolist. And "[s]tandard case law and treatises assume that the profit-maximizing incentives of a monopolist … will lead it to restrict output and raise price." Andrew I. Gavil, *Exclusionary Distribution Strategies by Dominant Firms: Striking A Better Balance*, 72 ANTITRUST L.J. 3, 32 (2004). Add in the political element—that is, that the foreign power controlling critical resources is often hostile to American interests and might impose higher prices for *non*-economic reasons, too—and the price implications are laid plain. *See* WHITE HOUSE, INTERIM NATIONAL SECURITY STRATEGIC GUIDANCE 7-8 (2021), https://bit.ly/3DOTgxI (describing "new threats," including "China, in particular, [which] has rapidly become more assertive"); *id.* at 20 (discussing how the United States must "out-compete a more assertive and authoritarian China"); *see also* Michael Schuman, *The Electric-Car Lesson That China Is*

12

*Serving Up For America*, THE ATLANTIC (May 21, 2011), http://bit.ly/3fcPmqj ("The contest over electric cars is … a proxy war between the West and China, between their economic models and political ideologies.").

And if EPA is trying to say that "components" do not qualify as "energy" because they are not "consumed," EPA Resp. at 12-78, that idea fails as well. Batteries and magnets power a vehicle in the same essential way gasoline does—they supply the energy that makes the car go.  Rate of consumption might affect the volume of particular inputs that a stable market requires, but each input calls for a secure supply chain just the same.  In other words, EPA seems to willfully blind itself to the nuances and challenges that come with alternative energy even while insisting that automakers race to embrace that form of energy right now.

**b.**    Tellingly, just after dismissing these "security risks" as irrelevant, EPA acknowledged that the "security implications of an emerging electric-vehicle global supply chain is an important issue" after all.  EPA Resp. at 19-18 to -19.  Then it dismissed this "important issue" on hopes that domestic production would help resolve the problem: It imagined that plans for future government and automaker investments would bridge the supply gap, *id.* at 12-77, 19-19 to -20, and it promised to "continue the study" of the issue, *id.* at 12-78.  Not good enough.

Many of these "plans" still rest on foreign sources.  *See*, *e.g.*, *id.* at 19-20 n.111 (describing lithium supply contract out of China).  But anyway, the quiet admission in statements like these is that domestic production today cannot

13

keep up. None of EPA's aspirational initiatives speak to the market as it exists now, let alone the period the Final Rule covers. *Cf. Columbia Falls Aluminum Co. v. EPA.*, 139 F.3d 914, 923 (D.C. Cir. 1998) ("An agency's use of a model is arbitrary if that model bears no rational relationship to the reality it purports to represent." (cleaned up)). "EPA must offer more than timorous assertions"—it must summon *evidence* from the record. *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 63 (D.C. Cir. 2017).

Here is the reality: domestic production of both batteries and NdFeB magnets will not meet the increased demand for electric vehicles from the Final Rule. Even if domestic sourcing and production ticks up, they cannot be jumpstarted fast enough to meet the Final Rule's stringent and immediate demands.

Cobalt provides a useful example again. Cobalt mining has not existed in the United States for nearly 30 years. Kirk Siegler & Eric Whitney, *In Idaho, America's First, and Only, Cobalt Mine in Decades is Opening*, NPR (Oct. 8, 2022, 5:02 AM), http://bit.ly/3W8yIbW. Just weeks ago, an Australian-based company opened one cobalt mine in Idaho near the site of a defunct mine that had shut down in 1982. *Id.* Yet even once the mine becomes fully operational, it is "expected to meet only about 10 [percent] of overall U.S. demand." *Id.* This limited production is a thin reed to relieve security risks *now*, much less as demand continues to grow. In 2021, global cobalt demand expanded by 22 percent "largely due to the rapid growth of the lithium-ion battery market and strong sales of electric vehicles." COBALT INSTITUTE,

COBALT MARKET REPORT OF 2021 (May 2022), https://bit.ly/cobalt2021. Demand is predicted to keep rising, with electric vehicles expected to "account for half of the cobalt demand" by 2026. *Id.* And even if abundant cobalt could be mined domestically to meet this need, the United States would still have to rely on foreign countries for refining. Cobalt extracted from the Idaho mine will be shipped to a refinery in Brazil to be processed. *See* Siegler & Whitney, *supra.* With the Idaho project expected to have a seven-year run, building a domestic refinery would be too costly. *Id.*

Once again, facts like these are not unique to cobalt. The United States also has just one lithium mine, for example. Even "doubling [its] output will make a relatively small dent in the amount of lithium required." Oliver Milman, *There's Lithium in Them Thar Hills*, THE GUARDIAN (Oct. 18, 2022, 6:00 PM), http://bit.ly/3SI8iuN.

Next, even if the United States could immediately build up capacity to mine and refine all the required minerals to meet projected demand, it would still have to figure out how to make batteries from them. True, U.S. factories have manufactured batteries for several years—but here too, the numbers are not enough. As of 2020, domestic factories manufactured 56 gigawatt hours annually, just 9 percent of the global supply. Jakob Fieischmann, et al., *Unlocking Growth in Battery Cell Manufacturing for Electric Vehicles*, MCKINSEY & CO. (Oct. 25, 2021), https://mck.co/3tbFd0x. Domestic production is estimated to increase to 289 GWh by 2025, but even that is just 13 percent of the anticipated global need. *Id.* Nine of the thirteen plants set

to be built in the United States either do not have an estimated operation date or will open in 2024 or later. *FOTW #1217, and December 20, 2021: Thirteen New Electric Vehicle Battery Plants Are Planned in the U.S. Within the Next Five Years*, U.S. DEP'T OF ENERGY (Dec. 20, 2021), https://bit.ly/3hpwF3e. With the Final Rule's emission standards becoming more and more stringent over only a four-year period to 2026, some of these late-opening factories will not be operational by the time the standards peak. And not even all U.S.-based manufacturing options will help reduce foreign dependence; Contemporary Amperex Technology Co., a Chinese company and the world's largest battery manufacturer, is vetting sites in the United States to open a plant. Christoph Steitz & Ken Klayman, *CATL planning EV battery production in United States, vetting sites*, REUTERS (May 6, 2022, 5:00 AM), https://reut.rs/3TfJn1O.

Don't forget magnets, either, as domestic sources also cannot meet their production demand. No one in the United States produces sintered NdFeB magnets. *The Effect of Imports*, *supra*, at 96. As the market for electric vehicles grows, the United States' demand for NdFeB magnets will increase from around 16,000 tons in 2020 to around 37,000 tons in 2030. *Id.* at 95. Meanwhile, there are no firm plans to begin manufacturing them here. *Id.* at 96. Even if more of these magnets were produced and then consumed domestically, the United States would still need to import at least 49 percent of its NdFeB magnets from China. *Id.* at 96-97.

16

Time is also not on EPA's side. "[M]etals and mining is a long lead-time, highly capital-intensive sector." *The Raw-Materials Challenge: How The Metals And Mining Sector Will Be At The Core Of Enabling The Energy Transition*, MCKINSEY & CO. (Jan. 10, 2022), http://bit.ly/3SAUMcd. Building battery factories takes years, too. *See* Eli Leland, *So You Want To Build A Battery Factory*, MEDIUM: BATTERIES ARE COMPLICATED (July 16, 2021), http://bit.ly/3TVjftU. And while auto manufacturers are savvy sourcers, sourcing takes time under even the best supply conditions. Automakers subject their components to strict specifications and demanding performance standards. That deliberative process is by design, as production mistakes in electric vehicles—all vehicles, really—can cost lives. *See* Bradley Berman, *Battery Experts Provide Deeper Explanations for Chevy Bolt Fires*, AUTOWEEK (Nov. 15, 2021), http://bit.ly/3NbPi6O (describing recall of 141,000 electric vehicles following 16 reported fires).

So domestic production is not the panacea the Final Rule imagines. By trying on another variation of "nothing to see here," EPA again arbitrarily ignored the rule's serious energy security and dependence defects.

**B.     The Final Rule will undermine American energy security as to electricity production.**

Energy to power our vehicles is not the only problem. EPA also unreasonably ignored the Final Rule's threats to our nation's electricity grids. *See also* State Pets.' Br. 18-20.

### 1. The Final Rule will increase demand and strain on the already vulnerable power grids.

No one can dispute that the increased electric-vehicle use the Final Rule compels will affect our nation's electricity grids. And make no mistake: that effect is a bad one.

As one expert explained, "[p]ower grids are already strained as we deal with a greater [renewable energy] share and the challenge of more intermittent energy supply." Luis Avelar, *The Road to An EV Future Still Has a Few Potholes. Here's How To Fix Them*, WORLD ECON. FORUM (Jan. 31, 2022), http://bit.ly/3gEVgRj. Indeed, this Court recognized earlier in the year that winter weather alone will likely bring "fuel energy security risks" from "stress" to the Northeast region's "electricity grid." *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 177 (D.C. Cir. 2022). Energy crises in California and Texas have already landed above the fold in recent years. *See The Twin Challenges of Increased Electrification*, ENERGY FAIRNESS (Oct. 28, 2011), http://bit.ly/3FmtxPM. In short, our grids are "overloaded and running on an antiquated delivery system established several decades ago." Gina S. Warren, *Hotboxing the Polar Bear: The Energy and Climate Impacts of Indoor Marijuana Cultivation*, 101 B.U. L. REV. 979, 982 (2021); *see also* Matthew Hutton & Thomas Hutton*, Legal and Regulatory Impediments to Vehicle-to-Grid Aggregation,* 36 WM. & MARY ENV'T L. & POL'Y REV. 337, 338 (2012) ("The electrical grid in the United States faces formidable and

interrelated challenges, and the challenges are expected to intensify in the coming years.").

"Increased adoption" of electric vehicles piles on to all this by "add[ing] further electricity load." Avelar, *supra*. Electric-vehicle use in just Texas is expected to add "about 17,000 megawatts of demand to the state's grid," over the next few years, "which is nearly a quarter of its peak demand." James Downing, *Federal Funding Will Speed Up Grid Modernization, Utility Officials Say*, CQ ROLL CALL (Oct. 12, 2022), 2022 WL 6905896. Texas is not alone: California and other States will face similar energy strains from increased electric-vehicle market penetration. *See* F. Todd Davidson, et al., *Is America's Power Grid Ready For Electric Cars?*, CITYLAB (Dec. 7, 2018), https://perma.cc/N3BZ-F9K4. And to account for already-expected demand jumps (setting aside for now the Final Rule's even bigger push toward electric vehicles), Texas, California, and the rest of the country would need to invest "as much as $125 billion in the grid to allow it to handle electric vehicles." Will Englund, *Plug-In Cars Are The Future. The Grid Isn't Ready*, WASH. POST. (Oct. 13, 2021), http://bit.ly/3SEDPhk. But there is no sign that level of spending is coming any time soon. So "[t]he electrification of the transportation sector will," to put it mildly, "catch most utilities a little bit off guard." Nichola Groom & Tina Bellon, *EV Rollout Will Require Huge Investments In Strained U.S. Power Grids*, REUTERS (Mar. 5, 2021, 7:07 AM), http://bit.ly/3szNQ4x.

Nor are increased load levels the only engineering challenges the Final Rule's fondness for electrification compounds.    Distribution is another. Because electric vehicles charge from the low-voltage distribution network, the electricity to power them must flow through hundreds of miles of transmission and distribution lines and several substations.  Costly upgrades would thus be needed.  Systems could also break down as new electric-vehicle drivers continue to place peak demand at the same hours current drivers do— right when they get home from work.  *See* Alex Brown, *Electric Cars Will Challenge State Power Grids*, PEW CHARITABLE TRS. (Jan. 9, 2020), http://bit.ly/3sFjn53; *see also Electric Cars Could Break The Grid If Future Drivers Stick To Today's Routines*, NATURE (Sept. 27, 2022), https://bit.ly/3szPaEx.

In the end, the increased electric-vehicle use the Final Rule prescribes leaves our national energy grids less reliable—and as a result our nation less energy secure.

> ## 2. The Final Rule's increased demand, combined with present administration policies, will destabilize the grid.

EPA was forced to concede that "increased penetration of [electric vehicle]s would lead to increased electricity demand."  EPA Resp. at 12-83. Even so, it determined that increase was no cause for concern because of one Department of Energy study projecting sufficient capacity, a belief that car owners would charge during off-peak times, and speculation that new "vehicle-

to-grid" technology would ease the problem.  *Id.*  The record supports none of that.

To start, the Department of Energy report does not carry the weight EPA gives it.  *See* State Pets.' Br. 20 (discussing report).  Put aside for a moment whether EPA reasonably relied on this single report in the face of substantial evidence to the contrary.  Even assuming it did, the report concludes that the gird *should* be able to sustain increased demand because "historical growth rates" imply that supply would increase in line with demand.  U.S. DRIVE, GRID INTEGRATION TECH TEAM & INTEGRATED SYSTEMS ANALYSIS TECH TEAM, SUMMARY REPORT ON EVs AT SCALE AND THE U.S. ELECTRIC POWER SYSTEM, at v (2019), https://bit.ly/3D5bieY.  The report explains that it "offers an illustrative context showing that there have been sustained periods of time when the grid accommodated more demand than the expected additional electricity consumption associated with light-duty [electric-vehicle] market growth scenarios."  *Id.* at 11.  In other words, "We've done it before, so we can do it again."  But the conclusion doesn't necessarily follow—the United States upped its warplane production 100-fold in World War II, but that "illustrative context" is no guarantee we could do the same thing today.  All the more so when, as the report itself notes, energy production growth over the last decade has been insubstantial—under "5 TWh added [to the grid] each year."  *See id.* at 3.

EPA's conclusion also ignores a sharp truth: Present administration energy policy makes it more likely that energy production will fall over the

21

coming years, not rise.  Even EPA's preferred report warned that "non-technical factors such as policy, regulatory framework, and economic constraints may have changed over the period corresponding to the historical data presented [in the report] and may affect future energy generation and generation capacity expansion."  U.S. DRIVE, *supra*, at v.  That caveat proved prescient.  Acting on an earlier promise to "end fossil fuel," Steve Peoples, *In Intimate Moment, Biden Vows To 'End Fossil Fuel'*, AP NEWS (Sept. 6, 2019), http://bit.ly/3sx9YN8, President Biden has sought to smother conventional fuel production through a variety of regulatory and executive actions, *see* Jakob Puckett, *Joe Biden's War On Fossil Fuels*, REAL CLEAR ENERGY (July 18, 2022), http://bit.ly/3TZCMcD.  In fact, his administration aims to generate "all electricity from carbon-free sources" in just over a decade, Alexandra B. Klass, *Evaluating Project Need for Natural Gas Pipelines in an Age of Climate Change: A Spotlight on FERC and the Courts*, 39 YALE J. ON REG. 658, 674 (2022), so Biden intends to "shut[] down [coal] plants all across America," Caroline Downey, *Biden Vows to Shut Down Coal Plants 'All Across America,'* THE NAT'L REV. (Nov. 5, 2022, 10:12 AM), http://bit.ly/3hvjoGo.

These policies have tangible consequences for grid reliability and security.  Fossil fuels provide the baseload energy that keeps our grids online. *See* Zachary Robock, *Economic Solutions to Nuclear Energy's Financial Challenges*, 5 MICH. J. ENV'T & ADMIN. L. 501, 504 (2016).  "[M]ost new renewable sources are intermittent and are not suitable for generating

baseload power," Hampden Macbeth, *Nuclear Chaos: The Exelon-Phi Merger and What It Means for Nuclear Power in the United States and the EPA's Carbon Emission Rules*, 28 GEO. ENV'T L. REV. 731, 737 (2016), and those that might be are not slotting in fast enough to fill the federally created power gap from fossil-fuel elimination, *see*, *e.g.*, Katy Liebel, *International Oil Companies: Largest Carbon Emitters Turned Low-Carbon Leaders*, 59 HOUS. L. REV. 175, 178 (2021).   So the energy-production growth that EPA anticipates powering electric vehicles is a pipedream.   Under the policies EPA ignores, our nation will be lucky to keep pace with present demand.

As for EPA's other assumptions—that off-peak charging and vehicle-to-grid technology will ease expected grid strain—EPA did not provide *any* evidence to justify those assumptions.   An agency acts arbitrarily when it relies on a "fact" but "provide[s] absolutely no evidence to back it up."   *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 605 (D.C. Cir. 2007).   Worse still when the facts that *are* known undermine the agency's belief.   Here for instance, off-peak charging relies on the same "baseload fossil fuels" that the President is targeting for elimination.   Michael D. Miller, *Rethinking Electric Vehicle Incentives*, 29 COLO. NAT. RES., ENERGY & ENV'T L. REV. 373, 395 n.141 (2018).   And "there's a long way to go before we have a reliable bidirectional [vehicle-to-grid] charging infrastructure in place."   *What is Vehicle-to-Grid Technology and How Does It Work?*, EVCONNECT (Dec. 20, 2021), http://bit.ly/3gKFSmA.

All together, the Final Rule undermines our nation's energy security by destabilizing power grids already facing substantial infrastructure challenges. EPA acted unreasonably in disregarding that critical weakness.

## II. The Final Rule will force a decrease in renewable fuel consumption, frustrating the Renewable Fuel Standards program.

"In the Energy Policy Act of 2005, Congress amended the [Clean Air Act] to encourage the use of renewable fuels." *Sinclair Wyo. Ref. Co. v. EPA*, 887 F.3d 986, 988 (10th Cir. 2017); *see* 42 U.S.C. § 7545(o), *as amended by id.* § 17001, *et seq.* In the Renewable Fuel Standards program that act created, Congress sought to implement a "market forcing policy" that "requir[es] upstream market participants" to "introduce increasing volumes of renewable fuel in the transportation fuel supply." *Growth Energy v. EPA*, 5 F.4th 1, 33 (D.C. Cir. 2021). That increased supply in turn "creates demand pressure to increase consumption of renewable fuel." *Id.* (cleaned up). The program has been a success: It has reduced air pollution, decreased oil imports, and created jobs. *Renewable Fuel Standard*, RENEWABLE FUELS ASS'N, https://bit.ly/3TWyRxa (last visited Nov. 7, 2022).

Commenters correctly noted, however, that the Final Rule would "promote the substantial or exclusive use of a technology that will frustrate" the Renewable Fuel Standard's production-volume goals. EPA Resp. at 26-155 to -156. The reasoning is not hard to follow. EPA predicts that the Final Rule will "reduce U.S. gasoline consumption by more than 360,000 million gallons through 2050"—a 15 percent reduction. 86 Fed. Reg. at 74,503. But

24

decrease in total gasoline consumption also decreases renewable fuel production and consumption. That's because the Renewable Fuel Standards program contemplates that a producer "makes a gallon of renewable fuel, *blends the renewable fuel with petroleum-based fuel*, and sells the resulting product domestically." *Sinclair Wyo.*, 887 F.3d at 989 (emphasis added). In other words, renewable fuel's fortunes are tied to gasoline's, so dropping total consumption runs afoul of Congress's intent in the program.

Although commenters raised the issue, EPA did not consider whether its plans were consistent with the Renewable Fuels Standards program. Instead, it declared that these comments were "all out of the scope of this rulemaking." EPA Resp. at 26-158. That reasoning seems little more than agency sleight-of-hand. Based on reports that EPA is expected to propose including electric vehicles in the Renewable Fuel Standards program to avoid just this problem, the agency seems to grasp the statutory disconnect. *See* Stephanie Kelly & Jarrett Renshaw, *U.S. EPA Expected to Propose Electric Cars be Eligible for Renewable Fuel Credits*, REUTERS (Oct. 5, 2022, 2:50 PM), http://bit.ly/3DgHuw3. EPA's refusal to consider how the Final Rule might affect the Renewable Fuels Standards program also runs afoul of basic administrative law. Agency actions that "frustrate the congressional policy of a statute" cannot stand. *ATF v. FLRA*, 464 U.S. 89, 97 (1983); *see also Pennsylvania v. ICC*, 561 F.2d 278, 292 (D.C. Cir. 1977) ("[W]hen two regulatory systems are applicable to a certain subject matter, they are to be reconciled and, to the extent possible, both given effect."). And an agency

action that does not "carry into effect the will of Congress" but instead acts "out of harmony with [a] statute" is a "mere nullity." *Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 134 (1936). Yet EPA thought this potentially fatal problem was not worth its attention.

And were all that not enough, undermining the Renewable Fuel Standards program undermines America's energy security—which further confirms that EPA acted unreasonably in finding that that factor supported the Final Rule, too. *See* S. Rep. No. 109-78, at 6, 18-19 (2005) (explaining that the Renewable Fuel Standards program came about because of a "widening gap between supply and demand, accompanied by reliance on foreign sources to close that gap"). Congress created the Renewable Fuel Standards program to improve energy independence by reducing reliance on foreign oil imports— and the program has been successful in that goal. Between 2005 and 2015, for example, United States crude oil imports decreased by 54 percent and gasoline imports by 89 percent. *Celebrating Ten Years of the Renewable Fuel Standard*, RENEWABLE FUELS ASS'N (Aug. 6, 2015), http://bit.ly/3hg1do0. Even the present administration and EPA recognize the program's value in advancing energy independence, as EPA recently announced plans to strengthen the program to "bolster our nation's energy security." *EPA Takes Action to Reset and Strengthen the RFS Program*, EPA.GOV (June 3, 2022), http://bit.ly/3T6F48U. But the Final Rule ditches the Renewable Fuel Standards program's support for corn-based fuels and the like and takes another path entirely. And while an increase in electric-vehicle production in

the United States might decrease reliance on foreign oil, it merely trades one foreign dependency for another.  It forces manufactures to shift gears and instead rely on foreign countries for several components to produce the electric vehicles, threatening the United States' energy independence.  *See supra* Part I.A; *see also* Private Pets.' Br. 30.

## CONCLUSION

The Court should vacate and remand the Final Rule.

Respectfully submitted,

PATRICK MORRISEY
  ATTORNEY GENERAL

/s/ Lindsay S.  See
Lindsay S. See
  *Solicitor General*
  *Counsel of Record*

Michael R. Williams
  *Senior Deputy Solicitor General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021

Dated:  November 10, 2022

C*ounsel for* Amicus Curiae
*State of West Virginia*

27

## ADDITIONAL COUNSEL

DEREK SCHMIDT
ATTORNEY GENERAL
STATE OF KANSAS

MARK VARGO
ATTORNEY GENERAL
STATE OF SOUTH DAKOTA

JONATHAN SKRMETTI
ATTORNEY GENERAL AND REPORTER
STATE OF TENNESSEE

JASON MIYARES
ATTORNEY GENERAL
COMMONWEALTH OF VIRGINIA

BRIDGET HILL
ATTORNEY GENERAL
STATE OF WYOMING

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, this brief contains 6,451 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6), as required by Rule 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Lindsay S. See
Lindsay S. See