## ORAL ARGUMENT NOT YET SCHEDULED
### No. 22-1031 (and consolidated cases)

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF TEXAS, ET AL.,

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondents*,

ADVANCED ENERGY ECONOMY, ET AL.,

*Intervenors.*

———————

On Petition for Judicial Review of Final Action of the
United States Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0208)

———————

## ANSWERING BRIEF FOR INTERVENOR ALLIANCE FOR AUTOMOTIVE INNOVATION

———————

CHARLES H. HAAKE
CATHERINE M. W. PALIN
ALLIANCE FOR AUTOMOTIVE
  INNOVATION
1050 K STREET, N.W. SUITE 650
Washington, D.C. 20001
(202) 326-5500

JOHN C. O'QUINN
  *Counsel of Record*
STUART A C DRAKE
AARON L. NIELSON
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
john.oquinn@kirkland.com

*Counsel for Intervenor Alliance for Automotive Innovation*

March 21, 2023

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

As required by D.C. Circuit Rule 28(a)(1), Intervenor Alliance for Automotive Innovation certifies:

**(A)  Parties and Amici**

All petitioners, respondents, and intervenors appearing here are listed in Petitioners' Opening Briefs.  All *amici* for Petitioners appearing here are listed in Respondent's Answering Brief.  As of the date of this certification, *amici* for Respondents or Intervenors are International Council on Clean Transportation, National League of Cities, U.S. Conference of Mayors, Senator Thomas R. Carper, Representative Frank Pallone, Jr., Consumer Reports, American Thoracic Society, American Medical Association, American Public Health Association, American College of Occupational and Environmental Medicine, American Academy of Pediatrics, American Association for Respiratory Care, Climate Psychiatry Alliance, American College of Physicians, American College of Chest Physicians, Academic Pediatric Association and American Academy of Allergy, Asthma, & Immunology, Constitutional Accountability Center, Institute for Policy Integrity at New York University School of Law, Margo Oge, and John Hannon.

**(B)   Ruling Under Review**

The ruling under review is EPA's "Revised 2023 and Later Model Year Light- Duty Vehicle Greenhouse Gas Emissions Standards," 86 Fed. Reg. 74,434 (Dec. 30, 2021) (effective date Feb. 28, 2022) ("Final Rule").

**(C)   Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).  These consolidated cases have been designated for argument on the same day and before the same panel as *Natural Resources Defense Council v. NHTSA*, No. 22-1080, and consolidated cases.  *See* Order (Sept. 22, 2022).

March 21, 2023

s/ John C. O'Quinn
John C. O'Quinn
*Counsel for Intervenor Alliance*
*for Automotive Innovation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Intervenor Alliance for Automotive Innovation hereby certifies that it is a not-for-profit trade association representing the interests of the automotive industry. It has no parent companies and has not issued shares or other securities to the public, and no companies have a 10 percent or greater ownership interest in it.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................................................................i

CORPORATE DISCLOSURE STATEMENT ........................................ iii

GLOSSARY ...........................................................................................ix

INTRODUCTION ................................................................................. 1

STATEMENT OF ISSUES .................................................................... 2

STATEMENT OF THE CASE ............................................................... 3

SUMMARY OF ARGUMENT ............................................................... 4

ARGUMENT ........................................................................................ 5

I.     Section 202(a) Authorizes EPA To Establish Fleetwide Standards That Provide For Credit Averaging, Banking And Trading Including Electric Vehicles. ................................................ 5

    A.     The Final Rule Does Not Implicate The Major Questions Doctrine. ................................................................ 5

    B.     EPA's Use Of Fleetwide Averaging And Consideration Of Electric Vehicles Is Consistent With §202(a) .................. 13

II.    EPA Properly Declined Proposals To Amend Its Treatment Of "Upstream" Greenhouse Gas Emissions. ................................. 22

CONCLUSION .................................................................................... 24

CERTIFICATE OF COMPLIANCE ..................................................... 26

CERTIFICATE OF SERVICE .............................................................. 27

## <u>TABLE OF AUTHORITIES</u>*

**Page(s)**

**Cases**

*_Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Env'tl Prot._,
  163 F.3d 74 (1st Cir. 1998) ................................................................. 10

_Amoco Oil Co. v. EPA_,
  501 F.2d 722 (D.C. Cir. 1974) ............................................................ 22

_Barnhart v. Thomas_,
  540 U.S. 20 (2003) .............................................................................. 21

_Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist._,
  541 U.S. 246 (2004) ............................................................................ 17

_Lockhart v. United States_,
  577 U.S. 347 (2016) ............................................................................ 21

_Mayo Found. for Med. Educ. & Research v. United States_,
  562 U.S. 44 (2011) .............................................................................. 14

_Murphy Expl. & Prod. Co. v. Dep't of Interior_,
  252 F.3d 473 (D.C. Cir.), _modified on reh'g_, 270 F.3d 957
  (D.C. Cir. 2001) .................................................................................. 21

*_Nat. Res. Def. Council v. Thomas_,
  805 F.2d 410 (D.C. Cir. 1986) ........................................ 7, 13, 14, 18, 19

*_West Virginia v. EPA_,
  142 S.Ct. 2587 (2022) ....................................................................... 5, 6

**Statutes**

15 U.S.C. §2501(a)(4) ............................................................................. 14

*42 U.S.C. §7521(a) ....................................... 1, 2, 4, 5, 6, 9, 11, 13, 18-24

---

\*    Authorities upon which we chiefly rely are marked with an asterisk.

v

*42 U.S.C. §7521(a)(1) ................................................. 13, 19, 20

42 U.S.C. §7525(b)(2) ...................................................... 15

42 U.S.C. §7543(b) (Supp. I 1977) ................................... 10

42 U.S.C. §7586(b) .......................................................... 12

42 U.S.C. §7586(f)(4) ...................................................... 12

42 U.S.C. §7589 ................................................................ 12

42 U.S.C. §7602(k) .......................................................... 16

49 U.S.C. §32902(h) .......................................................... 2

Pub. L. No. 90-148, 81 Stat. 485 (1967) ........................... 9

**Regulations**

40 C.F.R. §85.2302 .......................................................... 24

40 C.F.R. §85.2304 .......................................................... 24

40 C.F.R. §86.115-78 ...................................................... 16

40 C.F.R. §86.1803-01 ...................................................... 20

40 C.F.R. §86.1818-12(c)(2)(i)(A)-(C) ........................... 20, 22

40 C.F.R. §86.1818-12(c)(3)(i)(A)-(D) ........................... 20, 22

40 C.F.R. §86.1818-12(d) ............................................... 16

40 C.F.R. §86.1843-01(a) ............................................... 17

40 C.F.R. §86.1845-04(b)(5) ........................................... 16

40 C.F.R. §86.1865-12(i)(1) ........................................... 15

40 C.F.R. §86.1865-12(j)(4)(iii)-(iv) ............................... 16

40 C.F.R. §600.109-08 ................................................... 16

49 C.F.R §523.4 ................................................................... 20

49 C.F.R §523.5 ................................................................... 20

38 Fed.Reg. 10,317 (Apr. 26, 1973) ................................... 9

45 Fed.Reg. 14,496 (Mar. 5, 1980) .................................... 7

46 Fed.Reg. 62,608 (Dec. 24, 1981) .................................. 7

48 Fed.Reg. 33,456 (July 21, 1983) .................................... 7

50 Fed.Reg. 10,606 (Mar. 15, 1985) ................................... 7

55 Fed.Reg. 30,584 (July 26, 1990) .............................. 8, 19

56 Fed.Reg. 67,038 (Dec. 27, 1991) ................................. 11

58 Fed.Reg. 4166 (Jan. 13, 1993) ..................................... 11

59 Fed.Reg. 50,042 (Sept. 30, 1994) ................................ 12

62 Fed.Reg. 31,192 (June 6, 1997) ................................... 12

63 Fed.Reg. 926 (Jan. 7, 1998) .................................... 11, 12

75 Fed.Reg. 25,324 (May 7, 2010) ................................... 16

86 Fed.Reg. 74,434 (Dec. 30, 2021) ..................... 1, 3, 20, 24

## Other Authorities

*Automakers to Double Spending on EVs, Batteries to $1.2
    Trillion by 2030*, Reuters (Oct. 25, 2022),
    https://www.reuters.com/technology/exclusive-
    automakers-double-spending-evs-batteries-12-trillion-by-
    2030-2022-10-21/ ....................................................... 3

Cal. Air Res. Bd., *Proposed Regulations for Low-Emission
    Vehicles and Clean Fuels: Technical Support Document*
    (Aug. 13, 1990) ......................................................... 11

EPA, *Tier 2 Motor Vehicle Emissions Standards and Gasoline Sulfur Control Requirements: Response to Comments* (Dec. 1999) ...................................................... 8, 14

H.Rep. 1783, 91st Cong.2d Sess. (Dec. 17, 1970) .................................... 18

## GLOSSARY

| | |
|---|---|
| Auto Innovators | Alliance for Automotive Innovators |
| CAA | Clean Air Act |
| EPA | Environmental Protection Agency |
| EPA.Br. | Answering Brief for Environmental Protection Agency |
| NHTSA | National Highway Traffic Safety Administration |
| Priv.Pet.Br. | Opening Brief for Private Petitioners |
| State.Pet.Br. | Opening Brief for State Petitioners |
| ULEV | Ultra-Low Emission Vehicle |
| U.S. | United States |

## INTRODUCTION

The members of the Alliance for Automotive Innovation ("Auto Innovators") produce nearly all new vehicles sold in the United States, and they are the parties directly regulated by the Environmental Protection Agency's ("EPA's") revised standards for greenhouse gas emissions for model years 2023-2026. *See* 86 Fed.Reg. 74,434 (Dec. 30, 2021) ("Final Rule").

In their view, §202(a) of the Clean Air Act ("CAA") grants EPA significant discretion to establish emissions standards and to include regulatory provisions to incentivize game-changing technologies, like electric vehicles, that do not have widespread market adoption. EPA has exercised that discretion for more than a decade in setting greenhouse gas standards and, apart from an increase in the stringency of the standards, there are no salient differences between the Final Rule and its predecessors. Indeed, the features of the Final Rule to which Petitioners most strenuously object—its use of averaging and application to electric vehicles—are longstanding and fully supported by §202(a)'s plain meaning.

This action stands in stark contrast to *Natural Resources Defense*

*Council v. NHTSA*, No. 22-1080 (D.C. Cir.), where the same coalition of States and fuel-industry representatives petition for review of the National Highway Traffic Safety Administration's ("NHTSA's") corporate average fuel economy ("CAFE") standards. There, Auto Innovators filed an *amicus* brief explaining that NHTSA's CAFE standards violate 49 U.S.C. §32902(h) because the agency improperly "consider[ed] the fuel economy" of electric vehicles in its standard setting, among other infirmities. *See* Alliance for Automotive Innovation Br., *Nat. Res. Def. Council v. NHTSA*, No. 22-1080 (D.C. Cir. Dec. 1, 2022). But here, §202(a) contains no such express prohibition and permits EPA to encourage reductions in emissions by incentivizing automakers to produce and sell vehicles with advanced powertrains such as electric vehicles, and to do so using a fleet-averaging regulatory framework.

## STATEMENT OF ISSUES

1.    Whether §202(a) authorizes EPA to establish fleetwide standards using averaging, banking, and trading that include electric vehicles.

2.    Whether EPA properly declined proposals to reverse its longstanding treatment of "upstream" emissions.

## STATEMENT OF THE CASE

Auto Innovators adopts EPA's Statement of the Case and offers two additional points.

*First*, however this litigation concludes, widespread vehicle electrification is inevitable. The auto industry is already rapidly deploying electric vehicles in their U.S. sales fleets even apart from the Final Rule.[1] Once a recharging infrastructure is more fully developed, supply chains are matured, and economies of scale are reached, this important technology will become even more widespread.

*Second*, despite the rise of electric vehicles, Petitioners' predictions that the Final Rule will create a sharp decline in gasoline use are exaggerated. The Final Rule projects that the greenhouse gas standards at issue could result in the electric vehicle share of the new vehicle market reaching up to 17 percent by 2026. *See* 86 Fed.Reg. at 74,438. In light of the hundreds of millions of internal combustion vehicles that will

---

[1] Electric vehicles include battery-electric vehicles, "plug-in" hybrid vehicles that use both electric motors powered from the electric grid and gasoline engines, and hydrogen fuel-cell vehicles. *See* Paul Lienert, *Automakers to Double Spending on EVs, Batteries to $1.2 Trillion by 2030*, Reuters (Oct. 25, 2022), https://www.reuters.com/technology/exclusive-automakers-double-spending-evs-batteries-12-trillion-by-2030-2022-10-21/.

remain in the light-duty fleet, liquid fuels will remain important. *See* Comments of Auto Innovators, Doc. No. 571, at 37-38 (Sept. 27, 2021).

## SUMMARY OF ARGUMENT

I.    Section 202(a) permits the Final Rule's use of fleetwide averaging, banking, and trading, including as applied to electric vehicles, and does not implicate the major questions doctrine.  Rather than being a novel power grab, the Final Rule hews closely to the model EPA has used for decades and falls comfortably within §202(a).

II.    EPA properly decided to base its greenhouse gas standards on emissions from vehicles themselves, and not by including "upstream" emissions from the production of electricity used to power electric vehicles.  What Petitioners contemplate—EPA attributing to motor vehicles emissions associated with the fuel that powers the vehicles— would have been a drastic departure from EPA's longstanding approach; is not consistent with §202(a)'s mandate that EPA regulate pollutants "from" motor vehicles; and, regardless, would have been unreasonable given the short lead-time prior to the Final Rule's first applicable model year.

## ARGUMENT

### I.    Section 202(a) Authorizes EPA To Establish Fleetwide Standards That Provide For Credit Averaging, Banking And Trading Including Electric Vehicles.

Petitioners' contention that the major questions doctrine applies because EPA has never before claimed authority to "use … averaging, banking, and trading to electrify the Nation's vehicle fleet," Priv.Pet.Br. 38, is wrong, as are the contentions that it applies because the Final Rule will "diminish electric grid reliability" or "jeopardize national security," State.Pet.Br.15, 22.   In reality, EPA's use of fleetwide averaging with electric vehicles—with any associated effects on the nation's electric grid or security more generally—is a longstanding feature of EPA regulation under the CAA that is readily supported by the statute.

#### A.    The Final Rule Does Not Implicate The Major Questions Doctrine.

In *West Virginia v. EPA*, the Supreme Court recognized that "in certain extraordinary cases," an agency may not invoke "a merely plausible textual basis" for its action but instead must "point to clear congressional authorization for the power it claims."   142 S.Ct. 2587, 2609 (2022).   There, EPA "claimed to discover in a long-extant statute an unheralded power," and it "located that newfound power in the vague

5

language of an ancillary provision … that was designed to function as a gap filler and had rarely been used in the preceding decades." *Id.* at 2610. "Given th[o]se circumstances," the Court found "every reason" to demand clear congressional authorization for the agency's regulation. *Id.*

Whatever other considerations may be necessary or sufficient to trigger the major questions doctrine, it does not apply here because EPA has not claimed an "unheralded" or "newfound" power. There is nothing unprecedented about EPA's use of fleetwide averaging, banking, and trading under §202(a), nor in setting standards that require greater deployment of emission-reducing technologies, such as electric vehicles. While it is true that EPA's new standards will require greater deployment of electric vehicles by full-line vehicle manufacturers to meet them, the Agency's approach in the Final Rule has a well-established and direct regulatory lineage.[2]

1. Even Private Petitioners concede that EPA's use of fleetwide averaging under §202(a) can be traced back decades. Priv.Pet.Br.38. As

---

[2] While Auto Innovators maintains that the Final Rule here does not implicate the major questions doctrine, we do not rule out the possibility of the doctrine applying to other potential sets of greenhouse gas emissions standards under §202(a), such as those so stringent that they effectively force a shift to electrification that is well beyond what the

early as 1980, General Motors and Volkswagen proposed fleetwide averaging for an EPA rule setting particulate-matter emissions standards for certain light-duty vehicles. 45 Fed.Reg. 14,496, 14,502 (Mar. 5, 1980). Although EPA did not then adopt fleetwide averaging, it soon changed course, proposing an averaging program to "introduce new flexibility—and … accompanying cost savings—into particulate emission control efforts." 46 Fed.Reg. 62,608, 62,611 (Dec. 24, 1981).

EPA adopted that averaging program for certain vehicles in mid-1983, 48 Fed.Reg. 33,456 (July 21, 1983), and never looked back. Indeed, EPA soon adopted averaging for certain types of emissions from heavy-duty engines and light-duty trucks. 50 Fed.Reg. 10,606 (Mar. 15, 1985). Upon review, a panel of this Court unanimously upheld EPA's use of averaging. *See Nat. Res. Def. Council v. Thomas*, 805 F.2d 410, 425 (D.C. Cir. 1986).

After *Thomas*, EPA adopted an emissions crediting system allowing for both "banking"—in which manufacturers "generate credits and save them for future use"—and "trading"—in which manufacturers exchange

---

industry or market could bear on their own and would thus create a significant market disruption.

their credits.  55 Fed.Reg. 30,584, 30,585 (July 26, 1990).  This "extension of the averaging concepts and programs" was designed to provide "an economic incentive to develop and use improved emission technologies," and was "particularly important during the transition to more stringent emission standards" that "strongly push the limits of emission-control technology."  *Id.*  That rationale is precisely the same today with respect to the Final Rule's emissions standards.

Averaging, banking, and trading are thus ubiquitous features of vehicle emissions regulations.  Such features played a critical role in EPA's push to reduce smog-forming exhaust emissions to near-zero levels.  *See, e.g.*, EPA, *Tier 2 Motor Vehicle Emissions Standards and Gasoline Sulfur Control Requirements: Response to Comments* (Dec. 1999) 2-25, at Comment I.  These features have also been essential to the auto industry's efforts to meet EPA's increasingly ambitious goals for greenhouse gas reduction that have existed long before the Final Rule.  Indeed, ever since EPA began regulating greenhouse gas emissions in

2010, all six sets of its emissions standards have employed averaging, banking, and trading.  EPA.Br.16.

EPA thus has widely used averaging, banking, and trading to enable cost-effective emissions reductions for decades.  It cannot be that such a well-established regulatory approach upon which the automotive industry has relied for more than a generation now suddenly constitutes a novel assertion of authority implicating the major questions doctrine.

2.    Equally unfounded is any suggestion that the Final Rule is unprecedented because it "incorporat[es] non-emitting vehicles into emission averages."  Priv.Pet.Br.39.  To the contrary, EPA has long recognized that electric vehicles may be accounted for in complying with fleet-average emissions regulations.

Before Congress enacted §202(a) in 1965, California had begun to regulate vehicle smog-forming emissions and in that effort became "the leader in automobile emission control," 38 Fed.Reg. 10,317, 10,318 (Apr. 26, 1973).  To allow California to retain that role, Congress granted EPA authority to waive the preemptive effect of federal emissions standards for California for smog precursors.  *See, e.g.*, Pub. L. No. 90-148, 81 Stat. 485 (1967).  When Congress revised the CAA in 1977, it permitted

California to obtain a waiver of federal preemption so long as the standards that EPA is considering for a waiver are "[i]n the aggregate, at least as protective of public health and welfare as applicable Federal standards," subject to meaningful review by EPA.  42 U.S.C. §7543(b) (Supp. I 1977). One prerequisite for granting California a waiver is that its standards must be "consistent with section [202(a)]" of the Act. *Id*. §7543(b)(1)(C).

California, in turn, adopted its "Low Emission Vehicle" Program in September 1990—one month *before* Congress enacted the CAA Amendments of 1990.  The Low Emission Vehicle Program created increasingly stringent standards to reduce smog, mandated the production of zero-emission vehicles for sale in California, and effectively "force[d] the seven largest automakers to sell and lease low emission vehicles by requiring them to meet a … Fleet Average standard." *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Env'tl Prot.*, 163 F.3d 74, 78 (1st Cir. 1998).  California also required that zero-emission vehicles "had to comprise two percent of all vehicles sold or leased by each manufacturer in California each year for model years 1998–2000, five percent for model years 2001–2002, and ten percent for model year 2003." *Id*.  This acted

as an electrification mandate, as California expected "only battery-powered electric vehicles that do not use fuel fired heaters" to qualify as zero-emission vehicles. Cal. Air Res. Bd., *Proposed Regulations for Low-Emission Vehicles and Clean Fuels: Technical Support Document* 1-19 (Aug. 13, 1990); *see also* 56 Fed.Reg. 67,038, 67,039 (Dec. 27, 1991).

EPA granted California's waiver request for the 1990 Low Emission Vehicle Program because, *inter alia*, EPA believed that California's then-proposed standards were "consistent with section 202(a)." 58 Fed.Reg. 4166, 4166 (Jan. 13, 1993).[3] By the late 1990s, the auto industry even led a successful effort with EPA, California, and other stakeholders to create a voluntary "National Low Emission Vehicle" Program with features like California's, including a crediting system for zero-emission vehicles—*i.e.*, electric vehicles. 63 Fed.Reg. 926, 954 (Jan. 7, 1998). Importantly, the National Low Emission Vehicle Program, with EPA's

---

[3]  To be sure, California later repealed its 1990 zero-emission vehicle mandate. But that is irrelevant to the critical point: EPA blessed such a mandate as "consistent with section 202(a)" as early as 1993.

blessing, included averaging, banking, and trading that could be used to meet the fleet average requirements. *Id.* at 963.[4]

Rather than questioning California's push toward electrification through fleet average emissions regulations, the 1990 CAA Amendments further enabled it. For example, Congress required many States to establish clean-fuel vehicle programs. 42 U.S.C. §7586(b). To implement those programs, Congress further directed EPA to create a credit-trading system and to "establish … standards for Ultra-Low Emission Vehicles ('ULEV's) and Zero Emissions Vehicles ('ZEV's)" that "shall conform as closely as possible to standards which are established by the State of California for ULEV and ZEV vehicles in the same class." *Id.* §7586(f)(4); *see also id.* §7589 (granting EPA authority to create a similar credit system for a California clean-fuel vehicle pilot program that other States could voluntarily join); 59 Fed.Reg. 50,042, 50,050 (Sept. 30, 1994). This

---

[4] *See also* 62 Fed.Reg. 31,192, 31,213 (June 6, 1997) ("An important part of today's National [Low Emission Vehicle] rulemaking is the set of provisions allowing manufacturers to use a market-based approach to meet the fleet average … requirements through averaging, banking, and trading ….").

history refutes any claim that the Final Rule relies on newfound authority for novel ends.

### B. EPA's Use Of Fleetwide Averaging And Consideration Of Electric Vehicles Is Consistent With §202(a).

Stripped of Petitioners' "major questions" gloss, it is apparent that §202(a) allows EPA to use averaging, banking, and trading in its emissions standards, including for electric vehicles.

1. Section 202(a) requires EPA to "prescribe … standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [its] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §7521(a)(1). "Nothing" in this language precludes EPA's consideration "of a manufacturer's ability to meet emissions standards by averaging different engine families." *Thomas*, 805 F.2d at 425; *compare id. with* Priv.Pet.Br.40-41 (ignoring *Thomas*). Nor does it dictate what technologies EPA may consider when setting standards. Given this structure, EPA's use of averaging and consideration of electric vehicles turns on whether its approach is "reasonable"—*i.e.*, not "arbitrary or

capricious in substance." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011).

Here, EPA's approach is at least *reasonable*. Averaging "makes sense" because it "allow[s] manufacturers more flexibility in cost allocation while ensuring that a manufacturer's overall fleet still meets the emissions reduction standards." *Thomas*, 805 F.2d at 425. Indeed, averaging combined with banking and trading permits "a manufacturer [to] apply its capital to those vehicles from which it can get the most cost-effective reductions or to those vehicles which have the longest remaining production lives." *Tier 2 Motor Vehicle Emissions*, *supra*, at 2-25. That flexibility allows EPA "to impose tough emissions standards on manufacturers," while "accommodat[ing] the realities of product life cycles, the demands of niche markets and the limitations of manufacturers to reengineer all of their products in a short period of time." *Id.*

Furthermore, considering electric vehicles while setting emission standards makes even more sense given Congress's support for "the expeditious introduction of electric and hybrid vehicles into the Nation's transportation fleet." 15 U.S.C. §2501(a)(4).

14

**2.**    Petitioners resist this straightforward application of settled interpretive principles, but their arguments fail.  Although word limits preclude a line-by-line rebuttal of Petitioners' arguments, the following points demonstrate why EPA's interpretation is reasonable.

*First*, Petitioners claim the Final Rule "clashes with … Title II['s] comprehensive, interlocking scheme for enforcing emission standards through testing, certification, warranties, remediation and penalties," which supposedly "are designed to apply to individual vehicles and cannot rationally be extended to fleets."  Priv.Pet.Br.43-44; *see also id.* at 41-43.  This argument ignores the Final Rule's language, which contains exactly the type of "comprehensive, interlocking" certification, testing and enforcement program Petitioners claim is lacking.

Before each model year, EPA and manufacturers test representative vehicles to ensure compliance with "certification standard[s] *for each model type*."  40 C.F.R. §86.1865-12(i)(1) (emphasis added).  Failure to meet those standards can result in denial, suspension, or revocation of certificates of conformity (all of which would restrict the automaker's ability to sell affected vehicles in the United States).  *E.g.*, 42 U.S.C. §7525(b)(2).  The greenhouse gas regulations require testing

vehicles sold to the public using an "in-use" standard.  40 C.F.R. §§86.1818-12(d), 86.1845-04(b)(5).  Remedies similar to those for other emissions standards also apply: greenhouse gas emissions-related warranties are required; certain defects must be reported and repaired through recalls when data warrant; and some violations are subject to per-vehicle penalties.  *E.g.*, *id.* §86.1865-12 (j)(4)(iii)-(iv).  Those familiar features align with EPA's approach to vehicle regulation for decades.  Thus, contrary to Petitioners' depiction, fleet averaging has never been a substitute for vehicle-specific standards—instead, EPA enforces *both* its vehicle-specific standards and its fleet-averaging requirements.  EPA made that point clear at the start of its greenhouse gas regulatory program, 75 Fed.Reg. 25,324, 25,468 (May 7, 2010), and it remains true today.

*Second*, Petitioners claim that averaging does not comply with the CAA's definition that an "emission standard" should "limit[] the quantity, rate or concentration of air pollutants on a continuous basis." Priv.Pet.Br.45-46 (quoting 42 U.S.C. §7602(k)).  EPA, however, measures greenhouse gas emissions on a continuous basis during the testing.  40 C.F.R. §§86.115-78, 600.109-08.  That is the only plausible approach for

16

*any* motor vehicle standard, whether using averaging or not. Merely because a "standard" for continuous emission limits is not *testable* on a continuous basis does not make it any less a "standard." After all, "the standards themselves are separate from th[e] enforcement techniques." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004). If Petitioners were right, each major emissions program for decades would also be unlawful.

*Third*, Petitioners also argue that the CAA's "history … reflects Congress's understanding that emissions standards would apply to all vehicles individually." Priv.Pet.Br.48. Petitioners cite a 1970 House Report establishing the unremarkable proposition that EPA could require that all pre-production prototype vehicles meet the emissions standard. *Id.* at 49. Fleetwide averaging, by contrast, pertains to the groups of vehicles that have obtained and maintained their certificates of conformity. Each vehicle sold to the public is included in a "test group" to which the certification standards set before the start of a model year apply. *See* 40 C.F.R. §86.1843-01(a); *see also supra* p. 14. Those standards may be below or slightly above the applicable fleetwide average emissions limit. Along with the corresponding in-use standards,

17

*see supra* p. 15, this ensures that each individual vehicle is subject to enforceable limits and also helps ensure the integrity of the averaging, banking, and trading program. Nothing in the statute—much less legislative history—precludes such averaging. *See, e.g.*, *Thomas*, 805 F.2d at 425.[5]

The rest of Petitioners' tour of Title II and its legislative history is also unavailing. It is irrelevant that in §211—relating to liquid fuels—Congress provided for "banking and trading credits" and instructed EPA to account for "annual average aggregate emissions." Priv.Pet.Br.47–50. Creating a *mandatory* credit system hardly demonstrates that Congress—without saying so—curtailed EPA's *discretionary* authority to use averaging and emissions credits elsewhere. Nor does the inclusion of credit provisions in two subsections of the 1990 CAA Amendments prove that "[i]f Congress had wanted to permit credits in connection with emissions standards under Section 202(a), it knew how to and would have

_____

[5] Petitioners omit the 1970 Conference Report, which explains that Congress rejected language in the Senate bill for CAA §206 that "would have required compliance testing of each vehicle prior to delivery," in favor of the current operative text of CAA §206 that contains no such requirement. *See* H.Rep. 1783, 91st Cong.2d Sess. (Dec. 17, 1970).

18

done so expressly." *Id.* at 50.  Not only does §202(a) allow credit mechanisms, but EPA had been using them for years pre-1990, and this Court approved such analysis in *Thomas*.

*Fourth*, Petitioners (at 50-51) latch onto a footnote in *Thomas* that questioned in *dicta* whether fleetwide averaging can be squared with §206's testing and certification requirements—which "speak[] of 'any,' 'a,' or 'such' motor vehicle or engine being tested and certified."  805 F.2d at 425 n.24.  Even *Thomas*, however, conceded that its "linguistic analysis is [] somewhat ambiguous." *Id.*  Regardless, for reasons explained by EPA, the Final Rule's certification and in-use standards are vehicle-specific and "'ensure that each engine meets the [applicable] limit.'" EPA.Br.72 (quoting 55 Fed.Reg. at 30,594).  Ambiguous legislative history cannot overcome EPA's reasonable interpretation of §202(a).

*Fifth*, Petitioners assert that §202(a) only permits vehicles that "actually emit the relevant pollutant" to be included in fleet averaging. Priv.Pet.Br.53 (emphasis omitted).  To be sure, EPA cannot regulate the performance of individual zero-emission vehicles under §202(a) because they do not "emi[t] … any air pollutant."   42 U.S.C. §7521(a)(1).

19

Nevertheless, zero-emission vehicles *are* properly included in fleet averaging for compliance purposes as part of a class of vehicles.

Section 202(a) directs EPA to set standards for "any *class or classes* of new *motor vehicles* … [that] cause, or contribute to, [harmful] air pollution."  42 U.S.C. §7521(a)(1) (emphasis added).  In the Final Rule, as before, EPA established greenhouse gas "target values" (average standards) for seven categories or classes of new motor vehicles—three for passenger automobiles and four for light trucks.  The seven categories or classes are based on the vehicles' intended function (as passenger automobiles or light trucks) and size (*i.e.*, "footprint").  *See* 40 C.F.R. §86.1818-12(c)(2)(i)(A)-(C), (c)(3)(i)(A)-(D); 86 Fed.Reg. at 74,450-51; *see also* 49 C.F.R §§523.4, 523.5 (NHTSA classifications adopted by EPA); 40 C.F.R. §86.1803-01 (EPA definitions of vehicle types).  And each of those classes "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare," 42 U.S.C. §7521(a)(1), because *those classes* include vehicles that emit air pollutants.  Nothing in §202(a) dictates how EPA defines new motor vehicle classes, nor does

it demand that *every member* of each class "cause, or contribute to, air pollution." *Id.*[6]

Petitioners try to obscure matters by invoking the "rule of the antecedent," Priv.Pet.Br.55-56, which provides that a "limiting clause or phrase … should ordinarily be read as modifying only the noun or phrase that it immediately follows," *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Yet this rule "is not absolute," *id.*, and generally applies to "a list of terms or phrases followed by a limiting clause," *Lockhart v. United States*, 577 U.S. 347, 351 (2016). Here, there is no list, *see* EPA.Br.77, so the question is whether the limiting clause ("which in [EPA's] judgment cause, or contribute, to air pollution") applies to the entire phrase ("any class or classes of new motor vehicles or new motor vehicle engines") or to only a sub-part of it ("new motor vehicles or new motor vehicle engines"). The rule of the antecedent cannot answer that question. *See, e.g.*, *Murphy Expl. & Prod. Co. v. Dep't of Interior*, 252 F.3d 473, 482 (D.C. Cir.),

---

[6]  Petitioners argue that "[w]hen we refer to a class of objects that does something, the ordinary and accurate meaning is that *all* the members of the class do that thing." Priv.Pet.Br.56. Because they transport people or cargo and meet the definitions of passenger automobiles or light trucks, electric vehicles are thus full-fledged members of the classes EPA included in fleet averaging.

*modified on reh'g*, 270 F.3d 957 (D.C. Cir. 2001). Instead, Congress left it for EPA's reasonable resolution. And it is entirely reasonable for EPA to conclude that the "*classes*" of vehicles as defined in 40 C.F.R. §86.1818-12(c)(2)(i)(A)-(C) and (c)(3)(i)(A)-(D)—which include electric vehicles—"cause, or contribute, to air pollution."

At bottom, EPA and automakers have long relied on averaging, credits, and banking, and these features are now integral to many manufacturers' business strategies. Nothing requires the Court to toss out that approach, and doing so would harm consumers, the environment, and the auto industry. Whether or not greater energy diversity may injure the fossil-fuels industry, "[t]he root of petitioners' interest is financial"—and not protected by law. *Amoco Oil Co. v. EPA*, 501 F.2d 722, 726 (D.C. Cir. 1974).

## II. EPA Properly Declined Proposals To Amend Its Treatment Of "Upstream" Greenhouse Gas Emissions.

Ironically, after wrongly claiming that long-standing elements of the Final Rule represent a sea change, Petitioners argue that EPA erred by failing to do something that would have been truly revolutionary: Attributing "upstream" emissions to new vehicles under §202(a). Priv.Pet.Br.62-64.

22

EPA has been regulating motor-vehicle emissions under §202(a) since 1975, and in that time, has *never* included in its compliance standards any emissions occurring during the production or transport of liquid fuels. Petitioners offer no sound reason why EPA should change course now—let alone *only* for electric vehicles. EPA.Br.84.

Indeed, the statute does not permit EPA to consider upstream emissions at all. Section 202(a) authorizes EPA to regulate "emission of any air pollutant *from* any class or classes of new motor vehicles." 42 U.S.C. §7521(a). By definition, "upstream emissions" from electricity-generating units do not originate "from" a class of vehicles. Such upstream air pollutants thus cannot be included in emission standards any more than greenhouse gas emissions from gasoline refineries can.[7]

Regardless, although not required to do so, EPA *did* consider "significant" upstream emissions from *both* gasoline-fueled *and* electric vehicles when deciding on the appropriate stringency for the greenhouse gas emissions standards. EPA.Br.82-83. Petitioners nonetheless argue that EPA acted arbitrarily and capriciously by "continuing to use

---

[7] It is doubtful whether §202(a) would allow EPA to base emissions regulation even in part on such upstream emissions.

tailpipe-only values to determine vehicle [greenhouse gas] emissions" when assessing *compliance* with the standards.  86 Fed.Reg. at 74,446. That argument ignores that any revision to EPA's longstanding approach would have been unreasonable given the Final Rule's model year 2023–2026 timeframe.  *See* EPA, *Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emission Standards: Response to Comments* 6-64 (Dec. 2021).  Planning and capital expenditures for a model year must be completed years in advance.  Because model year 2023 was about to begin for some models, *see* 40 C.F.R. §§85.2302, 85.2304, and is now well under way industrywide, EPA properly refused to undertake a massive reworking of its regulatory programs when there was no time for manufacturers to respond, especially when doing so would have raised serious questions about EPA's authority under §202(a).

### CONCLUSION

The Court should deny the petitions.

24

<div style="display: flex;">

<div>

CHARLES H. HAAKE
CATHERINE M. W. PALIN
ALLIANCE FOR AUTOMOTIVE
  INNOVATION
1050 K STREET, N.W. Suite 650
Washington, D.C. 20001
(202) 326-5500

</div>

<div>

s/ John C. O'Quinn
JOHN C. O'QUINN
  *Counsel of Record*
STUART A C DRAKE
AARON L. NIELSON
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
john.oquinn@kirkland.com

</div>

</div>

*Counsel for Intervenor Alliance for Automotive Innovation*

March 21, 2023

25

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limits of Fed. R. App. P. 32 and this Court's September 22, 2022 Order.  This brief uses 14-point, Century Schoolbook font and contains 4380 words, excluding exempted parts, according to the word-processing system used to prepare it.

<div align="right">

s/ John C. O'Quinn
John C. O'Quinn

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2023, I electronically filed the foregoing Answering Brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system and that service was accomplished upon counsel of record by the Court's CM/ECF system.

s/ John C. O'Quinn
John C. O'Quinn